UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA          :

    -against-                     :
                          S2 07 Cr. 124 (WHP)
EMMANUEL ORUCHE, et al.,           :

        Defendants.       :

- - - - - - - - - - - - - - - - - -X


**MEMORANDUM OF LAW RESPONDING TO DEFENDANTS' MOTIONS**


                       **MICHAEL J. GARCIA**
                       **United States Attorney for the**
                       **Southern District of New York**
                       **Attorney for the United States**
                              **of America**


**JOSEPH P. FACCIPONTI**
**MICHAEL M. ROSENSAFT**
**Assistant United States Attorneys**

      **- Of Counsel -**

## TABLE OF CONTENTS

Background. . . . . . . . . . . . . . . . . . . . . . . . 2

I.  Oruche's Motion To Suppress Wiretap Evidence Should
    Be Denied. . . . . . . . . . . . . . . . . . . . . . 4

    A.  The Wiretaps. . . . . . . . . . . . . . . . . . 5

    B.  Applicable Law On Probable Cause And Necessity
        In Wiretap Applications.. . . . . . . . . . . . 7

    C.  The August 30, 2006 Wiretap Was
        Properly Authorized.. . . . . . . . . . . . . . 12

    D.  The September 21, 2006 Wiretap Was
        Properly Authorized.. . . . . . . . . . . . . . 26

    E.  The September 27, 2006 Wiretap Was
        Properly Authorized.. . . . . . . . . . . . . . 32

    F.  The Remaining Wiretaps Were Properly Authorized.. . 35

    G.  Even If The Orders Granting Wiretapping Authority
        Were Flawed, They Should Not Be Suppressed Pursuant
        To The Good Faith Exception.. . . . . . . . . . 36

II. Oruche's Motion To Suppress Evidence Seized From Nicobi
    Healthcare Services Should Be Denied Without A Hearing.. 37

    A.  Standard For Denial Without A Hearing.. . . . . . 38

    B.  Oruche Is Not Entitled To A Hearing.. . . . . . . 38

    C.  Conclusion. . . . . . . . . . . . . . . . . . . 46

III. Oruche, Oluigbo, and Osuji's Motion For Further
     Discovery Should Be Denied.. . . . . . . . . . . . . 46

    A.  Discovery In The Case.. . . . . . . . . . . . . 46

    B.  Oruche's Discovery Motion Should Be Denied. . . . 47

    C.  Oluigbo's Discovery Motion Should Be Denied.. . . 49

    D.  Osuji's Discovery Motion Should Be Denied.. . . . 50

IV.   Oruche's Motion For Notice Of 404(b) Evidence Is
      Premature At This Time.. . . . . . . . . . . . . . . .  51

V.    Osuji Has Not Shown That A Joint Trial Will Unduly
      Prejudice Him And A Severance Would Waste Judicial
      Resources And Create A Duplication Of Efforts. . . . . .  52

      A.   General Standard For Severance. . . . . . . . . .  52

      B.   Osuji Has Not Shouldered His Burden Of Showing
           That He Would Be So Prejudiced By The Joinder
           That He Would Be Denied A Constitutionally
           Fair Trial. . . . . . . . . . . . . . . . . . . .  54

      C.   Severing Osuji From His Codefendants Will Waste
           Judicial Resources And Create A Duplication
           Of Efforts. . . . . . . . . . . . . . . . . . . .  56

      D.   Conclusion. . . . . . . . . . . . . . . . . . . .  58

VI.   Oluigbo and Osuji's Motion For A Bill Of Particulars
      Should Be Denied.. . . . . . . . . . . . . . . . . . .  58

      A.   Standard. . . . . . . . . . . . . . . . . . . . .  58

      B.   Defendant Osuji Has Been Provided Sufficient
           Information To Prepare His Defense. . . . . . . .  60

      C.   Defendant Oluigbo Has Been Provided Sufficient
           Information To Prepare His Defense. . . . . . . .  61

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . .  64

## TABLE OF AUTHORITIES

**Statutes and Regulations**                                     **Page**

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2515. . . . . . . . . . . . . . . . . . . . 34

18 U.S.C. § 2518. . . . . . . . . . . . . . . . 5, 9, 11, 14

**Cases**

Brady v. Maryland, 373 U.S. 83 (1963). . . . . . . . . . . 48-49

Bruton v. United States, 391 U.S. 123 (1968). . . . . . . . . 50

Franks v. Delaware, 438 U.S. 154(1978). . . . . . . . . 22-23, 37

Giglio v. United States, 405 U.S. 150 (1972). . . . . . . . . 48

Illinois v. Gates, 462 U.S. 213(1983). . . . . . . . . . 7-9, 14

Naugle v. Witney, 755 F. Supp. 1504 (D. Utah 1990). . . . . . 41

Spinelli v. United States, 393 U.S. 410 (1969). . . . . . . . . 9

United States v. Ambrosio,
898 F. Supp. 177 (S.D.N.Y 1995). . . . . . . . . . 7, 9, 12, 14

United States v. Andrews, 381 F.2d 377 (2d Cir. 1967). . . 59, 63

United States v. Bellomo, 954 F. Supp. 630(S.D.N.Y 1997). 8-9, 36

United States v. Bianco, 998 F.2d 1112 (2d Cir. 1993). . . . . 37

United States v. Bin Laden,
92 F. Supp. 2d 225 (S.D.N.Y. 2000). . . . . . . . . . . . . 59

United States v. Borelli, 435 F.2d 500 (2d Cir. 1970). . . . . 53

United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987). 58, 63

United States v. Cancelmo, 64 F.3d 804 (2d Cir. 1985). . . . . 18

United States v. Carrasquillo,
2000 WL 45708,(S.D.N.Y Jan. 19, 2000). . . . . . . . . . . . 20

United States v. Casamento, 887 F.2d 1141 (2d Cir. 1989). . 52-53

iii

**Cases cont.**                                                    **Page**

United States v. <u>Corr</u>, 543 F.2d 1042 (2d Cir. 1976).. . . . . .  57

United States v. <u>Culotta</u>, 413 F.2d 1343 (2d Cir. 1969). .  20, 38

United States v. <u>Diaz</u>, 176 F.3d 52 (2d Cir. 1999).. . . . . . 7, 10

United States v. <u>Emmons</u>, 24 F.3d 1210 (10th Cir. 1994). . . .  44

United States v. <u>Fama</u>, 758 F.2d 834 (2d Cir. 1985). . . . . .  18

United States v. <u>Feliciano, Jr.</u>, 2002 WL 575662,
No. 01 Cr. 448 (S.D.N.Y April 16, 2002).. . . . . . . . . . .  52

United States v. <u>Friedman</u>, 854 F.2d 535 (2d Cir. 1988). . . .  54

United States v. <u>Freeman</u>, 2007 WL 1200110,
No. 06-20138 at *6 (D. Kan. Apr. 23, 2007). . . . . . . . . 41, 44

United States v. <u>Fury</u>, 554 F.2d 522 (2d Cir. 1977). .7, 9, 16, 18

United States v. <u>Gangi</u>, 33 F. Supp. 2d 303(S.D.N.Y. 1999).8-9, 14

United States v. <u>George</u>, 975 F.2d 72(2d Cir. 1992). . . . . .  39

United States v. <u>Gigante</u>, 979 f. Supp. 959 (S.D.N.Y 1997). . . 12

United States v. <u>Gilette</u>,383 F.2d 843 (2d Cir. 1967). . . . .  20

United States v. <u>Gottlieb</u>, 493 F.2d 987 (2d Cir. 1974). . . .  59

United States v. <u>Hill</u>, 459 F.3d 966 (9th Cir. 2006). . . . . .  44

United States v. <u>Henson</u>, 848 F.2d 1374 (6th Cir. 1988). . . .  44

United States v. <u>Jailall</u>,
2000 WL 1368055, (S.D.N.Y. Sept. 20, 2000). . . . . . . . . .  20

United States v. <u>Kahn</u>, 415 U.S. 143(1974) . . . . . . . . .  10

United States v. <u>Kornblau</u>, 586 F. Supp. 614
(S.D.N.Y. 1984). . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. <u>Labate</u>, 00 Cr. 632 (WHP),
2001 WL 533714 (S.D.N.Y May 18, 2001).. . . . . . . . 8-9, 14, 22

United States v. <u>Lanza</u>, 790 F.2d 1015 (2d Cir. 1986). . . . .  56

**Cases cont.**                                                        **Page**

United States v. Lilla, 699 F.2d 99 (2d Cir. 1983). . . . . . 11

United States v. Leon, 468 U.S. 897 (1984). . . . . . . . .36-37

United States v. Lombardo, 98 Cr. 1180 (DLC),
1999 WL 305096 (S.D.N.Y May 14, 1999).. . . . . . . . . . . 10

United States v. Lyles, 593 F.2d 182 (2d Cir. 1979).. . . 53, 57

United States v. Malekzadeh, 855 F.2d 1492 (11th Cir. 1988). . 36

Richardson v. Marsh, 481 U.S. 200 (1987). . . . . . . . . 53, 58

United States v. Matos-Peralta,
691 F. Supp. 780 (S.D.N.Y 1988). . . . . . . . . . . . . . . 51

United States v. Matthews, 20 F.3d 538 (2d Cir. 1994). . . . . 51

United States v. Miller, 116 F.3d 641 (2d Cir. 1997). . . 11, 37

United States v. Moore, 41 F.3d 370 (8th Cir. 1994). . . . . . 36

United States v. Nachamie, 91 F. Supp. 2d 565(S.D.N.Y 2000).. 63

United States v. Pena, 961 F.2d 333 (2d Cir. 1992). . . . . . 20

United States v. Reed, 773 F.2d 477 (2d Cir. 1985). . . . . . 59

United States v. Rice, 478 F.3d 704 (6th Cir. 2007). . . . . . 36

United States v. Riley, 906 F.2d 41 (2d Cir. 1990). . . . . . 41

United States v. Rosa, 11 F.3d 315 (2d Cir. 1993).. . . . . . 53

United States v. Ruggiero, 824 F. Supp. 379 (S.D.N.Y. 1993)
aff'd 44 F.3d 1102 (2d Cir. 1995).. . . . . . . . . . . 8, 11, 14

United States v. Salazar, 485 F.2d 1272 (2d Cir. 1973) . . . . 59

United States v. Sanchez, 635 F.2d 47(2d Cir. 1980).. . . . . 39

United States v. Santiago,
185 F. Supp. 2d 287(S.D.N.Y. 2002). . . . . . . . . . . . 9, 14

United States v. Simmons, 431 F. Supp. 2d 38 (D.D.C. 2006). . 56

**Cases cont.**                                                    **Page**

United States v. Simon, 30 F.R.D. 53 (S.D.N.Y 1962).. . . 59, 63

United States v. Sprewell, 1991 WL 113647,
No. 89-50571 (9th cir. June 26, 1991). . . . . . . . . . 41, 44

United States v. Stokes, 96 Cr. 381 (SAS),
1996 WL 727400, (S.D.N.Y Dec. 18, 1996).. . . . . . . . . 17, 28
United States v. Summage, 481 F.3d 1075 (8th Cir. 2007). . . . 44

United States v. Torres, 901 F.2d 205 (2d Cir. 1990).10-11, 53-54

United States v. Trippe,
171 F. Supp. 2d 230 (S.D.N.Y. 2001).. . . . . . . . . . . 10-12

United States v. Valenti, 60 F.3d 941 (2d cir. 1995). . . . . 51

United States v. Ventura, 724 F.2d 305 (2d Cir. 1983).. . . . 52

United States v. Wagner, 989 F.2d 69 (2d Cir. 1993).. 7-9, 12, 14

United States v. Walser, 275 F.3d 981 (10th Cir. 2001). . . . 44

United States v. Watson, 404 F.3d 163 (2d Cir. 2005). . . 20, 38

United States v. Wilkinson, 754 F. 2d 1427 (2d Cir. 1985).. . 12

United States v. Wilson, 565 F. Supp. 1416 (S.D.N.Y. 1983). . 59

United States v. Young, 822 F.2d 1234 (2d Cir. 1987). . . . . 11

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA          :

      -against-                    :
                                        S2 07 Cr. 124 (WHP)
EMMANUEL ORUCHE, et al.,           :

            Defendants.            :

- - - - - - - - - - - - - - - - - -X
```

**MEMORANDUM OF LAW RESPONDING TO DEFENDANTS' MOTIONS**

The Government hereby responds to multiple motions brought by defendants Emmanuel Oruche, Paul Osuji, Joseph Oluigbo, and joined in by defendant Rebecca Ambo Fomum-Tibah.  Defendant Oruche argues: 1) the items seized during a search of Nicobi Healthcare Services should be suppressed; 2) phone calls intercepted from three of Oruche's cellular phones should be suppressed; 3) certain discovery should be ordered; and 4) notice of 404(b) evidence should be given at this time.  Defendant Osuji also argues that further discovery should be ordered, and also requests: 1) his case should be severed from the other codefendants; and 2) a bill of particular should be ordered. Finally, defendant Oluigbo requests a bill of particulars and further discovery.  Defendant Fomum-Tibah merely joins in those motions that are applicable to her.  For the reasons discussed fully below, these motions should be denied.

1

**BACKGROUND**

Beginning in August 2006 and continuing through December 2006, the Government applied for and obtained several court orders to conduct electronic surveillance of three cellphones used by Emmanuel Oruche.  These wiretaps provided substantial evidence that Oruche and his co-defendants were engaged in multiple narcotics conspiracies involving heroin and cocaine; money laundering; health care fraud; among other possible crimes.

On February 15, 2007, a grand jury sitting in the Southern District of New York returned a four-count Indictment in the present case, charging Oruche, Rebecca Ambo Fomum-Tibah,[1] and others, with conspiring to violate the narcotics laws of the United States by distributing narcotics and importing narcotics into the United States.

On February 28, 2007, agents from the Drug Enforcement Administration arrested Emmanuel Oruche and Rebecca Ambo-Fomum-Tibah on the February 15, 2007 indictment.  Agents also arrested Joseph Oluigbo and Paul Osuji pursuant to separate complaints, attached as Exhibits 10 and 11, charging participation in the same narcotics conspiracy.

---

[1]     Fomum-Tibah had also been arrested in the Eastern District of New York on August 11, 2006, and charged with importing narcotics into the United States.  She was indicted in that case on December 14, 2006, and her case is still pending.

On that same day, after obtaining Oruche's consent[2], law enforcement agents conducted a search of Nicobi Healthcare Services, Oruche's business at which Oluigbo had been employed. During that search, agents seized computers, a MoneyGram terminal (used to process wire transfers), and voluminous documents. Subsequent to that search, agents submitted an affidavit for a search warrant, attached as Exhibit 9, to search the computers and MoneyGram terminal themselves. This warrant was signed by Magistrate Judge Keith A. Pesto in the Western District of Pennsylvania (where the computers had been taken), on or about August 11, 2007.

On June 12, 2007, a superseding five-count indictment was returned against Oruche, Fomum-Tibah, Osuji, and Oluigbo. Counts One and Two charged Oruche with violating the narcotics laws of the United States in December 2003, by distributing and possessing with the intent to distribute, and by importing one kilogram or more of heroin, in violation of Title 21, United States Code, Section 846; Counts Three and Four charged Oruche, Fomum-Tibah, and Oluigbo, among others, with violating the narcotics laws of the United States in 2006, by distributing and possessing with the intent to distribute and by importing one

---

[2]    As discussed more fully _infra_, the exact scope of this consent is a contested issue of fact, although all parties agree at the very least that Oruche consented to a search of Nicobi Healthcare Services for "drugs."

kilogram or more of heroin, in violation of Title 21, United States Code, Section 846; and Count Five charged Oruche and Osuji with violating the narcotics laws of the United States in December 2006, by distributing and possessing with the intent to distribute, 500 grams or more of cocaine, in violation of Title 21, United States Code, Section 846.  After a lengthy discovery period, defendants filed the instant motions.

## ARGUMENT

### I.   Oruche's Motion To Suppress Wiretap Evidence Should Be Denied

Oruche seeks to suppress phone calls intercepted from three of his cellphones pursuant to court-authorized wiretaps. Oruche argues that the Government's initial wiretap applications for each of his cellphones failed to establish (i) probable cause to believe that Oruche's cellphones would be used for criminal activity and/or (ii) necessity for the wiretap of Oruche's cellphones.  Oruche further argues that, because the Government's initial wiretaps on his phones were improperly authorized and because the Government's applications to renew those wiretaps relied on calls intercepted pursuant to the improper wiretaps, all renewals should also be suppressed.

Oruche's contentions are meritless.  All of the Government's wiretap applications in this case, which are supported by the affidavits of DEA Special Agent Andrew

4

Authurton, were approved by a District Judge (and before that, by the Department of Justice's Office of Enforcement Operations) and provide specific facts that demonstrated that Oruche was involved in narcotics offenses and that he used his cellphones to further those offenses.  In addition, Agent Authurton's affidavits detailed the investigative steps that he and his fellow law enforcement officers had taken towards meeting the objectives of the investigation and how those steps did not render a wiretap superfluous.  In short, the Government's wiretap applications complied with both the "probable cause" and "necessity" requirements of Title 18, United States Code, Section 2518.  None of the arguments Oruche makes overcome the presumption in favor of the reviewing Judges' decisions to approve the Government's applications.  Accordingly, the motion should be denied.

### A.    The Wiretaps

Over the course of this investigation, the Government obtained authorization to intercept calls on three cellphones used by Oruche, which had the following call numbers: (646) 533-8587 (the "646 Cellphone"); (917) 815-6747 (the "917 Cellphone"); and (832) 613-4067 (the "832 Cellphone").

On August 30, 2006, the Government first received authorization to intercept calls on the 646 Cellphone from the Honorable Denise L. Cote, United States District Judge for the Southern District of New York.  As with all the wiretap

applications in this case, Agent Arthurton provided a supporting
affidavit to the Government's application.[3]  Interceptions on the
646 Cellphone began on August 31, 2006 and continued, with brief
periods of interruption, until December 26, 2006.  During this
time, the Government submitted three additional applications to
authorize further interceptions on the 646 Cellphone, including
one on September 27, 2006 and one on October 26, 2006, both of
which were approved by Judge Cote, and one on November 27, 2006,
which was approved by the Honorable Lewis A. Kaplan, United
States District Judge for the Southern District of New York.
Interceptions on the 646 Cellphone were terminated on or about
December 26, 2006.

On September 21, 2006, the Honorable Gerard E. Lynch,
United States District Judge for the Southern District of New
York, authorized interceptions on the 917 Cellphone.
Interceptions on the 917 Cellphone were reauthorized, along with
the 646 Cellphone, on October 26, 2006 and November 27, 2006 by
Judge Cote and Judge Kaplan, respectively.  Interceptions on the
917 Cellphone were terminated on or about December 26, 2006.

On October 13, 2006, the Honorable Robert P. Patterson,

---

[3]    The Arthurton affidavits will be referred to by the
date of authorization, e.g., the "Aug. 30, 2006 Aff.", and are
attached as exhibits to this motion.  (See Ex. 1 (Aug. 30, 2006
Aff.); Ex. 2 (Sept. 21, 2006 Aff.); Ex. 3 (Sept. 27, 2006 Aff.);
Ex. 4 (Oct. 13, 2006 Aff.); Ex. 5 (Oct. 26, 2006 Aff.); Ex. 6
(Nov. 21, 2006 Aff.); and Ex. 7 (Nov. 27, 2006 Aff.)).

United States District Judge for the Southern District of New
York, authorized a wiretap on the 832 Cellphone.  On November 21,
2006, the Honorable Richard Conway Casey, United States District
Judge for the Southern District of New York, authorized
additional interceptions on the 832 Cellphone.  Interceptions on
the 832 Cellphone were terminated on or about December 21, 2006.

### B.   Applicable Law on Probable Cause and Necessity in Wiretap Applications

#### 1.   **Probable Cause**

Title 18, United States Code, Section 2518 sets out the
procedures governing the interception of oral communications.
Section 2518(3) requires a probable cause determination on three
issues: that an individual is committing, has committed, or is
about to commit an enumerated offense; that particular
communications concerning that offense will be obtained through
the requested interception; and that the facilities subject to
interception are being used in connection with the offense.  18
U.S.C. § 2518(3).  See United States v. Diaz, 176 F.3d 52, 110
(2d Cir. 1999); United States v. Wagner, 989 F.2d 69, 71 (2d Cir.
1993); United States v. Ambrosio, 898 F. Supp. 177, 181 (S.D.N.Y.
1995).

The Second Circuit has stated that the test for
determining probable cause under 18 U.S.C. § 2518 is the same as
that for determining probable cause for a search warrant.  Diaz,
176 F.3d at 110 (citing United States v. Fury, 554 F.2d 522, 530

(2d Cir. 1977)).  In <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983),
the Supreme Court set forth a "totality of the circumstances"
test for determining probable cause to support a search warrant.
The Court indicated that a judicial officer must "make a
practical, common-sense decision whether, given all the
circumstances set forth in the affidavit before him, including
the 'veracity' and 'basis of knowledge' of persons supplying
hearsay information, there is fair probability that . . .
evidence of a crime will be found."  <u>Id</u>.  Moreover, "[p]robable
cause is not an especially demanding standard in this context.
'Only the probability, and not the prima facie showing, of
criminal activity is the standard of probable cause.'"  <u>United
States v. Bellomo</u>, 954 F. Supp. 630, 636 (S.D.N.Y. 1997) (quoting
<u>Gates</u>, 462 U.S. at 235).  <u>See also</u> <u>Wagner</u>, 989 F.2d at 72; <u>United
States v. Labate</u>, 00 Cr. 632 (WHP), 2001 WL 533714 at *16
(S.D.N.Y. May 18, 2001) ("A finding of probable cause requires
only a probability and not a prima facie showing of criminal
activity.") (quotation omitted); <u>United States v. Ruggiero</u>, 824
F. Supp. 379, 398 (S.D.N.Y. 1993), <u>aff'd</u>, 44 F.3d 1102 (2d Cir.
1995) ("Probable cause to issue a wiretap order exists when the
facts made known to the issuing court are sufficient to warrant a
prudent man in believing that evidence of a crime could be
obtained through the use of electronic surveillance.") (quotation
and footnote omitted).

In assessing probable cause, a wiretap affidavit must be read as a whole and in a common-sense manner. Defendants may not "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause." United States v. Gangi, 33 F. Supp. 2d 303, 306 (S.D.N.Y. 1999). See Ruggiero, 824 F. Supp. at 399 (a wiretap affidavit "must be read as a whole, and construed in a realistic and common-sense manner, so that its purpose is not frustrated").

A reviewing court must accord great deference to the findings of an issuing judicial officer that probable cause exists. See Wagner, 989 F.2d at 72 ("substantial deference" owed to finding of an issuing judicial officer that probable cause exists in a wiretap case); United States v. Santiago, 185 F. Supp. 2d 287, 288 (S.D.N.Y. 2002) (same); Bellomo, 954 F. Supp. at 636 (wiretap case); Gangi, 33 F. Supp. 2d at 306 ("[T]he issuing judicial officer's decision to authorize wiretaps 'should be paid great deference by reviewing courts.'") (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause. See, e.g., Gates, 462 U.S. at 236; Wagner, 989 F.2d at 72-74; Santiago, 185 F. Supp. 2d at 288. Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization. See Labate, 2001 WL 533714 at *16;

9

Gangi, 33 F. Supp. 2d at 306; Ambrosio, 898 F. Supp. at 181.
Thus, "wiretap orders are entitled to a presumption of validity."
Id. (citing Fury, 554 F.2d at 530).

### 2. Necessity

Title 18, United States Code, Section 2518(1)(c)
requires that an application for the interception of telephonic
communications include "a full and complete statement as to
whether or not other investigative procedures have been tried and
failed or why they reasonably appear to be unlikely to succeed if
tried or to be too dangerous."  Similarly, Section 2518(3)(c)
requires the judge reviewing a wiretap application to determine,
as a condition of authorizing the wiretap, that "normal
investigative procedures have been tried and have failed or
reasonably appear to be unlikely to succeed if tried or to be too
dangerous."

These requirements ensure that "wiretapping is not
resorted to in situations where traditional investigative
techniques would suffice to expose the crime." United States v.
Kahn, 415 U.S. 143, 153 n.12 (1974).  The Second Circuit
explained the significance of these statutory requirements:

> [T]he purpose of the statutory requirements of §
> 2518 is not to preclude the Government's resort to
> wiretapping until after all other possible means
> of investigation have been exhausted by
> investigative agents; rather, the statute only
> requires that the agents inform the authorizing
> judicial officer of the nature and progress of the
> investigation and of the difficulties inherent in

10

the use of normal law enforcement methods.

United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999) (citing United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990)).  See also United States v. Trippe, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001); United States v. Lombardo, 98 Cr. 1180 (DLC), 1999 WL 305096 at *5 (S.D.N.Y. May 14, 1999).  Thus, Title III's "alternative investigative techniques" sections do not establish a "requirement 'that any particular investigative procedure be exhausted before a wiretap be authorized.'"  United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (quoting United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983)); see also United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997) (same).

The legislative history of the statute further makes clear that Section 2518(1)(c) is not designed to force the Government to exhaust all "other investigative techniques."  As the Senate Report concerning the statute explained:

> Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely.  What the provision envisions is that the showing be tested in a practical and commonsense fashion.

S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2190 (citations omitted); see also Torres, 901 F.2d at 231-32 (quoting legislative history); United States v. Ruggiero, 726 F.2d 913, 924 (2d Cir. 1984) (explaining that affidavits in support of wiretap applications are viewed in

11

common sense and realistic fashion); <u>Trippe</u>, 171 F. Supp. 2d at

236 ("[T]he application must be viewed in a practical and common

sense manner and need be only minimally adequate to support the

issuing judge's determination of necessity.").

In reviewing the authorization for a wiretap, a great

deal of deference is owed by the reviewing court to the issuing

court's prior finding of necessity.  <u>See</u> <u>United States v.</u>

<u>Gigante</u>, 979 F. Supp. 959, 963 (S.D.N.Y. 1997) ("In subsequently

reviewing these determinations [probable cause and necessity],

the trial court must accord substantial deference to the findings

of the issuing judicial officer, limiting its review to whether

the issuing judicial officer had a 'substantial basis' for making

the requisite findings.") (citing <u>United States v. Wagner</u>, 989

F.2d 69, 71 (2d Cir. 1993)); <u>see also</u> <u>Trippe</u>, 171 F. Supp. 2d at

236 ("The issuing judge's determination that the Government has

made adequate use of alternative investigatory techniques is

entitled to substantial deference.") (citing <u>United States v.</u>

<u>Wilkinson</u>, 754 F.2d 1427, 1433 (2d Cir. 1985)).

**C.    The August 30, 2006 Wiretap Was Properly Authorized**

**1.    <u>The August 30, 2006 Affidavit Establishes Probable Cause</u>**

Oruche contends that the August 30, 2006 Affidavit,

submitted in support of the Government's request to intercept

calls on the 646 Cellphone, "fails to establish probable cause

that Mr. Oruche was involved in narcotics trafficking."  (Oruche

Mem. at 6).  Contrary to Oruche's contention, the August 30, 2006
Affidavit provided a substantial basis for Judge Cote to find
probable cause to justify the wiretap.  The August 30, 2006
Affidavit contains detailed allegations that establish probable
cause to believe that the 646 Cellphone was "being used in
furtherance of narcotics trafficking activities involving the
importation of heroin into the United States from Nigeria" and
that Oruche is involved in the importation of heroin into the
United States.  (Ex. 1 ¶¶ 13-14).  Among other things, the
affidavit alleges that:

- A heroin courier named William Wagabono who was
  arrested in December 2003 at Newark International
  Airport while attempting to import heroin into the
  United States identified a photograph of Oruche (whom
  Wagabono knew as "Emmanuel" or "Manny") as the intended
  recipient of the heroin and as the man to whom he had
  delivered heroin on four prior occasions.  (Ex. 1 ¶
  15).

- Two days later, when law enforcement officers attempted
  a controlled delivery of the heroin to Oruche at the
  place where Wagabono was supposed to make the delivery,
  Oruche arrived, conducted surveillance, and perhaps
  sensing the presence of law enforcement, left without
  completing the transaction.  (Ex. 1 ¶ 16).

- On June 2, 2006, another heroin courier, named
  Ikechukwu Ojeogwu, was arrested at JFK Airport and was
  found to have swallowed approximately 60 pellets of
  heroin.  Ojeogwu had flown to JFK from Port Harcourt,
  Nigeria through Frankfurt, Germany.  He told law
  enforcement officers that he was to deliver the heroin
  to Oruche and gave the officers Oruche's name and the
  number of the 646 Cellphone.  (Ex. 1 ¶¶ 20, 25).

- In the three days before Ojeogwu's arrival and arrest
  at JFK, the Government intercepted a number of calls
  pursuant to a court-authorized wiretap on the cellphone

of an individual named Chimdi Ibiam, who was believed to be involved in the importation of heroin into the United States. In those calls, Ibiam discussed, with others, a heroin courier who was going to travel from Port Harcourt in Nigeria to New York. (Ex. 1 ¶¶ 21-24). At night on June 2, 2006, after Ojeogwu had been arrested, Ibiam is intercepted calling an individual named "Mazzi" and stating that the courier did not arrive. (Ex. 1 ¶ 26).

- Later, on July 14, 2006, a call was intercepted on Ibiam's phone between Ibiam and Oruche, who was using the 646 Cellphone, in which Ibiam and Oruche discuss, in coded language, a heroin courier. (Ex. 1 ¶ 27).

- On August 9, 2006, yet another courier destined to give heroin to Oruche was arrested at JFK Airport. The courier was Fomum-Tibah, Oruche's co-defendant in this case. After she was arrested, she informed law enforcement officers that Oruche had sent her to Turkey where she had swallowed pellets (that were found to contain approximately 1.3 kilograms of heroin) before returning to the United States. She further informed law enforcement officers that Oruche was in the drug business with two individuals in Detroit. (Ex. 1 ¶¶ 28-31).

- Toll analysis of the 646 Cellphone revealed that in late July and early August 2006, there were six calls between the 646 Cellphone and Asaga Ugbo, who had also been intercepted speaking with Ibiam about narcotics trafficking. (Ex. 1 ¶¶ 23, 32-33). Further toll analysis reveals that during the same period the 646 Cellphone made five calls to four different numbers in Nigeria. (Ex. 1 ¶ 34).

Taken together, these allegations provide ample evidence to support a probable cause finding as required by Section 2518(3). The Court's review here, however, is not de novo. Judge Cote has already found that the August 30, 2006 Affidavit establishes probable cause, and the Court's determination should be limited to whether Judge Cote had a

14

substantial basis for that finding, see, e.g., Gates, 462 U.S. at 236; Wagner, 989 F.2d at 72-74; Santiago, 185 F. Supp. 2d at 288, with any doubts as to the existence of probable cause being resolved in favor of upholding the authorization. See Labate, 2001 WL 533714 at *16; Gangi, 33 F. Supp. 2d at 306; Ambrosio, 898 F. Supp. at 181.

          Oruche attacks selected pieces of evidence in the August 30, 206 Affidavit, and the other wiretap affidavits in this case, hoping to show that what he deems to be weaknesses in certain allegations negate probable cause for the whole application.  This approach should fail.  A wiretap affidavit "must be read as a whole, and construed in a realistic and common-sense manner, so that its purpose is not frustrated." Ruggiero, 824 F. Supp. at 399.  Defendants may not "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause."  United States v. Gangi, 33 F. Supp. 2d 303, 306 (S.D.N.Y. 1999).

       a.  **The Affidavit Establishes a Connection Between Chimdi Ibiam, Ikechukwu Ojeogwu, Asaga Ugbo, and Oruche**

        Oruche argues, for example, that the affidavit fails to establish Oruche is part of a drug trafficking organization that also involved Chimdi Ibiam, Ikechukwu Ojeogwu, and Asaga Ugbo or indeed, that these individuals had any connection with each other.  (Oruche Mem. at 9).  The affidavit, however, provides

15

ample evidence of a connection.  After his arrest on June 2, 2006, Ikechukwu Ojeogwu confessed that he was attempting to smuggle 60 pellets of heroin into the United States and deliver them to Oruche.  (Ex. 1 ¶¶ 20, 25).  Ojeogwu provided law enforcement officers not just with Oruche's name but with Oruche's cellphone number--the 646 Cellphone that is the target of the wiretap application.  (Id.).  Contrary to Oruche's assertions, Ojeogwu's statements are not "uncorroborated."  They are supported by the post-arrest confessions of two other individuals who were also caught attempting to import heroin into the United States and deliver the heroin to Oruche and by intercepted conversations of Ibiam and others.  (Ex. 1 ¶¶ 15-16, 20-31).

Ojeogwu's statements are also supported by the intercepted conversations involving Ibiam and his associates. These interceptions reveal that starting just three days before Ojeogwu made his ill-fated trip from Port Harcourt, Nigeria to New York, Ibiam and his confederates, including Asaga Ugbo, were discussing the details of a drug courier who was going to travel from Port Harcourt to New York.  (Ex. 1 ¶¶ 21-24).  A few hours after Ojeogwu was arrested, Ibiam is intercepted speaking about how the "man" did not show up.  (Ex. 1 ¶ 26).  And while it is true that Ibiam and his associates did not mention Ojeogwu by name on the intercepted calls, one would expect individuals

16

engaged in narcotics trafficking who are conscious of law enforcement[4] would be reluctant to freely use a courier's real name or provide specific identifying information about the courier over a phone.

If Ojeogwu's direct implication of Oruche is not enough, however, to establish a connection between Oruche and Ibiam's organization, the affidavit recites a call between Oruche and Ibiam in which the two discuss another drug courier. (Ex. 1 ¶ 27). Oruche responds by challenging the Government's interpretation of this call, finding the words used by Oruche and Ibiam to be "ambiguous, if not entirely innocent." (Oruche Mem. at 7).[5] During the conversation, Oruche stated that he wanted to give an individual named "Ide Asaba" a "ticket" to bring that "thing," which the Government interpreted to mean drugs. Later in the call, Ibiam indicated that Asaba was "around" and that when Oruche came "you guys will discuss face to face." In the context of the other evidence presented in the August 30, 2006

---

[4]    For example, during one of the intercepted calls, the individual identified as Mazzi stated, "you never know. You know people watch . . . they look at you and ask you where are you going/what are you up to?" (Ex. 1 ¶ 22).

[5]    Oruche asserts that the Government has not provided him with a recording or transcript of this conversation. (Oruche Mem. at 7). As is discussed elsewhere by the Government, the Government offered, in a letter dated August 22, 2007, to make the Ibiam wiretap materials available for review by all defendants in this case if they so requested. In any event, the Government will produce these materials to the defendants.

17

Affidavit, Agent Arthurton's interpretations, which are also
based on his experience as a DEA Agent (Ex. 1 ¶ 1), are entirely
reasonable.  "So long as a law enforcement officer's
interpretations of intercepted calls are not unreasonable or
implausible, a district judge can rely on them in finding
probable cause."  United States v. Stokes, 96 Cr. 481 (SAS), 1996
WL 727400, at *4 (S.D.N.Y. Dec. 18, 1996) (citing United States
v. Cancelmo, 64 F.3d 804, 808 (2d Cir. 1995); United States v.
Fama, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an
innocent explanation may be consistent with the facts as alleged
... will not negate probable cause."); Fury, 554 F.2d, at 530-31
(finding that ambiguous intercepted conversations "can be
reasonably interpreted to indicate what the detective interpreted
them to be")).[6]

> **b.    Information Regarding William Wagabono Is Not
> Stale and Oruche Is Not Entitled to a Hearing**

Similarly, Oruche's arguments regarding the staleness
of William Wagabono's post-arrest confession implicating Oruche
is similarly unavailing.  (Oruche Mem. at 9-11).  Like Ojeogwu,
Wagabono was arrested at an airport while attempting to import
heroin into the United States.  He identified a photograph of
Oruche as being the man to whom he intended to deliver the heroin

---

[6]    In addition, toll analysis also showed that there were
several phone calls between the 646 Cellphone and Asaga Ugbo, who
was intercepted speaking with Ibiam regarding heroin couriers.
(Ex. 1 ¶¶ 23, 33).

18

(and to whom he had delivered heroin on four prior occasions), and provided information about Oruche's car as well. (Ex. 1 ¶ 15). When agents attempted to conduct a controlled delivery at the location where Wagabono was to deliver the drugs, Oruche arrived but left after he apparently discovered law enforcement officers in the area.[7] (Ex. 1 ¶ 16). Oruche acknowledges that courts recognize that the temporal requirements for staleness are relaxed in narcotics cases but nonetheless argues that Wagabono's statements and arrest, which occurred in December 2003, are too stale because they are "wholly unrelated to the current indictment and investigation." (Oruche Mem. at 11). This argument might be valid if Wagabono had not implicated Oruche for doing <u>exactly</u> what he is accused of doing throughout the August 30, 2006 Affidavit, which is using couriers to import heroin into the United States. At the very least, the evidence relating to Wagabono provides background information regarding the investigation of Oruche, and corroborates the information provided elsewhere in the affidavit.

Oruche argues in the alternative that if the Wagabono evidence is not stale, then he demands a hearing "to determine the circumstances involved," because he has not been provided

---

[7]    Oruche asserts that he has not received photographic evidence from the controlled delivery. (Oruche Mem. at 10). As is discussed in the Government's response to Oruche's discovery motion, the Government is reviewing its files and will produce these materials if they exist.

with any discovery.  (Oruche Mem. at 11).  This contention is
meritless.  Oruche has not met his burden to receive a hearing.
The Second Circuit has held that a fact hearing is only required
where "'the moving papers are sufficiently definite, specific,
detailed, and nonconjectural to enable the court to conclude that
contested issues of fact going to the validity of the search are
in question.'"  United States v. Watson, 404 F.3d 163, 167 (2d
Cir. 2005) (quoting United States v. Pena, 961 F.2d 333, 339 (2d
Cir. 1992)).  "Suppression motions are not . . . a vehicle to
conduct discovery."  United States v. Kornblau, 586 F. Supp. 614,
622 (S.D.N.Y. 1984).  The Court is "not required as a matter of
law to hold an evidentiary hearing if [defendant's] papers did
not state sufficient facts which, if proven, would have required
the granting of relief requested."  United States v. Culotta, 413
F.2d 1343, 1345 (2d Cir. 1969); see also United States v.
Gillette, 383 F.2d 843, 848-49 (2d Cir. 1967); United States v.
Jailall, 2000 WL 1368055, at *8-9 (S.D.N.Y. Sept. 20, 2000);
United States v. Carrasquillo, 2000 WL 45708, at *2 (S.D.N.Y.
Jan. 19, 2000).

        Oruche has been provided with notice, through the
allegations set forth in the wiretap affidavits, of the
allegations made against him by Wagabono and the attempted
controlled delivery.  Oruche has not set forth, in his affidavit,
any facts to contest these allegations.  Accordingly, he is not

                                  20

entitled to a hearing.  Further, it is unclear what Oruche
expects the photographs of the attempted controlled delivery to
reveal, but such discovery is not necessary for Oruche to present
his own version of the facts.  (And in any case the Government
will produce any photographs or videos if they exist).

        **c.**    **The Statements of Fomum-Tibah Are Reliable**

       Oruche also argues that the Court should not consider
the statements of his co-defendant Fomum-Tibah because they are
unreliable or, in the alternative, that the Court should hold a
hearing to inquire about Fomum-Tibah's credibility.  (Oruche Mem.
at 11-13).  The crux of Oruche's argument appears to be that
because the Government has not (in his view) signed Fomum-Tibah
to a cooperation agreement, it must not find her to be credible,
and therefore her statements implicating Oruche must be
incredible.  Oruche's argument is pure speculation.  Whatever
Fomum-Tibah's cooperation status, the Government has no reason to
believe that her statements set forth in the August 30, 2006
Affidavit, _i.e._, that she was carrying heroin to deliver to
Oruche and that Oruche was involved in heroin trafficking with
two individuals in Detroit, are false.[8]  (Ex. 1 ¶ 31).

---

    [8]    It is true that Fomum-Tibah was not a cooperator for
the Government when she the August 30, 2006 wiretap was approved.
The Government has not disclosed whether it has since entered
into a cooperation agreement with Fomum-Tibah and will not do so
now.  (The Government would not be required to disclose such
information until and unless Fomum-Tibah were to testify for the
Government).

Third, Oruche is not entitled to any hearing on this issue, as he has not met his burden to set forth any facts contesting Fomum-Tibah's statements.  And, to the extent that Oruche suggests that Agent Arthurton deliberately misled Judge Cote by omitting concerns about Fomum-Tibah's credibility from the affidavit, he has not met his burden for a <u>Franks</u> hearing. As this Court held, "[t]o obtain a hearing to challenge the accuracy of statements set forth in an affidavit supporting an application for electronic surveillance, a defendant must make 'a substantial preliminary showing' that (i) 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' and (ii) that 'the allegedly false statement is necessary to the finding of probable cause.'" <u>Labate</u>, 2001 WL 533714, at *17 (quoting <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978)).  The Supreme Court defined "substantial showing" in the following way:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence explained.

<u>Franks</u>, 438 U.S. at 171.  "If all those requirements are met, and

22

if setting aside the material that is the subject of the alleged falsity or reckless disregard, there remain sufficient content in the warrant affidavit to support a finding of probable cause, then no hearing is required." Labate, 2001 WL 533714, at *17 (quotation omitted). "A defendant is entitled to a hearing only if the remaining content is insufficient." Id. (citing Franks, 438 U.S. at 172).

In this case, mere speculation regarding the reasons why the Government has or has not signed a cooperation agreement with Fomum-Tibah is not a "substantial showing" to merit a Franks hearing. In addition, because the August 30, 2006 Affidavit contains detailed allegations establishing probable cause even without Fomum-Tibah's statements, no hearing is necessary.

### d.  Toll Analysis

Oruche disputes that the toll analysis contained in the August 30, 2006 Affidavit is sufficient to establish probable cause. He argues, again, that there is nothing in the toll analysis to establish that Oruche was involved with heroin trafficking with Asaga Ugbo, and therefore the six calls between the 646 Cellphone and Ugbo that occurred between July 17, 2006 and August 8, 2006 count for nothing. (Oruche Mem. at 13-14). As discussed at length above, however, the affidavit does provide ample evidence establishing Oruche's connection to Ugbo and Ibiam. In addition, Oruche raises several arguments regarding

23

the absence of toll records to other countries beside Nigeria. (Oruche Mem. 14-15). The absence of toll records to other countries besides Nigeria does not negate the probable cause that is established throughout the rest of the affidavit, which shows that Oruche is involved with narcotics trafficking and was using the 646 Cellphone to do so. The affidavit need not establish that Oruche is involved in every aspect of the narcotics trafficking organization's operations or that Oruche called every country linked to the organization's operations during the limited time period of late July 2006 through early August 2006.

### 2. The August 30, 2006 Affidavit Establishes Necessity

The August 30, 2006 Affidavit also provides detailed allegations that clearly establish, as found by Judge Cote, that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. In the ten pages that the August 30, 2006 Affidavit devotes to the subject, Agent Arthurton explains the various investigative methods the Government has and has not used in this investigation, and has provided explanations as to why they reasonably appear likely to fail or are too dangerous to use. (Ex. 1 ¶¶ 35-45). These include surveillance, analysis of toll records, grand jury process, witness interviews, use of confidential informants and undercover officers, search warrants, and arrests. (Id.).

24

Oruche makes several arguments which attack the Government's investigation in this case without showing that the affidavit fails to adequately address other investigative techniques. For example, he contends that the Government should have done more with Wagabono "beyond the single attempted controlled delivery." (Oruche Mem. at 17). But this argument misses the point. At the time the August 30, 2006 Affidavit was approved, Wagabono was nearing the end of a prison sentence, had little incentive to cooperate, and was of little use to the Government in attempting proactive investigation. (Ex. 1 ¶ 42). And the "single attempted controlled delivery" that Wagabono had attempted in 2003 failed, apparently because Oruche detected the presence of law enforcement, so it is unclear what use, exactly, Oruche would have the Government make of Wagabono in its investigation.

Oruche also condemns the Government for failing to "use either Ojeogwu or Fomum-Tibah to make a controlled delivery, wear a wire, or make a monitored phone call" to Oruche, and that the affidavit does not "explain why these techniques were not used." (Oruche Mem. at 17). Actually, the August 30, 2006 Affidavit does explain why these techniques were not used: "ORUCHE undoubtedly knows that they have been arrested and would not trust them if they were released or tried to place a phone call to ORUCHE." (Ex. 1 ¶ 42). Further, the affidavit explains that

"Fomum-Tibah has expressed to agents that ORUCHE is violent and fears that he would hurt her." (Id.).   Judge Cote found these explanations sufficient to meet the necessity requirement and Oruche's arguments here fall far short of providing a reason to upset the deference owed to that ruling.

D.    **The September 21, 2006 Wiretap Was Properly Authorized**

1.    **The September 21, 2006 Affidavit Establishes Probable Cause**

Oruche also contends that the September 21, 2006 Affidavit, in which Judge Lynch authorized a wiretap on the 917 Cellphone, also fails to establish probable cause because it relies in part on the same insufficient facts presented in the August 30, 2007 Affidavit and the new facts it does present are likewise insufficient to establish probable cause.   (Oruche Mem. at 18-19).   Oruche fails to show why Judge Lynch's authorization should be overturned.

Like the August 30, 2006 Affidavit, the September 21, 2006 Affidavit sets forth the same facts concerning William Wagabono (Ex. 2 ¶¶ 14-15); Ikechukwu Ojeogwu (Id. ¶ 16); and Fomum-Tibah (Id. ¶ 17).   The September 21, 2006 Affidavit further provides the following facts:

- A description of intercepted calls between Oruche and Chimdi Ibiam and another individual named Charlie in which Oruche discusses narcotics trafficking.  (Ex. 2 ¶¶ 17-18).

- Information, provided by Fomum-Tibah and toll analysis, showing that Oruche used the 917 Cellphone for

26

narcotics-related activities more often than the 646 Cellphone, and in particular to make calls to Nigeria, Turkey, and Detroit.  (Ex. 2 ¶ 19).

• Recorded prison phone calls between Fomum-Tibah and the 917 Cellphone revealing that she and Oruche discussed heroin trafficking, including Fomum-Tibah's heroin smuggling route.  (Ex. 2 ¶¶ 21).

• Toll records showing that between August 29, 2006 and September 8, 2006, the 917 Cellphone was involved in 14 calls with nine different numbers in Nigeria; six calls with two different numbers in Turkey; and 47 times with six different numbers in Detroit.  The toll records also show that the 917 Cellphone was involved with calls to phone numbers believed to belong to individuals in Orcuhe's drug trafficking organization, based on intercepted calls between those numbers and the 646 Cellphone.

While all of these facts amply support a finding of probable cause, Oruche argues, however, that these facts are insufficient.  He renews his objection to the statements of Fomum-Tibah, arguing, again, that because the Government had not signed Fomum-Tibah to a cooperation agreement at the time the affidavit was written (and may not have signed her to a cooperation agreement now), her statements are not credible. (Oruche Mem. at 19-20).  The Government addressed that argument above.  Oruche also points to a lie that Fomum-Tibah told to the Government, which is that she had made a trip with drugs from Turkey only once, when in fact records show she traveled to Turkey three times.  (Ex. 2 at 16 n.9).  This attempt to minimize her own conduct, does not, however, make her statements implicating Oruche unreliable.  In fact, calls between Fomum-

27

Tibah and Oruche demonstrate that Oruche was involved in importing heroin with Fomum-Tibah. (Ex. 2 ¶ 21). In one call, which Oruche does not address in his moving papers, Oruche informed Fomum-Tibah that "you understand everything was suspended you know the British Airways all this man . . . People will not come when you have something like this when this is something that you have to do yourself." (Id.). Agent Arthurton explains that Oruche was informing Fomum-Tibah that he had suspended sending mules on British Airways (which was the airline that Fomum-Tibah used to travel from Turkey) because of her arrest. (Id.). In addition, during the call Fomum-Tibah reminds Oruche, who had been talking about the investigation, that the call was being recorded. (Id. at 18 n.10).

Next, Oruche disputes Agent Arthurton's interpretation of a call between Oruche and an individual named Charlie on the 646 Cellphone. Oruche concedes, however, that it is "plausible" that Oruche and Charlie were speaking in code, but that it is unclear that they were referring to heroin. (Oruche Mem. at 21-22). Agent Arthurton's interpretation of the call, in which the two talk about "one house" and whether someone would give it to Oruche at "five five" for which he will "break it down six six and make one one," is that the two were talking about prices of buying and selling a kilogram of heroin. (Ex. 2 ¶ 18). This interpretation is reasonable, given the context and the other

28

facts in the affidavit.  See, e.g., Stokes, 1996 WL 727400, at *4 ("So long as a law enforcement officer's interpretations of intercepted calls are not unreasonable or implausible, a district judge can rely on them in finding probable cause.").

Oruche further argues that "Charlie was not a target subject, so no negative inference can be properly drawn against Oruche solely on the basis that he is speaking with Charlie." (Oruche Mem. at 22).  The Government is unaware of what the authority is for this argument (and Oruche cites none), but no matter, for Charlie is, in fact, a target subject.  (See Ex. 2 ¶¶ 3, 19 ("I believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by . . . FNU LNU, a/k/a "Charlie," . . . (the "TARGET SUBJECTS")")).

Oruche similarly attacks Agent Arthurton's reasonable interpretations of other calls in the affidavit, to similarly futile effect.  (Oruche Mem. at 22-26).  In one instance, Oruche accuses Agent Arthurton of misleading Judge Lynch by omitting information about Oruche's medical supply business in his discussion of a call between Oruche and "Mike."[9]  (Id. at 24). Had Judge Lynch been aware of such information, Oruche suggests, he surely would have found that Oruche was speaking with Mike

---

[9]     Oruche states that Mike is not a target subject (it is unclear what import he takes this to have).  (Oruche Mem. at 24). No matter.  Oruche is incorrect, as Mike is a target subject. (Ex. 2 ¶ 3 (listing "FNU LNU, a/k/a 'Mike'" as a target subject)).

29

about wheelchairs instead of heroin.  That is incorrect.  Agent Arthurton did not mislead the Court by not mentioning Oruche's business.  During the call, Oruche stated, "Even though things have spoiled here but there are still people that gives things, you understand?", to which Mike responded, "Yeah, ok," and Oruche continued, "If I can get like two or four and pay them . . . you understand."  (Ex. 2 ¶ 26).  A reasonable interpretation of this call leads to the conclusion that it does not concern any legal business activity, certainly not "prescriptions for home health care products."  (Oruche Mem. at 25).  Common senses tells us that if Oruche was talking about something legitimate, he would have explicitly said what he was talking about, rather than speaking obliquely and appealing to some unspoken understanding he had with Mike.[10]

Oruche also attacks the toll analysis in the September 27, 2006 Affidavit, suggesting that any of the calls listed there could have been innocent.  (Oruche Mem. at 26-27).  None of these arguments are make a sufficient showing to overturn Judge Lynch's finding of probable cause.  In fact, in his opposition to the August 30, 2006 Affidavit, Oruche had decried the absence of any

---

[10]    Although he does not ask for a hearing in connection with his accusation against Agent Arthurton, he would not be entitled to one under the standards governing Franks hearings, as he has not made a substantial showing that Agent Arthurton deliberately mislead the Court or that the particular call is essential for Judge Lynch's finding of probable cause.

toll records of calls to Turkey, arguing that the toll records "suggest that Mr. Oruche was not involved in the multinational drug conspiracy the government alleges." (Oruche Mem. at 14-16). Now that the Government has provided toll records of calls to Turkey, Oruche changes his position, arguing that "[w]hile this fact might be suggestive, little is established by the fact that calls were made, without any evidence as to who was called or what was discussed." (Oruche Mem. at 27).

### 2. The September 21, 2006 Affidavit Establishes Necessity

Like the August 30, 2006 Affidavit, the September 21, 2006 Affidavit also provides detailed allegations that clearly establish, as found by Judge Lynch, that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. The September 21, 2006 Affidavit contains seven pages of detailed information provided by Agent Arthurton, who explains the various investigative methods the Government has and has not used in this investigation, and has provided explanations as to why they reasonable appear likely to fail or are too dangerous to use. (Ex. 2 ¶ 27). These include surveillance, analysis of toll records, grand jury process, witness interviews, use of confidential informants and undercover officers, search warrants, and arrests. (Id.).

Oruche argues that the Government should have tried to

use Fomum-Tibah to make recorded calls to Oruche (and therefore a wire on the 917 Cellphone was not necessary) because Fomum-Tibah was speaking with Oruche about the case over the prison phone. (Oruche Mem. at 27-28). This argument ignores and misinterprets the reasons given by the Government in the September 21, 2006 Affidavit. Agent Arthurton clearly stated that the Government had been proffering Fomum-Tibah but had stopped, because she was not fully forthcoming, and had not scheduled any further meetings with her. (Ex. 2 ¶ 27b). Accordingly, at the time the affidavit was written, Fomum-Tibah was not working with the Government, and therefore could not be used to make any calls to Oruche.

**E.    The September 27, 2006 Wiretap Was Properly Authorized**

Like the applications that preceded it, the September 27, 2006, which renews the wiretap on the 646 Cellphone and was approved by Judge Cote, establishes probable cause. (See Ex. 3). The affidavit discusses eight calls that had been intercepted on the 646 Cellphone, all of which show that Oruche was using to cellphone to engage in heroin trafficking. (Id. ¶ 14).

Oruche, however, challenges the factual allegations in the affidavit, contending that it "fails to establish probable cause to believe Mr. Oruche was involved in an ongoing narcotics conspiracy." (Oruche Mem. at 35). Yet again, Oruche claims that Agent Arthurton's explanation of certain intercepted calls are incorrect. None of Oruche's arguments, however, overcome the

substantial deference to Judge Cote's decision to renew the wiretap on the 646 Cellphone.

Oruche again complains, for example, that Agent Arthurton has omitted a reference to Oruche's medical supply business from the affidavit.[11]  In particular, Oruche contends that Agent Arthurton failed to include in his description of a call between Oruche and an individual named "Okey"[12] (see Ex. 3 ¶ 14a) additional information from the linesheets supports an innocent, or at least non-drug trafficking, interpretation of the call.  (Oruche Mem. at 29-30).  This information is from a summary at the beginning of the linesheet that reads, "Manny, Okey and Godfather are trying to find someone they can rely on to get some things for them, things for the medical service."  (Id. at 29).  This additional information does not make Agent Arthurton's interpretation of the call misleading or incorrect. First, Oruche ignores the very next sentence of this summary, which is also not discussed in the affidavit, "They are trying to

---

[11]    The affidavit states that the 646 Cellphone is subscribed to "Nicobi Health Care Services, 3682B White Plains Road, Bronx, New York 10467."  (Ex. 3 ¶ 2).

[12]    Yet again, Oruche contends that the Government has not designated an individual who is intercepted speaking to Oruche on a call as a target subject when the Government has, in fact, listed the individual as a target subject in the affidavit. Here, Oruche declares that "Okey is not a target suspect in the investigation."  (Oruche Mem. at 30).  The September 27, 2006 Affidavit, however, declares that Okey is a target subject.  (See Ex. 3 ¶ 2).

be careful so as not to be caught by the law." (Siegel Aff. Ex. H). Oruche has an explanation for the caution exercised by the participants to the call, however, as he asserts they were aware that the Government also suspected Oruche of participating in health care fraud. (Oruche Mem. at 30-31).

Even taking this summary statement (which is the opinion of the person who prepared the linesheet, not an actual statement made by any of the participants to the call) into consideration, however, Agent Arthurton's interpretation of the call as having to do with heroin trafficking remains reasonable. During the conversation, Oruche and Okey discuss, among other things, receiving "six," with Okey stating, "I know the routes of those that use to give me things then, you understand what I mean, but you know . . . what is being searched for now, where people are watched, you don't know who is or isn't watched." (Ex. 3 ¶ 14a).

Later, Oruche asserts that the call summarized in paragraph 14f, in which Oruche discuss a drug mule who died on a plane from having swallowed drugs, does not show that Oruche was involved in a narcotics conspiracy because it does not show a direct connection between Oruche and the deceased courier. (Oruche Mem. at 32-33). This argument is unpersuasive. Oruche's knowledge of the details of the courier's death speaks volumes of about his connection to the courier. During the call, Oruche

stated, "he was on his way to Nigeria and had a heart attack on the plane . . . You know these people . . . I think he ate something before leaving," (indicating that the courier had swallowed drugs) to which an unidentified individual responded, "And if what you said is true, these people will definitely know . . . They'll find out if that's what happened" (indicating that they were concerned about law enforcement discovering the drugs inside the courier), to which Oruche stated "they diverted him to Canada."[13]  (Ex. 3 ¶ 14f).  Later in the same conversation, Oruche and the unidentified individual clearly discuss the sale of narcotics, in which Oruche stated, "It's the same thing . . . It's just that I mashed it up . . . It's the same thing that you gave me that I mashed up, and gave it to them," and then later, "I usually break it up in front of them so they'll know."  (Id.). Agent Arthurton's common sense interpretation of this call is reasonable.

### F.    The Remaining Wiretaps Were Properly Authorized

Oruche contends that the remaining wiretaps should also be suppressed to the extent they (i) rely on any of the evidence he disputes from the August 30, 2006 Affidavit, September 21, 2006 Affidavit, or the September 27, 2006 Affidavit and/or (ii)

---

[13]    The call is corroborated by records that show that just two weeks earlier a plane en route to London had been diverted to Canada because a passenger, who later died, was sick.  An autopsy found approximately 66 balloons containing cocaine in his stomach, approximately 12 of which had ruptured.  (Ex. 3 ¶ 14g).

rely on any calls or evidence obtained as a result of any inappropriately-authorized wiretaps.  Because all the prior wiretaps were properly authorized (and Oruche has failed to show they were not), this argument fails.

G.    **Even if the Orders Granting Wiretapping Authority Were Flawed, They Should Not Be Suppressed Pursuant to the Good Faith Exception**

Finally, even if the orders granting wiretapping authority were flawed, the DEA relied on those orders in good faith and suppression would not be an appropriate remedy.  See United States v. Leon, 468 U.S. 897, 922 (1984).

Wiretap evidence obtained in violation of Section 2518 is subject to suppression under 18 U.S.C. § 2515, which provides for exclusion of such evidence if disclosure "would be in violation of this chapter."  See also 18 U.S.C. § 2518(10) (specifying grounds for suppression).  While the statute thus contains its own exclusionary provisions, several courts have held that the exceptions to the Fourth Amendment's exclusionary rule are equally applicable to these statutory provisions, and that, in particular, the holding of Leon that evidence will not be suppressed if it was obtained in good faith reliance on a search warrant applies equally to motions to suppress evidence obtained under wiretap orders.  See, e.g., United States v. Moore, 41 F.3d 370, 376-77 (8th Cir. 1994); United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988); United States

v. Bellomo, 954 F. Supp. 630, 638 (S.D.N.Y. 1997).  But see

United States v. Rice, 478 F.3d 704 (6th Cir. 2007) (good-faith

exception to exclusionary rule is not applicable to an improperly

obtained warrant for a wiretap).[14]

Accordingly, because there is no reason to question

that the investigating agents relied in good faith on the various

wiretap orders, there would be no reason to suppress any of the

evidence collected, even if the Court, contrary to the

Government's position here, were to find some defect in those

orders.

## II.  Oruche's Motion To Suppress Evidence Seized From Nicobi Healthcare Services Should Be Denied Without A Hearing

---

[14]    The Second Circuit has not yet ruled on this precise issue, however, in United States v. Bianco, 998 F.2d 1112, 1125-26 (2d Cir. 1993), the Court squarely rejected the contention that the statutory exclusionary provisions applicable to wiretap evidence preclude application of identified exceptions to the Fourth Amendment exclusionary rule.  Instead, the Bianco Court held that the holding of Franks v. Delaware, 438 U.S. 154 (1978) — that evidence seized pursuant to a search warrant would not be suppressed on the basis of false statements or omissions in the application, unless they were intentional and material — was equally applicable to wiretaps.  United States v. Bianco, 998 F.2d at 1126; accord United States v. Miller, 116 F.3d 641, 664 (2d Cir. 1997).  The Court's analysis in Bianco strongly suggests that the good faith exception of Leon also applies to wiretaps. The principle articulated in Leon is analogous to the holding of Franks, and serves the same purpose of declining to suppress evidence where suppression would serve no deterrent purpose. Indeed, the Bianco Court specifically cited Leon as one of the exceptions to the exclusionary rule that it had in mind in concluding that Fourth Amendment principles apply to the statutory exclusion provisions relating to wiretap evidence. Bianco, 998 F.2d at 1126.

37

Oruche also moves to suppress all evidence seized from Nicobi Healthcare Services on the grounds that Oruche's consent to law enforcement officers to search the premises was limited to a search for narcotics. The Government disputes that Oruche's consent to search Nicobi Healthcare Services was limited in any way, but even if it were the search and seizure would still have been proper as all of the items were facially connected to Oruche's criminal activity and in plain view. Thus, there is no need to hold a hearing on the issue of the scope of Oruche's consent and his motion should be denied.

## A. Standard for Denial Without a Hearing

As discussed above, _supra_ at 19-20, caselaw is clear that a fact hearing need only be held if "'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" _Watson_, 404 F.3d at 167. No hearing need be held, however, "if [defendant's] papers did not state sufficient facts which, if proven, would have required the granting of relief  requested." _Culotta_, 413 F.2d at 1345.

## B. The Defendant Is Not Entitled to a Hearing

Oruche moves to suppress evidence – namely "seven computers, a MoneyGram terminal, and thousands of pages of documents" – that he contends was unlawfully seized. Oruche Mem.

38

at 2.  Oruche admits that "the agents were lawfully on the premises," and does not attack any aspect of the law enforcement agents' search.  <u>Id.</u>  Rather, Oruche only attacks the seizure of the above-items by the agents.

The Government disputes Oruche's contention that, despite the broadly worded search form he signed, <u>see</u> Siegel Aff. Ex. K, he orally told law enforcement officers that they could only search for drugs.  <u>See</u> Oruche Aff.  However, even if Oruche's statement is taken as true, the seizure of the complained-of items (seven computers, a MoneyGram terminal, and paper documents) would still be lawful as all of these items were in plain view and connected to Oruche's criminal activities.

### 1.  Oruche Is The Only Defendant With Standing To Contest The Seizure Of These Items

Although other defendants have joined in Oruche's motion to suppress the seizure of the above-referenced items from Nicobi Healthcare Services, none of the other defendants have shown that they have standing to challenge that search.  As noted by the Second Circuit, "[a] defendant has no right to have evidence excluded as violative of Fourth Amendment rights unless the rights violated were his own."  <u>United States v. Sanchez</u>, 635 F.2d 47, 63 (2d Cir. 1980).  None of the other defendants have shown that they "own[ed] the premises or property subjected to search" and thus have no standing to challenge the above-items seized.  <u>Id.</u> at 64.

###### 2.    All Of The Complained-Of Items Were In Plain View And Connected To Oruche's Criminal Activity

Evidence of a crime may be seized by law enforcement officers without a warrant when agents are lawfully on the premises, the evidence is in plain view, and "it is immediately apparent that the object is connected with criminal activity." United States v. George, 975 F.2d 72, 78 (2d Cir. 1992). Although there is a factual dispute as to the scope of Oruche's consent, there is no dispute that the consent included entering the premises of Nicobi Healthcare Services and, at the very least, searching for "drugs."  There is also no dispute that the items were in plain view.  Thus, the only legal issue that remains is whether it was immediately apparent to the agents that the items were connected with Oruche's criminal activity.

Indeed, there was ample evidence that each of these seized items was connected to Oruche's criminal activity (namely, the distribution and importation of narcotics, money laundering, and health care fraud).  (Senn Aff. at 3.)  As discussed below, law enforcement had obtained evidence that showed that Oruche had used his MoneyGram terminal, computers, and business itself to conduct drug transactions, money laundering, and health care fraud, among other possible crimes.[15]

---

[15]    With specific regard to the documents seized, Agents did not simply seize all documents from Nicobi Healthcare Services, but sought out those documents or those folders that would bare on the issues of how Oluigbo was using his MoneyGram

As detailed in the complaint against Oluigbo, attached as Government Exhibit 10, agents intercepted wire communications in late September 2006 that revealed Oluigbo, on behalf of Oruche, meeting drug couriers and/or paying them money. (See id. ¶ 8.) During that same time, as discussed in the Senn Affidavit, agents also intercepted calls regarding the transmission of money through Western Union and a MoneyGram terminal relating to this criminal activity:

- On or about September 26, 2006, at approximately 11:26 a.m., Oruche had a conversation with Oluigbo, his employee, in which they discuss a call from Western Union "about [an] unusual/large amount . . . [and] if we got all the money, and if they paid cash." (Senn. Aff. ¶ 12a). Oluigbo then indicates that the amount of money was "Fourteen thousand something." (Id.)

---

Terminal, any accounts Oluigbo was keeping of narcotics transactions, and documents related to the possible health care fraud discussed more fully infra. Furthermore, while agents did not perform an onsite a review of every page they seized, such a review would have been impracticable given the volume of the documents. See Naugle v. Witney, 755 F. Supp. 1504, 1516 (D. Utah 1990) (seizure of entire filing cabinet for later investigation, even though it was later found that bulk of files were personal, was reasonable and less intrusive than requiring agents to remain on premises for days to search it). The Second Circuit has also noted that wide latitude must be given to law enforcement agents in conducting a search for drug ledgers and the likes, as "few people keep documents of their criminal transactions in a folder marked 'drug records.'" United States v. Riley, 906 F.2d 41, 845 (2d Cir. 1990). See also United States v. Sprewell, 1991 WL 113647, No. 89-50571, at *4 (9th Cir. June 26, 1991) (when warrant authorized law enforcement to search for "any talley sheets or pay and owe sheets which tend to establish any narcotics and dangerous drug transactions," it was lawful to search and seize computer because the officer could "reasonable expect to find them within the memory of a computer").

41

- On another call on or about September 29, 2006, at
  approximately 4:30 p.m., another individual called
  "Blessing" tells Oruche that he was "supposed to come
  there and collect," but Oruche responded, "I said not
  everyday cause you know they watch." (Senn. Aff.
  ¶ 12b). Later in that same conversation Oruche says
  "Joe has to be able to watch what he is doing. I don't
  wanna people to charge us for money laundering . . . .
  We have to be very careful with what we do."
  "Blessing" then tells Oruche "I sent it to Moneygram
  and they said that it was held; Western Union held it
  so I can't send this time around. They have to send
  someone near me to come collect the money." (Id.)

- In another conversation on or about November 2, 2006,
  at approximately 10:04 a.m. Oruche tells someone named
  "Emeka": "[T]ell these people, if this thing comes back
  here and they seize their money, nobody should call me
  here and tell me to call Western Union . . . . [I]f
  it's big like that they'll start looking into social
  security and all these things," finally telling Emeka
  "they should break it down." (Senn. Aff. ¶ 12d).

- Subsequent to these conversations, further wire
  intercepts detail problems Olguibo and Oruche were
  having with Western Union "because of fraudulent
  activities on the account," which, based on the
  investigation, Agent Senn understood to mean the
  shutting down of Oruche's Western Union account due to
  suspected fraud and money laundering. (Senn. Aff.
  ¶¶ 12e-f).

Moreover, also as related in the Senn. Affidavit, according to a
representative of Western Union, "Western Union licenses entities
like Nicobi to serve as wire transfer agents . . . [and] such
agents . . . use their own computers in connection with
conducting the Western Union transactions." (Id. at 15-16.)
Although the above detailed specific examples of evidence that
Oruche was using Western Union and his MoneyGram terminal in this
activity, Agent Senn also described that based on his training,

42

experience, and participation in other narcotics investigations, individuals involved in the distribution of narcotics and money laundering commonly have contact information, ledgers, and other documents relating to their business, which they often keep on computers.  (Senn Aff., at 14-15.)

The Senn Affidavit also details the evidence that Oruche and Oluigbo, among others, were engaged in healthcare and Medicare fraud.  (Id., at 16.)  Such evidence included intercepted wire communications between Oruche and others regarding the purchasing of patient information.  (See, e.g., id. ¶¶ 19g, 19h.)  Again, although the affidavit provided specific examples, Agent Senn also described generally that based on his training and experience:

> persons engaged in health care fraud frequently maintain records relating to the fraud, including billing and claim records, payment records, address books and/or personal diaries, rolodexes, calendars, correspondence, memos, receipts, telephone records, bank account and financial information, notes and personal documents, names of coconspirators, and equipment purchase, sale, and delivery records.

(Id. ¶ 20.)

The Senn Affidavit lays out more fully the evidence law enforcement agents had before arresting Oruche and conducting the search of Nicobi Healthcare Services, but given the large narcotics distribution and importation conspiracy with which Oruche was charged, combined with the specific evidence relating Oruche using his business, Western Union, and his MoneyGram

43

terminal in aiding that criminal activity, agents had ample cause to seize this evidence, all of which was in plain view. Furthermore, the concept that one would find evidence of such criminal activity on the computer of someone engaged in such a narcotics conspiracy is hardly novel.  See United States v. Sprewell, 1991 WL 113647, No. 89-50571, at *4 (9th Cir. June 26, 1991) (holding seizure of computer in drug case lawful because "a computer is 'by its very nature a device for recording information'" and "[a]n officer searching for pay-and-owe sheets could reasonably expect to find them within the memory of a computer."); see also United States v. Freeman, 2007 WL 1200110, No. 06-20138, at *6 (D. Kan. Apr. 23, 2007), quoting United States v. Emmons, 24 F.3d 1210, 1216 (10th Cir. 1994) (recognizing that records of transactions are often kept in a variety of digital media).[16]

Finally, the seizure of these items was also

---

[16]    Furthermore, the seizure of the computers for offsite review was also appropriate.  See United States v. Summage, 481 F.3d 1075 (8th Cir. 2007) ("As a practical matter, it is frequently difficult, and often times more intrusive to an individual's privacy, to perform an on-site review of certain items."); United States v. Hill, 459 F.3d 966, 974-75 (9th Cir. 2006) (recognizing that an on-site search of a computer "could take many hours and perhaps days" and "would not only impose a significant and unjustified burden on police resources, it would also make the search more intrusive"); United States v. Henson, 848 F.2d 1374 (6th Cir. 1988) (unreasonable to require law enforcement to sift through "large mass of documents and computer files found in the defendants' office" in mail fraud case).

appropriate given the possibility of destruction of this evidence.  See United States v. Walser, 275 F.3d 981, 984 (10th Cir. 2001) (seizure of computer was reasonable considering impracticability of on-site review and vulnerability of computer to tampering or destruction).  As noted in the Senn Affidavit, Ex. 9, on September 22, 2006, Oruche realized that law enforcement agents were conducting surveillance of Oruche: "The police are following me . . . . There are two cars that've been following me since I left the store."  (Id. ¶ 23.)  Then, Oruche instructs Oluigbo: "Joe, just mind the store.  Remove everything in the store. . . .  Take out your book, take out everything in the store, let me know who is following me here."  (Id.)

All of these facts, which are in greater detail laid out in the search warrant affidavit and complaints described above, led law enforcement agents to the reasonable conclusions that the computers, the MoneyGram terminal, and the documents contained records related to Oruche's narcotics operation and money laundering, and that information within them was relevant to their investigation.  In short, it was immediately apparent that these items were connected to Oruche's criminal activities, and thus even if the Court were to take as true Oruche's statements that his consent was limited to a search of "drugs," (again, which the Government disputes) the seizure of these items was lawful.

45

**C.    Conclusion**

If a hearing were held, the Government would expect testimony from law enforcement agents to support the written consent to search form that Oruche signed – namely, that his consent was not conditioned only upon a search of narcotics (and did not include evidence of drug trafficking activity).  However, given that the items seized were in plain view, law enforcement agents clearly were authorized to be in the premises, and the items were all readily apparent evidence of Oruche's drug trafficking, money laundering, and health care fraud activities, it is not necessary to hold a hearing on this issue, and Oruche's motion to suppress the items seized from this search (and then later searched pursuant to a search warrant) should be denied.

**III. Oruche, Oluigbo, and Osuji's Motions For Further Discovery Should Be Denied**

Defendants Oruche, Oluigbo, and Osuji move for additional discovery.  Some of their requests clearly fall far outside of the Government's discovery obligations and therefore should be denied as meritless.  As for the defendants' remaining requests, the Government will produce the requested materials and therefore the defendants' motions as to those requests should be denied as moot.

**A.    Discovery in the Case**

There is no dispute that the discovery the Government

46

has produced in this case has been substantial.  All defendants
have had, since April 2007, a copy of materials and applications
from the wiretaps in this case (including 19 CDs containing
recorded calls and linesheets), copies of charging documents, and
each defendant's criminal history and post-arrest statements
(produced only to the defendant to whom they pertain).  In months
following, the Government has made supplemental discovery to the
defendants several times, including, among other things, pen
register and cellsite applications, documents seized during
consent searches, search warrants and a supporting affidavit for
computers seized from Nicobi Health Services, and DVDs containing
raw data recovered from the computers.

**B.    Oruche's Discovery Motion Should Be Denied**

Citing no law in support of his motion, Oruche seeks to
compel the Government to produce (i) recordings and linesheets of
conversations intercepted pursuant to wiretaps of telephones
belonging to Chimdi Ibiam and Emmanuel Obi Maduka;[17] (ii) Post-
arrest statements of William Wagabono, Ikechukwu Ojeogwu, and

---

[17]    Both Oruche and Oluigbo request material from the
wiretaps on Ibiam's and Maduka's phones.  In their moving papers,
both Oluigbo and Oruche ignore the Government's letter of August
22, 2007 (which accompanied a supplemental production of
discovery on that date) informing all defendants that materials
from the Ibiam and Maduka wiretaps, including the recorded
communications, linesheets, affidavits, and orders, were
available at the U.S. Attorney's Office for inspection.  (See Ex.
8, Letters dated Aug. 22, 2007 from Jesse Furman to counsel for
Oruche and Oluigbo).

defendant Fomum-Tibah; (iii) photographic and video surveillance of Oruche taken at two locations; (iv) cellsite information for Oruche; and (v) any and all undisclosed statements made by any of Oruche's co-defendants or co-conspirators.  (Oruche Mem. at 37-38; Siegel Aff. ¶ 9).  As discussed below, the Government will produce material in response to requests (i), (iii), and (iv), to the extent it has not already done so and to the extent such materials exist.  Accordingly, his motion should be denied as moot with respect to these items.

Oruche's other requests go beyond the Government's discovery obligations and Oruche provides no authority showing why he is entitled to them.  Rule 16 of the Federal Rules of Criminal Procedure does not require the production of post-arrest or other statements made by a defendant's co-conspirators or co-defendants.  See Fed. R. Crim. P. 16(a).  Moreover, the Government is aware of its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and will produce such material as soon as it becomes aware of any.  The Government also understands its obligations to produce the prior statements of its witnesses pursuant to Title 18, United States Code, Section 3500 and impeachment material for its witnesses pursuant to Giglio v. United States, 405 U.S. 150 (1972).  Oruche has not made showing that he is entitled to these additional materials at this time, and therefore his motion should be denied.

48

### C.    Oluigbo's Discovery Motion Should Be Denied

Oluigbo also moves for discovery.  He seeks (i) recorded prison phone conversations between defendants Fomum-Tibah and Oruche; (ii) transcripts of conversations between Chimdi Ibiam and Emmanuel Maduka, intercepted pursuant to a court-authorized wiretap for the two weeks before and after Fomum-Tibah's arrest; (iii) all evidence regarding any post-arrest statements made by Oluigbo; and (iv) the substance of any statements made by Fomum-Tibah or any other co-defendant regarding Oluigbo.  (Oluigbo Mem. at 6-8).  As noted above, the Government will produce materials, including linesheets and recorded conversations, from the Ibiam and Maduka wiretaps, and to the extent they have already been prepared as part of the Government's trial preparation for the trial of Ibiam and Maduka, any transcripts from the relevant time period.  The Government has already produced a report of Oluigbo's post-arrest statements and considers its discovery obligations complete on that issue.  However, the Government will agree to produce any notes taken by agents interviewing Oluigbo, to the extent they exist.  Accordingly, Oluigbo's motion should be denied as moot with respect to these items.

Oluigbo is not entitled, however, to Fomum-Tibah's prison calls and co-defendant statements, and accordingly they will not be produced and Oluigbo's motion should be denied on

49

those issues.  As noted above, the Government understands its
Brady obligations and is not currently aware of any Brady
material in the requested items.  Should the Government learn of
any Brady material, it will promptly produce it.  The Government
also understands the holding of Bruton v. United States, 391 U.S.
123 (1968), and, to the extent it will seek to introduce at trial
any post-arrest statements made by Oluigbo's co-defendants, it
will address any Bruton issues in an in limine motion.

###    D.    Osuji's Discovery Motion Should Be Denied

            Finally, Osuji requests that the Government be required
to translate and transcribe all intercepted conversations that
are relevant to the charges against him.  (Osuji Mem. at 3-4).
Osuji's request goes beyond the Government's discovery
obligations.  Osuji has already received recordings and
linesheets of all the relevant conversations.  The Government is
also aware that funds are available under the Criminal Justice
Act for Osuji to prepare his own transcripts of these calls,
which he has had since April 2007.  Nonetheless, as part of its
trial preparation, the Government has undertaken to make
transcripts of some of the calls involving the defendants in this
case and has promised to produce those calls as they are
prepared, subject to a stipulation on the use of draft
transcripts.  On December 5, 2007, the Government faxed a letter
and proposed stipulation regarding draft transcripts to all

defendants in this case.  To date, only Oluigbo has returned a signed stipulation to the Government.  The Government will produce its draft transcripts to Osuji once it receives back the stipulation signed by Osuji's counsel.

## IV.  Oruche's Motion For Notice Of 404(b) Evidence Is Premature At This Time

Oruche also seeks notice and discovery of the Government's intent to use any evidence of his prior bad acts under Federal Rule of Evidence 404(b) at trial.  (Oruche Mem. at 38).  Oruche contends that given the length of trial and the need to thoroughly investigate such evidence, the Court should order the defendant to disclose such evidence immediately.  Oruche's motion is premature and should be denied.

Rule 404(b) sets no time limit for the Government to disclose evidence it intends to offer pursuant to the rule.  Such a limitation would be unworkable, because the Government cannot predict whether it will offer such evidence until the proof and the anticipated defenses begin to crystallize as the trial date nears.  See United States v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988).  Indeed, the Second Circuit has approved disclosure of Rule 404(b) evidence as late as several days before, and even during trial, depending on the circumstances of the particular case.  See United States v. Valenti, 60 F.3d 941, 945 (2d Cir. 1995) (notice four days prior to trial sufficient

51

where Government provided documents to defense on same day they were obtained); United States v. Matthews, 20 F.3d 538, 16 551 (2d Cir. 1994) (notice during trial sufficient when balanced against need to avoid indirect disclosure of identity of Government witness).

In the instant case, the Government intends to provide notice of any additional Rule 404(b) evidence it intends to offer no later than two weeks before the beginning of trial. The Government respectfully submits that such notice is more than adequate under the governing law in this Circuit, and that the defendant's motion should therefore be denied.

**V.  Osuji Has Not Shown That A Joint Trial Will Unduly Prejudice Him And A Severance Would Waste Judicial Resources And Create A Duplication Of Efforts**

**A.  General Standard For Severance**

Rule 14 of the Federal Rules of Criminal Procedure, in relevant part, provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or defendants in an indictment . . . or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

A motion to sever is "committed to the sound discretion of the trial court." United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989). Generally, where "defendants . . . are jointly indicted [they] should be jointly tried." United States v.

52

Ventura, 724 F.2d 305, 312 (2d Cir. 1983); United States v.

Feliciano, Jr., 2002 WL 575662, No. 01 Cr. 448, at *4 (S.D.N.Y.

April 16, 2002).  The strong institutional considerations

underlying this settled principle were explained by the Supreme

Court as follows:

> It would impair both the efficiency and the fairness of
> the criminal justice system to require . . . that
> prosecutors bring separate proceedings, presenting the
> same evidence again and again, requiring victims and
> witnesses to repeat the inconvenience (and sometimes
> trauma) of testifying, and randomly favoring the
> last-tried defendants who have the advantage of knowing
> the prosecution's case beforehand.  Joint trials
> generally serve the interests of justice by avoiding
> inconsistent verdicts and enabling more accurate
> assessment of relative culpability — advantages which
> sometimes operate to the defendant's benefit.  Even
> apart from these tactical considerations, joint trials
> generally serve the interests of justice by avoiding
> the scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 209-210 (1987).  See also

United States v. Lyles, 593 F.2d 182, 191 (2d Cir. 1979)

(presumption in favor of joint trials "conserves judicial

resources, alleviates the burden on citizens serving as jurors,

and avoids the necessity of having witnesses reiterate testimony

in a series of trials") (quoting United States v. Borelli, 435

F.2d 500, 502 (2d Cir. 1970)).

A defendant who seeks severance must shoulder an

"extremely difficult burden" of showing that he would be so

prejudiced by the joinder that he would be denied a

constitutionally fair trial.  Casamento, 887 F.2d at 1149.  See

53

also United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993);
Torres, 901 F.2d at 230.  It is insufficient for a defendant
seeking severance merely to show that he may suffer some
prejudice, or may have a better chance for acquittal at a
separate trial.  Torres, 901 F.2d at 230.  Instead, the defendant
must show that he may suffer prejudice so substantial that a
"miscarriage of justice" will occur.  United States v. Friedman,
854 F.2d 535, 563 (2d Cir. 1988).

### B.    Osuji Has Not Shouldered His Burden Of Showing That He Would Be So Prejudiced By The Joinder That He Would Be Denied A Constitutionally Fair Trial

Osuji claims that he will be "unfairly prejudiced if he
is required to file pretrial motions and proceed to trial on the
schedule set by the Court" primarily because of the time Osuji
has spent in the Western District of North Carolina preparing for
another trial.  Osuji Mem. at 1.  However, considering the period
of time Osuji has already had to confer with his attorney and
review discovery, and, most importantly, given the expected
conclusion of his North Carolina case by the end of January,
Osuji will not suffer such severe prejudice so as to require
severance.

The amount of time Osuji has had to communicate with
his lawyer and prepare a trial strategy up until the present has
been substantial.  Osuji was initially presented in this District
on a complaint on February 28, 2007, and was detained.  An

Indictment was returned against Osuji on March 13, 2007, and Osuji appeared before Your Honor on March 23, 2007 for arraignment.  The Government provided all CDs of the wiretapped phone conversations, among other discovery, to Osuji's counsel on April 19, 2007.  Osuji appeared again before Your Honor on June 6, 2007 for a status conference.  It was shortly after that conference that Osuji was removed by the United States Marshals to the Western District of North Carolina, to face charges there. Thus, Osuji was present in this District a little more than three months before being removed, albeit with two different counsel; and had available for review the wiretap CDs for almost two months of that time.

Osuji arrived back in this District on August 22, 2007, and remained here for approximately two weeks before being returned to North Carolina.  While Osuji was in North Carolina, the Government provided a printout of linesheets for the three phones referenced above for which it had already provided the actual calls in April.

According to the Assistant United States Attorney who is assigned to Osuji's case in North Carolina, Osuji's trial there is expected to begin January 7th and continue approximately two weeks.  Thus, it is expected that Osuji's trial will be complete by January 21st, at which time the Government will do everything possible to ensure that Osuji is promptly returned to

55

this District, two full months before trial.  Given the amount of
time Osuji has been able to review discovery before his removal
to North Carolina and the two months Osuji and his counsel will
have after his expected trial there, it would be premature at
this time to sever Osuji from the other defendants, as there
still exists adequate time within which to prepare for trial,
including time necessary to review wiretap evidence.[18]  See
United States v. Simmons, 431 F. Supp. 2d 38, 51 (D.D.C. 2006)
(providing notice of wiretap evidence several weeks before trial,
and providing defendant transcripts and wiretaps fifteen days
before could not be said to prejudice the defendant such that a
severance or adjournment was required).

   **C.   Severing Osuji From His Codefendants Will Waste
         Judicial Resources And Create A Duplication Of Efforts**

        Furthermore, even assuming that a particular defendant
is somehow prejudiced by joinder with a codefendant, the issue
under Federal Rule of Criminal Procedure 14 is not whether there
is any prejudice, but whether that prejudice "is sufficiently

---

[18]    The Government notes that Osuji's North Carolina trial
has been adjourned previously.  However, based on discussions on
January 3, 2008, with the Assistant United States Attorneys in
the Western District of North Carolina in charge of the case
against Osuji, it is not anticipated that the January 7th, 2008
date for his trial will suffer a similar fate.  However, if his
trial is subsequently adjourned for any lengthy period of time,
the Government would reconsider whether it might be appropriate
to sever Osuji's case.  However, at this time, all indicia
indicate that Osuji will have adequate time to prepare for the
March 3, 2008 trial.

severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986) (internal quotation marks omitted).  The presumption in favor of joint trials thus "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials."  Lyles, 593 F.2d at 191 (internal quotation marks omitted); United States v. Corr, 543 F.2d 1042, 1052 (2d Cir. 1976).

Because most, if not all, of the evidence that would be admitted at a joint trial would also be admissible in a separate trial of Osuji, separate trials would result in an enormous duplication of effort, wasting judicial resources.  Moreover, severing Osuji's case would not save any substantial time in either Osuji's or the other defendants' trial.  The Government currently estimates a joint trial against all defendants would last approximately two weeks, and hopefully less depending on whether the parties can agree to certain stipulations that would streamline the Government's proof.  If the trials were severed, the Government does not believe either of the resulting trials would be substantially shorter.

Thus, severing the defendants will waste judicial resources, increase the burden on citizens serving as jurors, and necessitate having witnesses reiterate the same testimony in two,

57

lengthy trials.  Cf. Lyles, 593 F.2d 182, 191 (2d Cir. 1979)
(citing these three issues as the reason for the presumption
against severance).  It would run afoul of the warning of the
Supreme Court in Richardson, 481 U.S. at 210, by impairing the
efficiency of the criminal justice system in requiring
prosecutors to "present[] the same evidence again and again[,] .
. . randomly favoring the last-tried defendants," and facing "the
scandal and inequity of inconsistent verdicts."

       **D.    Conclusion**

       Under these circumstances, severing the trials of Osuji
and his codefendants would be extremely burdensome and would
needlessly disadvantage the public, the Court, and the Government
with lengthy, repetitive trials, and with no lessening of
"prejudice" to Osuji.  Therefore, at least at this time, Osuji's
motion for severance should be denied.


**VI.  Oruche and Osuji's Motion For A Bill Of Particulars Should
       Be Denied**

       **A.    Standard**

       The purpose of a bill of particulars under Rule 7(f) of
the Federal Rules of Criminal Procedure is to "identify with
sufficient particularity the nature of the charge pending against
him, thereby enabling defendant to prepare for trial, to prevent
surprise, and to interpose a plea of double jeopardy should he be
prosecuted a second time for the same offense."  United States v.

<u>Bortnovsky</u>, 820 F.2d 572, 574 (2d Cir. 1987).  However, "if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."  <u>Id.</u>  In exercising its discretion in deciding whether or not to order a bill of particulars, "the court must examine the totality of the information available to the defendant – through indictment, affirmations, and general pre-trial discovery."  <u>United States v. Bin Laden</u>, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000).

A bill of particulars is neither a general investigative tool for the defense, <u>United States v. Salazar</u>, 485 F.2d 1272, 1277-78 (2d Cir. 1973), not a device to compel disclosure of the Government's evidence prior to trial, <u>see, e.g.,</u> <u>United States v. Gottlieb</u>, 493 F.2d 987, 994 (2d Cir. 1974).  In particular, the Government is not required to disclose:

- The manner in which it will attempt to prove the changes (<u>United States v. Wilson</u>, 565 F. Supp. 1416, 1439 (S.D.N.Y. 1983), <u>disagreed with on other grounds by</u> <u>United States v. Reed</u>, 773 F.2d 477 (2d Cir. 1985));

- The precise manner in which the crimes charged in the indictment were committed (<u>United States v. Andrews</u>, 381 F.2d 377, 377-78 (2d Cir. 1967)); or

- Information that would, in effect, provide the defendant with a preview of the Government's case before trial (<u>United States v. Simon</u>, 30 F.R.D. 53, 55 (S.D.N.Y. 1962)).

**B.    Osuji Has Been Provided Sufficient Information To Prepare His Defense**

The complaint and indictment against Osuji coupled with the discovery that has been provided in this case has provided more than sufficient information such that Osuji can prepare his defense for trial. Osuji is charged only in one count of the superseding indictment. That count charges Osuji, for the limited time period of December 2006, with conspiring to violate the narcotics laws by distributing and possessing with the intent to distribute 500 grams or more of cocaine. Siegel Aff. Ex. B.

Previous to the indictment, however, a complaint was filed against Osuji on February 20, 2007. Osuji Compl., attached as Gov't Ex. 11. This complaint details evidence that gives Osuji sufficient information to prepare for his trial including details of the following intercepted wire communications:

- a call on December 19, 2006, in which a co-conspirator (later identified in the indictment as codefendant Emmanuel Oruche), discussing the availability and price of cocaine (id. ¶ 7c);

- a call later in the day on December 19, 2006, in which Osuji and Oruche talk about Osuji having brought four bricks of cocaine to Oruche on a previous day (id. ¶ 7d); and

- multiple calls between Osuji and Oruche on December 20, 2006, in which they discuss a potential buyer for cocaine (id. ¶ 7e).

Osuji has also been provided with extensive discovery in this case – and, in particular, recordings of those phone conversations. Although defense counsel for Osuji has not signed

60

stipulations relating to his use of draft transcripts from these calls, as soon as that stipulation is signed, the Government will begin providing such transcripts to Osuji as well.  Such disclosures, along with the Government's other discovery under Rule 16,  have apprised Osuji with precise details of the conduct for which he has been indicted, and thus Osuji's motion for a bill of particulars should be denied.

**C.    Defendant Oluigbo Has Been Provided Sufficient Information To Prepare His Defense**

As discussed above, Oluigbo was also charged in a complaint in this case (Oluigbo Compl., Ex. 10).  That complaint goes into great details about two different drug couriers that Oluigbo was supposed to meet and/or pay, including:

- statements of a drug courier, codefendant Rebecca Ambo Fomum-Tibah, who said that Oluigbo was supposed to pick her up from the airport on August 9, 2006 (<u>id.</u> ¶ 6);

- a call on September 30, 2006, regarding the arrival of another drug courier, codefendant (and fugitive) Cosme Frederic Tiburce Jemy, followed by a call later that morning between Oluigbo and codefendant Emmanuel Oruche in which Oluigbo complains to Oruche about taking out $10,000 from the bank because he would have to fill out papers (<u>id.</u> ¶ 8c);

- more calls later that same day between Oruche and Oluigbo regarding Oluigbo's meeting with Jemy and his payment of money to Jemy (<u>id.</u> ¶ 8e-f); and

- additional calls in October and November 2006, where Oruche discusses Oluigbo's payment to Jemy (<u>id.</u> ¶ 8g).

Furthermore, the indictment provides even more detail for Oluigbo.  Oluigbo is named in two counts in the Indictment -

61

Counts 3 and 4.  Count 3 charges Oluigbo with conspiracy to
possess with the intent to distribute and to distribute more than
1 kilogram of heroin, and Count 4 charges Oluigbo with conspiracy
to import more than 1 kilogram of heroin.  Oluigbo's precise role
in this conspiracy is described in the indictment in that Oluigbo
"directly assisted Oruche and would provide assistance to
couriers upon arrival in the United States."  Siegel Aff. Ex. B.
This mirrors the allegations in the complaint against Oluigbo in
helping to pay and pick up the two drug couriers Fomum-Tibah and
Jemy.

     The complaint and indictment, which provide Oluigbo on
their sufficient information from which to prepare a defense for
trial, is further illuminated by the discovery provided to
Oluigbo – including the recordings of the calls referenced in the
complaint and the indictment.  As defense counsel for Oluigbo has
in fact signed a stipulation with regards to the draft
transcripts of these calls, these transcripts will be provided to
defense counsel shortly.  All of this information is sufficient
to allow defense counsel to prepare for trial.

     The other information requested by Oluigbo goes far
further than is required to prepare an adequate a defense.  For
example, defense asks for: "Where, when, and under what
circumstances Mr. Oluigbo agreed to join the conspiracy . . . .";
All acts that the government alleges Mr. Oluigbo took in

62

furtherance of the conspiracy"; and "All other facts relevant to Mr. Oluigbo's involvement in the alleged conspiracy." However, as noted above, defense is not entitled to a preview of the Government case or the precise manner in which the crimes alleged in the indictment were committed. Simon, 30 F.R.D. at 55; Andrews, 381 F.2d at 377-78. Furthermore, the Government could not provide at this point the wiretap conversations that it intends to introduce at trial against Oluigbo because, two months before trial, it has not selected those what conversations it will seek to introduce. However, according to its usual practice, the Government will make this disclosure shortly before trial.

Finally, defense counsel asks the Government to name unindicted co-conspirators. The decision whether to grant defendant's request to name unindicted co-conspirators rests "with the sounds discretion of the Court." United States v. Nachamie, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000). As with other requests included in a bill of particulars, courts should consider whether the defendant has been given adequate information to prepare his case for trial. Bortnovsky, 820 F.2d at 574. However, in the case of naming unindicted co-conspirators, courts must also consider "potential harm to the Government's investigation." Nachamie, 91 F. Supp. 2d at 572. Naming unindicted persons may tip off those individuals into

63

continuing investigations.

In this instance, all of the names of the co-conspirators specifically identified in the complaint are known to defense counsel through either the Oluigbo Complaint, Osuji Complaint, or wire affidavits in this case. However, if there are any identified co-conspirators (e.g. "CC-1") for which defense counsel is not sure of, the Government would be happy to identify them. However, the Government objects to identifying any possible co-conspirators that any of the defendants had as there are still outstanding investigations and such identifications would threaten those investigations.

## CONCLUSION

For the reasons discussed above, defendants motions should be denied.

Dated:    New York, New York
          January 3, 2008


                        Respectfully Submitted,

                        MICHAEL J. GARCIA
                        United States Attorney


                   By:   /s/ Michael M. Rosensaft
                        Joseph Facciponti
                        Michael M. Rosensaft
                        Assistant United States Attorneys
                        (212) 637-2366


                        64