UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING OVER A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (646) 533-8587, WITH INTERNATIONAL MOBIL SUBSCRIBER IDENTITY NUMBER 316010013940954 | AFFIDAVIT IN SUPPORT OF APPLICATION FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS |

STATE OF NEW YORK              )
COUNTY OF NEW YORK             : ss.:
SOUTHERN DISTRICT OF NEW YORK  )

ANDREW ARTHURTON, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states:

### INTRODUCTION

1.    I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code.  I have been employed as a special agent for the DEA for approximately four years.  Since becoming a Special Agent with the DEA, I have conducted numerous investigations of unlawful drug distribution and importation in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960 and 963, and have

conducted or participated in wire and physical surveillance,

surveillance of undercover transactions, the introduction of

undercover agents, the execution of search warrants, debriefings

of informants and reviews of taped conversations and drug

records.  Through my training, education and experience, I have

become familiar with the manner in which illegal drugs are

transported, stored, and distributed and the methods of payment

for such drugs.

2.    I submit this Affidavit in support of an application

for an Order pursuant to Section 2518 of Title 18, United States

Code, authorizing the interception and recording of wire

communications over a cellular telephone assigned call number

(646) 533-8587, which is a cellular telephone with service

provided by Sprint Nextel, subscribed to Nicobi Health Care

Services, 3682B White Plains Road, Bronx, New York 10467, with

International Mobil Subscriber Identity ("IMSI") number

316010013940954 and UFMI number 173*109485*1 (the "TARGET

CELLPHONE"), and any telephone number(s) subsequently assigned to

or accessed by or through the same IMSI number as the TARGET

CELLPHONE, or assigned to the instrument bearing the same IMSI

number as the TARGET CELLPHONE, as well as any IMSI number or

Electronic Serial Number ("ESN") subsequently assigned to the

2

instruments bearing the same telephone number assigned to the

TARGET CELLPHONE; concerning offenses enumerated in Title 18,

United States Code, Section 2516, that is: offenses involving the

importation, distribution, and possession with intent to

distribute, of controlled substances; the use of wire facilities

to facilitate the same; conspiracy to do the same and attempts to

do the same, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952,

960, and 963 (the "TARGET OFFENSES").[1]  I believe that the TARGET

OFFENSES have been committed, are being committed, and will

continue to be committed by EMMANUEL ORUCHE, CHIMDI O. IBIAM,[2]

ASAGA UGBO, and others as yet unidentified (the "TARGET

SUBJECTS").  The requested Order is sought for a period of time

until the interception fully reveals the manner in which the

above-named individuals and their confederates participate in the

above-described offenses, or for a period of thirty (30) days,

whichever occurs first, pursuant to Title 18, United States Code,

Section 2518(5).  Pursuant to Section 2518(5) of Title 18, United

---

[1]  Additionally, although not a predicate offense under 18 U.S.C. § 2516, I believe that the TARGET SUBJECTS (as defined below) have aided and abetted and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

[2]  As discussed below in paragraph 41, Target Subject CHIMDI O. IBIAM was arrested on or about August 22, 2006.  Because he was a participant in the TARGET OFFENSES and because he may continue to communicate with the TARGET CELLPHONE notwithstanding his arrest, he is included as a Target Subject.

States Code, it is further requested that the time set forth in the order run from the date on which interception is first conducted, or ten days after the date on which this Court signs this order, whichever is earlier.

3.   I have personally participated in the investigation of the offenses referred to in paragraph 2, and make this Affidavit based on my personal participation in this investigation, and based on reports made to me by other agents and by other law enforcement authorities.  Except where otherwise noted, the information set forth in this Affidavit has been provided to me by other law enforcement officers who have assisted in the investigation.  Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the statement was made by another law enforcement officer or other person (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others and are stated in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly

4

or indirectly through other law enforcement officers who conducted such surveillance.

4.    Because this Affidavit is being submitted for the limited purpose of securing an Order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date.  Facts not set forth herein are not being relied on in reaching my conclusion that an Order should be issued.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an Order authorizing the interception of wire communications.  Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate the following:

**SUBJECTS AND OFFENSES**

5.    As set forth below, I believe that the TARGET SUBJECTS have committed, are committing, and will continue to commit the following offenses: importation, distribution, and possession with intent to distribute, of controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same; and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963.[3]

_____

[3]    Additionally, as mentioned above, although not a predicate offense under 18 U.S.C. § 2516, I believe that the TARGET SUBJECTS have aided and abetted and are aiding and abetting those

5

## THE DESIGNATED TELEPHONE

6.    There is probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE has been using, is using, and will in the future use the TARGET CELLPHONE to facilitate, accomplish, and to commit the above-described offenses.

7.    I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack.  The cellular telephone system divides the New York City and other metropolitan area into many small coverage areas, which are called "cells."  As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed.  Each portable cellular telephone that does not contain party lines bears a unique electronic number called an ESN and an assigned telephone number. It is requested that interception be permitted over any changed

_____

substantive offenses, in violation of 18 U.S.C. § 2.

6

23

telephone numbers subsequently assigned to the above-listed IMSI
for the TARGET CELLPHONE.

    8.   Because of the mobility of portable cellular
telephones, pursuant to Title 18, United States Code, Section
2518(3), authorization is requested for interception of wire
communications both within the Southern District of New York,
and, in the event the TARGET CELLPHONE is transferred outside the
jurisdiction of this Court, in any other jurisdiction within the
United States.  In addition, it is requested that background
conversations, in the vicinity of the TARGET CELLPHONE while it
is off the hook or otherwise in use, also be permitted to be
intercepted.

    9.   It is anticipated that TARGET SUBJECT EMMANUEL ORUCHE
will use the TARGET CELLPHONE to communicate to and from the
Southern District of New York, as well as other locations.  This
belief is supported by the facts described below.  In any event,
pursuant to United States v. Rodriquez, 968 F.2d 130 (2d Cir.),
cert. denied, 506 U.S. 847 (1992), a Court in the Southern
District of New York is empowered to issue an Order for the
interception of wire communications over telephones located in
other districts, as long as the interceptions of these

7

communications are first heard in the Southern District of New York.

10.   In connection with the telecommunication company which provides the service for the TARGET CELLPHONE, all interceptions over the TARGET CELLPHONE will automatically be routed to New York, New York, regardless of where the telephone calls are placed to or from.   Accordingly, all interceptions will first be heard in the Southern District of New York.   During the requested wire surveillance, all monitoring will be performed in New York, New York, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including law enforcement officers with the DEA, and Government employees or individuals operating under a contract with the Government, including, if necessary, translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception, and specifically under the supervision of law enforcement officers from the DEA.

## OBJECTIVES

11.   There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal:   (i) the nature, extent and methods of operation of the narcotics activities of the TARGET SUBJECTS; (ii) the identities of the TARGET SUBJECTS,

8

their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of narcotics, contraband, and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities; and (vii) the locations and disposition of the proceeds from those activities. In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses.

### PRIOR APPLICATIONS

12. I have been informed that reviews have been conducted of the electronic surveillance files of the Drug Enforcement Administration, Immigration and Customs Enforcement and the Federal Bureau of Investigation.[4] Based on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS, or over the facilities or places named herein, with the exception of the following:

---

[4] A check of DEA, ICE and FBI files was completed on or about August 25, 2006.

9

a.  An order dated May 25, 2006, signed by the Honorable Naomi Reice Buchwald, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by Target Subject CHIMDI IBIAM (the "Ibiam Phone").  Interceptions pursuant to that order began on May 26, 2006, and ended on June 23, 2006.

b.  An order dated June 23, 2006, signed by the Honorable William H. Pauley III, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30 day-period. Interceptions pursuant to that order began on June 23 and ended on July 21, 2006.

c.  An order dated July 21, 2006, signed by the Honorable Richard J. Holwell, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30-day period. Interceptions pursuant to that order began on July 21 and ended on August 22, 2006.

d.  An order dated August 7, 2006, signed by the Honorable Stephen C. Robinson, United States District Judge, Southern District of New York for a New York cell phone number used by EMMANUEL OBI MADUKA, aka "Mazu" (the "Maduka Phone").

10

27

Target Subject Chimdi Ibiam was intercepted over the Maduka Phone. Interceptions pursuant to that order began on or about August 7, 2006, and ended on or about August 23, 2006.

## I. THERE IS PROBABLE CAUSE TO BELIEVE THAT TARGET SUBJECTS ARE USING AND WILL CONTINUE TO USE THE TARGET CELLPHONE IN FURTHERANCE OF THE TARGET OFFENSES.

13. As set forth below, there is probable cause to believe that the TARGET CELLPHONE is being used in furtherance of narcotics trafficking activities involving the importation of heroin into the United States from Nigeria.

14. Based on an ongoing investigation, EMMANUEL ORUCHE, the user of the TARGET CELLPHONE, has been identified as a member of a drug organization that brings heroin from Pakistan, through countries in Africa, and to the United States for ultimate distribution.

### The Identification of ORUCHE as the Recipient of Heroin Brought from West Africa

15. On December 5, 2003, Immigration and Customs Enforcement ("ICE") agents arrested a heroin courier named William Wagabono, as he arrived in the United States at Newark International Airport. Wagabono gave statements following his arrest. According to Wagabono, the heroin he was carrying was

11

intended for an individual he knew as "Emmanuel" or "Manny" who drove a white Lexus. ICE agents retrieved registrant information for all white Lexus cars in New York registered to individuals named "Emmanuel." Based on that search, ICE agents obtained a photograph of Emmanuel Oruche, which Wagabono subsequently identified as "Emmanuel"/"Manny" to whom he was supposed to deliver heroin. Wagabono further said that he was paid to transport suitcases from Uganda to Newark via England on four previous occasions, and that "Manny" was the recipient of the heroin each time.

16. Two days after Wagabono's arrest, on or about December 7, 2003, agents attempted a controlled delivery to the Crown Motor Inn in Newark, NJ, where Wagabono was supposed to meet ORUCHE. ORUCHE was observed by law enforcement agents conducting surveillance in the area and, perhaps sensing that he was being watched, ORUCHE left the area and did not meet with Wagabono.

17. From speaking to one of the ICE agents who handled the Wagabono case, I understand that Wagabono was prosecuted in the District of New Jersey, where he cooperated and has been sentenced. He is scheduled to be released from prison in the near future.

12

29

## Interceptions Over the Ibiam Phone

18.  As indicated in the Prior Applications section above, in late May 2006, law enforcement agents began Court-authorized interceptions over the Ibiam Phone, based on probable cause to believe that the Ibiam Phone was being used in furtherance of drug-trafficking activities.  The probable cause included, among other things, evidence that Ibiam was the intended recipient of heroin being sent from Pakistan to the United States.

19.  The interceptions confirmed that the Ibiam Phone was used in furtherance of drug-trafficking activities and that Ibiam was an individual responsible for meeting couriers carrying heroin, and a middleman for heroin transactions.

20.  During the course of the wiretap, agents intercepted calls regarding the travel of a courier who brought heroin from Nigeria to New York.  Some of those calls are summarized below.[5] As described in more detail below, the courier was arrested upon entering the United States.  During a post-arrest interview, the

---

[5]    Because the intercepted calls have taken place primarily in Igbo, a Nigerian language, the summaries set forth herein are based on translations prepared by individuals proficient in that language.  Translations are preliminary and are subject to modification.  Quoted portions are not necessarily exact quotes, but are the sum and substance of the calls according to the monitoring agent or translator.  My interpretations of some terms used are indicated in parentheses or are otherwise noted.

13

courier admitted to swallowing 60 pellets totaling approximately 1 kilogram, gross weight, of heroin. The courier also told agents that he was supposed to give the heroin to his "uncle," EMMANUEL ORUCHE, and provided law enforcement agents with the number of TARGET CELLPHONE, which he indicated was ORUCHE's phone. While the courier provided helpful information to law enforcement, he was not yet believed to be fully forthcoming. While he may provide fuller information after subsequent meetings, those meetings have not yet happened. He is not at this time signed up as a cooperator.

### The Calls Intercepted Over the Ibiam Phone

21. On May 30, 2006, at approximately 7:43 p.m., CHIMDI IBIAM received a call from FNU LNU, aka "Mazzi," in Nigeria. Mazzi told IBIAM that there was "something" he needed IBIAM "to do." Mazzi said to IBIAM: "The person that left on Thursday to get there on Saturday, will you do me the favor in it?" Based on subsequent calls and the arrest of a drug courier, described more fully below, I believe that "the person" referred to the drug courier, and "there" referred to New York. Mazzi further told IBIAM that "he" – the courier – "will arrive in New York. When he does, you take him to your place, then decide who to give 'it' (drugs) to." Mazzi then asked IBIAM to get him a New York

14

number, so "we can give the guy (the courier) in case, you know who they ask where one visitor the country is going and a number to reach you at? When you get the number, you hold on to it in case they ask then you can say you are 'James,' you understand?" In other words, Mazzi asked IBIAM to get a New York number that the drug courier could present as the number of his contact in New York, "James," in case he was questioned by airport personnel. Mazzi told IBIAM that the number would be just for "the deal date." Mazzi then told IBIAM that "he," the courier, was coming in on Friday, at "about 1." Mazzi then asked "So how will we do it?" IBIAM responded, "Give me tomorrow. Let me call you, let me find a phone or I'll buy one and give you the number." The call was cut off. In a subsequent call immediately thereafter, IBIAM told Mazzi that he would get the New York number to Mazzi "by Thursday evening" (June 1, 2006).

22. On May 31, 2006, at approximately 11:03 a.m., IBIAM spoke with Mazzi. IBIAM told him, "I'm gonna come from my city and go where we discussed and pick up the man and come to my city," meaning that IBIAM was going to go to Baltimore to New York to pick up the drug courier. IBIAM said that he would "take the man to my place first," and then asked, "what city am I

15

32

dropping him?," meaning where was he taking the courier. Before
Mazzi could answer, IBIAM said that "he," the courier, would
"just stay at my house until you decide what you want to do."
Mazzi said that "there are two of them," i.e., two drug couriers,
but then said, "Just one person is coming ... but I'll give both
of them the number... One is leaving tonight ... tomorrow morning
... but I'll give him the same number ... for that one you don't
need to do anything... that one is gonna be in a hotel." Mazzi
further said that "it" - giving the other drug courier the New
York number - was "just in case. You never know. You know
people watch ... they look at you and ask you where are you
going/what are you up to?"

    23. At approximately 6:40 p.m., IBIAM spoke with ASAGA
UGBO, who was using a Maryland phone number. IBIAM asked UGBO,
"Have you gotten my phone?" - that is, the phone that IBIAM
needed to provide to Mazzi in Nigeria. UGBO told IBIAM that he
could not get the phone until the next day. IBIAM told UGBO that
it was "important" to him, and UGBO responded, "Don't worry I
will get it for you."

    24. On June 1, 2006, at approximately 12:29 p.m., IBIAM
spoke with the Mazzi in Nigeria. IBIAM told Mazzi that "these

16

people I sent on this errand, they went and bought a card number," even though IBIAM had "said to buy a phone. Buy a phone and he went and bought a card number." Mazzi said, "I don't want this boy (meaning the drug courier) to come there (New York) now. This boy is on his way to the airport, and I asked him to call me when he gets there. If he gets to the airport in Port Harcourt, boards the plane, and has a problem then? What if he asks about what to do?" IBIAM said, "If you want you can give him my number. When he gets to Europe he'll call me and I will then give him the number. What do you think?" Later in the conversation, IBIAM told Mazzi that he would "do it for you" – i.e., he would get the New York phone number himself. Mazzi said, "So there's no need to talk more about this, what do we do? This boy is on his way to the airport." IBIAM said, "before he calls you at the airport let me know what I will do, I will call you back ... let me know what I will do." Mazzi responded, "Okay."

25. On the afternoon of June 2, an individual named Ikechukwu Ojeogwu who had flown in from the Port of Harcourt, Nigeria, to JFK, through Frankfurt, was stopped by customs inspectors at JFK. In the course of subsequent questioning,

17

34

Ojeogwu admitted to swallowing heroin pellets. He is being prosecuted in the Eastern District of New York. As mentioned above, during a post-arrest statement Ojeogwu gave law enforcement agents the number of the TARGET CELLPHONE as well as ORUCHE's name, and indicated that this was the individual to whom he was to deliver the heroin he was carrying. (Ibiam is believed to have been designated to play the role of a middleman.)

26. At approximately 10:31 p.m. on June 2, IBIAM called Mazzi in Nigeria. IBIAM told Mazzi that "the person I came for," meaning the drug courier, "didn't come in." IBIAM further said that "No one knew if something happened, he hasn't come in." Mazzi said, "I thought you went to pick someone up." IBIAM said, "I did, but he didn't arrive."

27. In addition to the above calls relating to the drug courier, ORUCHE himself was intercepted at least once (using the TARGET CELLPHONE) on the wiretap of the Ibiam Phone. Specifically, on July 14, 2006, at approximately 12:38 p.m., IBIAM spoke with EMMANUEL ORUCHE (who was using the TARGET CELLPHONE). During the conversation, ORUCHE asked IBIAM about "Ide." When IBIAM asked him "Who?," ORUCHE clarified: "Ide Asaba." ORUCHE asked, "Has he gone home?" IBIAM responded that

18

he was "around." ORUCHE asked IBIAM to tell Ide to call him "so
that I can see if he will go there next week," meaning to
Nigeria. ORUCHE further said, "So I can give him a ticket
(meaning a ticket to travel) to bring that 'thing,'" meaning
drugs. Later in the conversation, ORUCHE asked again about Ide's
whereabouts: "Is Ide in Baltimore, or did he travel?" IBIAM
repeated, "He is around," and then said, "When you come then you
guys will discuss face to face." ORUCHE said that he would call
IBIAM the next day. (To my knowledge, no call from ORUCHE to
Ibiam over the Ibiam Phone was intercepted the next day.)

### The Arrest of Heroin Courier Rebecca Ambo Fomum-Tibah

28. On or about August 9, 2006, Rebecca Ambo Fomum-Tibah
was selected for a Customs examination by officers of U.S.
Customs and Border Protection ("CBP") as she arrived at John F.
Kennedy International Airport in Queens, New York ("JFK Airport")
aboard a flight from Istanbul, Turkey. During questioning by the
officers, Fomum-Tibah was unable to provide concrete information
regarding, among other things, who she had visited in Turkey and
where she was staying in New York. Her ticket had been purchased
two days before her trip with $1,600 in cash, and a records
search revealed that Fomum-Tibah had traveled to Istanbul three

19

other times in 2006.  Following the questioning, Fomum-Tibah was presented with an x-ray consent form, which she refused to sign because, according to her, "x-rays are not safe," and she had been subjected to six x-rays already that year.

29.  Fomum-Tibah was then taken by the CBP officers to the medical facility at JFK Airport for a monitored bowel movement. Fomum-Tibah subsequently passed approximately 16 pellets, one of which field tested positive for the presence of heroin.  A vaginal insert also dropped from the defendant, which also field tested positive for the presence of heroin.

30.  Fomum-Tibah was again presented with an x-ray consent form, which she read, appeared to understand, and signed.  An x-ray was subsequently taken of Fomum-Tibah's intestinal tract, which indicated the presence of foreign bodies.  The total amount of heroin recovered from Fomum-Tibah was approximately 1,341 grams, net weight.

31.  Fomum-Tibah was placed under arrest.  Among the items in her possession were a driver's license bearing the name and photograph of EMMANUEL ORUCHE, as well as a business card in his name.  Fomum-Tibah later made statements to law enforcement agents, stating, among other things, that the heroin she was

20

37

carrying was to be delivered to ORUCHE, who was her boyfriend, that she was sent on his behalf to Istanbul to get the heroin, and that ORUCHE works in the drug business for two unidentified individuals in Detroit.  Fomum-Tibah is being prosecuted in the Eastern District of New York.

C.    **TOLL ANALYSIS OF THE TARGET CELLPHONE**

32.    In connection with this investigation, I have analyzed toll records on the TARGET CELLPHONE, obtained pursuant to administrative subpoenas during the period from on or about July 17, 2006, to on or about August 8, 2006 (the "Covered Period"). These toll records further establish probable cause to believe that the TARGET CELLPHONE has been used to further narcotics activity.

33.    During the Covered Period, the TARGET CELLPHONE was in contact approximately six times with phone number (443) 854-7531, used by Target Subject ASAGA UGBO (the "UGBO phone").  The most recent contact with the UGBO number during the Covered Period was on or about August 5, 2006.  I believe that the UGBO phone is used in furtherance of drug trafficking activities based on intercepted calls between the UGBO phone and the IBIAM phone on or about August 1 and 2, 2006.  During those calls UGBO told

21

IBIAM that he had arrived in New York and was heading to "LaGuardia" (LaGuardia Airport in New York), where he appears to have picked up a traveler coming from Nigeria, whom I believe, based on this investigation, was a heroin courier.  According to one of the calls, UGBO planned to return "home" (to Maryland) after the pick up.  However, according to the last call, UGBO appeared to run into problems at the airport, saying that "things are somehow weird."

34.  During the Covered Period, the TARGET CELLPHONE was in contact approximately five times with four different telephone numbers in Nigeria.  The most recent contact during the Covered Period between the TARGET CELLPHONE and a Nigerian number was on or about August 3, 2006.  Contacts with Nigerian numbers are significant to this investigation because in the course of this investigation heroin couriers have traveled from Nigeria and other West African countries to the United States with drugs.

## II.  ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR UNLIKELY TO SUCCEED IF TRIED AND THUS THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS

35.  The principal goals of this investigation are to identify, locate, and arrest persons responsible for the importation and distribution of narcotics.  The investigation to

22

date has produced some evidence against the TARGET SUBJECTS concerning their involvement in the importation and distribution of cocaine and heroin.  As discussed above, however, the principal goals of this continuing investigation are to identify and develop evidence against not only the currently identified TARGET SUBJECTS, but also all of their suppliers, distributors, customers and associates, as well as the locations at which the TARGET SUBJECTS store narcotics and the methods by which they operate their narcotics trafficking business.  As a result of the facts set forth above, and as indicated below, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives:

**SURVEILLANCE**

36.  The wiretaps of the Ibiam Phone and the Maduka Phone were useful in advancing the investigation into the drug-trafficking activities of IBIAM, MADUKA and their criminal associates.  However, these wiretaps do not negate the need for a wiretap on the TARGET CELLPHONE.  First and foremost, IBIAM and MADUKA have both been arrested, so interceptions of their phones have ended.  In addition, ORUCHE was not intercepted on the

23

Maduka Phone and was intercepted over the IBIAM phone only a few times.

37.    Moreover, pure physical surveillance, without the wiretap, would not be possible to accomplish the goals of this investigation based on the geographical breadth of this organization, including couriers who travel from Africa and elsewhere with heroin.  Although agents may be able to conduct some physical surveillance of ORUCHE himself, pure physical observation, without wire surveillance, would not be likely to advance the investigation, as the purpose of a TARGET SUBJECT's visit to a location or in-person meeting with another individual would not be known.  With the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, with the knowledge of the purpose and nature of the meeting.  Wire surveillance would also minimize the risks of discovery inherent in following subjects or remaining at target locations for extended periods of time.

### TELEPHONE RECORDS

38.    Telephone toll records, although they have been used in this investigation, provide only limited information; these

24

41

methods do not enable the DEA to identify with certainty the persons involved in committing the TARGET OFFENSES. Among other problems, a telephone number appearing in the records may not be listed or subscribed in the name(s) or address(es) of the person(s) using the telephone. Indeed, in this investigation, at least some of the individuals with whom the TARGET CELLPHONE has been in contact cellular telephones with no subscriber information or false subscriber information. In addition, many phone numbers in contact with the TARGET CELLPHONE are numbers from other countries. Subscriber information for such numbers are not readily available to United States law enforcement authorities. It is only through intercepting calls into and out of the TARGET CELLPHONE that we have been able to gain any understanding as to the identity of the individual in contact with IBIAM, and that individual's role in the drug-trafficking organization.

## FEDERAL GRAND JURY

39.  Use of a federal grand jury does not appear to be a promising method of investigation. The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to

25

42

the pendency of this investigation.  Witnesses who could provide
additional relevant evidence to a grand jury have not been
identified or would themselves be participants in the narcotics
trafficking.  Such individuals would face prosecution themselves;
it is unlikely therefore that any of them would testify
voluntarily.  Nor would it be desirable at this time to seek
immunity for such individuals and to compel their testimony.
Immunizing them could thwart the public policy that they be held
accountable for their crimes.  Moreover, it is likely that such
subjects would go into contempt rather than testify.  The
issuance of grand jury subpoenas to other individuals likely
would not lead to the discovery of critical information and
undoubtedly would alert the TARGET SUBJECTS to the pendency of an
investigation.  Moreover, not all of the TARGET SUBJECTS have
been identified and, in the absence of further evidence
identifying co-conspirators and their respective involvement in
drug trafficking, it is difficult to determine whom to subpoena
to the Grand Jury.

## WITNESS INTERVIEWS

1.  Based upon my experience, I believe that interviews of
the TARGET SUBJECTS or their known associates - even if such

26

43

interviews were possible, which, at this time, they are not, would produce insufficient information as to the identities of all of the persons involved with the TARGET SUBJECTS in narcotics trafficking, the source of the drugs, the sources of financing, the location of records and drugs, and other pertinent information regarding the TARGET OFFENSES.  I also believe that any responses to the interviews would contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation.  More importantly, questioning any of the co-conspirators would alert the other co-conspirators, and cause a change in their methods of operation before all of the co-conspirators are identified, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to cooperating sources whose identities may become known or whose existence may otherwise be compromised.

## USE OF CONFIDENTIAL INFORMANTS and COOPERATING WITNESSES

41.  On or about August 22, 2006, IBIAM was arrested.  On or about August 23, 2006, EMMANUEL OBI MADUKA, aka "Mazu," who is an organizer or leader of the organization in Detroit, Michigan, was arrested.  IBIAM made some post-arrest statements, but ha

27

44

indicated through his attorney that he is not interested in cooperating further. MADUKA made no post-arrest statements and has given no indication that he is interested in cooperating. Because of their lack of cooperation, their arrests cannot advance the investigation proactively or provide information on ORUCHE.

42. The investigation to date has also involved the arrest of three heroin couriers, all of whom gave statements to law enforcement witnesses describing ORUCHE's drug-trafficking activities. Waganobo admitted he was supposed to deliver heroin to ORUCHE in December 2003, and attempted a controlled delivery of the heroin. Ikechukwu Ojeogwu also admitted in early June 2006, after being arrested at JFK Airport, to bringing in heroin that he was supposed to deliver to ORUCHE. Finally, earlier this month, Rebecca Ambo Fomum-Tibah stated that she had brought heroin to deliver to ORUCHE after she was arrested at JFK Airport with heroin. While the information from these couriers has confirmed ORUCHE's involvement in drug-trafficking activities, there is still a need for interceptions over the TARGET CELLPHONE. Neither Ojeogwu nor Fomum-Tibah are signed up cooperators at this time. Although they may be signed up in the

future, there is no information at this time indicating that they could advance the investigation proactively. Wagabono was a signed up cooperator, but my understanding is that he is due to be released from prison soon. His incentive to cooperate is therefore minimal. Moreover, any information he could provide would be purely historical, and almost three years old. ORUCHE undoubtedly knows that they have been arrested and would not trust them if they were released or tried to place a call to ORUCHE. Moreover, neither Ojeogwu nor Fomum-Tibah are knowledgeable enough about the organization to negate the need for a wiretap. Fomum-Tibah indicated that she knew ORUCHE worked for two individuals in Detroit, but she was unable to provide their names. While Fomum-Tibah said that she knew the stash locations kept by ORUCHE, it is not clear that those stash locations still exist, in light of Fomum-Tibah's arrest. To conduct a search warrant at this time based on Fomum-Tibah's information, moreover, would expose the fact that Fomum-Tibah has given information to law enforcement which would potentially place her in danger. Fomum-Tibah has expressed to agents that ORUCHE is violent and fears that he would hurt her.

<strong><u>UNDERCOVER OFFICERS</u></strong>

29

46

43.    There is currently no expectation that an undercover officer will be able to infiltrate the New York-based organization involving the user of the TARGET CELLPHONE, let alone determine the full scope of the TARGET SUBJECTS' operations, identify and meet all of the other TARGET SUBJECTS and their co-conspirators in New York, or identify the TARGET SUBJECTS' narcotics suppliers and their confederates.  Based on my experience as a narcotics investigator, as well as discussions with my fellow agents, I believe that drug traffickers are unlikely to discuss the full extent of their organization's activities or membership when dealing with an "outsider" such as an undercover officer.  In my training and experience, I have learned that narcotics traffickers tend to be highly reticent about discussing narcotics with unknown persons.

## SEARCH WARRANTS

44.    Applications for search warrants are not appropriate at this stage of the investigation, as the locations where the TARGET SUBJECTS currently receive, hide, and distribute their narcotics, and narcotics proceeds have not been identified.  Moreover, investigative methods used to date do not by themselves seem likely to yield this information.  Wire surveillance will

30

assist law enforcement in identifying such locations, so that search warrants for such locations may be obtained at a later time.

### ARRESTS

45.    Attempting to arrest EMMANUEL ORUCHE, the user of the TARGET CELLPHONE, while possible, would mean that several of the objectives of this investigation would be unfulfilled.  Arresting ORUCHE would almost certainly cause his unidentified co-conspirators to cease their illegal activities or change the locations, instrumentalities and methods used to conduct their illegal activities.  Moreover, although there is now probable cause to believe that TARGET SUBJECTS are engaged in narcotics trafficking, the likelihood of convicting the TARGET SUBJECTS that have been identified of narcotics charges would be increased by evidence obtained from the requested surveillance.

### MINIMIZATION

46.    All monitoring of wire communications over the TARGET CELLPHONE will be minimized in accordance with Chapter 119 of Title 18, United States Code.

47.    The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry

31

48

out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges.  In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature.  Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that neither the TARGET SUBJECTS nor any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  If an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

## AUTHORIZATION REQUEST

32

49

48.   Based on the foregoing, it is my opinion that the interception of wire communications occurring over the TARGET CELLPHONE, as specified above, is essential to uncover the full scope of the TARGET SUBJECTS' narcotics trafficking activities.

49.   Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier.  The 30 days would be measured from the earlier of:  (1) ten days after the date on which this Court signs the order or (2) the date on which interception is first conducted.

50.   Pursuant to the provisions of Title 18, United States Code, Sections 2518(4), it is requested that it be ordered that Sprint Nextel, the service provider for the TARGET CELLPHONE, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose

33

50

communications are to be intercepted (including all dial digits
(including all incoming and outgoing calls), pen register
information, audio interception capability whether the cellular
telephone is in roaming mode or otherwise, and interception of
communications utilizing the Direct Connect two-way communication
feature).  The assistance of Sprint Nextel is required to
accomplish the objectives of the requested interceptions.
Reasonable expenses incurred pursuant to this activity will be
processed for payment by the DEA.

     51.  Because the need for contemporaneous information
concerning the intercepted communications is especially important
in the present investigation, it is further requested that Sprint
Nextel be ordered to provide originating and terminating cell
site information for the intercepted wire communications, by
permitting the DEA's SMART System to access such information.

     52.  It is further requested that Sprint Nextel (a provider
of electronic communications service as defined in Title 18,
United States Code, Section 2510(15)), and other electronic
communications service providers shall disclose to agents and
officers of the DEA all published and non-published subscriber
information and toll records and information relevant to this

34

investigation, that is, all such information pertaining to the telephone numbers associated with telephones, digital display devices, and mobile telephones used, if any, which may be requested in furtherance of this investigation, within 24 hours of said request, there being reason to believe that the contents of the information sought are relevant and material to an ongoing criminal investigation.

53.   It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of officers, agents and others.

ANDREW ARTHURTON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
30 day of August, 2006

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

35