UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                     :
IN THE MATTER OF THE APPLICATION OF  :
THE UNITED STATES OF AMERICA FOR     :    AFFIDAVIT IN SUPPORT
AFFIDAVIT IN SUPPORT OF              :    OF APPLICATION FOR
AUTHORIZATION TO INTERCEPT WIRE      :    AUTHORIZATION TO
COMMUNICATIONS OCCURRING OVER THE    :    INTERCEPT WIRE
CELLULAR TELEPHONE ASSIGNED CALL     :    COMMUNICATIONS
NUMBER (917) 815-6747, WITH          :
INTERNATIONAL MOBILE SUBSCRIBER      :
IDENTIFICATION ("IMSI") NUMBER       :
310260910058759.                     :
                                     :
- - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK            )
COUNTY OF NEW YORK           )
SOUTHERN DISTRICT OF NEW YORK ):ss.:

        ANDREW ARTHURTON, a Special Agent with the Drug

Enforcement Administration ("DEA"), being duly sworn, deposes and

states:


**I.   INTRODUCTION**

        1.    I am an "investigative or law enforcement officer

of the United States" within the meaning of Section 2510(7) of

Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and

to make arrests for offenses enumerated in Section 2516 of Title

18, United States Code.  I have been employed as a Special Agent

for the DEA for approximately four years.  I have participated in

several investigations of unlawful drug distribution and have

conducted or participated in surveillance, the execution of

121

search warrants, debriefings of informants and reviews of taped conversations and drug records.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.

2.    I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications concerning offenses enumerated in Section 2516 of Title 18, United States Code — that is, offenses involving (1) importation of, distribution of, and possession with intent to distribute of, controlled substances, the use of wire facilities to facilitate the same, conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; and (2) laundering the monetary proceeds of criminal activity, in violation of Title 18, United States Code, Sections 1956 and 1957 (the "TARGET OFFENSES").[1]

3.    I believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed

---

[1]    Although not a predicate offense under 18 U.S.C. § 2516, the DEA is also investigating the TARGET SUBJECTS (as subsequently defined herein) in connection with violations of 18 U.S.C. § 2, for aiding and abetting the TARGET OFFENSES.

2

by EMMANUEL ORUCHE, WISE UKOMADU, REBECCA AMBO FOMUM-TIBAH,[2] FNU LNU, a/k/a "Charlie," FNU LNU, a/k/a "Mike," FNU LNU, a/k/a "Ralph," a/k/a "Chidi Obi," and others as yet unknown (the "TARGET SUBJECTS"). The requested Order is sought for a period of time until the interception fully reveals the manner in which the above-named individuals and their confederates participate in the TARGET OFFENSES, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5). Pursuant to Section 2518(5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days after the date of this Court's Order.

    4.    This case is being investigated by the Drug Enforcement Administration, in the New York metropolitan area, Detroit, Michigan, and elsewhere in the United States. I have personally participated in the investigation of the offenses referred to above, and make this affidavit based on my personal participation in this investigation, and based on reports made to me by other agents and officers and other law enforcement authorities. Except where otherwise noted, the information set

---

[2] As discussed below in paragraph 17, TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH was arrested on or about August 9, 2006, and is currently detained. Based on recorded telephone conversations with TARGET SUBJECT EMMANUEL ORUCHE, summarized below, however, I believe she may still be involved in the TARGET OFFENSES. Accordingly, she is included as a TARGET SUBJECT.

forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed. Such statements are reported in substance and in part, unless otherwise indicated.

5.    Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications. Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate that:

**DESIGNATED CELLULAR TELEPHONE**

6.    There is probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE has been using, is using, and will in the future use, in order to accomplish, to discuss and to commit the TARGET OFFENSES, a prepaid cellular telephone assigned call

4

number (917) 815-6747, with IMSI number 310260910058759, no listed subscriber, and service provided by T-Mobile USA (the "TARGET CELLPHONE").

      7.    I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack.  The cellular telephone system divides the New York City and other metropolitan area into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed.  Each portable cellular telephone that does not contain party lines bears a unique electronic number called an ESN or an IMSI number, and an assigned telephone number.  It is requested that interception be permitted over any changed telephone numbers subsequently assigned to the IMSI numbers for the TARGET CELLPHONE.[3]

---

[3]    The TARGET CELLPHONE utilizes an IMSI number, encoded into a removable computer chip located inside the instrument.  The IMSI number assigned to the computer chip is unique to the subscriber, as opposed to the phone.  This application seeks authorization to intercept communications occurring over any telephones or telephone numbers accessed by or through the use of the IMSI number identified above.

8.    Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518(3), authorization is requested for interception of wire communications both within the Southern District of New York, and, in the event the TARGET CELLPHONE is transferred outside the jurisdiction of this Court, in any other jurisdiction within the United States.   In addition, it is requested that background conversations in the vicinity of the TARGET CELLPHONE while it is off the hook or otherwise in use also be permitted to be intercepted.

9.    It is anticipated that the TARGET SUBJECT EMMANUEL ORUCHE will use the TARGET CELLPHONE to place calls to and from the Southern District of New York, as well as other locations.   This belief is supported by the facts described below.   In any event, pursuant to <u>United States</u> v. <u>Rodriguez</u>, 968 F.2d 130 (2d Cir.), <u>cert</u>. <u>denied</u>, 506 U.S. 847 (1992), a Court in the Southern District of New York is empowered to issue an Order for the interception of wire communications over telephones located in other districts, as long as the interceptions of these communications are first heard in the Southern District of New York.

10.   In connection with the telecommunication companies which provide the service for the TARGET CELLPHONE, all interceptions over the TARGET CELLPHONE will automatically be

6

routed to New York, New York, regardless of where the telephone calls are placed to or from. Accordingly, all interceptions will first be heard in the Southern District of New York. During the requested wire surveillance, all monitoring will be performed in New York, New York, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including law enforcement officers with the DEA, and Government employees or individuals operating under a contract with the Government, including, if necessary, translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception, and specifically under the supervision of law enforcement officers from the DEA.

### OBJECTIVES

11. There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal: (i) the nature, extent and methods of operation of the TARGET SUBJECTS' narcotics trafficking and money laundering activities; (ii) the identity of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (iii) the receipt and distribution of contraband and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records relating to those activities; (vi) the location and

7

source of resources used to finance their illegal activities; and (vii) the location and disposition of the proceeds from those activities. In addition, these wire communications are expected to constitute admissible evidence of the commission of the TARGET OFFENSES.

## PRIOR APPLICATIONS

12. I have been informed that reviews have been done of the electronic surveillance files of the New York Drug Enforcement Task Force, the Drug Enforcement Administration (DEA), the Federal Bureau of Investigation (FBI) and other law enforcement agencies.[4] Based on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS, or over the facilities or places named herein, except as follows:

a. An order dated May 25, 2006, signed by the Honorable Naomi Reice Buchwald, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by Chimdi Ibiam (the "Ibiam Phone"). Interceptions pursuant to that order began on or about May 26, 2006, and ended on or about June 23, 2006.

---

[4] A check of DEA and FBI files was completed on or about September 21, 2006.

8

128

b.    An order dated June 23, 2006, signed by the Honorable William H. Pauley III, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30 day-period. Interceptions pursuant to that order began on or about June 23, 2006, and ended on or about July 21, 2006.

c.    An order dated July 21, 2006, signed by the Honorable Richard J. Holwell, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30-day period. Interceptions pursuant to that order began on or about July 21, 2006, and ended on or about August 22, 2006, with Ibiam's arrest.

d.    An order dated August 7, 2006, signed by the Honorable Stephen C. Robinson, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by Emmanuel Obi Maduka, a/k/a "Mazu" (the "Maduka Phone").  Interceptions pursuant to that order began on or about August 7, 2006, and ended on or about August 23, 2006, with Maduka's arrest.

e.    An order dated August 30, 2006, signed by the Honorable Denise L. Cote, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by TARGET SUBJECT EMMANUEL ORUCHE (the "First Oruche Phone").  Interceptions pursuant to that order

9

129

began on or about August 31, 2006, and are continuing.  As
discussed in part below, interception of wire communications
occurring over the FIRST ORUCHE PHONE reveal that the user of the
phone is ORUCHE and that he is using the FIRST ORUCHE PHONE to
conduct his narcotics trafficking activities.

## II.  THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS AND OTHERS AS YET UNKNOWN WILL USE THE TARGET CELLPHONE IN FURTHERANCE OF TARGET OFFENSES

13.  As set forth below, there is probable cause to
believe that TARGET SUBJECT EMMANUEL ORUCHE is using the TARGET
CELLPHONE in furtherance of narcotics trafficking activities
involving the importation of heroin into the United States from
Nigeria, Turkey, and other countries, and the distribution of
heroin within the United States.

### ORUCHE'S HEROIN-TRAFFICKING ACTIVITIES

14.  From an ongoing investigation, I have identified
TARGET SUBJECT EMMANUEL ORUCHE, the user of the TARGET CELLPHONE,
as a member of a drug organization that brings heroin from
Pakistan, through Nigeria, Turkey, and other countries, to the
United States for ultimate distribution.  Three heroin couriers
arrested by law enforcement authorities have identified ORUCHE as
the intended recipient of the heroin.  In addition,
communications intercepted over the Ibiam Phone and the FIRST
ORUCHE PHONE reveal that ORUCHE is involved in the distribution
of heroin within the United States.

10

130

**Couriers Naming ORUCHE as the Recipient of Imported Heroin**

15.   On December 5, 2003, Immigration and Customs Enforcement ("ICE") agents arrested a heroin courier named William Wagabono, as he arrived in the United States at Newark International Airport.  Following his arrest, Wagabono stated that the heroin he was carrying was intended for an individual he knew as "Emmanuel" or "Manny" who drove a white Lexus.  ICE agents retrieved registration information for all white Lexus cars in New York registered to individuals named "Emmanuel." Based on that search, ICE agents obtained a photograph of TARGET SUBJECT EMMANUEL ORUCHE, whom Wagabono subsequently identified as the person to whom he was supposed to deliver heroin.  Wagabono further said that he was paid to transport suitcases containing heroin from Uganda to Newark via England on four previous occasions, and that "Manny" was the recipient of the heroin each time.  Two days after Wagabono's arrest, on or about December 7, 2003, agents attempted a controlled delivery to the Crown Motor Inn in Newark, New Jersey, where Wagabono was supposed to meet ORUCHE.  ORUCHE was observed by law enforcement agents conducting surveillance in the area.  Perhaps sensing that he was being watched, however, ORUCHE left the area and did not meet with Wagabono.[5]

_____

[5]    From speaking to one of the ICE agents who handled the Wagabono case, I understand that Wagabono was prosecuted in the District of New Jersey, where he cooperated and has been sentenced.  He is scheduled to be released from prison in the

11

131

16.   On or about June 2, 2006, officers of U.S. Customs and Border Protection ("CBP") at John F. Kennedy International Airport in Queens, New York ("JFK Airport") stopped an individual named Ikechukwu Ojeogwu, who had arrived from the Port of Harcourt, Nigeria, via Frankfurt, Germany.   Ojeogwu was discovered to have swallowed heroin.   During a post-arrest interview, Ojeogwu admitted to swallowing 60 pellets totaling approximately one kilogram, gross weight, of heroin.   Ojeogwu stated that he was supposed to deliver the heroin to his "uncle," TARGET SUBJECT EMMANUEL ORUCHE, and he provided law enforcement agents with the number of the FIRST ORUCHE PHONE, which he indicated was ORUCHE's phone.[6]

17.   On or about August 9, 2006, CBP officers at JFK Airport stopped TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH, who had arrived aboard a British Airways flight from Istanbul, Turkey. When FOMUM-TIBAH's answers to routine questions made officers suspicious, FOMUM-TIBAH was taken to the medical facility at JFK Airport for a monitored bowel movement.   FOMUM-TIBAH subsequently passed approximately 16 pellets, one of which field tested positive for the presence of heroin.   A vaginal insert also

---

near future.

[6]   He is being prosecuted in the Eastern District of New York. While Ojeogwu has provided helpful information to law enforcement, he is not yet believed to be fully forthcoming. While he may provide fuller information after subsequent meetings, those meetings have not yet happened.   He is not at this time signed up as a cooperator.

132

dropped from her, which field tested positive for the presence of heroin. In all, approximately 1341 grams of heroin, net weight, was recovered from FOMUM-TIBAH. Among the items in FOMUM-TIBAH's possession were a driver's license bearing the name and photograph of TARGET SUBJECT EMMANUEL ORUCHE, as well as a business card in his name. Following her arrest, FOMUM-TIBAH stated that the heroin she was carrying was to be delivered to ORUCHE, who was her boyfriend; that she was sent on his behalf to Istanbul to get the heroin; and that ORUCHE works in the drug business for two unidentified individuals in Detroit.[7]

**ORUCHE's Intercepted Wire Communications Concerning Heroin**

18. In addition to these three couriers who identified ORUCHE as the intended recipient of heroin imported from Nigeria, Uganda, and Turkey, wire communications intercepted over the Ibiam Phone and the FIRST ORUCHE PHONE reveal that ORUCHE is involved in the importation and distribution of heroin and that he utilizes cellular telephones in furtherance of those activities. The following intercepted wire communications, among others, relate to ORUCHE:[8]

---

[7]    FOMUM-TIBAH is being prosecuted in the Eastern District of New York. Although, as discussed below, FOMUM-TIBAH has provided helpful information to law enforcement, she is not yet believed to be fully forthcoming. While she may provide fuller information after subsequent meetings, those meetings have not yet happened. She is not at this time signed up as a cooperator.

[8]    Because the intercepted calls have taken place primarily in Igbo, a Nigerian language, the summaries set forth herein are based on translations prepared by individuals proficient in that language. Translations are preliminary and are subject to

13

a.    On or about July 14, 2006, at approximately 12:38 p.m., Chimdi Ibiam, using the Ibiam Phone, spoke with EMMANUEL ORUCHE, using the FIRST ORUCHE PHONE.  During the conversation, ORUCHE asked Ibiam about "Ide Asaba."  ORUCHE then asked Ibiam to tell Ide to call him "so that I can see if he will go there next week," meaning to Nigeria.  ORUCHE further said, "So I can give him a ticket [a ticket to travel] to bring that 'thing,'" meaning drugs.  Later in the conversation, ORUCHE asked again about Ide's whereabouts: "Is Ide in Baltimore, or did he travel?"  Ibiam repeated, "He is around," and then said, "When you come then you guys will discuss face to face."  ORUCHE said that he would call Ibiam the next day.  (To my knowledge, no call from ORUCHE to Ibiam was intercepted over the Ibiam Phone the next day.)

b.    On or about September 7, 2006, at approximately 1:43 p.m., TARGET SUBJECT FNU LNU, a/k/a "Charlie" ("CHARLIE"), called ORUCHE, using the FIRST ORUCHE PHONE.  During the call, CHARLIE asked: "He said to ask you, um, like if it's taken, um, one house, how many nights will it stay?"  ORUCHE replied: "Tell him one week, you understand?"  CHARLIE then asked: "Wait, one week in one house?"  ORUCHE replied: "Yes, one week."  CHARLIE then said: "No, it's too long, which one is,

---

modification.  Quoted portions are not necessarily exact quotes, but are the sum and substance of the calls according to the monitoring agent or translator.  My interpretations of some terms used are indicated in parentheses or are otherwise noted.

what's one week in one house?" Shortly thereafter, ORUCHE
stated: "No, you don't take and then bring money man, I'm not a,
this thing. . . ." CHARLIE then stated: "I'm not agreeing.  I'm
saying if it's agreed it will be, if you take, it goes, you go
get money and give them the one that [U/I] this is what they do."
ORUCHE then stated: "No, for me to make money, you understand, I
will give it to they people that do things for me, [U/I], give me
money, one money." After some further back and forth of this
sort, ORUCHE stated: "But if they are giving me five five, I will
guarantee them money, when I get there I'll break it down six six
and make one one.  They'll get their money in four days if they
give it to me." CHARLIE then asked: "If they give it to you at
what?"  ORUCHE replied: "Five five." After CHARLIE stated no,
ORUCHE stated: "Within three days, give them their money."
(Session 1316).  Based on my training and experience, my
participation in this investigation, and my review of other
intercepted communications, I believe that during this
conversation, ORUCHE and CHARLIE were discussing the trafficking
of heroin – specifically, whether CHARLIE's associate would
provide heroin to ORUCHE on consignment (i.e., for later
payment).  The reference to "one house" is to some quantity of
heroin; the references to "five five" and "six six" are to
$55,000 and $66,000, the prices at which ORUCHE hoped to buy and
sell, respectively, one kilogram of heroin.

15

## ORUCHE'S USE OF THE TARGET CELLPHONE

19.    Based on information provided by TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH, recorded telephone calls between FOMUM-TIBAH and TARGET SUBJECT EMMANUAL ORUCHE, and a "common call" analysis between the TARGET CELLPHONE and the FIRST ORUCHE PHONE, I believe that ORUCHE not only uses the FIRST ORUCHE PHONE, but also uses the TARGET CELLPHONE, in furtherance of the TARGET OFFENSES.  As discussed below, I further believe that ORUCHE primarily uses the TARGET CELLPHONE, rather than the FIRST ORUCHE PHONE, to communicate with his co-conspirators in Nigeria, Turkey, and Detroit, Michigan.

20.    On or about September 7, 2006, TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH attended a proffer session in the Eastern District of New York.  Among other things, FOMUM-TIBAH admitted that she had imported heroin into the United States and that she was supposed to deliver the heroin to ORUCHE; she claimed that this was the first and only time that she acted as a courier.[9]  She provided the TARGET CELLPHONE as one of ORUCHE's telephone numbers.  She further stated that she had communicated with ORUCHE using that telephone number during her incarceration on the present charges.

---

[9]    Between in or about June 2006, and her arrest on or about August 9, 2006, FOMUM-TIBAH made three round trips from the United States to Istanbul, Turkey; on each occasion, she stayed a relatively short time in Istanbul.  Based on this information, and the recorded call discussed below in paragraph 21(b), I believe that FOMUM-TIBAH's claim that she imported heroin into the United States only once is false.

16

136

21.    Following TARGET SUBJECT REBECCA AMBO FOMUM-
TIBAH's proffer session on or about September 7, 2006, I obtained
recordings pursuant to a Grand Jury Subpoena of all the telephone
calls that FOMUM-TIBAH had made while incarcerated at the
Metropolitan Detention Center in Brooklyn, New York.  Among those
calls, there are several to TARGET SUBJECT EMMANUEL ORUCHE (whose
voice I recognize from interceptions of the FIRST ORUCHE PHONE),
using the TARGET CELLPHONE.  These include the following:

a.    On or about August 25, 2006, at approximately
10:56 a.m., FOMUM-TIBAH called ORUCHE on the TARGET CELLPHONE.
During the conversation, ORUCHE discussed borrowing money from
Nigeria for FOMUM-TIBAH's defense.  ORUCHE further stated that
"you understand everything was suspended you know the British
Airways all this man. . . .  People will not come when you have
something like this when this is something that you have to do
yourself."  Based on my experience and training, my participation
in this investigation, and my review of other recorded
communications, I believe that during this conversation, ORUCHE
was claiming that the organization had ceased sending heroin on
British Airways following FOMUM-TIBAH's arrest (as noted above,
she had traveled on British Airways from Istanbul, Turkey), and

17

137

that the organization was having difficulty finding people to act
as couriers given her arrest.[10]

       b.   On or about September 2, 2006, at
approximately 3:28 p.m., FOMUM-TIBAH called ORUCHE on the TARGET
CELLPHONE.  During the conversation, FOMUM-TIBAH stated that she
had "told this person" - her defense attorney - that "I do that
thing one time so they say make it go away."  ORUCHE replied:
"Yeah."  Based on my experience and training, my participation in
this investigation, and my review of other recorded
communications, I believe that during this conversation, FOMUM-
TIBAH was informing ORUCHE that she intended to claim that she
had transported heroin only once, believing that that might make
the prosecution "go away."

       22.  In connection with this investigation, law
enforcement officers have conducted a "common call" analysis
between the TARGET CELLPHONE and the FIRST ORUCHE PHONE.  During
the period from on or about August 21, 2006, through and
including on or about September 8, 2006, the TARGET CELLPHONE
communicated with at least seven different telephone numbers that
were, within the last year, also in communication with the FIRST

---

[10]   It is important to note that, during this conversation,
ORUCHE was aware that it was being recorded by the Bureau of
Prisons.  First, at various points during FOMUM-TIBAH's call to
ORUCHE, a recording reminded the speakers that the call was "from
a federal prison."  Additionally, in a previous conversation, on
or about August 22, 2006, FOMUM-TIBAH had reminded ORUCHE - who
had began talking about her case - that the call was being
recorded.

ORUCHE PHONE.   Those numbers included telephone numbers in New York, Michigan, and Texas.

### TOLL ANALYSIS OF THE TARGET CELLPHONE

23.   In connection with this investigation, I have analyzed toll records for the TARGET CELLPHONE, obtained pursuant to administrative subpoenas, for the period from on or about August 29, 2006, to on or about September 8, 2006 (the "Covered Period").   These toll records further establish probable cause to believe that the TARGET CELLPHONE has been used to further narcotics activity.

24.   During the Covered Period, the TARGET CELLPHONE was in contact approximately 14 times with nine different telephone numbers in Nigeria, most recently on or about September 8, 2006; approximately six times with two different telephone numbers in Turkey, most recently on or about September 5, 2006; and approximately 47 times with six different telephone numbers in and around Detroit, Michigan, most recently on or about September 8, 2006.   Contacts with Nigerian, Turkish, and Detroit numbers are significant to this investigation because, as discussed above, in the course of this investigation heroin couriers have traveled from Nigeria and Turkey to the United States with drugs and because the investigation has revealed that leaders of the narcotics organization are in Detroit, Michigan.

19

25. During the Covered Period, the TARGET CELLPHONE was in contact approximately six times with a telephone assigned call number (972) 261-6774 (the "6774 Number"), most recently on or about September 6, 2006. I believe that the 6774 Number is used in furtherance of drug trafficking activities based on the following intercepted call between the 6774 Number and the FIRST ORUCHE PHONE: On or about September 4, 2006, at approximately 8:22 p.m., TARGET SUBJECT EMMANUEL ORUCHE, using the FIRST ORUCHE PHONE, called the 6774 Number and spoke to an unidentified male (the "UM"). During the conversation, ORUCHE stated: "We didn't hear anything from you anymore." The UM replied: "It's a sad story . . . in the sense that nobody could come anymore and I went and put myself on hold. You know it's the reason I stayed this long . . . . [Unintelligible] hoping that I will see the point. The woman that was supposed to come yesterday like we agreed." The UM continued: "That's how Rose who got her ready called me on Sunday and told me that the woman said that she dreamt, and I was like, what does her dream have to do with the thing, and she said that her dream was clear. And then I was like, her prayer man told her what to do. Okay, so what were we going to do, that maybe they had taken the stuff and given it to Mr. Rawlings." Shortly thereafter, the UM stated: "I want to go tomorrow and see how I can get a ticket so I can [unintelligible]. The only thing I'm doing right now is when I

20

140

get back, I'll get somebody ready, and then call you if someone goes, and then they'll stay at that place you said they usually stay.  If the person comes, then you go and you'll be meeting up with them."  (Session 784).  Based on my experience and training, my participation in this investigation, and my review of other recorded communications, I believe that during this conversation, ORUCHE and the UM were discussing a heroin courier who had been prepared by "Rose," who backed out of transporting the heroin after having a dream.

26.    During the Covered Period, the TARGET CELLPHONE was in contact approximately nine times with the Nigerian phone number 805-2709466 (the "Nigerian Number"), most recently on or about September 7, 2006.  I believe that the Nigerian Number is used in furtherance of drug-trafficking activities based on the following calls intercepted on the FIRST ORUCHE PHONE:

a.    On or about September 5, 2006, TARGET SUBJECT EMMANUEL ORUCHE spoke with someone he referred to as "Mike" using a telephone assigned call number (516) 924-8833 (the "8833 Number").  During the conversation, ORUCHE stated: "It is business that I am looking for, not pleasure.  You know with this out thing, we can supply anywhere."  Shortly thereafter, he continued: "Yeah, so I'm looking for how to get business here.  You know here's better than our side.  Even though things have spoiled here but there are still people that gives things, you

21

understand?"  After "Mike" said "Yeah, ok," ORUCHE continued: "If
I can get like two or four and pay them . . . you understand."
(Session 904).  Based on my experience and training, my
participation in this investigation, and my review of other
recorded communications, I believe that during this conversation,
ORUCHE and "Mike" were discussing the trafficking of heroin; the
reference to "two or four" is to two or four kilograms of heroin.

        b.  On or about September 13, 1006, ORUCHE had
two additional conversations with "Mike," on the 8833 Number.
During the first conversation, ORUCHE asked: "Have you confirmed
with this woman?"  "Mike" responded: "No, . . . she hasn't called
me, and I didn't call her yet."  ORUCHE then stated: "So maybe
she hasn't gotten it yet, since she hasn't called you."  "Mike"
replied: "Probably, but when I'm done talking to you now, I'll
call her."  ORUCHE then stated: "Okay, so I'll know what I'm
doing."  (Session 2452).  Approximately three minutes later,
"Mike" called back and told ORUCHE that "Ngozi" was on the line.
"Mike" then stated: "She said that as of yesterday, they didn't
pay any money in.  I am tired of this kind of thing."  ORUCHE
then stated: "Hold on, hold on, hold on, let me call these
people."  ORUCHE then provided "Mike" and "Ngozi" with the
Nigerian Number and instructed "Ngozi" to call the Nigerian
Number.  When "Mike" asked, "What's the name of the man?," ORUCHE
replied: "Ralph or Chidi Obi."  ORUCHE also stated: "I'm also

22

142

calling him now to know if I will get him, because all these things, I'm tired of this nonsense." (Session 2453). Based on my experience and training, my participation in this investigation, and my review of other recorded communications, I believe that during this conversation, ORUCHE and "Mike" were discussing a deposit that they had been expecting in connection with their narcotics-trafficking activities; since the deposit had not arrived, ORUCHE gave "Mike" (and "Ngozi") the Nigerian Number and identified it as the number of TARGET SUBJECT FNU LNU, a/k/a "Ralph," a/k/a "Chidi Obi."

## III. ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS OVER THE TARGET PHONE

27. The investigation to date has produced some evidence against the TARGET SUBJECTS concerning the TARGET OFFENSES. As discussed above, the principal goals of this continuing investigation are to identify and develop evidence against not only the currently identified TARGET SUBJECTS, but also all of their suppliers, customers, accomplices, and associates, as well as the locations at which the TARGET SUBJECTS store narcotics and/or narcotics proceeds, and the methods by which they operate their narcotics trafficking and money laundering business. As a result of the facts set forth above, several investigative techniques have been tried, or reasonably

appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives:

       a.    There is currently no expectation that an undercover officer or confidential informant will be able to infiltrate the organization involving the user of the TARGET CELLPHONE, let alone determine the full scope of the TARGET SUBJECTS' operations, identify and meet all of the other TARGET SUBJECTS and their co-conspirators, or identify the TARGET SUBJECTS' narcotics suppliers and their confederates. In order to make use of an undercover a viable option, there would have to be someone inside the organization working with the Government who could make the introduction. Moreover, based on my experience as a narcotics investigator, as well as discussions with my fellow agents, I believe that drug traffickers are unlikely to discuss the full extent of their organization's activities or membership when dealing with an "outsider" such as an undercover officer or confidential informant. Narcotics traffickers tend to be highly reticent about discussing narcotics with unknown persons.

       b.    As demonstrated above, this and related investigations have resulted in the arrests of Chimdi Ibiam; Emmanuel Obi Maduka, a/k/a "Mazu"; William Wagabono; Ikechukwu Ojeogwu; and TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH. Nevertheless, these arrests do not obviate the need for

24

interception of the TARGET CELLPHONE. Other than Wagabono, none
of these individuals are signed up cooperators at this time.
Wagabono was a signed up cooperator, but my understanding is that
he is due to be released from prison soon. His incentive to
cooperate is therefore minimal. Moreover, any information he
could provide would be purely historical, and almost three years
old. As for the other four individuals, although two of them,
Ojeogwu and FOMUM-TIBAH, have attended proffer sessions with the
Government, law enforcement officials do not believe that they
have been completely forthcoming and there are no additional
proffers currently scheduled. Indeed, as discussed above, there
is some indication that FOMUM-TIBAH is still collaborating with
TARGET SUBJECT EMMANUEL ORUCHE. Additionally, neither Ojeogwu
nor Fomum-Tibah are knowledgeable enough about the organization
to negate the need for a wiretap. Fomum-Tibah, for example,
indicated that she knew ORUCHE worked for two individuals in
Detroit, but she was unable to provide their names. Even if
someone other than Wagabono were signed up in the future, there
is no information at this time indicating that they could advance
the investigation proactively. ORUCHE undoubtedly knows that
they have been arrested and would not trust them if they were
released or tried to place a call to ORUCHE. Accordingly, these
arrests are unlikely to further the investigation substantially.

25

c.    The investigation has involved the use of some physical surveillance to observe ORUCHE.  But pure physical surveillance, without the wiretap, would not accomplish the goals of this investigation given the geographical breadth of the organization, including couriers who travel from Africa, Turkey, and elsewhere with heroin.  Pure physical observation, without wire surveillance, would not be likely to advance the investigation, as the purpose of a TARGET SUBJECT's visit to a location or in-person meeting with another individual would not be known.  With the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, with the knowledge of the purpose and nature of the meeting.  Wire surveillance would also minimize the risks of discovery inherent in following subjects or remaining at target locations for extended periods of time.

d.    As demonstrated above, telephone toll records and pen registers have been used in this investigation and have been helpful to connect certain individuals.  However, such information provides only limited information.  At most, it reveals contact between two individuals, not the nature of the contact or the substance of the conversation.  Moreover, these methods do not enable law enforcement officers to identify with certainty the persons involved in the conversations or the

26

146

significance of the communications in the context of ongoing narcotics trafficking or money laundering.  Among other problems, a telephone number appearing in the records may not be listed or subscribed in the name(s) or address(es) of the person(s) using the telephone.  Indeed, in this investigation, at least some of the individuals with whom the TARGET CELLPHONE has been in contact cellular telephones with no subscriber information or false subscriber information.  In addition, many phone numbers in contact with the TARGET CELLPHONE are numbers from other countries.  Subscriber information for such numbers are not readily available to United States law enforcement authorities. It is only through intercepting calls into and out of the TARGET CELLPHONE that we have been able to gain any understanding as to the identity of a caller and that individual's role in the drug-trafficking organization.

        e.    Use of a federal grand jury does not appear to be a promising method of investigation.  Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation.  Because any such individuals would face prosecution, it is unlikely that they would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony.  Immunizing them could

27

thwart the public policy that they be held accountable for their crimes. The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation. For many of the same reasons, the use of witness interviews does not appear to be a promising method of investigation. Again, witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation.

f.    While certain addresses associated with the TARGET SUBJECTS have been identified, a search of such locations is impracticable without more specific knowledge about the identity of the individual living there and the nature of his or her involvement in the organization.

g.    Arresting any of the TARGET SUBJECTS and attempting to obtain their cooperation in investigating the narcotics trafficking and money laundering of their criminal associates is an investigative route that, in the judgment of the law enforcement agencies involved, is too risky at the present time. Were an attempt made to arrest certain TARGET SUBJECTS and obtain their cooperation in the current investigation without success, other TARGET SUBJECTS almost certainly would be alerted to the existence of the investigation and would take defensive

measures that would seriously jeopardize the investigation. Accordingly, the risks of failure in attempting to obtain these targets' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make that investigative technique unavailable.

h.   Although the wiretaps on the Ibiam Phone and the FIRST ORUCHE PHONE have been useful in developing evidence against certain of the TARGET SUBJECTS, including ORUCHE, the wiretaps have not revealed the full extent of the TARGET SUBJECTS' narcotics trafficking and money laundering activities. For example, the wiretaps have not revealed the identity of all TARGET SUBJECTS, where they store their drugs and drug proceeds, or who the suppliers to ORUCHE are.  Moreover, there have been no intercepted calls between the FIRST ORUCHE PHONE and numbers in Turkey; virtually no intercepted calls between the FIRST ORUCHE PHONE and numbers in Nigeria; and relatively few intercepted calls between the FIRST ORUCHE PHONE and numbers in Detroit, Michigan.  Given the importance of those locations in this investigation, and the frequency of calls between the TARGET CELLPHONE and numbers in these locations, I believe that ORUCHE uses the TARGET CELLPHONE, rather than the FIRST ORUCHE PHONE, to communicate with many of his co-conspirators.  For that reason, the wiretap of the FIRST ORUCHE PHONE does not obviate the need to intercept communications over the TARGET CELLPHONE.

29

149

28.  Because the above-described investigative techniques have been unsuccessful, authorization to intercept communications over the TARGET CELLPHONE is necessary to identify and develop evidence against the TARGET SUBJECTS.

III.  **CONCLUSION**

A.  **Personnel**

29.  As noted above, this case is being investigated by the DEA.  It is anticipated that, during the requested electronic surveillance, all monitoring will be performed and supervised in the Southern District of New York by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the DEA, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

B.  **Minimization**

30.  All monitoring of wire communications over the TARGET CELLPHONE will be minimized in accordance with Chapter 119 of Title 18, United States Code.  The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they

30

should take to avoid infringing upon any attorney-client privilege or other recognized privileges. In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that TARGET SUBJECTS or any of their confederates, when identified, are not participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

    31. It is requested that the order authorizing interception of wire communications provide that, if necessary, translators be authorized to assist in conducting this surveillance and to receive disclosure of intercepted communications. Certain of the TARGET SUBJECTS may be expected to communicate with each other in Igbo, a Nigerian language. It may therefore be necessary to secure the services of translators in order to assist Agents in monitoring and translating the intercepted communications. All such translators will be under

31

contract to the DEA and will be directly supervised by the DEA.

It is further requested, pursuant to Title 18, United States

Code, Section 2518(5), that, in the event the intercepted

communications are in a code or foreign language, and an expert

in that code or foreign language is not reasonably available

during the interception period, minimization may be accomplished

as soon as practicable after such interception.

### C.    Authorization Request

32.   The information set forth in this affidavit

establishes, among other things, probable cause to believe that

TARGET SUBJECT EMMANUEL ORUCHE is utilizing the TARGET CELLPHONE

to discuss and engage in the TARGET OFFENSES.   Based on the

foregoing, it is my opinion that the interception of wire

communications occurring over the TARGET CELLPHONE, as specified

above, is essential to uncover the full scope of the illegal

activity described herein.

33. IT IS HEREBY REQUESTED that orders be issued

authorizing Special Agents of the DEA and other investigative and

law enforcement officers to intercept wire communications

occurring over the TARGET CELLPHONE concerning the affairs of the

enterprise described herein and the TARGET SUBJECTS' commission

of the above-described offenses.   Because the offenses described

herein are continuing in nature and are likely to continue after

the initial interception of the particular communications that

32

are the objects of this request, it is requested that the Court's orders authorizing interception of wire communications not be required to terminate automatically when the communications described above have first been obtained, but be permitted to continue until all wire communications are intercepted that reveal fully the manner in which the TARGET SUBJECTS, and others as yet unknown, participate in the above-described offenses, or until the accomplishment of the objectives set forth herein, or for a period of thirty (30) days, whichever is earlier. It is further requested that such thirty (30) day period begin on the earlier of the day on which an investigative or law enforcement officer first begins to conduct an interception under the Court's order or ten (10) days after the order is entered.

34. IT IS HEREBY REQUESTED, pursuant to the provisions of Title 18, United States Code, Section 2518(4), that it be ordered that the ultimate service provider for the TARGET CELLPHONE furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all incoming and outgoing calls), pen register information (including all dial digits), trap and trace information, and audio interception capability. The assistance of these providers is required to accomplish the objectives of the requested

interceptions.   Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

35. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

ANDREW ARTHURTON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to me before this
21st day of September, 2006

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

34

154