UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING OVER A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (646) 533-8587, WITH INTERNATIONAL MOBIL SUBSCRIBER IDENTITY NUMBER 316010013940954 | AFFIDAVIT IN SUPPORT OF APPLICATION FOR CONTINUED AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS |

STATE OF NEW YORK            )
COUNTY OF NEW YORK           : ss.:
SOUTHERN DISTRICT OF NEW YORK )


ANDREW ARTHURTON, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states:

**INTRODUCTION**

1.    I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code.  I have been employed as a special agent for the DEA for approximately four years.  Since becoming a Special Agent with the DEA, I have conducted numerous investigations of unlawful drug distribution and importation in

219

violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960 and

963, and have conducted or participated in wire and physical

surveillance, surveillance of undercover transactions, the

introduction of undercover agents, the execution of search

warrants, debriefings of informants and reviews of taped

conversations and drug records.  Through my training, education

and experience, I have become familiar with the manner in which

illegal drugs are transported, stored, and distributed and the

methods of payment for such drugs.

   2. I submit this Affidavit in support of an

application for an Order pursuant to Section 2518 of Title 18,

United States Code, authorizing the continued interception and

recording of wire communications over a cellular telephone

assigned call number (646) 533-8587, which is a cellular

telephone with service provided by Sprint Nextel, subscribed to

Nicobi Health Care Services, 3682B White Plains Road, Bronx, New

York 10467, with International Mobil Subscriber Identity ("IMSI")

number 316010013940954 and UFMI number 173*109485*1 (the "TARGET

CELLPHONE"), and any telephone number(s) subsequently assigned to

or accessed by or through the same IMSI number as the TARGET

CELLPHONE, or assigned to the instrument bearing the same IMSI

number as the TARGET CELLPHONE, as well as any IMSI number or

Electronic Serial Number ("ESN") subsequently assigned to the instruments bearing the same telephone number assigned to the TARGET CELLPHONE; concerning offenses enumerated in Title 18, United States Code, Section 2516, that is: offenses involving the importation, distribution, and possession with intent to distribute, of controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960, and 963 (the "TARGET OFFENSES").[1]   I believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by EMMANUEL ORUCHE, CHIMDI IBIAM, a/k/a "Actor,"[2] ASAGA UGBO, WISE UKOMADU, REBECCA AMBO FOMUM-TIBAH,[3] FNU LNU, a/k/a "Okey," FNU LNU, a/k/a "Leroy," FNU LNU, a/k/a "Charlie," FNU LNU, a/k/a "Mazi," JOY LNU, TONY EBI, EMMANUEL OBIDIASO, FNU LNU, a/k/a "Ralph," a/k/a "Chidi Obi," and others

---

[1]   Additionally, although not a predicate offense under 18 U.S.C. § 2516, I believe that the TARGET SUBJECTS (as defined below) have aided and abetted and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

[2] IBIAM was arrested on or about August 22, 2006.  Because he was a participant in the TARGET OFFENSES and because he may continue to communicate with the TARGET CELLPHONE notwithstanding his arrest, he is included as a Target Subject.

[3] FOMUM-TIBAH was arrested on or about August 9, 2006, and is currently detained.  Based on recorded telephone conversations (obtained through Grand Jury subpoena) with TARGET SUBJECT EMMANUEL ORUCHE, however, she may still be involved in the TARGET OFFENSES.  Accordingly, she is included as a TARGET SUBJECT.

3

as yet unidentified (the "TARGET SUBJECTS"). The requested Order
is sought for a period of time until the interception fully
reveals the manner in which the above-named individuals and their
confederates participate in the above-described offenses, or for
a period of thirty (30) days, whichever occurs first, pursuant to
Title 18, United States Code, Section 2518(5). It is further
requested that the 30-day period run from the date of this
Court's order.

        3.    I have personally participated in the
investigation of the offenses referred to in paragraph 2, and
make this Affidavit based on my personal participation in this
investigation, and based on reports made to me by other agents
and by other law enforcement authorities. Except where otherwise
noted, the information set forth in this Affidavit has been
provided to me by other law enforcement officers who have
assisted in the investigation. Unless otherwise noted, wherever
in this Affidavit I assert that a statement was made, the
statement was made by another law enforcement officer or other
person (any of whom may have had either direct or hearsay
knowledge of that statement) to whom I or other law enforcement
officers have spoken or whose reports I have read and reviewed.
Such statements are among many statements made by others and are

                               4

stated in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

4. Because this Affidavit is being submitted for the limited purpose of securing an Order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that an Order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an Order authorizing the interception of wire communications. Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate the following:

## SUBJECTS AND OFFENSES

5. As set forth below, I believe that the TARGET SUBJECTS have committed, are committing, and will continue to commit the following offenses: importation, distribution, and possession with intent to distribute, of controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same; and attempts to do the same, in violation of Title

5

223

21, United States Code, Sections 841, 843(b), 846, 952, 960 and
963.[4]

## THE DESIGNATED TELEPHONE

6.    There is probable cause to believe that TARGET
SUBJECT EMMANUEL ORUCHE has been using, is using, and will in the
future use the TARGET CELLPHONE to facilitate, accomplish, and to
commit the above-described offenses.

7.    I have been informed by other law enforcement
personnel who are familiar with the applicable telephone
technology that a "portable cellular telephone" (or a "mobile
telephone") can be used both within a vehicle and outside a
vehicle through the use of a portable battery pack.    The cellular
telephone system divides the New York City and other metropolitan
area into many small coverage areas, which are called "cells."
As a vehicle in which a portable cellular telephone is located,
or the cellular telephone itself, is moved from one cell to
another, transmitters within each cell and a master switching
network permit "wire communications" to be completed.    Each
portable cellular telephone that does not contain party lines

---

[4]    Additionally, as mentioned above, although not a predicate
offense under 18 U.S.C. § 2516, I believe that the TARGET
SUBJECTS have aided and abetted and are aiding and abetting those
substantive offenses, in violation of 18 U.S.C. § 2.

bears a unique electronic number called an ESN and an assigned telephone number.  It is requested that interception be permitted over any changed telephone numbers subsequently assigned to the above-listed IMSI for the TARGET CELLPHONE.

8.    Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518(3), authorization is requested for interception of wire communications both within the Southern District of New York, and, in the event the TARGET CELLPHONE is transferred outside the jurisdiction of this Court, in any other jurisdiction within the United States.  In addition, it is requested that background conversations, in the vicinity of the TARGET CELLPHONE while it is off the hook or otherwise in use, also be permitted to be intercepted.

9.    It is anticipated that TARGET SUBJECT EMMANUEL ORUCHE will use the TARGET CELLPHONE to communicate to and from the Southern District of New York, as well as other locations. This belief is supported by the facts described below.  In any event, pursuant to United States v. Rodriguez, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992), a Court in the Southern District of New York is empowered to issue an Order for the interception of wire communications over telephones located in

7

other districts, as long as the interceptions of these
communications are first heard in the Southern District of New
York.

10.   In connection with the telecommunication company
which provides the service for the TARGET CELLPHONE, all
interceptions over the TARGET CELLPHONE will automatically be
routed to New York, New York, regardless of where the telephone
calls are placed to or from.   Accordingly, all interceptions will
first be heard in the Southern District of New York.   During the
requested wire surveillance, all monitoring will be performed in
New York, New York, by law enforcement officers authorized under
Section 2510(7) of Title 18, United States Code, including law
enforcement officers with the DEA, and Government employees or
individuals operating under a contract with the Government,
including, if necessary, translators, who will be acting under
the supervision of investigative or law enforcement officers
authorized to conduct the interception, and specifically under
the supervision of law enforcement officers from the DEA.

## OBJECTIVES

11.   There is probable cause to believe that the
interception of wire communications, the authorization for which
is sought herein, will help to reveal:   (i) the nature, extent

8

and methods of operation of the narcotics activities of the
TARGET SUBJECTS; (ii) the identities of the TARGET SUBJECTS,
their accomplices, aiders and abettors, co-conspirators, and
participants in their illegal activities; (iii) the source,
receipt, and distribution of narcotics, contraband, and money
involved in those activities; (iv) the locations and items used
in furtherance of those activities; (v) the existence and
locations of records; (vi) the locations and sources of resources
used to finance their illegal activities; and (vii) the locations
and disposition of the proceeds from those activities.   In
addition, these wire communications are expected to constitute
admissible evidence of the commission of the above-described
offenses.

**PRIOR APPLICATIONS**

12.   I have been informed that reviews have been
conducted of the electronic surveillance files of the Drug
Enforcement Administration, Immigration and Customs Enforcement
and the Federal Bureau of Investigation.[5]  Based on these reviews,
I have been informed that there have been no prior applications
for Court authorization to intercept wire, oral, or electronic

_____

[5]    A check of DEA, ICE and FBI files was completed on or about
August 25, 2006.

9

communications of the TARGET SUBJECTS, or over the facilities or places named herein, with the exception of the following:

a.  An order dated May 25, 2006, signed by the Honorable Naomi Reice Buchwald, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by TARGET SUBJECT CHIMDI IBIAM, a/k/a "Actor" (the "Ibiam Phone").  Interceptions pursuant to that order began on May 26, 2006, and ended on June 23, 2006.

b.  An order dated June 23, 2006, signed by the Honorable William H. Pauley III, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30 day-period. Interceptions pursuant to that order began on June 23 and ended on July 21, 2006.

c.  An order dated July 21, 2006, signed by the Honorable Richard J. Holwell, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30-day period. Interceptions pursuant to that order began on July 21 and ended on August 22, 2006.

d.  An order dated August 7, 2006, signed by the Honorable Stephen C. Robinson, United States District Judge,

Southern District of New York for a New York cell phone number used by EMMANUEL OBI MADUKA, aka "Mazu" (the "Maduka Phone"). TARGET SUBJECT CHIMDI IBIAM, a/k/a "Actor," was intercepted over the Maduka Phone. Interceptions pursuant to that order began on or about August 7, 2006, and ended on or about August 23, 2006.

e. An order dated August 30, 2006, signed by the Honorable Denise L. Cote, United States District Judge, Southern District of New York for the TARGET CELLPHONE (the "August 30th Order"). Interceptions pursuant to that order began on or about August 31, 2006, and are ongoing. As discussed below, intercepted communications reveal that TARGET SUBJECT EMMANUEL ORUCHE uses the TARGET CELLPHONE in furtherance of his narcotics-trafficking activities.

f. An order dated September 21, 2006, signed by the Honorable Gerard E. Lynch, United States District Judge, Southern District of New York for another cell phone number used by ORUCHE. Interceptions pursuant to that order began on or about September 21, 2006, and are ongoing.

11

I.   THERE IS PROBABLE CAUSE TO BELIEVE THAT TARGET SUBJECTS ARE
     USING AND WILL CONTINUE TO USE THE TARGET CELLPHONE IN
     FURTHERANCE OF THE TARGET OFFENSES.

     A.   Overview of Criminal Investigation of Target Subjects

          13.  As set forth below and in my affidavit in support

of the August 30th Order (the "August 30th Affidavit"), there is

probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE is

using the TARGET CELLPHONE in furtherance of narcotics

trafficking activities involving the importation of heroin into

the United States from Nigeria and other countries, and the

distribution of heroin within the United States.  ORUCHE, the

user of the TARGET CELLPHONE, has been identified as a member of

a drug organization that brings heroin from Pakistan, through

Turkey and countries in Africa, and to the United States for

ultimate distribution.  Wire interceptions have further revealed

that ORUCHE is involved in the distribution and/or export of

cocaine from or within the United States.

     B.   Interception of the Target Cellphone Pursuant to the
          August 30th Order

          14.  Interception of the TARGET CELLPHONE pursuant to

the August 30th Order began on or about August 31, 2006 and is

ongoing.  The pertinent calls made and received on the TARGET

CELLPHONE, some of which are summarized below, demonstrate that

12

230

the TARGET CELLPHONE is being used by TARGET SUBJECT EMMANUEL

ORUCHE and other TARGET SUBJECTS, to arrange for the importation

and distribution of heroin and cocaine.  Based on my training and

experience and my discussions with other law enforcement officers

involved in this investigation, I have also included in the

following summaries interpretations of certain terms and phrases.[6]

    September 1, 2006

        a.    On or about September 1, 2006, at

approximately 11:39 a.m., TARGET SUBJECT FNU LNU, a/k/a "Okey"

("OKEY"), using a telephone assigned call number (713) 449-0092,

called TARGET SUBJECT EMMANUEL ORUCHE, using the TARGET

CELLPHONE.  At the outset of the call, OKEY asked ORUCHE how he

was doing.  ORUCHE replied: "I'm good. . .  Me and this person

just saw."  When OKEY asked who ORUCHE was talking about, ORUCHE

responded: "Me and the 10 o'clock person."  OKEY then asked: "You

and the person talked, or you and godfather talked?"  ORUCHE

responded: "Godfather and I talked."  Later in the conversation,

ORUCHE asked: "How many is it?  Let me know how much.  How many

---

[6]  The original language of many of the intercepted conversations
was Igbo, a West African language.  These conversations have been
translated by translators assigned to assist the DEA in
connection with this case.  Translations are preliminary and are
subject to modification.  Quoted portions are not necessarily
exact quotes, but are the sum and substance of the calls
according to the monitoring agent or translator.

did you say it is?" OKEY then responded: "What the person is saying is . . . you know I don't want to say anything on my phone, you know what I mean. . . . I don't say anything on my phone." Later OKEY stated: "The thing is, the person and I have spoken, is just, he says to check with him this afternoon, but he says it's in his home. . . . You understand what I mean? So, he used to give me when I was doing it but he and I still keep in touch. This person is reliable." OKEY then asked: "But the person you all meet, what the person is saying is not useful?" ORUCHE then replied: "The person said we will have about six by Tuesday." Later in the conversation, OKEY stated: "I know the routes of those that use to give me things then, you understand what I mean, but you know . . . what is being searched for now, where people are watched, you don't know who is or isn't watched . . . . If this person calls, I'll let you know but the other people, go and meet them. . . . You understand what I mean, meet the other people because that person won't meet 'Esy.' Because 'Esy' says its by Tuesday or Wednesday that he/she will have something. So if there's no money, try to pump some money from New York to start." (Session 121). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this

14

conversation, ORUCHE and OKEY were discussing the trafficking of heroin.  The reference to "six" is to six kilograms of heroin.

September 5, 2006

b.    On or about September 5, 2006, ORUCHE, using the TARGET CELLPHONE, spoke with TARGET SUBJECT FNU LNU, a/k/a "Mike," using a telephone assigned call number (516) 924-8833 (the "8833 Number").  During the conversation, ORUCHE stated: "It is business that I am looking for, not pleasure.  You know with this out thing, we can supply anywhere."  Shortly thereafter, he continued: "Yeah, so I'm looking for how to get business here. You know here's better than our side.  Even though things have spoiled here but there are still people that gives things, you understand?"  After "Mike" said "Yeah, ok," ORUCHE continued: "If I can get like two or four and pay them . . . you understand." (Session 904).  Based on my experience and training, participation in this investigation, and review of other recorded communications, I believe that during this conversation, ORUCHE and "Mike" were discussing the trafficking of heroin; the reference to "two or four" is to two or four kilograms of heroin.

September 7, 2006

c.    On or about September 7, 2006, at approximately 1:43 p.m., TARGET SUBJECT FNU LNU, a/k/a "Charlie"

15

233

("CHARLIE"), called ORUCHE, using the TARGET CELLPHONE. During

the call, CHARLIE asked: "He said to ask you, um, like if it's

taken, um, one house, how many nights will it stay?" ORUCHE

replied: "Tell him one week, you understand?" CHARLIE then

asked: "Wait, one week in one house?" ORUCHE replied: "Yes, one

week." CHARLIE then said: "No, it's too long, which one is,

what's one week in one house?" Shortly thereafter, ORUCHE

stated: "No, you don't take and then bring money man, I'm not a,

this thing. . . ." CHARLIE then stated: "I'm not agreeing. I'm

saying if it's agreed it will be, if you take, it goes, you go

get money and give them the one that [U/I] this is what they do."

ORUCHE then stated: "No, for me to make money, you understand, I

will give it to they people that do things for me, [U/I], give me

money, one money." After some further back and forth of this

sort, ORUCHE stated: "But if they are giving me five five, I will

guarantee them money, when I get there I'll break it down six six

and make one one. They'll get their money in four days if they

give it to me." CHARLIE then asked: "If they give it to you at

what?" ORUCHE replied: "Five five." After CHARLIE stated no,

ORUCHE stated: "Within three days, give them their money."

(Session 1316). Based on my training and experience,

participation in this investigation, and review of other

16

intercepted communications, I believe that during this conversation, ORUCHE and CHARLIE were discussing the trafficking of heroin - specifically, whether CHARLIE's associate would provide heroin to ORUCHE on consignment (i.e., for later payment). The reference to "one house" is to some quantity of heroin; the references to "five five" and "six six" are to $55,000 and $66,000, the prices at which ORUCHE hoped to buy and sell, respectively, one kilogram of heroin.

       d.   On or about September 7, 2006, at approximately 6:43 p.m., FNU LNU, a/k/a "Mazi" ("MAZI"), using a telephone assigned call number (713) 291-8055, called ORUCHE, using the TARGET CELLPHONE. During the call, ORUCHE asked: "How many did you say you have?" MAZI then replied: "I said if I have at least three I'll give it to you, then if you call them and give them three in Nigeria for the 3000, I give you the 2000 [U/I]. Give them the money in Nigeria, if . . . ." ORUCHE then asked: "Is it as 128?" MAZI replied: "What I told you was 130 but if you say it's 128 . . . just that I need the money." ORUCHE then stated: "Okay, let me make a call tomorrow morning you understand. When I make the call, I'll tell you where they will take it at Lagos. . . . But you said you have 3000 right?" MAZI replied: "Yes, 3000, but I need more than that but this is

17

what . . . based on what you said I need 500 all together but I don't have the whole 3800 or 900 so the remaining one . . . ." ORUCHE then stated: "If must be . . . because it usually. . . The amount you are saying you need, if it's calculated, you will be owing me 900." MAZI then replied: "That's what I'm saying if you give then the whole 500, and I give you the 3000, by Thursday next week, I will another money and give you the money if you are around or if you want, I'll wire it to you." (Session 1403). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE and MAZI were discussing a heroin transaction – specifically, MAZI's purchase of 500 grams of heroin from ORUCHE for approximately $35,000, to be paid in Nigeria. The reference to "500" is to either 500 grams of heroin or $5000; the references to "3000" and the like are to $30,000 and the like; the references to "128" and "130" are to the exchange rates used to calculate payment in Nigeria.

   September 13, 2006

        e.    On or about September 13, 1006, ORUCHE had two conversations with TARGET SUBJECT FNU LNU, a/k/a "Mike," using the 8833 Number. During the first conversation, ORUCHE asked: "Have you confirmed with this woman?"  "Mike" responded:

18

"No, . . . she hasn't called me, and I didn't call her yet."
ORUCHE then stated: "So maybe she hasn't gotten it yet, since she
hasn't called you."  "Mike" replied: "Probably, but when I'm done
talking to you now, I'll call her."  ORUCHE then stated: "Okay,
so I'll know what I'm doing."  (Session 2452).  Approximately
three minutes later, "Mike" called back and told ORUCHE that
"Ngozi" was on the line.  "Mike" then stated: "She said that as
of yesterday, they didn't pay any money in.  I am tired of this
kind of thing."  ORUCHE then stated: "Hold on, hold on, hold on,
let me call these people."  ORUCHE then provided "Mike" and
"Ngozi" with a Nigerian telephone number and instructed "Ngozi"
to call it.  When "Mike" asked, "What's the name of the man?,"
ORUCHE replied: "Ralph or Chidi Obi."  ORUCHE also stated: "I'm
also calling him now to know if I will get him, because all these
things, I'm tired of this nonsense."  (Session 2453).  Based on
my training and experience, participation in this investigation,
and review of other intercepted communications, I believe that
during these conversations, ORUCHE and "Mike" were discussing a
deposit that they had been expecting in connection with their
narcotics-trafficking activities; since the deposit had not
arrived, ORUCHE gave "Mike" (and "Ngozi") the Nigerian telephone

19

237

number and identified it as the number of TARGET SUBJECT FNU LNU,
a/k/a "Ralph," a/k/a "Chidi Obi."

September 15, 2006

   f. On or about September 15, 2006, at
approximately 10:33 p.m., an unidentified male ("UM1"), using a
telephone assigned call number (614) 989-9905, called ORUCHE,
using the TARGET CELLPHONE. At the beginning of the call, ORUCHE
stated: "One of my friends that died . . . .  I'm trying to go to
his wake keeping now." ORUCHE continued: "[H]e was on his way to
Nigeria and had a heart attack on the plane. . . . You know these
people . . . .  I think he ate something before leaving."
Shortly thereafter, the UM1 stated: "And if what you said is
true, these people will definitely know. . . .  They'll find out
if that's what happened." ORUCHE stated: "Yea, that's it.  But
they diverted. . . .  He was in the plane, and had this eeeh
. . . and they diverted him to Canada."  The UM1 then stated: "I
have another bad news now, you know, 'cos all the suffering I
went through to get there yesterday, this man called me and was
telling me . . . the way the thing was, but I'm just trying to
figure out what I'll do now."  The UM1 then continued: "I was
telling him that it's the same thing."  ORUCHE replied: "It's the
same thing. . . .  It's just that I mashed it up. . . .  It's the

20

238

same thing that you gave me that I mashed up, and gave it to

them. . . . you gave me two colors; one is white and the other is

dark." The UM1 answered: "The color is not the problem, you

understand . . . . He said that it's the way that the stuff is.

It was broken up." After additional conversation, ORUCHE stated:

"The way I do it is I break it up and then give it to the

person." The UM1 asked: "But why? The person should do whatever

the person wants with it." ORUCHE stated: "I usually break it up

in front of them so they'll know." (Session 2724). Based on my

training and experience, participation in this investigation, and

review of other intercepted communications, I believe that during

this conversation, ORUCHE and the UM1 were discussing two things:

a cocaine courier who died enroute from Atlanta to London and a

delivery of heroin and/or cocaine that ORUCHE had made. The

reference to "he ate something before leaving" is to the courier

having swallowed drugs, and the reference to "these people will

definitely know" is to law enforcement discovering the load of

cocaine that the courier had swallowed.

        g.   From other law enforcement officers, I have

learned that on or about August 31, 2006, a Northwest Airlines

flight from Atlanta to London (with a stop in Detroit) was

diverted to Halifax, Canada, when a passenger became sick. That

passenger subsequently died, and an autopsy revealed
approximately 66 balloons containing approximately 660 grams of
cocaine inside his stomach; approximately 12 of the balloons had
ruptured.  The individual carrying the cocaine was ticketed on a
subsequent flight from London to Nigeria.  Based on my training
and experience, and my participation in this investigation, I
believe that the individual who died on this flight was the
courier about whom ORUCHE was talking in the communication
summarized in the previous paragraph.

September 18, 2006

h.    On or about September 18, 2006, at
approximately 11:30 a.m., TARGET SUBJECT JOY LNU, using a
telephone assigned call number (718) 522-9073, called ORUCHE,
using the TARGET CELLPHONE.  At the beginning of the call, "Joy"
stated: "Will you tell them to stop using my address anymore
because this guy called me yesterday."  ORUCHE then asked who had
called her, and "Joy" replied: "Chimdi."  She then stated:
"Called me yesterday saying that they were talking about the
people that keep coming to my place with you know, my address
that they use."  ORUCHE replied: "You know it's them, it this
man, what's his name, the friend of . . . the one that lives in
Nigeria, he keeps giving people your address."  "Joy" then

22

stated: "You know?  And because I no longer answer my cell phone,
I don't know what's going on."  Shortly thereafter, "Joy" stated:
"Keinde called me." When ORUCHE asked who Keinde was, "Joy"
replied: "The Yoruba on that lives in Maryland or something.  Let
me give you his number to call him and tell him not to call me
anymore to ask me anything concerning this thing you know,
because I'm no longer answering my phone. . . . cause I no longer
want to be talking about anything about this thing on you know
the phone cause this guy called me collect yesterday telling me
that they were asking my name . . . ."  ORUCHE then asked: "How
is it that they are even asking your name in this thing?"  "Joy"
then replied: "Because they were asking, you know who was coming
to our place you know, that my name is what comes out there, and
my address.  So I don't know what's going on right now."  ORUCHE
then stated: "I don't know about that guy, that guy will have to
start watching his mouth too, you understand, yeah Actor.  I
don't know how they . . .  Actor is you know, I just don't know."
"Joy" then gave ORUCHE telephone number (240) 643-4334, and
stated: "So call him because I can't talk to him you know cause I
don't know if my phone, if they did this thing to my phone or not
so that's why I don't say anything on my phone."  Based on my
training and experience, participation in this investigation, and

23

review of other intercepted communications, I believe that during

this conversation, ORUCHE and JOY LNU were discussing a

conversation that JOY LNU had had the previous day with TARGET

SUBJECT CHIMDI IBIAM, a/k/a "Actor," who is currently

incarcerated; "Joy" was stating that she did not want the co-

conspirators to use her address in connection with any heroin

couriers because she thought that law enforcement was aware of

her involvement; she further stated that she was no longer using

her telephone because she was concerned that it was wiretapped.

September 23, 2006

i.    On or about September 23, 2006, at

approximately 5:34 p.m., an unidentified male ("UM2"), using a

telephone assigned call number (646) 305-3891, called ORUCHE,

using the TARGET CELLPHONE.  At the beginning of the call, UM2

stated that he was with "the person we went and met for furniture

one time" and that that person ("UM3") wanted to speak with

ORUCHE.  UM3 then took the telephone from UM2, and said the

ORUCHE: "I've been looking for you for the longest time."

Shortly thereafter, UM3 asked: "You know that thing we talked

about? . . .  That thing we discussed that day over there?"  When

ORUCHE answered in the affirmative, UM3 continued: "I have gotten

many of it now, and I have been looking for you."  ORUCHE

24

replied: "Okay then, come and let us see then."  UM3 replied that

he was "coming right now."  (Session 4033).  Based on my training

and experience, participation in this investigation, and review

of other intercepted communications, I believe that during this

conversation, ORUCHE and UM3 were discussing a potential

narcotics transaction; the reference to "furniture" is to heroin.

## II. ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR UNLIKELY TO SUCCEED IF TRIED AND THUS THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS

15.  The investigation to date has produced some

evidence against the TARGET SUBJECTS concerning the TARGET

OFFENSES.  As discussed above, the principal goals of this

continuing investigation are to identify and develop evidence

against not only the currently identified TARGET SUBJECTS, but

also all of their suppliers, customers, accomplices, and

associates, as well as the locations at which the TARGET SUBJECTS

store narcotics and/or narcotics proceeds, and the methods by

which they operate their narcotics trafficking and money

laundering business.  As a result of the facts set forth above,

several investigative techniques have been tried, or reasonably

appear likely to fail if tried, or are likely to be too dangerous

to employ to achieve these objectives:

25

243

a.   There is currently no expectation that an undercover officer or confidential informant will be able to infiltrate the organization involving the user of the TARGET CELLPHONE, let alone determine the full scope of the TARGET SUBJECTS' operations, identify and meet all of the other TARGET SUBJECTS and their co-conspirators, or identify the TARGET SUBJECTS' narcotics suppliers and their confederates.  In order to make use of an undercover a viable option, there would have to be someone inside the organization working with the Government who could make the introduction.  Moreover, based on my experience as a narcotics investigator, as well as discussions with my fellow agents, I believe that drug traffickers are unlikely to discuss the full extent of their organization's activities or membership when dealing with an "outsider" such as an undercover officer or confidential informant.  Narcotics traffickers tend to be highly reticent about discussing narcotics with unknown persons.

b.   As demonstrated in the August 30th Affidavit, this and related investigations have resulted in the arrests of TARGET SUBJECT CHIMDI IBIAM, a/k/a "Actor"; Emmanuel Obi Maduka, a/k/a "Mazu"; William Wagabono; Ikechukwu Ojeogwu; and TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH.  Nevertheless, these arrests do

26

244

not obviate the need for interception of the TARGET CELLPHONE.
Other than Wagabono, none of these individuals are signed up
cooperators at this time.  Wagabono was a signed up cooperator,
but my understanding is that he is due to be released from prison
soon.  His incentive to cooperate is therefore minimal.
Moreover, any information he could provide would be purely
historical, and almost three years old.  As for the other four
individuals, although two of them, Ojeogwu and FOMUM-TIBAH, have
attended proffer sessions with the Government, law enforcement
officials do not believe that they have been completely
forthcoming and there are no additional proffers currently
scheduled.  Indeed, based on recorded telephone calls from jail
obtained pursuant to a Grand Jury subpoena, there is some
indication that FOMUM-TIBAH is still collaborating with TARGET
SUBJECT EMMANUEL ORUCHE.  Additionally, neither Ojeogwu nor
FOMUM-TIBAH are knowledgeable enough about the organization to
negate the need for a wiretap.  FOMUM-TIBAH, for example,
indicated that she knew ORUCHE worked for two individuals in
Detroit, but she was unable to provide their names.  Even if
someone other than Wagabono were signed up in the future, there
is no information at this time indicating that they could advance
the investigation proactively.  ORUCHE undoubtedly knows that

27

they have been arrested and would not trust them if they were released or tried to place a call to ORUCHE. Accordingly, these arrests are unlikely to further the investigation substantially.

c.    The investigation has involved the use of some physical surveillance to observe ORUCHE. But pure physical surveillance, without the wiretap, would not accomplish the goals of this investigation given the geographical breadth of the organization, including couriers who travel from Africa, Turkey, and elsewhere with heroin. Pure physical observation, without wire surveillance, would not be likely to advance the investigation, as the purpose of a TARGET SUBJECT's visit to a location or in-person meeting with another individual would not be known. With the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, with the knowledge of the purpose and nature of the meeting. Wire surveillance would also minimize the risks of discovery inherent in following subjects or remaining at target locations for extended periods of time.

d.    Telephone toll records and pen registers have been used in this investigation and have been helpful to connect certain individuals. However, such information provides only

28

246

limited information.  At most, it reveals contact between two
individuals, not the nature of the contact or the substance of
the conversation.  Moreover, these methods do not enable law
enforcement officers to identify with certainty the persons
involved in the conversations or the significance of the
communications in the context of ongoing narcotics trafficking or
money laundering.  Among other problems, a telephone number
appearing in the records may not be listed or subscribed in the
name(s) or address(es) of the person(s) using the telephone.
Indeed, in this investigation, at least some of the individuals
with whom the TARGET CELLPHONE has been in contact cellular
telephones with no subscriber information or false subscriber
information.  In addition, many phone numbers in contact with the
TARGET CELLPHONE are numbers from other countries.  Subscriber
information for such numbers are not readily available to United
States law enforcement authorities.  It is only through
intercepting calls into and out of the TARGET CELLPHONE that we
have been able to gain any understanding as to the identity of a
caller and that individual's role in the drug-trafficking
organization.

                    e.   Use of a federal grand jury does not appear
to be a promising method of investigation.  Witnesses who could

29

provide additional relevant evidence to a grand jury have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation.  Because any such individuals would face prosecution, it is unlikely that they would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony.  Immunizing them could thwart the public policy that they be held accountable for their crimes.  The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation.  For many of the same reasons, the use of witness interviews does not appear to be a promising method of investigation.  Again, witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation.

        f.    While certain addresses associated with the TARGET SUBJECTS have been identified, a search of such locations is impracticable without more specific knowledge about the identity of the individual living there and the nature of his or her involvement in the organization.

g.     Arresting any of the TARGET SUBJECTS and attempting to obtain their cooperation in investigating the narcotics trafficking and money laundering of their criminal associates is an investigative route that, in the judgment of the law enforcement agencies involved, is too risky at the present time.    Were an attempt made to arrest certain TARGET SUBJECTS and obtain their cooperation in the current investigation without success, other TARGET SUBJECTS almost certainly would be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize the investigation. Accordingly, the risks of failure in attempting to obtain these targets' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make that investigative technique unavailable.

h.     Although the wiretaps on the Ibiam Phone were useful in developing evidence against certain of the TARGET SUBJECTS, including ORUCHE, the wiretaps did not reveal the full extent of the TARGET SUBJECTS' narcotics trafficking and money laundering activities.    For example, the wiretaps did not reveal the identity of all TARGET SUBJECTS, where they store their drugs and drug proceeds, or who the suppliers to ORUCHE are.

16.    Because the above-described investigative

31

techniques have been unsuccessful, authorization to intercept communications over the TARGET CELLPHONE is necessary to identify and develop evidence against the TARGET SUBJECTS.

III.  CONCLUSION

    A.  Personnel

       17.  As noted above, this case is being investigated by the DEA.  It is anticipated that, during the requested electronic surveillance, all monitoring will be performed and supervised in the Southern District of New York by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the DEA, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

    B.  Minimization

       18.  All monitoring of wire communications over the TARGET CELLPHONE will be minimized in accordance with Chapter 119 of Title 18, United States Code.  The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of

wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges. In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that TARGET SUBJECTS or any of their confederates, when identified, are not participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

19. It is requested that the order authorizing interception of wire communications provide that, if necessary, translators be authorized to assist in conducting this surveillance and to receive disclosure of intercepted communications. Certain of the TARGET SUBJECTS may be expected to communicate with each other in Igbo, a West African language.

33

It may therefore be necessary to secure the services of translators in order to assist Agents in monitoring and translating the intercepted communications. All such translators will be under contract to the DEA and will be directly supervised by the DEA. It is further requested, pursuant to Title 18, United States Code, Section 2518(5), that, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

   C.   **Authorization Request**

        20.   The information set forth in this affidavit establishes, among other things, probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE is utilizing the TARGET CELLPHONE to discuss and engage in the TARGET OFFENSES. Based on the foregoing, it is my opinion that the interception of wire communications occurring over the TARGET CELLPHONE, as specified above, is essential to uncover the full scope of the illegal activity described herein.

        21.   IT IS HEREBY REQUESTED that orders be issued authorizing Special Agents of the DEA and other investigative and law enforcement officers to continue intercepting wire communica-

34

tions occurring over the TARGET CELLPHONE concerning the affairs of the enterprise described herein and the TARGET SUBJECTS' commission of the above-described offenses.  Because the offenses described herein are continuing in nature and are likely to continue after the initial interception of the particular communications that are the objects of this request, it is requested that the Court's orders authorizing interception of wire communications not be required to terminate automatically when the communications described above have first been obtained, but be permitted to continue until all wire communications are intercepted that reveal fully the manner in which the TARGET SUBJECTS, and others as yet unknown, participate in the above-described offenses, or until the accomplishment of the objectives set forth herein, or for a period of thirty (30) days, whichever is earlier.  It is further requested that such thirty (30) day period begin on the date of the Court's order.

    22.  IT IS HEREBY REQUESTED, pursuant to the provisions of Title 18, United States Code, Section 2518(4), that it be ordered that the ultimate service provider for the TARGET CELLPHONE furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the

35

253

persons whose communications are to be intercepted (including all incoming and outgoing calls), pen register information (including all dial digits), trap and trace information, and audio interception capability.  The assistance of these providers is required to accomplish the objectives of the requested interceptions.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

23.  It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

ANDREW ARTHURTON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to me before this
27th day of September, 2006

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

36

254