UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                     :
IN THE MATTER OF THE APPLICATION OF  :
THE UNITED STATES OF AMERICA FOR     :    AFFIDAVIT IN SUPPORT
AUTHORIZATION TO INTERCEPT WIRE      :    OF APPLICATION FOR
COMMUNICATIONS OCCURRING OVER THE    :    AUTHORIZATION TO
CELLULAR TELEPHONE ASSIGNED CALL     :    INTERCEPT WIRE
NUMBER (832) 613-4067, WITH          :    COMMUNICATIONS
INTERNATIONAL MOBILE SUBSCRIBER      :
IDENTIFICATION ("IMSI") NUMBER       :
310260220884062.                     :
                                     :
- - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK          )
COUNTY OF NEW YORK         )
SOUTHERN DISTRICT OF NEW YORK ):ss.:

         ANDREW ARTHURTON, a Special Agent with the Drug

Enforcement Administration ("DEA"), being duly sworn, deposes and

states:


I.  **INTRODUCTION**

         1.    I am an "investigative or law enforcement officer

of the United States" within the meaning of Section 2510(7) of

Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and

to make arrests for offenses enumerated in Section 2516 of Title

18, United States Code.  I have been employed as a Special Agent

for the DEA for approximately four years.  I have participated in

several investigations of unlawful drug distribution and have

conducted or participated in surveillance, the execution of

search warrants, debriefings of informants and reviews of taped
conversations and drug records. Through my training, education
and experience, I have become familiar with the manner in which
illegal drugs are transported, stored, and distributed, and the
methods of payment for such drugs.

2.    I submit this affidavit in support of an
application for an order pursuant to Section 2518 of Title 18,
United States Code, authorizing the interception and recording of
wire communications concerning offenses enumerated in Section
2516 of Title 18, United States Code — that is, offenses
involving (1) importation of, distribution of, and possession
with intent to distribute of, controlled substances, the use of
wire facilities to facilitate the same, conspiracy to do the same
and attempts to do the same, in violation of Title 21, United
States Code, Sections 841, 843(b), 846, 952, 960 and 963; and (2)
laundering the monetary proceeds of criminal activity, in
violation of Title 18, United States Code, Sections 1956 and 1957
(the "TARGET OFFENSES").[1]

3.    I believe that the TARGET OFFENSES have been
committed, are being committed, and will continue to be committed

---

    Although not a predicate offense under 18 U.S.C. § 2516, the
DEA is also investigating the TARGET SUBJECTS (as subsequently
defined herein) in connection with violations of 18 U.S.C. § 2,
for aiding and abetting the TARGET OFFENSES.

2

298

by EMMANUEL ORUCHE, WISE UKOMADU, REBECCA AMBO FOMUM-TIBAH,[2] FNU

LNU, a/k/a "Charlie," FNU LNU, a/k/a "Mike," FNU LNU, a/k/a

"Ralph," a/k/a "Chidi Obi," JOSEPH OLUIGBO, OKEKE FRANCIS,

MICHAEL ANORUE, EMMANUEL OBIDIASO, LARRY DAVIS, TONY EBI, LESLIE

NESBITT, OKPARA OKECHUKWU, COSME FREDERIC TIBURCE JEMY, and

others as yet unknown (the "TARGET SUBJECTS").   The requested

Order is sought for a period of time until the interception fully

reveals the manner in which the above-named individuals and their

confederates participate in the TARGET OFFENSES, or for a period

of thirty (30) days, whichever occurs first, pursuant to Title

18, United States Code, Section 2518(5).   Pursuant to Section

2518(5) of Title 18, United States Code, it is further requested

that the 30-day period be measured from the earlier of the date

on which investigative or law enforcement officers begin to

conduct interception under this Court's Order or ten days after

the date of this Court's Order.

        4.   This case is being investigated by the Drug

Enforcement Administration, in the New York metropolitan area,

Detroit, Michigan, and elsewhere in the United States.   I have

personally participated in the investigation of the offenses

referred to above, and make this affidavit based on my personal

---

As discussed below in paragraph 17, TARGET SUBJECT REBECCA
AMBO FOMUM-TIBAH was arrested on or about August 9, 2006, and is
currently detained.   Based on recorded telephone conversations
with TARGET SUBJECT EMMANUEL ORUCHE, however, I believe she may
still be involved in the TARGET OFFENSES.   Accordingly, she is
included as a TARGET SUBJECT.

participation in this investigation, and based on reports made to me by other agents and officers and other law enforcement authorities.   Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed.   Such statements are reported in substance and in part, unless otherwise indicated.

        5.    Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date.   Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued.   Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications.   Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate that:

DESIGNATED CELLULAR TELEPHONE

4

6.    There is probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE has been using, is using, and will in the future use, in order to accomplish, to discuss and to commit the TARGET OFFENSES, a prepaid cellular telephone assigned call number (832) 613-4067, with IMSI number 310260220884062, no listed subscriber, and service provided by T-Mobile USA (the "TARGET CELLPHONE").

7.    I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack.  The cellular telephone system divides the New York City and other metropolitan area into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed.  Each portable cellular telephone that does not contain party lines bears a unique electronic number called an ESN or an IMSI number, and an assigned telephone number.  It is requested that interception be permitted over any changed telephone numbers

5

301

subsequently assigned to the IMSI numbers for the TARGET CELLPHONE.[3]

8.    Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518(3), authorization is requested for interception of wire communications both within the Southern District of New York, and, in the event the TARGET CELLPHONE is transferred outside the jurisdiction of this Court, in any other jurisdiction within the United States.    In addition, it is requested that background conversations in the vicinity of the TARGET CELLPHONE while it is off the hook or otherwise in use also be permitted to be intercepted.

9.    It is anticipated that the TARGET SUBJECT EMMANUEL ORUCHE will use the TARGET CELLPHONE to place calls to and from the Southern District of New York, as well as other locations.    This belief is supported by the facts described below.    In any event, pursuant to United States v. Rodriguez, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992), a Court in the Southern District of New York is empowered to issue an Order for the interception of wire communications over telephones located in other districts, as long as the interceptions of these

_____

        The TARGET CELLPHONE utilizes an IMSI number, encoded into a removable computer chip located inside the instrument.    The IMSI number assigned to the computer chip is unique to the subscriber, as opposed to the phone.    This application seeks authorization to intercept communications occurring over any telephones or telephone numbers accessed by or through the use of the IMSI number identified above.

communications are first heard in the Southern District of New York.

10.  In connection with the telecommunication companies which provide the service for the TARGET CELLPHONE, all interceptions over the TARGET CELLPHONE will automatically be routed to New York, New York, regardless of where the telephone calls are placed to or from.  Accordingly, all interceptions will first be heard in the Southern District of New York.  During the requested wire surveillance, all monitoring will be performed in New York, New York, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including law enforcement officers with the DEA, and Government employees or individuals operating under a contract with the Government, including, if necessary, translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception, and specifically under the supervision of law enforcement officers from the DEA.

## OBJECTIVES

11.  There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal:  (i) the nature, extent and methods of operation of the TARGET SUBJECTS' narcotics trafficking and money laundering activities; (ii) the identity of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-

303

conspirators and participants in their illegal activities; (iii) the receipt and distribution of contraband and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records relating to those activities; (vi) the location and source of resources used to finance their illegal activities; and (vii) the location and disposition of the proceeds from those activities.  In addition, these wire communications are expected to constitute admissible evidence of the commission of the TARGET OFFENSES.

### PRIOR APPLICATIONS

12.  I have been informed that reviews have been done of the electronic surveillance files of the New York Drug Enforcement Task Force, the Drug Enforcement Administration (DEA), the Federal Bureau of Investigation (FBI) and other law enforcement agencies.[4]  Based on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS, or over the facilities or places named herein, except as follows:

a.  An order dated May 25, 2006, signed by the Honorable Naomi Reice Buchwald, United States District Judge,

---------------------------

A check of DEA and FBI files was completed on or about October 10, 2006

304

Southern District of New York, authorizing wire interceptions over a cellular telephone used by Chimdi Ibiam (the "Ibiam Phone"). Interceptions pursuant to that order began on or about May 26, 2006, and ended on or about June 23, 2006.

b.    An order dated June 23, 2006, signed by the Honorable William H. Pauley III, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30 day-period. Interceptions pursuant to that order began on or about June 23, 2006, and ended on or about July 21, 2006.

c.    An order dated July 21, 2006, signed by the Honorable Richard J. Holwell, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30-day period. Interceptions pursuant to that order began on or about July 21, 2006, and ended on or about August 22, 2006, with Ibiam's arrest.

d.    An order dated August 7, 2006, signed by the Honorable Stephen C. Robinson, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by Emmanuel Obi Maduka, a/k/a "Mazu" (the "Maduka Phone"). Interceptions pursuant to that order began on or about August 7, 2006, and ended on or about August 23, 2006, with Maduka's arrest.

e.    An order dated August 30, 2006, signed by the
Honorable Denise L. Cote, United States District Judge, Southern
District of New York, authorizing wire interceptions over a
cellular telephone used by TARGET SUBJECT EMMANUEL ORUCHE (the
"FIRST ORUCHE PHONE").  Interceptions pursuant to that order
began on or about August 31, 2006, and terminated on or about
September 27, 2006.  As discussed in part below, interception of
wire communications occurring over the FIRST ORUCHE PHONE reveal
that the user of the phone was ORUCHE and that he is using the
FIRST ORUCHE PHONE to conduct his narcotics trafficking
activities.

f.    An order dated September 21, 2006, signed by
the Honorable Gerard E. Lynch, United States District Judge,
Southern District of New York, authorizing wire interceptions
over another cellular telephone used by TARGET SUBJECT EMMANUEL
ORUCHE (the "SECOND ORUCHE PHONE").  Interceptions pursuant to
that order began on or about September 21, 2006, and are ongoing.
As discussed in part below, interception of wire communications
occurring over the SECOND ORUCHE PHONE reveals that the user of
the phone is ORUCHE and that he is using the SECOND ORUCHE PHONE
to conduct his narcotics trafficking activities.

g.    An order dated September 27, 2006, signed by
the Honorable Denise L. Cote, United States District Judge,
Southern District of New York, authorizing continued wire

10

interceptions over the FIRST ORUCHE PHONE.   Interceptions

pursuant to that order began on or about September 27, 2006, and

are ongoing.   As discussed in part below, interception of wire

communications occurring over the FIRST ORUCHE PHONE reveal that

the user of the phone is ORUCHE and that he is using the FIRST

ORUCHE PHONE to conduct his narcotics trafficking activities.


II.   **THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS AND OTHERS AS YET UNKNOWN WILL USE THE TARGET CELLPHONE IN FURTHERANCE OF TARGET OFFENSES**

13.   As set forth below, there is probable cause to

believe that TARGET SUBJECT EMMANUEL ORUCHE is using the TARGET

CELLPHONE in furtherance of narcotics trafficking activities

involving the importation of heroin into the United States from

Nigeria, Turkey, and other countries, and the distribution of

heroin within the United States.

### ORUCHE'S HEROIN-TRAFFICKING ACTIVITIES

14.   From an ongoing investigation, I have identified

TARGET SUBJECT EMMANUEL ORUCHE, the user of the TARGET CELLPHONE,

as a member of a drug organization that brings heroin from

Pakistan, through Nigeria, Turkey, and other countries, to the

United States for ultimate distribution.   Three heroin couriers

arrested by law enforcement authorities have identified ORUCHE as

the intended recipient of the heroin.   In addition,

communications intercepted over the Ibiam Phone, the FIRST ORUCHE

11

307

PHONE, and the SECOND ORUCHE PHONE reveal that ORUCHE is involved in the distribution of heroin within the United States.

**Couriers Naming ORUCHE as the Recipient of Imported Heroin**

15.    On December 5, 2003, Immigration and Customs Enforcement ("ICE") agents arrested a heroin courier named William Wagabono, as he arrived in the United States at Newark International Airport.  Following his arrest, Wagabono stated that the heroin he was carrying was intended for an individual he knew as "Emmanuel" or "Manny" who drove a white Lexus.  ICE agents retrieved registration information for all white Lexus cars in New York registered to individuals named "Emmanuel." Based on that search, ICE agents obtained a photograph of TARGET SUBJECT EMMANUEL ORUCHE, whom Wagabono subsequently identified as the person to whom he was supposed to deliver heroin.  Wagabono further said that he was paid to transport suitcases containing heroin from Uganda to Newark via England on four previous occasions, and that "Manny" was the recipient of the heroin each time.  Two days after Wagabono's arrest, on or about December 7, 2003, agents attempted a controlled delivery to the Crown Motor Inn in Newark, New Jersey, where Wagabono was supposed to meet ORUCHE.  ORUCHE was observed by law enforcement agents conducting surveillance in the area.  Perhaps sensing that he was being

12

308

watched, however, ORUCHE left the area and did not meet with Wagabono.[5]

16. On or about June 2, 2006, officers of U.S. Customs and Border Protection ("CBP") at John F. Kennedy International Airport in Queens, New York ("JFK Airport") stopped an individual named Ikechukwu Ojeogwu, who had arrived from the Port of Harcourt, Nigeria, via Frankfurt, Germany. Ojeogwu was discovered to have swallowed heroin. During a post-arrest interview, Ojeogwu admitted to swallowing 60 pellets totaling approximately one kilogram, gross weight, of heroin. Ojeogwu stated that he was supposed to deliver the heroin to his "uncle," TARGET SUBJECT EMMANUEL ORUCHE, and he provided law enforcement agents with the number of the FIRST ORUCHE PHONE, which he indicated was ORUCHE's phone.[6]

17. On or about August 9, 2006, CBP officers at JFK Airport stopped TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH, who had arrived aboard a British Airways flight from Istanbul, Turkey. When FOMUM-TIBAH's answers to routine questions made officers suspicious, FOMUM-TIBAH was taken to the medical facility at JFK

---

From speaking to one of the ICE agents who handled the Wagabono case, I understand that Wagabono was prosecuted in the District of New Jersey, where he cooperated and has been sentenced. He is scheduled to be released from prison in the near future.

Ojeogwu is being prosecuted in the Eastern District of New York. While Ojeogwu has provided helpful information to law enforcement, he is not yet believed to be fully forthcoming. While he may provide fuller information after subsequent meetings, those meetings have not yet happened. He is not at this time signed up as a cooperator.

13

309

Airport for a monitored bowel movement.  FOMUM-TIBAH subsequently

passed approximately 16 pellets, one of which field tested

positive for the presence of heroin.  A vaginal insert also

dropped from her, which field tested positive for the presence of

heroin.  In all, approximately 1341 grams of heroin, net weight,

was recovered from FOMUM-TIBAH.  Among the items in FOMUM-TIBAH's

possession were a driver's license bearing the name and

photograph of TARGET SUBJECT EMMANUEL ORUCHE, as well as a

business card in his name.  Following her arrest, FOMUM-TIBAH

stated that the heroin she was carrying was to be delivered to

ORUCHE, who was her boyfriend; that she was sent on his behalf to

Istanbul to get the heroin; and that ORUCHE works in the drug

business for two unidentified individuals in Detroit.[7]

**ORUCHE's Intercepted Wire Communications Concerning Heroin**

18.  In addition to these three couriers who identified

ORUCHE as the intended recipient of heroin imported from Nigeria,

Uganda, and Turkey, wire communications intercepted over the

Ibiam Phone, the FIRST ORUCHE PHONE, and the SECOND ORUCHE PHONE

have revealed that ORUCHE is involved in the importation and

---

FOMUM-TIBAH is being prosecuted in the Eastern District of
New York.  While FOMUM-TIBAH has provided helpful information to
law enforcement, she is not yet believed to be fully forthcoming.
Indeed, based on recorded telephone calls that she has made to
ORUCHE (some of which were intercepted over the SECOND ORUCHE
PHONE and some of which I obtained through a Grand Jury subpoena
from the detention center where FOMUM-TIBAH is incarcerated), I
have reason to believe that FOMUM-TIBAH is still communicating
with ORUCHE in furtherance of the TARGET OFFENSES.  While she may
provide fuller information after subsequent meetings, those
meetings have not yet happened.  She is not at this time signed
up as a cooperator.

14

distribution of heroin and that he utilizes multiple cellular telephones in furtherance of those activities.  The following intercepted wire communications, among others, relate to ORUCHE's involvement in the importation and distribution of heroin in late September:[8]

       a.   On or about September 26, 2006, at approximately 6:03 a.m., an unidentified male ("UM1"), using a telephone assigned Nigerian call number 234 18048837 (the "Nigerian Number"), called ORUCHE, using the SECOND ORUCHE PHONE. During the call, ORUCHE asked the UM1 if he could call after he (ORUCHE) had woken up.  The UM1 then stated: "Listen, listen, 'cause something will be coming in."  (Session 46).  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, the UM1 was informing ORUCHE that a courier would shortly be traveling to the United States carrying heroin.

       b.   On or about September 26, 2006, at approximately 12:32 p.m., the UM1, using the Nigerian Number, called ORUCHE, using the SECOND ORUCHE PHONE.  During the call, ORUCHE asked: "Do you know why I told you to not talk on this

---

    Because the intercepted calls have taken place primarily in Igbo, a Nigerian language, the summaries set forth herein are based on translations prepared by individuals proficient in that language.  Translations are preliminary and are subject to modification.  Quoted portions are not necessarily exact quotes, but are the sum and substance of the calls according to the monitoring agent or translator.  My interpretations of some terms used are indicated in parentheses or are otherwise noted.

phone?  When that person comes in, he should call you.  I don't
want to go anywhere 'cause you know . . . . Let one know which
one he's suffering from.  But stop giving him that bank account
'cause it seems like these people that are brought in are given
that bank account and they know, you know.  Tell them to go to
any bank they like . . . the bank that's around where you went,
you understand? . . . 'Cause you give them that one bank.  When
they come out . . . they're supposed to know where they are
going, you understand?  They may know it off heart.  They should
stop writing it down on paper. . . . They should memorize it;
they should stop writing it, you understand?  They should have
the number to the place of residence they are going to."
(Session 69).  Based on my training and experience, participation
in this investigation, and review of other intercepted
communications, I believe that during this conversation, ORUCHE
was instructing the UM1 that, in order to minimize the risk of
interdiction, couriers should memorize the address and telephone
number of their destination, rather than writing them on paper.

        c.  On or about September 30, 2006, at
approximately 8:34 a.m., ORUCHE, using the SECOND ORUCHE PHONE,
called the UM1, using the Nigerian Number.  During the call, the
UM1 indicated that ORUCHE had woken him up.  ORUCHE then stated:
"This guy has entered the hotel."  The UM1 then replied: "Okay.
My work, my work . . . ."  (Session 125).  Based on my training

16

and experience, participation in this investigation, and review
of other intercepted communications, I believe that during this
conversation, ORUCHE was informing the UM1 that the courier
discussed in the communications summarized above had arrived.

        d.    On or about September 30, 2006, at
approximately 1:30 p.m., ORUCHE, using the SECOND ORUCHE PHONE,
called another unidentified male (the "UM2"), using a telephone
assigned call number (313) 585-7130 (the "Detroit Number").  Near
the beginning of the conversation, ORUCHE asked: "Can you come
over here?"  The UM2 replied: "Where you at?  Down there? . . .
are you at home-home?"  ORUCHE responded yes, then the UM2
stated: "I might have to.  If we have to come, I come."  ORUCHE
then stated: "Yeah, if you can come, come. . . .  I don't want to
leave this place for now."  Shortly thereafter, ORUCHE stated:
"You got to get me about two.  Big ones."  The UM2 then asekd:
"Is that what you got?"  ORUCHE replied: "I have two, yeah.  But
one, I'm talking about one now."  After the UM2 asked "What did
you say now?," ORUCHE continued: "I'm talking about twenty."  The
UM2 answered: "I know what you are talking about."  ORUCHE then
stated: "Okay, got to send them home.  Let me go, let me know if
you can make it.  Just let me know.  You know."  (Session 130).
Based on my training and experience, participation in this
investigation, and review of other intercepted communications, I
believe that during this conversation, ORUCHE was informing the

                        17


                                                            313

UM2 that he had two kilograms of heroin available (presumably the
heroin ORUCHE had received in connection with the communications
summarized above) and asking whether UM2 would come to New York
to get it.  The reference to "two" is to two kilograms of heroin;
the reference to "twenty" is to $20,000; and the reference to
"home-home" is to New York.

   e. On or about October 2, 2006, at approximately
11:20 a.m., ORUCHE, using the FIRST ORUCHE PHONE, called a
telephone assigned call number (718) 234-4200 (the "Holiday Motel
Number"), which is listed or leased to the Holiday Motel on the
New England Thruway Service Road in the Bronx, New York.  During
the call, ORUCHE asked the receptionist to connect him with "Room
18."  After he was connected to the room, ORUCHE asked a male if
he was ready.  The male, subsequently identified as TARGET
SUBJECT COSME FREDERIC TIBURCE JEMY, said he was ready.  ORUCHE
instructed him to come downstairs.  (Session 5423).  Agents
conducting surveillance at the Holiday Motel at or about that
time observed ORUCHE in a vehicle pick up JEMY.  Based on my
training and experience, participation in this investigation, and
review of other intercepted communications, I believe that JEMY
was the heroin courier about whom ORUCHE spoke in the
communications summarized above.

   f. On October 3, 2006, at approximately 4:10
p.m., ORUCHE used the FIRST ORUCHE PHONE.  (Session 5611).  From

18

314

cell-site location information, I have learned that ORUCHE was in the area of Detroit, Michigan, at that time.  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that ORUCHE traveled to Detroit to meet with UM2, the user of the Detroit Number, and deliver heroin to him.

**ORUCHE'S USE OF THE TARGET CELLPHONE**

19.  Based on intercepted wire communications and other evidence, I believe that TARGET SUBJECT EMMANUEL ORUCHE has begun using the TARGET CELLPHONE either in lieu of or in addition to the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE to commit the TARGET OFFENSES.

20.  On or about October 3, 2006, at approximately 7:07 p.m., TARGET SUBJECT EMMANUEL ORUCHE, using the FIRST ORUCHE PHONE, called TARGET SUBJECT FNU LNU, a/k/a "Leroy."  During the call, ORUCHE stated: "Man, I ran out of that country, man.  I turned off my phone 'cos they're probably tracking me with this phone.  I'm gonna cut them off . . . huh."  (Session 5665).  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation ORUCHE was stating that he believed law enforcement was tracking him and possibly intercepting communications on his telephone or telephones and that he was going to cease using that telephone or telephones.  I

19

further believe that ORUCHE's reference to "I ran out of that country" was a reference to his having left Detroit (where cell-site location information located him) quickly, having delivered heroin to UM2, the user of the Detroit Number.

21. In addition, the declining number of calls to and from the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE provides a basis for believing that he has ceased, or may soon cease, using those telephones. On or about September 30, 2006, there were approximately 213 calls to or from the FIRST ORUCHE PHONE and 35 calls to or from the SECOND ORUCHE PHONE; on or about October 4, 2006, there were only 44 calls to or from the FIRST ORUCHE PHONE and only one call to or from the SECOND ORUCHE PHONE. Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that this data indicates that ORUCHE is reducing his usage of the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE because he is now also using the TARGET CELLPHONE.

22. On or about October 3, 2006, an individual, using the TARGET CELLPHONE, called the FIRST ORUCHE PHONE and retrieved voice mail messages from the FIRST ORUCHE PHONE. (Session 5598). Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that EMMANUEL ORUCHE was using the TARGET CELLPHONE to retrieve his messages from the FIRST ORUCHE PHONE.

20

316

23.    In connection with this investigation, I have analyzed toll records for the TARGET CELLPHONE, obtained pursuant to administrative subpoenas, for the period from on or about September 30, 2006, to on or about October 2, 2006 (the "Covered Period"). During the Covered Period, there were 29 calls to or from the TARGET CELLPHONE. Of those 29 calls, at least 21 were to telephone numbers that had communicated with either or both the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE. These common calls include at least two to a telephone assigned call number (646) 462-2737, which interceptions over the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE reveal is used by ORUCHE's wife or girlfriend; two to the Holiday Motel Number, discussed above in paragraph 18(e); one to the Nigerian Number, discussed above in paragraphs 18(a)-(c); and one to the Detroit Number, discussed above in paragraph 18(d). Based on this "common call analysis," I believe that ORUCHE is the user of the TARGET CELLPHONE.

24.    Of the 29 calls to or from the TARGET CELLPHONE during the Covered Period, there were at least four calls to or from telephone numbers in Nigeria - including, as noted above, at least one call to the Nigerian Number. The most recent such call was on or about October 2, 2006. Contacts with Nigerian numbers are significant to this investigation because, in the course of this investigation, heroin couriers have traveled from Nigeria to the United States with drugs. Moreover, as revealed by the

21

317

intercepted communications summarized above, the Nigerian Number is used in furtherance of the TARGET OFFENSES.

25.    Based on the foregoing evidence, including the common call analysis and the intercepted communications revealing that the TARGET CELLPHONE was used to check voice mail on the FIRST ORUCHE PHONE, I believe that EMMANUEL ORUCHE is now using the TARGET CELLPHONE in furtherance of the TARGET OFFENSES, either in lieu of or in addition to the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE.

### III. ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS OVER THE TARGET PHONE

26.    The investigation to date has produced some evidence against the TARGET SUBJECTS concerning the TARGET OFFENSES.  As discussed above, the principal goals of this continuing investigation are to identify and develop evidence against not only the currently identified TARGET SUBJECTS, but also all of their suppliers, customers, accomplices, and associates, as well as the locations at which the TARGET SUBJECTS store narcotics and/or narcotics proceeds, and the methods by which they operate their narcotics trafficking and money laundering business.  As a result of the facts set forth above, several investigative techniques have been tried, or reasonably

22

318

appear likely to fail if tried, or are likely to be too dangerous
to employ to achieve these objectives:

        a.    There is currently no expectation that an
undercover officer or confidential informant will be able to
infiltrate the organization involving the user of the TARGET
CELLPHONE, let alone determine the full scope of the TARGET
SUBJECTS' operations, identify and meet all of the other TARGET
SUBJECTS and their co-conspirators, or identify the TARGET
SUBJECTS' narcotics suppliers and their confederates.  In order
to make use of an undercover a viable option, there would have to
be someone inside the organization working with the Government
who could make the introduction.  Moreover, based on my
experience as a narcotics investigator, as well as discussions
with my fellow agents, I believe that drug traffickers are
unlikely to discuss the full extent of their organization's
activities or membership when dealing with an "outsider" such as
an undercover officer or confidential informant.  Narcotics
traffickers tend to be highly reticent about discussing narcotics
with unknown persons.

        b.    As demonstrated above, this and related
investigations have resulted in the arrests of Chimdi Ibiam;
Emmanuel Obi Maduka, a/k/a "Mazu"; William Wagabono; Ikechukwu
Ojeogwu; and TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH.
Nevertheless, these arrests do not obviate the need for

interception of the TARGET CELLPHONE.  Other than Wagabono, none
of these individuals are signed up cooperators at this time.
Wagabono was a signed up cooperator, but my understanding is that
he is due to be released from prison soon.  His incentive to
cooperate is therefore minimal.  Moreover, any information he
could provide would be purely historical, and almost three years
old.  As for the other four individuals, although two of them,
Ojeogwu and FOMUM-TIBAH, have attended proffer sessions with the
Government, law enforcement officials do not believe that they
have been completely forthcoming and there are no additional
proffers currently scheduled.  Indeed, as discussed above, there
is some indication that FOMUM-TIBAH is still collaborating with
TARGET SUBJECT EMMANUEL ORUCHE.  Additionally, neither Ojeogwu
nor Fomum-Tibah are knowledgeable enough about the organization
to negate the need for a wiretap.  FOMUM-TIBAH, for example,
indicated that she knew ORUCHE worked for two individuals in
Detroit, but she was unable to provide their names.  Even if
someone other than Wagabono were signed up in the future, there
is no information at this time indicating that they could advance
the investigation proactively.  ORUCHE undoubtedly knows that
they have been arrested and would not trust them if they were
released or tried to place a call to ORUCHE.  Accordingly, these
arrests are unlikely to further the investigation substantially.

24

320

c.    The investigation has involved the use of some physical surveillance to observe ORUCHE.  For example, as discussed above, on or about October 2, 2006, agents observed ORUCHE picking up TARGET SUBJECT COSME FREDERIC TIBURCE JEMY at the Holiday Motel.  Based on intercepted communications, however, I have learned that, on at least two occasions, ORUCHE observed law enforcement agents conducting surveillance, and he has begun employing counter-surveillance measures.  For this reason, I do not believe that surveillance will significantly further the goals of the investigation.  Moreover, pure physical surveillance, without the wiretap, would not accomplish the goals of this investigation given the geographical breadth of the organization, including couriers who travel from Africa, Turkey, and elsewhere with heroin.  Pure physical observation, without wire surveillance, would not be likely to advance the investigation, as the purpose of a TARGET SUBJECT's visit to a location or in-person meeting with another individual would not be known.  With the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, with the knowledge of the purpose and nature of the meeting.  Wire surveillance would also minimize the risks of discovery inherent in following subjects or remaining at target locations for extended periods of time.

321

d.    As demonstrated above, telephone toll records
and pen registers have been used in this investigation and have
been helpful to connect certain individuals.  However, such
information provides only limited information.  At most, it
reveals contact between two individuals, not the nature of the
contact or the substance of the conversation.  Moreover, these
methods do not enable law enforcement officers to identify with
certainty the persons involved in the conversations or the
significance of the communications in the context of ongoing
narcotics trafficking or money laundering.  Among other problems,
a telephone number appearing in the records may not be listed or
subscribed in the name(s) or address(es) of the person(s) using
the telephone.  Indeed, in this investigation, at least some of
the individuals with whom the TARGET CELLPHONE has been in
contact cellular telephones with no subscriber information or
false subscriber information.  In addition, many phone numbers in
contact with the TARGET CELLPHONE are numbers from other
countries.  Subscriber information for such numbers are not
readily available to United States law enforcement authorities.
It is only through intercepting calls into and out of the TARGET
CELLPHONE that we have been able to gain any understanding as to
the identity of a caller and that individual's role in the drug-
trafficking organization.

322

e.     Use of a federal grand jury does not appear to be a promising method of investigation. Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation. Because any such individuals would face prosecution, it is unlikely that they would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony. Immunizing them could thwart the public policy that they be held accountable for their crimes. The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation. For many of the same reasons, the use of witness interviews does not appear to be a promising method of investigation. Again, witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation.

f.     While certain addresses associated with the TARGET SUBJECTS have been identified, a search of such locations is impracticable without more specific knowledge about the identity of the individual living there and the nature of his or her involvement in the organization.

27

323

g.    Arresting any of the TARGET SUBJECTS and attempting to obtain their cooperation in investigating the narcotics trafficking and money laundering of their criminal associates is an investigative route that, in the judgment of the law enforcement agencies involved, is too risky at the present time.  Were an attempt made to arrest certain TARGET SUBJECTS and obtain their cooperation in the current investigation without success, other TARGET SUBJECTS almost certainly would be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize the investigation. Accordingly, the risks of failure in attempting to obtain these targets' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make that investigative technique unavailable.

h.    Although the wiretaps on the Ibiam Phone, the FIRST ORUCHE PHONE, and the SECOND ORUCHE PHONE, have been useful in developing evidence against certain of the TARGET SUBJECTS, including ORUCHE, the wiretaps have not revealed the full extent of the TARGET SUBJECTS' narcotics trafficking and money laundering activities.  For example, the wiretaps have not revealed the identity of all TARGET SUBJECTS, where they store their drugs and drug proceeds, or who the suppliers to ORUCHE are.   Moreover, as discussed above, I have reason to believe that ORUCHE has begun using the TARGET CELLPHONE either in lieu of or

28

324

in addition to the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE, due in part to his belief that those telephones might be monitored by law enforcement.  For that reason, the wiretaps of the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE do not obviate the need to intercept communications over the TARGET CELLPHONE.

27.  Because the above-described investigative techniques have been unsuccessful, authorization to intercept communications over the TARGET CELLPHONE is necessary to identify and develop evidence against the TARGET SUBJECTS.

## III.  CONCLUSION

### A.  Personnel

28.  As noted above, this case is being investigated by the DEA.  It is anticipated that, during the requested electronic surveillance, all monitoring will be performed and supervised in the Southern District of New York by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the DEA, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

29

325

B.    **Minimization**

29.    All monitoring of wire communications over the
TARGET CELLPHONE will be minimized in accordance with Chapter 119
of Title 18, United States Code.  The "investigative or law
enforcement officers of the United States" and translators, if
necessary, who are to carry out the requested interception of
wire communications, will be instructed concerning the steps they
should take to avoid infringing upon any attorney-client
privilege or other recognized privileges.  In addition, all
communications intercepted will be conducted in such a way as to
minimize the interception of communications not otherwise
criminal in nature or subject to interception under Chapter 119,
Title 18, United States Code.  All monitoring will cease when it
is determined that the monitored conversation is not criminal in
nature.  Interception will be suspended immediately when it is
determined through voice identification, physical surveillance,
or otherwise, that TARGET SUBJECTS or any of their confederates,
when identified, are not participants in the conversation, unless
it is determined during the portion of the conversation already
overheard that the conversation is criminal in nature.  If an
interception is minimized, monitoring agents shall spot check to
insure that the conversation has not turned to criminal matters.

30. It is requested that the order authorizing
interception of wire communications provide that, if necessary,

30

326

translators be authorized to assist in conducting this surveillance and to receive disclosure of intercepted communications. Certain of the TARGET SUBJECTS may be expected to communicate with each other in Igbo, a Nigerian language. It may therefore be necessary to secure the services of translators in order to assist Agents in monitoring and translating the intercepted communications. All such translators will be under contract to the DEA and will be directly supervised by the DEA. It is further requested, pursuant to Title 18, United States Code, Section 2518(5), that, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

### C. Authorization Request

31. The information set forth in this affidavit establishes, among other things, probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE is utilizing the TARGET CELLPHONE to discuss and engage in the TARGET OFFENSES. Based on the foregoing, it is my opinion that the interception of wire communications occurring over the TARGET CELLPHONE, as specified above, is essential to uncover the full scope of the illegal activity described herein.

31

32.  IT IS HEREBY REQUESTED that orders be issued authorizing Special Agents of the DEA and other investigative and law enforcement officers to intercept wire communications occurring over the TARGET CELLPHONE concerning the affairs of the enterprise described herein and the TARGET SUBJECTS' commission of the above-described offenses.  Because the offenses described herein are continuing in nature and are likely to continue after the initial interception of the particular communications that are the objects of this request, it is requested that the Court's orders authorizing interception of wire communications not be required to terminate automatically when the communications described above have first been obtained, but be permitted to continue until all wire communications are intercepted that reveal fully the manner in which the TARGET SUBJECTS, and others as yet unknown, participate in the above-described offenses, or until the accomplishment of the objectives set forth herein, or for a period of thirty (30) days, whichever is earlier.  It is further requested that such thirty (30) day period begin on the earlier of the day on which an investigative or law enforcement officer first begins to conduct an interception under the Court's order or ten (10) days after the order is entered.

33.  IT IS HEREBY REQUESTED, pursuant to the provisions of Title 18, United States Code, Section 2518(4), that it be ordered that the ultimate service provider for the TARGET

32

CELLPHONE furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all incoming and outgoing calls), pen register information (including all dial digits), trap and trace information, and audio interception capability.  The assistance of these providers is required to accomplish the objectives of the requested interceptions.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

34. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

ANDREW ARTHURTON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to me before this
13th day of October, 2006

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

33

329