UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x
                                  :
IN THE MATTER OF THE APPLICATION OF :
THE UNITED STATES OF AMERICA FOR  :        AFFIDAVIT IN SUPPORT
AUTHORIZATION TO INTERCEPT WIRE   :        OF APPLICATION FOR
COMMUNICATIONS OCCURRING OVER (1) A :       CONTINUED
CELLULAR TELEPHONE ASSIGNED CALL  :        AUTHORIZATION TO
NUMBER (646) 533-8587, WITH       :        INTERCEPT WIRE
INTERNATIONAL MOBILE SUBSCRIBER   :        <u>COMMUNICATIONS</u>
IDENTITY NUMBER ("IMSI")          :
316010013940954; AND (2) A PREPAID :
CELLULAR TELEPHONE ASSIGNED CALL  :
NUMBER (917) 815-6747, WITH IMSI  :
NUMBER 310260910058759.           :
                                  :
- - - - - - - - - - - - - - - - - x

STATE OF NEW YORK            )
COUNTY OF NEW YORK           : ss.:
SOUTHERN DISTRICT OF NEW YORK )

        ANDREW ARTHURTON, a Special Agent with the Drug

Enforcement Administration ("DEA"), being duly sworn, deposes and

states:

**INTRODUCTION**

        1.    I am an "investigative or law enforcement officer

of the United States" within the meaning of Section 2510(7) of

Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and

to make arrests for offenses enumerated in Section 2516 of Title

18, United States Code.  I have been employed as a Special Agent

for the DEA for approximately four years.  I have participated in

several investigations of unlawful drug distribution and have

conducted or participated in surveillance, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.

2.    I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications concerning offenses enumerated in Section 2516 of Title 18, United States Code — that is, offenses involving (1) importation of, distribution of, and possession with intent to distribute of, controlled substances, the use of wire facilities to facilitate the same, conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; and (2) laundering the monetary proceeds of criminal activity, in violation of Title 18, United States Code, Sections 1956 and 1957 (the "TARGET OFFENSES").[1]

3.    I believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed

---

[1]    Although not a predicate offense under 18 U.S.C. § 2516, the DEA is also investigating the TARGET SUBJECTS (as subsequently defined herein) in connection with violations of 18 U.S.C. § 2, for aiding and abetting the TARGET OFFENSES.

2

by EMMANUEL ORUCHE, WISE UKOMADU, REBECCA AMBO FOMUM-TIBAH,[2] FNU LNU, a/k/a "Charlie," FNU LNU, a/k/a "Mike," FNU LNU, a/k/a "Ralph," a/k/a "Chidi Obi," JOSEPH OLUIGBO, OKEKE FRANCIS, EMMANUEL OBIDIASO, LARRY DAVIS, TONY EBI, LESLIE NESBITT, OKPARA OKECHUKWU, COSME FREDERIC TIBURCE JEMY, CHISOZIE ANORUE, a/k/a "Michael Anorue," a/k/a "Chief," EDWARD YARBROUGH, ANTONIO HILL, IVY SHELTON, LOIS HARGROBE, KEVIN APPLE, FNU LNU, a/k/a "Eva," FNU LNU, a/k/a "Leroy," BLESSING IGBINOSA BROWN, OKEY IWUOHA, FNU LNU, a/k/a "Sir P," FNU LNU a/k/a "Jaster," and others as yet unknown (the "TARGET SUBJECTS").  The requested Order is sought for a period of time until the interception fully reveals the manner in which the above-named individuals and their confederates participate in the TARGET OFFENSES, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5).  Pursuant to Section 2518(5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days after the date of this Court's Order.

---

[2] As discussed below in paragraph 17, TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH was arrested on or about August 9, 2006, and is currently detained.  Based on recorded telephone conversations with TARGET SUBJECT EMMANUEL ORUCHE, however, I believe she may still be involved in the TARGET OFFENSES.  Accordingly, she is included as a TARGET SUBJECT.

4.    This case is being investigated by the Drug Enforcement Administration, in the New York metropolitan area, Detroit, Michigan, and elsewhere in the United States.  I have personally participated in the investigation of the offenses referred to above, and make this affidavit based on my personal participation in this investigation, and based on reports made to me by other agents and officers and other law enforcement authorities.  Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed.  Such statements are reported in substance and in part, unless otherwise indicated.

5.    Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date.  Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued.  Nor do I request that this Court rely on any

4

facts not set forth herein in reviewing this application for an order authorizing the interception of wire and electronic communications. Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate that:

### DESIGNATED CELLULAR TELEPHONE

6.    There is probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE has been using, is using, and will in the future use, in order to accomplish, to discuss and to commit the TARGET OFFENSES, (1) a cellular telephone assigned call number (646) 533-8587, with International Mobile Subscriber Identity ("IMSI") number 316010013940954, UFMI number 173*109485*1, subscribed to "Nicobi Health Care Services, 3682B White Plains Road, Bronx, New York 10467," and service provided by Sprint Nextel ("TARGET CELLPHONE #1"), and (2) a prepaid cellular telephone assigned call number (917) 815-6747, with IMSI number 310260910058759, no listed subscriber, and service provided by T-Mobile USA (the "TARGET CELLPHONE #2") (together, with TARGET CELLPHONE #1, the "TARGET CELLPHONES").

7.    I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack. The cellular

5

telephone system divides the New York City and other metropolitan area into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed. Each portable cellular telephone that does not contain party lines bears a unique electronic number called an ESN or an IMSI number, and an assigned telephone number. It is requested that interception be permitted over any changed telephone numbers subsequently assigned to the IMSI numbers for the TARGET CELLPHONES.[3]

     8.    Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518(3), authorization is requested for interception of wire communications both within the Southern District of New York, and, in the event the TARGET CELLPHONES are transferred outside the jurisdiction of this Court, in any other jurisdiction within the United States. In addition, it is requested that background

---

[3]    The TARGET CELLPHONES utilize IMSI numbers, encoded into removable computer chips located inside the instruments. The IMSI number assigned to the computer chip is unique to the subscriber, as opposed to the phone. This application seeks authorization to intercept communications occurring over any telephones or telephone numbers accessed by or through the use of the IMSI numbers identified above.

6

conversations in the vicinity of the TARGET CELLPHONES while they are off the hook or otherwise in use also be permitted to be intercepted.

9.    It is anticipated that the TARGET SUBJECT EMMANUEL ORUCHE will use the TARGET CELLPHONES to place calls to and from the Southern District of New York, as well as other locations.    This belief is supported by the facts described below.    In any event, pursuant to United States v. Rodriguez, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992), a Court in the Southern District of New York is empowered to issue an Order for the interception of wire communications over telephones located in other districts, as long as the interceptions of these communications are first heard in the Southern District of New York.

10.    In connection with the telecommunication companies which provide the service for the TARGET CELLPHONES, all interceptions over the TARGET CELLPHONES will automatically be routed to New York, New York, regardless of where the telephone calls are placed to or from.    Accordingly, all interceptions will first be heard in the Southern District of New York.    During the requested wire surveillance, all monitoring will be performed in New York, New York, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including law

7

400

enforcement officers with the DEA, and Government employees or individuals operating under a contract with the Government, including, if necessary, translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception, and specifically under the supervision of law enforcement officers from the DEA.

## OBJECTIVES

11.    There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal:  (i) the nature, extent and methods of operation of the TARGET SUBJECTS' narcotics trafficking and money laundering activities; (ii) the identity of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (iii) the receipt and distribution of contraband and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records relating to those activities; (vi) the location and source of resources used to finance their illegal activities; and (vii) the location and disposition of the proceeds from those activities.  In addition, these wire communications are expected to constitute admissible evidence of the commission of the TARGET OFFENSES.

### PRIOR APPLICATIONS

12.   I have been informed that reviews have been done of the electronic surveillance files of the New York Drug Enforcement Task Force, the Drug Enforcement Administration (DEA), Immigration and Customs Enforcement (ICE), the Federal Bureau of Investigation (FBI) and other law enforcement agencies.[4] Based on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS, or over the facilities or places named herein, except as follows:

a.   An order dated May 25, 2006, signed by the Honorable Naomi Reice Buchwald, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by Chimdi Ibiam (the "Ibiam Phone"). Interceptions pursuant to that order began on or about May 26, 2006, and ended on or about June 23, 2006.

b.   An order dated June 23, 2006, signed by the Honorable William H. Pauley III, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30 day-period. Interceptions pursuant to that order began on or about June 23, 2006, and ended on or about July 21, 2006.

---

[4]    A check of DEA and FBI files was completed on or about October 10, 2006

9

402

c.    An order dated July 21, 2006, signed by the
Honorable Richard J. Holwell, United States District Judge,
Southern District of New York, authorizing continued wire
interceptions over the Ibiam Phone for another 30-day period.
Interceptions pursuant to that order began on or about July 21,
2006, and ended on or about August 22, 2006, with Ibiam's arrest.

d.    An order dated August 7, 2006, signed by the
Honorable Stephen C. Robinson, United States District Judge,
Southern District of New York, authorizing wire interceptions
over a cellular telephone used by Emmanuel Obi Maduka, a/k/a
"Mazu" (the "Maduka Phone").   Interceptions pursuant to that
order began on or about August 7, 2006, and ended on or about
August 23, 2006, with Maduka's arrest.

e.    An order dated August 30, 2006, signed by the
Honorable Denise L. Cote, United States District Judge, Southern
District of New York, authorizing wire interceptions over TARGET
CELLPHONE #1 (the "August 30th Order").   Interceptions pursuant
to that order began on or about August 31, 2006, and terminated
on or about September 27, 2006.   As discussed in part below,
interception of wire communications occurring over TARGET
CELLPHONE #1 reveal that the user of the phone is TARGET SUBJECT
EMMANUEL ORUCHE and that he is using TARGET CELLPHONE #1 to
conduct his narcotics trafficking activities.

403

f.    An order dated September 21, 2006, signed by the Honorable Gerard E. Lynch, United States District Judge, Southern District of New York, authorizing wire interceptions over TARGET CELLPHONE #2 (the "September 21st Order"). Interceptions pursuant to that order began on or about September 21, 2006, and terminated on or about October 20, 2006. As discussed in part below, interception of wire communications occurring over TARGET CELLPHONE #2 reveals that the user of the phone is ORUCHE and that he is using TARGET CELLPHONE #2 to conduct his narcotics trafficking activities.

g.    An order dated September 27, 2006, signed by the Honorable Denise L. Cote, United States District Judge, Southern District of New York, authorizing continued wire interceptions over TARGET CELLPHONE #1 (the "September 27th Order"). Interceptions pursuant to that order began on or about September 27, 2006, and are ongoing. As discussed in part below, interception of wire communications occurring over TARGET CELLPHONE #1 reveal that the user of the phone is ORUCHE and that he is using TARGET CELLPHONE #1 to conduct his narcotics trafficking activities.

h.    An order dated October 13, 2006, signed by the Honorable Robert P. Patterson, Jr., United States District Judge, Southern District of New York, authorizing interception of

11

404

communications over another cellular telephone (the "THIRD ORUCHE

CELLPHONE") used by ORUCHE (the "October 13th Order").

Interceptions pursuant to that order began on or about October

16, 2006, and are ongoing.  As discussed in part below,

interception of wire communications occurring over the THIRD

ORUCHE CELLPHONE reveal that the user of the phone is ORUCHE and

that he is using the THIRD ORUCHE CELLPHONE to conduct his

narcotics trafficking activities.


I.  **THERE IS PROBABLE CAUSE TO BELIEVE THAT TARGET SUBJECTS ARE USING AND WILL CONTINUE TO USE THE TARGET CELLPHONES IN FURTHERANCE OF THE TARGET OFFENSES.**

A.  <u>Overview of Criminal Investigation of Target Subjects</u>

13.  As set forth below and in my affidavits in support

of the August 30th Order (the "August 30th Affidavit"), the

September 21st Order (the "September 21st Affidavit"), and the

September 27th Order (the "September 27th Order"), there is

probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE is

using the TARGET CELLPHONES in furtherance of narcotics

trafficking activities involving the importation of heroin into

the United States from Nigeria and other countries, and the

distribution of heroin within the United States.  ORUCHE, the

user of the TARGET CELLPHONES, has been identified as a member of

12

405

a drug organization that brings heroin from Pakistan, through Turkey and countries in Africa, and to the United States for ultimate distribution.  Wire interceptions have further revealed that ORUCHE is involved in the distribution and/or export of cocaine from or within the United States.

B.    Interception of the Target Cellphones Pursuant to the September 21st and September 27th Orders

14.    Interception of TARGET CELLPHONE #2 pursuant to the September 21st Order began on or about September 21, 2006, and terminated on or about October 20, 2006.  Interception of TARGET CELLPHONE #1 pursuant to the September 27th Order began on or about September 27, 2006, and is ongoing.  The pertinent calls made and received on the TARGET CELLPHONES, some of which are summarized below, demonstrate that the TARGET CELLPHONES are being used by TARGET SUBJECT EMMANUEL ORUCHE and other TARGET SUBJECTS, to arrange for the importation and distribution of heroin and cocaine.  Based on my training and experience and my discussions with other law enforcement officers involved in this investigation, I have also included in the following summaries interpretations of certain terms and phrases.[5]

---

[5]  The original language of many of the intercepted conversations was Igbo, a West African language.  These conversations have been translated by translators assigned to assist the DEA in connection with this case.  Translations are preliminary and are

13

September 26, 2006

a.    On or about September 26, 2006, at approximately 6:03 a.m., an unidentified male ("UM1"), using a telephone assigned Nigerian call number 234 18048837 (the "8837 Nigerian Number"), called ORUCHE on TARGET CELLPHONE #2.  During the call, ORUCHE asked the UM1 if he could call after he (ORUCHE) had woken up.  The UM1 then stated: "Listen, listen, 'cause something will be coming in."  (Session 46).  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, the UM1 was informing ORUCHE that a courier would shortly be traveling to the United States carrying heroin.

b.    On or about September 26, 2006, at approximately 12:32 p.m., the UM1, using the 8837 Nigerian Number, called ORUCHE on TARGET CELLPHONE #2.  During the call, ORUCHE asked: "Do you know why I told you to not talk on this phone?  When that person comes in, he should call you.  I don't want to go anywhere 'cause you know . . . . Let one know which one he's suffering from.  But stop giving him that bank account 'cause it seems like these people that are brought in are given that bank account and they know, you know.  Tell them to go to

subject to modification.  Quoted portions are not necessarily exact quotes, but are the sum and substance of the calls according to the monitoring agent or translator.

14

407

any bank they like . . . the bank that's around where you went, you understand? . . . 'Cause you give them that one bank.  When they come out . . . they're supposed to know where they are going, you understand?  They may know it off heart.  They should stop writing it down on paper. . . .  They should memorize it; they should stop writing it, you understand?  They should have the number to the place of residence they are going to." (Session 69).  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE was instructing the UM1 that, in order to minimize the risk of interdiction, couriers should memorize the address and telephone number of their destination, rather than writing them on paper.

   September 30, 2006

        c.    On or about September 30, 2006, at approximately 8:34 a.m., ORUCHE, using TARGET CELLPHONE #2, called the UM1, using the 8837 Nigerian Number.  During the call, the UM1 indicated that ORUCHE had woken him up.  ORUCHE then stated: "This guy has entered the hotel."  The UM1 then replied: "Okay.  My work, my work . . . ."  (Session 125).  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during

15

408

this conversation, ORUCHE was informing the UM1 that the courier

discussed in the communications summarized above had arrived.

          d.   On or about September 30, 2006, at

approximately 1:30 p.m., ORUCHE, using TARGET CELLPHONE #2,

called TARGET SUBJECT FNU LNU, a/k/a "Jaster" ("JASTER") on a

telephone assigned call number (313) 585-7130 (the "Jaster

Number").  Near the beginning of the conversation, ORUCHE asked:

"Can you come over here?"  JASTER replied: "Where you at?  Down

there? . . . are you at home-home?"  ORUCHE responded yes, then

JASTER stated: "I might have to.  If we have to come, I come."

ORUCHE then stated: "Yeah, if you can come, come. . . .  I don't

want to leave this place for now."  Shortly thereafter, ORUCHE

stated: "You got to get me about two.  Big ones."  JASTER then

asked: "Is that what you got?"  ORUCHE replied: "I have two,

yeah.  But one, I'm talking about one now."  After JASTER asked

"What did you say now?," ORUCHE continued: "I'm talking about

twenty."  JASTER answered: "I know what you are talking about."

ORUCHE then stated: "Okay, got to send them home.  Let me go, let

me know if you can make it.  Just let me know.  You know."

(Session 130).  Based on my training and experience,

participation in this investigation, and review of other

intercepted communications, I believe that during this

conversation, ORUCHE was informing JASTER that he had two

16

409

kilograms of heroin available (presumably heroin ORUCHE had received in connection with the communications summarized above) and asking whether JASTER would come to New York to get it.  The reference to "two" is to two kilograms of heroin; the reference to "twenty" is to $20,000; and the reference to "home-home" is to New York.

e.    On or about September 30, 2006, at approximately 3:21 p.m., TARGET SUBJECT EMMANUEL ORUCHE, using TARGET CELLPHONE #1, called TARGET SUBJECT JOSEPH OLUIGBO. During the conversation, ORUCHE asked: "Has the person come in?" Shortly thereafter, ORUCHE stated: "I think the person just got in there now.  His name is Jemy, he is wearing something black and carrying a bag like how our people carries bag."   (Session 5095).  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE was informing OLUIGBO that TARGET SUBJECT COSME FREDERIC TIBURCE JEMY, a heroin courier, had just arrived.

October 2, 2006

f.    On or about October 2, 2006, at approximately 11:20 a.m., TARGET SUBJECT EMMANUEL ORUCHE, using TARGET CELLPHONE #1, called a telephone assigned call number (718) 234-4200, which is listed or leased to the Holiday Motel on the New

17

410

England Thruway Service Road in the Bronx, New York.  During the call, ORUCHE asked the receptionist to connect him with "Room 18."  After he was connected to the room, ORUCHE asked a male if he was ready.  The male, subsequently identified as JEMY, said he was ready.  ORUCHE instructed him to come downstairs.  (Session 5423).  Agents conducting surveillance at the Holiday Motel at or about that time observed ORUCHE in a vehicle pick up JEMY.  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that JEMY had transported approximately two kilograms of heroin into the United States a few days earlier and that ORUCHE was picking JEMY up in order to transport the heroin to JASTER in Detroit, Michigan.

October 3, 2006

g.  On or about October 3, 2006, at approximately 10:16 a.m., TARGET SUBJECT EMMANUEL ORUCHE, using TARGET CELLPHONE #2, called an unidentified male (the "UM2") on telephone assigned Nigerian call number 234 803 3208297.  During the conversation, ORUCHE asked: "What about what we talked about? You never gave Onyema the thing.  You don't remember that you and I talked about . . . ."  UM2 replied: "Ah, Onyema said what happened?"  Shortly thereafter, ORUCHE stated: "He said it was 20000, that I should give him 30000 at least, you understand,

18

because of transportation to take it and all those things." UM2
then asked: "To go where?" ORUCHE replied: "To get it from Abuja
and take it to Owerri." UM2 then stated: "It's he that . . . it
because of the way he wants it that . . . because he knows that
if he tells me detail, I will ask him why he wants to take 10000,
what he can buy here, give transportation people 1000 . . . if it
something like . . . . The way we transport something here; he
buys it today and put it on the bus, tomorrow morning someone
collects it and you will not spend more than N1000, if it were me
I would ask him if N10000 is what you will use to do this thing?
That's why he was murmuring his words, if it's 30000 that he say
I should give him, when he comes he can take it." ORUCHE then
stated: "Yeah give him 30000, I'm giving him the extra 10000
please, you know, give him." (Session 183). Based on my
training and experience, participation in this investigation, and
review of other intercepted communications, I believe that during
this conversation, ORUCHE and UM2 were discussing payment to an
individual involved in the transportation of heroin.

        h.    On October 3, 2006, at approximately 4:10
p.m., ORUCHE used TARGET CELLPHONE #1. (Session 5611). From
cell-site location information obtained pursuant to the Order, I
have learned that ORUCHE was in the area of Detroit, Michigan, at
that time. Based on my training and experience, participation in

this investigation, and review of other intercepted communications, I believe that ORUCHE traveled to Detroit to deliver heroin to JASTER.

i.   On or about October 3, 2006, at approximately 7:07 p.m., ORUCHE, using TARGET CELLPHONE #1, called TARGET SUBJECT FNU LNU, a/k/a "Leroy." During the call, ORUCHE stated: "Man, I ran out of that country, man. I turned off my phone 'cos they're probably tracking me with this phone. I'm gonna cut them off . . . huh." (Session 5665). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation ORUCHE was stating that he believed law enforcement was tracking him and possibly intercepting communications on his telephone or telephones. I further believe that ORUCHE's reference to "I ran out of that country" was a reference to his having left Detroit quickly, having delivered heroin to JASTER.

October 6, 2006

j.   On or about October 6, 2006, CHISOZIE ANORUE, a/k/a "Michael Anorue," a/k/a "Chief," using a telephone assigned Nigerian call number 234 803 4412581, had several conversations with ORUCHE, using TARGET CELLPHONE #2. (Sessions 196, 198, 201, 202). During the second conversation, at approximately 3:35 p.m., ORUCHE stated: "I gave them a number to give you. How much

20

413

did you say you want?" ANORUE responded: "About 300,0000 Niara."
ORUCHE answered that he was not sure the "guy" has up to 300,0000
Niara there, and then asked: "But how much is 300,0000 Niara
equivalent of American currency?" Shortly thereafter, ANORUE
stated: "Just send me $1000 there, I don't want call this person
that person. You don't have a $1000, when I get back I will give
it to you." ORUCHE replied: "Okay, when I get to the store I'll
tell them to send you $1000." (Session 198). Based on my
training and experience, participation in this investigation, and
review of other intercepted communications, I believe that during
this conversation, ANORUE, who is involved in arranging for
people to serve as heroin couriers, was asking ORUCHE to wire
transfer him money.

October 8, 2006

        k.    On or about October 8, 2006, at approximately
8:40 p.m., ORUCHE, using TARGET CELLPHONE #1, called OLUIGBO. At
the beginning of the conversation, ORUCHE asked: "Did you reach
him?" OLUIGBO responed: "No, I did not reach him." ORUCHE then
asked: "Did they say he is not there?" OLUIGBO: "Well, they say
he is there but I went to his room kept knocking but he did not
answer so I went down stairs and asked them to tell him to call
me when he comes out." Shortly thereafter, ORUCHE asked: "But
have you called him on the phone to see if he would answer his

414

phone?" OLUIGBO replied: "There's nothing . . . . The thing is
if you call this thing . . . . " ORUCHE then interrupted: "When
you call they put you through to his room." OLUIGBO answered in
the affirmative. A few seconds later, OLUIGBO stated: "This guy
. . . I forgot to ask you , you know . . . Leroy. . . . He is
using here to do address for this thing he is doing." ORUCHE
then asked: "He is using what?" OLUIGBO replied: "This address."
ORUCHE responded:  "Is he mad?" OLUIGBO then stated:  "Well, the
letter says Henry Hayes and this address is what the thing is
using to get done . . . ." ORUCHE then asked: "It came with your
address?" OLUIGBO replied: "Yeah and Henry Hicks is the name on
the credit card, the American Express card is on. . . . I don't
see why he should use this address when he has his own address.
. . . You see Henry Hicks 1018 East 223rd." ORUCHE then asked:
"What came there?" OLUIGBO replied: "Is a letter from HSBC
Bank." ORUCHE responded: "Seize all the letter, let he and I
speak to him first." (Session 6363). Based on my training and
experience, participation in this investigation, and review of
other intercepted communications, I believe that during the
beginning of this conversation, ORUCHE and OLUIGBO were
discussing OLUIGBO's efforts to meet a heroin courier, presumed
to be JEMY, at his hotel. In the latter part of the

22

415

conversation, ORUCHE and OLUIGBO were discussing TARGET SUBJECT FNU LNU, a/k/a "Leroy," who appears to be using OLUIGBO's address in connection with some fraudulent scheme involving credit cards and/or banks.

October 9, 2006

1.    On or about October 9, 2006, at approximately 12:26 p.m., ORUCHE, using TARGET CELLPHONE #1, called OLUIGBO. During the conversation, ORUCHE asked: "Joe, have you picked up this guy?" After OLUIGBO answered no, ORUCHE asked: "What time are you going to pick him up?" OLUIGBO answered: "His flight is six o'clock." Shortly thereafter, ORUCHE asked: "They are not chasing him from the room right?" After OLUIGBO answered that they might chase "him," ORUCHE stated: "Well, go and look for him, call him and see if you can bring him out you understand, before they chase him from the room." OLUIGBO answered "Okay." (Session 6453). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation ORUCHE and OLUIGBO were discussing OLUIGBO's picking up heroin courier JEMY and taking him to the airport for JEMY's flight out of the United States. I have verified that JEMY traveled from New York to Dublin, Ireland, on October 9, 2006.

October 11, 2006

m.    On October 11, 2006, at approximately 1:23 p.m., ORUCHE, using TARGET CELLPHONE #1, received a call from TARGET SUBJECT FNU LNU, a/k/a "Sir P" ("SIR P"). Near the beginning of the conversation, ORUCHE stated: "One boy is using peoples' names to say stuff." "SIR P" responded: "Who's that?" ORUCHE answered: "One man they call Actor." "SIR P" asked: "In Nigeria?" ORUCHE answered: "Yea . . . no, here." "SIR P" then stated: "Oh. So they got him and he's just calling peoples' names?" ORUCHE stated: "Yea, it's just like sometimes, I stay and I feel like people are following me but I didn't do anything, I just ignore everybody." "SIR P" stated: "That won't set him free like that, that won't set him free." Shortly thereafter, "SIR P" stated: "What I'm saying is, my money, is there some way to get it 'cos our job is done." ORUCHE replied:  "If there's some way, you know that . . . you know what will happen?  When I call you this evening, I'll know if . . . let me call you so that we'll talk on another phone." (Session 6835). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during the first part of this conversation, ORUCHE was informing "SIR P" of his belief that Chimdi Ibiam, who was arrested on or about August 22, 2006, was cooperating with the Government, resulting

24

417

in surveillance of ORUCHE; the reference to "Actor" is to Ibiam, the reference to "using peoples' names to say stuff" is to cooperating with the Government (i.e., "naming names"), and the reference to "people following me" is to agents conducting surveillance.  (On two occasions in the last several weeks, ORUCHE appears to have detected agents' surveillance.)  In the latter part of the conversation, ORUCHE and "SIR P" appear to be discussing the payment of money to "SIR P" for some "job," which I believe to be related to drugs.

     October 17, 2006

       n.   On or about October 17, 2006, at approximately 1:34 p.m., FNU LNU, a/k/a "Ben," using a telephone assigned Nigerian call number 234 802 6434606, called ORUCHE, using TARGET CELLPHONE #1.  Near the beginning of the conversation, BEN stated: "There is someone from where you are that is coming here, so I want to know if that is Igenus?  [A name of a person] can do the thing about it. . . .  The person is where you are, and wants to come to our home. . . .  So if he/she can do that, kill that place this my did, because those people we deal with, all of them do 419 now, they steal."  Shortly thereafter, BEN stated: "They take people's things and run, so this person that is our home/country man, he and my younger brother are in Houston so he wants to come. . . .  So if the both

25

of them can do it together eh, so you can do the thing . . . ."
ORUCHE then stated: "No problem." ORUCHE and BEN then discussed
"Igenus" and whether BEN and "Igenus" were in touch. BEN then
stated: "No, since that time, he and I haven't spoken again,
because that boy that came that time, there were some people that
he took their things and ran. . . left bag . . . just left his
bag, just took the thing and ran away, left his bag and all his
things here. . . . God intervened for me not put my hand into
that thing (i.e., be a part of it)." (Session 7650). Based on
my training and experience, participation in this investigation,
and review of other intercepted communications, I believe that
during this conversation, ORUCHE and BEN were discussing various
heroin couriers, including one who left (presumably the airport)
without his load of heroin, thereby risking exposure of the
target subjects to discovery by law enforcement.

      October 19, 2006

            o.    On or about October 19, 2006, at
approximately 10:14 a.m., JASTER, using the Jaster Number, called
ORUCHE on TARGET CELLPHONE #2. Early in the conversation, ORUCHE
stated: "Look, I might be there this weekend okay, unless
something is gonna spoil for us. . . . I don't want things to
spoil for us. Those guys are putting pressures, that before they
send anything to me that I have to give them, you know . . . ."

JASTER then stated: "Man, that's what I'm saying though, we always . . . we told you where we was gonna be at and that's why, we gave you a whole lot up front." ORUCHE then replied: "Yeah, but remember that we said three weeks . . . ." shortly thereafter, JASTER stated: "We gave you all that paper up front my friend, we gave you all that paper up front, that was like two and a half, three weeks worth of mother-fucking paper of our time right then and there." After some further back and forth, ORUCHE stated: "Hold on. You have everything, it's not like I have something on me, I gave you everything so even if you gave what you have now to make sure that we get something coming, instead of waiting the next week, which will make it the fourth week, whether we are destroying a relationship where we can get something, you people have a [unintelligible] to work with what you have, but, give them something so they could send something. Waiting till the next week is gonna be late, do you understand what I'm saying?" Shortly thereafter, ORUCHE continued: "Yeah, because my whole thing now . . . they say that they have to get something to be able to do whatever they are doing and I don't want to keep them where I have to you know, go back again and be on a messy area, you know that's my major problem. I don't mind, but I need to pay this people you know? So I need to give them at least 16 by this weekend . . . ." Shortly thereafter, ORUCHE

27

continued: "We agreed on three weeks and this is the third week, so what you're telling me that you want extra week." JASTER then interrupted: "We don't want extra nothing, we just want . . . . we wanna get our paper back in front of us and let everybody be happy, we gave you $30 up front, it's not fair . . . ." (Session 331). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE and JASTER were discussing JASTER's debt for the two kilograms of heroin that ORUCHE had delivered to him in Detroit on or about October 3, 2006; ORUCHE was telling JASTER that he was supposed to have paid the remaining debt within three weeks, and that he owed money to his supplier, who might not supply him with more drugs if he failed to come up with the money. JASTER was complaining that he had paid a large amount - "$30," or $30,000 - up front, and that he was first recouping for that payment.

October 20, 2006

p.    On or about October 20, 2006, at approximately 8:26 p.m., TARGET SUBJECT OKEY IWUOHA called ORUCHE, using TARGET CELLPHONE #1. Near the beginning of the conversation, IWUOHA asked: "Your brother [TARGET SUBJECT TONY EBI] has left, right?" ORUCHE replied: "It was in the plane that

28

he called me, and I was like how will we be together and . . . he
told me he was going to go, but I said it was too sudden. I was
waiting for both of us to see, you understand. . . . He and I
talked yesterday from Nigeria. He called." Shortly thereafter,
IWUOHA stated: "I myself am going back soon." Later in the
converation, IWUOHA stated: "I have something I already am doing,
you know. He said he'll be in but I was like, how many is he
gonna do? So, but eeehm, that's how things are. Mazi, you know
my people are disturbing, saying that if you have, let's do, do,
bring, do . . . ." ORUCHE then stated: "Yeah, I understand what
you're saying." IWUOHA replied: "Yeah, so I decided to find out
if . . . ." ORUCHE then interrupted: "Nothing has hit at all."
IWUOHA then stated:  "The thing is difficult huh?" ORUCHE
answered: "Men, to tell you the truth, sometimes you just stay
and ask if anything's going on, you know but eeeh we're just
begging god, it'll be good." (Session 8154). Based on my
training and experience, participation in this investigation, and
review of other intercepted communications, I believe that during
the beginning of this conversation, ORUCHE and IWUOHA were
discussing TARGET SUBJECT TONY EBI's trip to Nigeria, and a trip
that IWUOHA was to take to Nigeria shortly. In the latter part
of the conversation, ORUCHE and IWUOHA were discussing an

29

422

upcoming load of heroin; there reference to "nothing has hit at all" is a reference to the fact that the load had not yet arrived.

## II. ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR UNLIKELY TO SUCCEED IF TRIED AND THUS THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS

15. The investigation to date has produced some evidence against the TARGET SUBJECTS concerning the TARGET OFFENSES. As discussed above, the principal goals of this continuing investigation are to identify and develop evidence against not only the currently identified TARGET SUBJECTS, but also all of their suppliers, customers, accomplices, and associates, as well as the locations at which the TARGET SUBJECTS store narcotics and/or narcotics proceeds, and the methods by which they operate their narcotics trafficking and money laundering business. As a result of the facts set forth above, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives:

a. There is currently no expectation that an undercover officer or confidential informant will be able to infiltrate the organization involving the user of the TARGET

30

423

CELLPHONES, let alone determine the full scope of the TARGET
SUBJECTS' operations, identify and meet all of the other TARGET
SUBJECTS and their co-conspirators, or identify the TARGET
SUBJECTS' narcotics suppliers and their confederates.  In order
to make use of an undercover a viable option, there would have to
be someone inside the organization working with the Government
who could make the introduction.  Moreover, based on my
experience as a narcotics investigator, as well as discussions
with my fellow agents, I believe that drug traffickers are
unlikely to discuss the full extent of their organization's
activities or membership when dealing with an "outsider" such as
an undercover officer or confidential informant.  Narcotics
traffickers tend to be highly reticent about discussing narcotics
with unknown persons.

       b.    As demonstrated in my previous affidavits,
this and related investigations have resulted in the arrests of
Chimdi Ibiam, a/k/a "Actor"; Emmanuel Obi Maduka, a/k/a "Mazu";
William Wagabono; Ikechukwu Ojeogwu; and TARGET SUBJECT REBECCA
AMBO FOMUM-TIBAH.  Nevertheless, these arrests do not obviate the
need for interception of the TARGET CELLPHONES.  Other than
Wagabono, none of these individuals are signed up cooperators at
this time.  Wagabono was a signed up cooperator, but my

understanding is that he is due to be released from prison soon.
His incentive to cooperate is therefore minimal. Moreover, any
information he could provide would be purely historical, and
almost three years old. As for the other four individuals,
although two of them, Ojeogwu and FOMUM-TIBAH, have attended
proffer sessions with the Government, law enforcement officials
do not believe that they have been completely forthcoming and
there are no additional proffers currently scheduled. Indeed,
from communications intercepted over TARGET CELLPHONE #2,
including a communication as recently as October 18, 2006, I
believe that FOMUM-TIBAH is still collaborating with TARGET
SUBJECT EMMANUEL ORUCHE. Additionally, neither Ojeogwu nor
FOMUM-TIBAH are knowledgeable enough about the organization to
negate the need for a wiretap. FOMUM-TIBAH, for example,
indicated that she knew ORUCHE worked for two individuals in
Detroit, but she was unable to provide their names. Even if
someone other than Wagabono were signed up in the future, there
is no information at this time indicating that they could advance
the investigation proactively. ORUCHE undoubtedly knows that
they have been arrested and would not trust them if they were
released or tried to place a call to ORUCHE. Accordingly, these
arrests are unlikely to further the investigation substantially.

32

425

c.    The investigation has involved the use of some physical surveillance to observe ORUCHE and the use of a Global Positioning System device on ORUCHE's vehicle.  But pure physical surveillance, without the wiretap, would not accomplish the goals of this investigation given the geographical breadth of the organization, including couriers who travel from Africa, Turkey, and elsewhere with heroin.  Moreover, pure physical observation, without wire surveillance, would not be likely to advance the investigation, as the purpose of a TARGET SUBJECT's visit to a location or in-person meeting with another individual would not be known.  With the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, with the knowledge of the purpose and nature of the meeting.  Finally, conducting surveillance of ORUCHE, who is extremely suspicious of law enforcement surveillance, has proved difficult; as noted above, on two occasions during this investigation, intercepted communications reveal that ORUCHE detected law enforcement surveillance.  Wire surveillance would minimize the risks of discovery inherent in following subjects or remaining at target locations for extended periods of time.

33

426

d.    Telephone toll records and pen registers have
been used in this investigation and have been helpful to connect
certain individuals.  However, such information provides only
limited information.  At most, it reveals contact between two
individuals, not the nature of the contact or the substance of
the conversation.  Moreover, these methods do not enable law
enforcement officers to identify with certainty the persons
involved in the conversations or the significance of the
communications in the context of ongoing narcotics trafficking or
money laundering.  Among other problems, a telephone number
appearing in the records may not be listed or subscribed in the
name(s) or address(es) of the person(s) using the telephone.
Indeed, in this investigation, at least some of the individuals
with whom the TARGET CELLPHONES have been in contact use cellular
telephones with no subscriber information or false subscriber
information.  In addition, many phone numbers in contact with the
TARGET CELLPHONES are numbers from other countries.  Subscriber
information for such numbers are not readily available to United
States law enforcement authorities.  It is only through
intercepting calls into and out of the TARGET CELLPHONES that we
have been able to gain any understanding as to the identity of a
caller and that individual's role in the drug-trafficking

34

organization.

       e.   Use of a federal grand jury does not appear to be a promising method of investigation. Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation. Because any such individuals would face prosecution, it is unlikely that they would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony. Immunizing them could thwart the public policy that they be held accountable for their crimes. The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation. For many of the same reasons, the use of witness interviews does not appear to be a promising method of investigation. Again, witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation.

       f.   While certain addresses associated with the TARGET SUBJECTS have been identified, a search of such locations

35

is impracticable without more specific knowledge about the identity of the individual living there and the nature of his or her involvement in the organization.

g. Arresting any of the TARGET SUBJECTS and attempting to obtain their cooperation in investigating the narcotics trafficking and money laundering of their criminal associates is an investigative route that, in the judgment of the law enforcement agencies involved, is too risky at the present time. Were an attempt made to arrest certain TARGET SUBJECTS and obtain their cooperation in the current investigation without success, other TARGET SUBJECTS almost certainly would be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize the investigation. Accordingly, the risks of failure in attempting to obtain these targets' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make that investigative technique unavailable.

h. Although the wiretaps on the Ibiam Phone were useful in developing evidence against certain of the TARGET SUBJECTS, including ORUCHE, the wiretaps did not reveal the full extent of the TARGET SUBJECTS' narcotics trafficking and money laundering activities. For example, the wiretaps did not reveal

36

the identity of all TARGET SUBJECTS, where they store their drugs and drug proceeds, or who the suppliers to ORUCHE are. Aside from TARGET CELLPHONE #1, the DEA is currently intercepting communications of the TARGET SUBJECTS only on the THIRD ORUCHE CELLPHONE. Although this wiretap has been useful in developing evidence of ORUCHE's narcotics activities, it does not obviate the need for the wiretaps of TARGET CELLPHONES. My investigation and intercepted communications have revealed that ORUCHE uses at least three different cellphones (the TARGET CELLPHONES and the THIRD ORUCHE CELLPHONE) and that he often uses different cellphones to communicate with different people. For example, ORUCHE primarily, if not exclusively, uses TARGET CELLPHONE #2 to speak with TARGET SUBJECT FNU LNU, a/k/a "Jaster." As a result, wiretaps on all three of ORUCHE's cellphones are necessary to reveal the full scope of ORUCHE's narcotics-trafficking activities.

16. Because the above-described investigative techniques have been unsuccessful, authorization to intercept communications over the TARGET CELLPHONES is necessary to identify and develop evidence against the TARGET SUBJECTS.

37

430

III.  CONCLUSION

    A.  Personnel

        17.  As noted above, this case is being investigated by the DEA.  It is anticipated that, during the requested electronic surveillance, all monitoring will be performed and supervised in the Southern District of New York by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the DEA, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

    B.  Minimization

        18.  All monitoring of wire communications over the TARGET CELLPHONES will be minimized in accordance with Chapter 119 of Title 18, United States Code.  The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges.  In addition, all communications intercepted will be conducted in such a way as to

38

minimize the interception of communications not otherwise
criminal in nature or subject to interception under Chapter 119,
Title 18, United States Code.  All monitoring will cease when it
is determined that the monitored conversation is not criminal in
nature.  Interception will be suspended immediately when it is
determined through voice identification, physical surveillance,
or otherwise, that TARGET SUBJECTS or any of their confederates,
when identified, are not participants in the conversation or
message, unless it is determined during the portion of the
conversation already overheard that the conversation is criminal
in nature.  If an interception is minimized, monitoring agents
shall spot check to insure that the conversation has not turned
to criminal matters.

19.  It is requested that the order authorizing
interception of wire communications provide that, if necessary,
translators be authorized to assist in conducting this
surveillance and to receive disclosure of intercepted
communications.  Certain of the TARGET SUBJECTS may be expected
to communicate with each other in Igbo, a West African language.
It may therefore be necessary to secure the services of
translators in order to assist Agents in monitoring and
translating the intercepted communications.  All such translators

39

432

will be under contract to the DEA and will be directly supervised by the DEA.  It is further requested, pursuant to Title 18, United States Code, Section 2518(5), that, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

C.    **Authorization Request**

20.    The information set forth in this affidavit establishes, among other things, probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE is utilizing the TARGET CELLPHONES to discuss and engage in the TARGET OFFENSES.  Based on the foregoing, it is my opinion that the interception of wire and electronic communications occurring over the TARGET CELLPHONES, as specified above, is essential to uncover the full scope of the illegal activity described herein.

21.    IT IS HEREBY REQUESTED that orders be issued authorizing Special Agents of the DEA and other investigative and law enforcement officers to continue intercepting wire communications occurring over the TARGET CELLPHONES concerning the affairs of the enterprise described herein and the TARGET SUBJECTS' commission of the above-described offenses.  Because the offenses

described herein are continuing in nature and are likely to continue after the initial interception of the particular communications that are the objects of this request, it is requested that the Court's orders authorizing interception of wire communications not be required to terminate automatically when the communications described above have first been obtained, but be permitted to continue until all wire communications are intercepted that reveal fully the manner in which the TARGET SUBJECTS, and others as yet unknown, participate in the above-described offenses, or until the accomplishment of the objectives set forth herein, or for a period of thirty (30) days, whichever is earlier.  It is further requested that such thirty (30) day period begin on the date of the Court's order.

22.  IT IS HEREBY REQUESTED, pursuant to the provisions of Title 18, United States Code, Section 2518(4), that it be ordered that the ultimate service provider(s) for the TARGET CELLPHONES furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all incoming and outgoing calls), pen register information (including all dial digits), trap and trace information, and audio

41

434

interception capability.  The assistance of these providers is required to accomplish the objectives of the requested interceptions.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

23.  It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

ANDREW ARTHURTON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to me before this
26th day of October, 2006

THE HONORABLE DENISE L. COTE
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

42

435