UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                     :
IN THE MATTER OF THE APPLICATION OF  :
THE UNITED STATES OF AMERICA FOR     :    AFFIDAVIT IN SUPPORT
AUTHORIZATION TO INTERCEPT WIRE      :    OF APPLICATION FOR
COMMUNICATIONS OCCURRING OVER THE    :    AUTHORIZATION TO
CELLULAR TELEPHONE ASSIGNED CALL     :    INTERCEPT WIRE
NUMBER (832) 613-4067, WITH          :    <u>COMMUNICATIONS</u>
INTERNATIONAL MOBILE SUBSCRIBER      :
IDENTIFICATION ("IMSI") NUMBER       :
310260220884062.                     :
                                     :
- - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK           )
COUNTY OF NEW YORK          )
SOUTHERN DISTRICT OF NEW YORK ):ss.:

ANDREW ARTHURTON, a Special Agent with the Drug

Enforcement Administration ("DEA"), being duly sworn, deposes and

states:

## I.   <u>INTRODUCTION</u>

1.   I am an "investigative or law enforcement officer of

the United States" within the meaning of Section 2510(7) of Title

18, United States Code, that is, an officer of the United States

who is empowered by law to conduct investigations of and to make

arrests for offenses enumerated in Section 2516 of Title 18,

United States Code.  I have been employed as a Special Agent for

the DEA for approximately four years.  I have participated in

several investigations of unlawful drug distribution and have

conducted or participated in surveillance, the execution of

search warrants, debriefings of informants and reviews of taped conversations and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.

2.    I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications concerning offenses enumerated in Section 2516 of Title 18, United States Code — that is, offenses involving (1) importation of, distribution of, and possession with intent to distribute of, controlled substances, the use of wire facilities to facilitate the same, conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; and (2) laundering the monetary proceeds of criminal activity, in violation of Title 18, United States Code, Sections 1956 and 1957 (the "TARGET OFFENSES").[1]

3.    I believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by

---

[1]    Although not a predicate offense under 18 U.S.C. § 2516, the DEA is also investigating the TARGET SUBJECTS (as subsequently defined herein) in connection with violations of 18 U.S.C. § 2, for aiding and abetting the TARGET OFFENSES.

2

491

EMMANUEL ORUCHE, WISE UKOMADU, REBECCA AMBO FOMUM-TIBAH,[2] FNU LNU, a/k/a "Charlie," FNU LNU, a/k/a "Mike," FNU LNU, a/k/a "Ralph," a/k/a "Chidi Obi," JOSEPH OLUIGBO, OKEKE FRANCIS, MICHAEL ANORUE, EMMANUEL OBIDIASO, LARRY DAVIS, TONY EBI, LESLIE NESBITT, OKPARA OKECHUKWU, COSME FREDERIC TIBURCE JEMY, CHISOZIE ANORUE, a/k/a "Michael Anorue," a/k/a "Chief," EDWARD YARBROUGH, ANTONIO HILL, IVY SHELTON, LOIS HARGROBE, KEVIN APPLE, FNU LNU, a/k/a "Joel," FNU LNU, a/k/a "Eva," FNU LNU, a/k/a "Leroy," BLESSING IGBINOSA BROWN, OKEY IWUOHA, FNU LNU, a/k/a "Sir P," FNU LNU a/k/a "Jaster," FESTUS AFOLABI, JAMES CHIDI BENSON, and LINUS IHEUKWU, and others as yet unknown (the "TARGET SUBJECTS"). The requested Order is sought for a period of time until the interception fully reveals the manner in which the above-named individuals and their confederates participate in the TARGET OFFENSES, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5). Pursuant to Section 2518(5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days after the date of this Court's Order.

---

[2] As discussed below, TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH was arrested on or about August 9, 2006, and is currently detained. Based on recorded telephone conversations with TARGET SUBJECT EMMANUEL ORUCHE, however, I believe she may still be involved in the TARGET OFFENSES. Accordingly, she is included as a TARGET SUBJECT.

3

4.    This case is being investigated by the Drug Enforcement Administration, in the New York metropolitan area, Detroit, Michigan, and elsewhere in the United States.  I have personally participated in the investigation of the offenses referred to above, and make this affidavit based on my personal participation in this investigation, and based on reports made to me by other agents and officers and other law enforcement authorities. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed.  Such statements are reported in substance and in part, unless otherwise indicated.

5.    Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date.  Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order

4

authorizing the interception of wire communications.  Based upon
this knowledge, I allege the facts contained in the paragraphs
below to demonstrate that:

### DESIGNATED CELLULAR TELEPHONE

6.    There is probable cause to believe that TARGET SUBJECT
EMMANUEL ORUCHE has been using, is using, and will in the future
use, in order to accomplish, to discuss and to commit the TARGET
OFFENSES, a prepaid cellular telephone assigned call number (832)
613-4067, with IMSI number 310260220884062, no listed subscriber,
and service provided by T-Mobile USA (the "TARGET CELLPHONE").

7.    I have been informed by other law enforcement personnel
who are familiar with the applicable telephone technology that a
"portable cellular telephone" (or a "mobile telephone") can be
used both within a vehicle and outside a vehicle through the use
of a portable battery pack.  The cellular telephone system
divides the New York City and other metropolitan area into many
small coverage areas, which are called "cells."  As a vehicle in
which a portable cellular telephone is located, or the cellular
telephone itself, is moved from one cell to another, transmitters
within each cell and a master switching network permit "wire
communications" to be completed.  Each portable cellular
telephone that does not contain party lines bears a unique
electronic number called an ESN or an IMSI number, and an
assigned telephone number.  It is requested that interception be

permitted over any changed telephone numbers

subsequently assigned to the IMSI numbers for the TARGET

CELLPHONE.[3]

8. Because of the mobility of portable cellular

telephones, pursuant to Title 18, United States Code, Section

2518(3), authorization is requested for interception of wire

communications both within the Southern District of New York,

and, in the event the TARGET CELLPHONE is transferred outside the

jurisdiction of this Court, in any other jurisdiction within the

United States. In addition, it is requested that background

conversations in the vicinity of the TARGET CELLPHONE while it is

off the hook or otherwise in use also be permitted to be

intercepted.

9. It is anticipated that the TARGET SUBJECT EMMANUEL

ORUCHE will use the TARGET CELLPHONE to place calls to and from

the Southern District of New York, as well as other locations.

This belief is supported by the facts described below. In any

event, pursuant to United States v. Rodriguez, 968 F.2d 130 (2d

Cir.), cert. denied, 506 U.S. 847 (1992), a Court in the Southern

District of New York is empowered to issue an Order for the

interception of wire communications over telephones located in

---

[3]    The TARGET CELLPHONE utilizes an IMSI number, encoded into a
removable computer chip located inside the instrument. The IMSI
number assigned to the computer chip is unique to the subscriber,
as opposed to the phone. This application seeks authorization to
intercept communications occurring over any telephones or
telephone numbers accessed by or through the use of the IMSI
number identified above.

6

other districts, as long as the interceptions of these
communications are first heard in the Southern District of New
York.

10.   In connection with the telecommunication companies
which provide the service for the TARGET CELLPHONE, all
interceptions over the TARGET CELLPHONE will automatically be
routed to New York, New York, regardless of where the telephone
calls are placed to or from.  Accordingly, all interceptions will
first be heard in the Southern District of New York.  During the
requested wire surveillance, all monitoring will be performed in
New York, New York, by law enforcement officers authorized under
Section 2510(7) of Title 18, United States Code, including law
enforcement officers with the DEA, and Government employees or
individuals operating under a contract with the Government,
including, if necessary, translators, who will be acting under
the supervision of investigative or law enforcement officers
authorized to conduct the interception, and specifically under
the supervision of law enforcement officers from the DEA.

**OBJECTIVES**

11.   There is probable cause to believe that the
interception of wire communications, the authorization for which
is sought herein, will help to reveal:  (i) the nature, extent
and methods of operation of the TARGET SUBJECTS' narcotics
trafficking and money laundering activities; (ii) the identity of

7

496

the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (iii) the receipt and distribution of contraband and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records relating to those activities; (vi) the location and source of resources used to finance their illegal activities; and (vii) the location and disposition of the proceeds from those activities.  In addition, these wire communications are expected to constitute admissible evidence of the commission of the TARGET OFFENSES.

### PRIOR APPLICATIONS

12.  I have been informed that reviews have been done of the electronic surveillance files of the New York Drug Enforcement Task Force, the Drug Enforcement Administration (DEA), the Federal Bureau of Investigation (FBI) and other law enforcement agencies.[4]  Based on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS, or over the facilities or places named herein, except as follows:

---

[4]    A check of DEA and FBI files was completed on or about November __, 2006

a.    An order dated May 25, 2006, signed by the Honorable Naomi Reice Buchwald, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by Chimdi Ibiam (the "Ibiam Phone").    Interceptions pursuant to that order began on or about May 26, 2006, and ended on or about June 23, 2006.

b.    An order dated June 23, 2006, signed by the Honorable William H. Pauley III, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30 day-period. Interceptions pursuant to that order began on or about June 23, 2006, and ended on or about July 21, 2006.

c.    An order dated July 21, 2006, signed by the Honorable Richard J. Holwell, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30-day period. Interceptions pursuant to that order began on or about July 21, 2006, and ended on or about August 22, 2006, with Ibiam's arrest.

d.    An order dated August 7, 2006, signed by the Honorable Stephen C. Robinson, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by Emmanuel Obi Maduka, a/k/a "Mazu" (the "Maduka Phone").    Interceptions pursuant to that

9

order began on or about August 7, 2006, and ended on or about August 23, 2006, with Maduka's arrest.

        e.   An order dated August 30, 2006, signed by the Honorable Denise L. Cote, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by TARGET SUBJECT EMMANUEL ORUCHE (the "FIRST ORUCHE PHONE"). Interceptions pursuant to that order began on or about August 31, 2006, and terminated on or about September 27, 2006.

        f.   An order dated September 21, 2006, signed by the Honorable Gerard E. Lynch, United States District Judge, Southern District of New York, authorizing wire interceptions over another cellular telephone used by TARGET SUBJECT EMMANUEL ORUCHE (the "SECOND ORUCHE PHONE"). Interceptions pursuant to that order began on or about September 21, 2006, and ended on or about October 21, 2006.

        g.   An order dated September 27, 2006, signed by the Honorable Denise L. Cote, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the FIRST ORUCHE PHONE. Interceptions pursuant to that order began on or about September 27, 2006, and ended on or about October 26, 2006. As discussed in part below, interception of wire communications occurring over the FIRST ORUCHE PHONE reveal that the user of the phone is ORUCHE and that

he is using the FIRST ORUCHE PHONE to conduct his narcotics trafficking activities.

h.    An order dated October 26, 2006, signed by the Honorable Denise L. Cote, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE. Interceptions pursuant to that order began on or about October 26, 2006, and are continuing as of the date of this affidavit.

i. An order dated October 13, 2006, signed by the Honorable Robert P. Patterson, Jr., United States District Judge, Southern District of New York, authorizing wire interceptions over the TARGET CELLPHONES.   Interceptions pursuant to that order began on or about October 16, 2006 and ended on or about November 11, 2006.[5]  This affidavit is submitted in support of an application to obtain authorization for continued interceptions.

## II.   THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS AND OTHERS AS YET UNKNOWN WILL USE THE TARGET CELLPHONE IN FURTHERANCE OF TARGET OFFENSES

13.    As set forth below, there is probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE is using the TARGET CELLPHONE in furtherance of narcotics trafficking activities involving the importation of heroin into the United States from

---

[5]    While interceptions did not begin until October 16, 2006, the 30-day authorization began to run on October 13, 2006, when the service provider began providing pen register data pursuant to the order.

Nigeria, Turkey, and other countries, and the distribution of heroin within the United States.

### ORUCHE'S HEROIN-TRAFFICKING ACTIVITIES

14.   From an ongoing investigation, I have identified TARGET SUBJECT EMMANUEL ORUCHE, the user of the TARGET CELLPHONE, as a member of a drug organization that brings heroin from Pakistan, through Nigeria, Turkey, and other countries, to the United States for ultimate distribution.   Three heroin couriers arrested by law enforcement authorities have identified ORUCHE as the intended recipient of the heroin.   In addition, communications intercepted over the Ibiam Phone, the FIRST ORUCHE PHONE, and the SECOND ORUCHE PHONE reveal that ORUCHE is involved in the distribution of heroin within the United States.

### Couriers Naming ORUCHE as the Recipient of Imported Heroin

15.   On December 5, 2003, Immigration and Customs Enforcement ("ICE") agents arrested a heroin courier named William Wagabono, as he arrived in the United States at Newark International Airport.   Following his arrest, Wagabono stated that the heroin he was carrying was intended for an individual he knew as "Emmanuel" or "Manny" who drove a white Lexus.   ICE agents retrieved registration information for all white Lexus cars in New York registered to individuals named "Emmanuel." Based on that search, ICE agents obtained a photograph of TARGET SUBJECT EMMANUEL ORUCHE, whom Wagabono subsequently identified as

12

501

the person to whom he was supposed to deliver heroin. Wagabono further said that he was paid to transport suitcases containing heroin from Uganda to Newark via England on four previous occasions, and that "Manny" was the recipient of the heroin each time. Two days after Wagabono's arrest, on or about December 7, 2003, agents attempted a controlled delivery to the Crown Motor Inn in Newark, New Jersey, where Wagabono was supposed to meet ORUCHE. ORUCHE was observed by law enforcement agents conducting surveillance in the area. Perhaps sensing that he was being watched, however, ORUCHE left the area and did not meet with Wagabono.[6]

16. On or about June 2, 2006, officers of U.S. Customs and Border Protection ("CBP") at John F. Kennedy International Airport in Queens, New York ("JFK Airport") stopped an individual named Ikechukwu Ojeogwu, who had arrived from the Port of Harcourt, Nigeria, via Frankfurt, Germany. Ojeogwu was discovered to have swallowed heroin. During a post-arrest interview, Ojeogwu admitted to swallowing 60 pellets totaling approximately one kilogram, gross weight, of heroin. Ojeogwu stated that he was supposed to deliver the heroin to his "uncle," TARGET SUBJECT EMMANUEL ORUCHE, and he provided law enforcement

---

[6]    From speaking to one of the ICE agents who handled the Wagabono case, I understand that Wagabono was prosecuted in the District of New Jersey, where he cooperated and has been sentenced. He is scheduled to be released from prison in the near future.

13

agents with the number of the FIRST ORUCHE PHONE, which he indicated was ORUCHE's phone.[7]

17.  On or about August 9, 2006, CBP officers at JFK Airport stopped TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH, who had arrived aboard a British Airways flight from Istanbul, Turkey. When FOMUM-TIBAH's answers to routine questions made officers suspicious, FOMUM-TIBAH was taken to the medical facility at JFK Airport for a monitored bowel movement.  FOMUM-TIBAH subsequently passed approximately 16 pellets, one of which field tested positive for the presence of heroin.  A vaginal insert also dropped from her, which field tested positive for the presence of heroin.  In all, approximately 1341 grams of heroin, net weight, was recovered from FOMUM-TIBAH.  Among the items in FOMUM-TIBAH's possession were a driver's license bearing the name and photograph of TARGET SUBJECT EMMANUEL ORUCHE, as well as a business card in his name.  Following her arrest, FOMUM-TIBAH stated that the heroin she was carrying was to be delivered to ORUCHE, who was her boyfriend; that she was sent on his behalf to Istanbul to get the heroin; and that ORUCHE works in the drug

---

[7]    Ojeogwu is being prosecuted in the Eastern District of New York.  While Ojeogwu has provided helpful information to law enforcement, he is not yet believed to be fully forthcoming. While he may provide fuller information after subsequent meetings, those meetings have not yet happened.  He is not at this time signed up as a cooperator.

14

business for two unidentified individuals in Detroit.[8]

### ORUCHE's Intercepted Wire Communications Concerning Heroin

18.  In addition to these three couriers who identified ORUCHE as the intended recipient of heroin imported from Nigeria, Uganda, and Turkey, wire communications intercepted thus far over the Ibiam Phone, the FIRST ORUCHE PHONE, the SECOND ORUCHE PHONE, and the TARGET CELLPHONE have revealed that ORUCHE is involved in the importation and distribution of heroin and that he utilizes multiple cellular telephones in furtherance of those activities. The following intercepted wire communications, among others, relate to ORUCHE's involvement in the importation and distribution of heroin in late September:[9]

a.  On or about September 26, 2006, at approximately 6:03 a.m., an unidentified male ("UM1"), using a telephone assigned Nigerian call number 234 18048837 (the

---

[8]  FOMUM-TIBAH is being prosecuted in the Eastern District of New York.  While FOMUM-TIBAH has provided helpful information to law enforcement, she is not yet believed to be fully forthcoming. Indeed, based on recorded telephone calls that she has made to ORUCHE (some of which were intercepted over the SECOND ORUCHE PHONE and some of which I obtained through a Grand Jury subpoena from the detention center where the FOMUM-TIBAH is incarcerated), I have reason to believe that FOMUM-TIBAH is still communicating with ORUCHE in furtherance of the TARGET OFFENSES.  While she may provide fuller information after subsequent meetings, those meetings have not yet happened.  She is not at this time signed up as a cooperator.

[9]  Because the intercepted calls have taken place primarily in Igbo, a Nigerian language, the summaries set forth herein are based on translations prepared by individuals proficient in that language.  Translations are preliminary and are subject to modification.  Quoted portions are not necessarily exact quotes, but are the sum and substance of the calls according to the monitoring agent or translator.  My interpretations of some terms used are indicated in parentheses or are otherwise noted.

15

"Nigerian Number"), called ORUCHE, using the SECOND ORUCHE PHONE. During the call, ORUCHE asked the UM1 if he could call after he (ORUCHE) had woken up. The UM1 then stated: "Listen, listen, 'cause something will be coming in." (Session 46). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, the UM1 was informing ORUCHE that a courier would shortly be traveling to the United States carrying heroin.

   b. On or about September 26, 2006, at approximately 12:32 p.m., the UM1, using the Nigerian Number, called ORUCHE, using the SECOND ORUCHE PHONE. During the call, ORUCHE asked: "Do you know why I told you to not talk on this phone? When that person comes in, he should call you. I don't want to go anywhere 'cause you know . . . . Let one know which one he's suffering from. But stop giving him that bank account 'cause it seems like these people that are brought in are given that bank account and they know, you know. Tell them to go to any bank they like . . . the bank that's around where you went, you understand? . . . 'Cause you give them that one bank. When they come out . . . they're supposed to know where they are going, you understand? They may know it off heart. They should stop writing it down on paper. . . . They should memorize it; they should stop writing it, you understand? They should have the number to the place of residence they are going to."

16

(Session 69).  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE was instructing the UM1 that, in order to minimize the risk of interdiction, couriers should memorize the address and telephone number of their destination, rather than writing them on paper.

        c.    On or about September 30, 2006, at approximately 8:34 a.m., ORUCHE, using the SECOND ORUCHE PHONE, called the UM1, using the Nigerian Number.  During the call, the UM1 indicated that ORUCHE had woken him up.  ORUCHE then stated: "This guy has entered the hotel."  The UM1 then replied: "Okay. My work, my work . . . ."  (Session 125).  Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE was informing the UM1 that the courier discussed in the communications summarized above had arrived.

        d.    On or about September 30, 2006, at approximately 1:30 p.m., ORUCHE, using the SECOND ORUCHE PHONE, called another unidentified male (the "UM2"), using a telephone assigned call number (313) 585-7130 (the "Detroit Number").  Near the beginning of the conversation, ORUCHE asked: "Can you come over here?"  The UM2 replied: "Where you at?  Down there? . . . are you at home-home?"  ORUCHE responded yes, then the UM2 stated: "I might have to.  If we have to come, I come."  ORUCHE

17

then stated: "Yeah, if you can come, come. . . . I don't want to leave this place for now." Shortly thereafter, ORUCHE stated: "You got to get me about two. Big ones." The UM2 then asekd: "Is that what you got?" ORUCHE replied: "I have two, yeah. But one, I'm talking about one now." After the UM2 asked "What did you say now?," ORUCHE continued: "I'm talking about twenty." The UM2 answered: "I know what you are talking about." ORUCHE then stated: "Okay, got to send them home. Let me go, let me know if you can make it. Just let me know. You know." (Session 130). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE was informing the UM2 that he had two kilograms of heroin available (presumably the heroin ORUCHE had received in connection with the communications summarized above) and asking whether UM2 would come to New York to get it. The reference to "two" is to two kilograms of heroin; the reference to "twenty" is to $20,000; and the reference to "home-home" is to New York.

     e.    On or about October 2, 2006, at approximately 11:20 a.m., ORUCHE, using the FIRST ORUCHE PHONE, called a telephone assigned call number (718) 234-4200 (the "Holiday Motel Number"), which is listed or leased to the Holiday Motel on the New England Thruway Service Road in the Bronx, New York. During the call, ORUCHE asked the receptionist to connect him with "Room

18

507

18." After he was connected to the room, ORUCHE asked a male if he was ready. The male, subsequently identified as TARGET SUBJECT COSME FREDERIC TIBURCE JEMY, said he was ready. ORUCHE instructed him to come downstairs. (Session 5423). Agents conducting surveillance at the Holiday Motel at or about that time observed ORUCHE in a vehicle pick up JEMY. Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that JEMY was the heroin courier about whom ORUCHE spoke in the communications summarized above.

f.    On October 3, 2006, at approximately 4:10 p.m., ORUCHE used the FIRST ORUCHE PHONE. (Session 5611). From cell-site location information, I have learned that ORUCHE was in the area of Detroit, Michigan, at that time. Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that ORUCHE traveled to Detroit to meet with UM2, the user of the Detroit Number, and deliver heroin to him.

### Interceptions Over the TARGET CELLPHONE

19.    Based in part on information set forth above, I applied for, and obtained, Court authorization to begin interceptions over the TARGET CELLPHONE. Interceptions over the TARGET CELLPHONE began on or about October 16, 2006, and ended on

19

or about November 11, 2006.[10]  Set forth below are summaries of
some of the pertinent calls that were intercepted over the TARGET
CELLPHONE during the first 30-day period of interceptions.

20.  On or about October 19, 2006, at approximately
1:37 p.m., an unidentified male ("UM"), using a telephone
assigned Nigerian call number 234 18048837, called TARGET SUBJECT
EMMANUEL ORUCHE on the TARGET CELLPHONE.  Near the beginning of
the call, the UM asked: "Where did it get to?"  ORUCHE then
replied: "Nothing, I spoke with them today so, I will go there
probably I'll . . . depends on how I feel, I will go there
tomorrow.  The UM then asked: "So tomorrow is when you will call
Festus?"  ORUCHE replied: "No, I go there and when I get back
I'll call Festus."  The UM then stated: "No problem, let him be
in charge [slightly unclear words]. . . cause these people should
be given money so as to lend me money [slightly unclear words]."
Shortly thereafter, the UM stated: "What I want is if I give
these people, if I take these people's money, this one that I
will later give back to them . . . then I will be able to release
[unclear but sounds like, "the load"]."  (Session 47).  Based on
my training and experience, participation in this investigation,
and review of other intercepted communications, I believe that

---

[10]    The 30-day authorization order began to run on October 13,
2006, when the service provider received the order and began
providing pen register data.  Due to technical difficulties,
however, there were no intercepted calls until the following
Monday, October 16, 2006.

20

during this conversation, ORUCHE and the UM were discussing
ORUCHE's plan to travel to Detroit, Michigan, to pick up money
owed by TARGET SUBJECT FNU LNU, a/k/a "Jaster" ("JASTER") to
ORUCHE and the UM for two kilograms of heroin delivered to JASTER
in early October.  ORUCHE and the UM further discussed importing
more heroin into the United States ("releas[ing] the load").

      21.  On or about October 20, 2006, at approximately
10:19 a.m., TARGET SUBJECT FESTUS AFOLABI, using a telephone
assigned call number (401) 499-0673, called ORUCHE on the TARGET
CELLPHONE.  During the conversation, AFOLABI asked: "Anything
new?"  ORUCHE replied: "No, I told you I'm going to call you as
soon as I get them I'll call you . . . . as soon as I get there
I'll call you."  (Session 50).  Based on my training and
experience, participation in this investigation, and review of
other intercepted communications, I believe that during this
conversation, ORUCHE was informing AFOLABI – the "Festus"
referred to in the conversation between ORUCHE and the UM
summarized above – that he had not yet picked up the money from
JASTER.

      22.  On or about October 23, 2006, at approximately
8:43 a.m., TARGET SUBJECT FNU LNU, a/k/a "Joel" ("JOEL"), using a
telephone assigned Nigerian call number 234-805-518-6415 (the
"6415 Number"), called ORUCHE on the TARGET CELLPHONE.  During
the conversation, ORUCHE stated: "I'm waiting to collect

510

everything so I can come back, you understand.  By Friday . . .
Thursday I'll get in here and call this guy."  JOEL replied: "By
Thursday? . . . You'll get in to New York?"  ORUCHE replied:
"Yea.  Let me collect everything, you know.  I just want, I don't
want to . . . ."  Shortly thereafter, JOEL stated: "Please
there's an emergency here.  Can you do Western Union to somebody
here?  There's an emergency.  He said it's $2500. . . . Let me
text the name you'll use to do it, please.  That's more important
than everything else.  It's someone that's trying to come where
you're at."  ORUCHE replied: "Okay, text it to me.  Use the
other phone."  (Session 72).  Based on my training and
experience, participation in this investigation, and review of
other intercepted communications, I believe that during this
conversation, ORUCHE was telling JOEL that he was collecting a
drug debt, and JOEL was providing contact information for ORUCHE
to wire $2500 so that a heroin courier could travel to the United
States.

        23.  At approximately 10:41 a.m. the same day, JOEL,
using the 6415 number, called ORUCHE again on the TARGET
CELLPHONE.  During the conversation, JOEL asked: "Did you get it?
. . . I sent it, have you seen it?"  After ORUCHE indicated he
had seen it, JOEL stated: "Have you seen the name?  It'll be done
in Accra, Ghana, not Nigeria. . . . The guy is in Ghana; let them
use it to [unintelligible]."  (Session 73).  Based on my training

and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, JOEL confirmed that he had received JOEL's text message, referred to in Session 72, summarized above, and that the heroin courier was from Ghana, not Nigeria.

24.  On or about October 28, 2006, at approximately 9:29 a.m., ORUCHE, using the TARGET CELLPHONE, called JOSEPH OLUIGBO at phone number 718-510-6880.  OLUIGBO told ORUCHE about some money that had just come in (approximately $1,907).  ORUCHE told OLUIGBO to "prepare the money for, what's his name, what's the name of the boy, the 2,500 that the boy took," referencing a money courier.  OLUIGBO said that the boy had come the day before but that OLUIGBO "did not give him anything."  OLUIGBO further said that this person wanted cash because "the person that has the thing," meaning the drugs, had "already left Canada," so the boy, the person responsible (or the person working for the person responsible) for paying the individual with the drugs, "wanted money desperately."  OLUIGBO said that he "didn't know what to do" so he "told him (the money courier) that the best" OLUIGBO could do for him was to "put it through Western Union," and that the boy could "go somewhere else and cash."  OLUIGBO's decision clearly upset ORUCHE, who said, "Yeah, but where you put two something from local you are implicating us, you understand? What you did is, you know, for local 2,000 something, is too

23

512

much.  They will give him stress and require two IDs," that is,
because OLUIGBO had wired more than $1,000, Western Union would
require a show of identification.  OLUIGBO said that "he himself
has ID. ... So he said he has no problem."  ORUCHE was still
disturbed by what OLUIGBO had done, saying that, "They shut
people down for these little things, you understand.  If they see
that you are doing something like this, it becomes money
laundering and all these things.  You know, wash, wash, that is
what they call it, you know.  You cannot do it locally like that.
A person sends another something and the person goes to the same
location to take it."  OLUIGBO responded, "I was sending it to
Yonkers."  ORUCHE said, "No matter where you send it, you
understand?"  OLUIGBO later said, "I have not checked the
account, I was waiting to hear from you to see."[11]

25.  That same day, at approximately 1:11 p.m., ORUCHE,
using the TARGET CELLPHONE, called FNU LNU, aka "Agwu," in
Nigeria, a believed source of drug supply or intermediary for a
source of supply in Nigeria.  ORUCHE told AGWU, "I think I told
you 6.  What did I tell you?," referencing a possible sum of
money, possibly $60,000, the approximate price in New York for a
kilogram of heroin.  AGWU responded, "I told you 7 and you said
6.5.  You don't want the one you will be selling and be entering

---

[11]    Through wire interceptions, I learned that a Western Union
account held by ORUCHE was recently shut down by Western Union
security personnel.

that of somebody." AGWU then said, "What happened? The person that is selling that thing – do you think they bought that thing 300,000? Calculate it and add transportation. In fact the business is useless business." ORUCHE said, "Ok, I will give this guy 30," meaning that he would pay $30,000 to someone working for or associated with AGWU. AGWU and ORUCHE then engaged in a discussion about apparent money calculations, including how much ORUCHE expected to receive. At the end of this, AGWU said, "Ok, give them 30 ($30,000), I will tell you to send me 4 here, you send 4 to that guy that sells car to use it to ship me a car." When ORUCHE asked if he could "give them 25" instead of 30 and keep "five" for bills that he had to pay, AGWU repeated, "Give them 30 to enable the guy to release the one going to Baltimore (meaning a drug courier making a drug trip) because the load has left today that is Saturday to Baltimore."

26. On or about November 3, 2006, at approximately 2:49 p.m., ORUCHE received a call on the Target Cellphone from FNU LNU, aka "EKENE," who said to ORUCHE, "My guy in Ghana is telling me that they have something, someone that they are preparing," meaning a courier with drugs. EKENE further told ORUCHE to "take that name, Edith's name," referencing the name that the two had used in the past as a purported recipient of a wire transfer. EKENE asked ORUCHE to "do the thing so tomorrow they can bring this money." EKENE further said "to make sure

25

514

that this person that is preparing (meaning the drug courier) is
coming out." ORUCHE asked, "The Tuesday person didn't come
out?," meaning a courier who was supposed to have traveled on
Tuesday. EKENE responded, "No." ORUCHE told EKENE that, to
avoid problems, "they should bring me three names ... so it
(meaning the amount of money wired) can be broken down. This
country's trouble is huge when you put like that."

          27. On or about Tuesday, November 7, 2006, at
approximately 11:06 a.m., ORUCHE called an unidentified male
("UM"). The digits dialed by ORUCHE were not captured. The UM
told ORUCHE, "this man hasn't [U/I]." ORUCHE asked, "Really?,"
and the UM said, "He'll go with the one going the day after
tomorrow." The UM said that he had "talked to them very early
this morning and he said he couldn't go with this one." He
further said that "they haven't given him anything so he decided
to go with the one going the day after tomorrow." The UM
finished by telling ORUCHE that "If he gets ready to start
leaving, I'll text you." Based on my training and experience, my
review of earlier wiretap calls, and other knowledge that I have
gained during the course of this investigation, I believe that
the person being discussed by the UM and ORUCHE in this call was
a drug courier who, according to previous calls in which he was
referred to as "Tuesday's person," was supposed to have traveled
on Tuesday with drugs. In this specific call, I believe that the

UM was informing ORUCHE that the courier had not left, but was expected to leave two days later, and that the UM would let ORUCHE know once the courier got "ready to start leaving."

28.  On or about November 9, 2006, at approximately 2:35 p.m., ORUCHE spoke with [OBI] (session 202) using the TARGET CELLPHONE – ORUCHE said that "these people closed my Western Union," meaning that his Western Union account had been closed. ORUCHE said that he would call OBI back when he resolved the problem with Western Union.

29.  On or about November 10, 2006, at approximately 9:25 a.m., ORUCHE spoke with JOE using the TARGET CELLPHONE. ORUCHE asked JOE whether there was "any information from them," meaning whether JOE had learned anything more about the closure of the Western Union account.  JOE said that he had not.  JOE also said to ORUCHE that he should "come in and remove any other IDs there" ORUCHE speculated that the "Chinese woman" had "caused" the problem, since "she gave 18 names."  JOE agreed. ORUCHE told JOE about a conversation he had with a Western Union employee about the closure of the account and resolving the issue.

30.  Based on the foregoing, I believe that EMMANUEL ORUCHE is now using the TARGET CELLPHONE in furtherance of the TARGET OFFENSES, either in lieu of or in addition to the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE.

27

III. **ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED
OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A
NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS OVER
THE TARGET PHONE**

31.    The investigation to date has produced some
evidence against the TARGET SUBJECTS concerning the TARGET
OFFENSES.  As discussed above, the principal goals of this
continuing investigation are to identify and develop evidence
against not only the currently identified TARGET SUBJECTS, but
also all of their suppliers, customers, accomplices, and
associates, as well as the locations at which the TARGET SUBJECTS
store narcotics and/or narcotics proceeds, and the methods by
which they operate their narcotics trafficking and money
laundering business.  As a result of the facts set forth above,
several investigative techniques have been tried, or reasonably
appear likely to fail if tried, or are likely to be too dangerous
to employ to achieve these objectives:

a.    There is currently no expectation that an
undercover officer or confidential informant will be able to
infiltrate the organization involving EMMANUEL ORUCHE, the user
of the TARGET CELLPHONE, let alone determine the full scope of
the TARGET SUBJECTS' operations, identify and meet all of the
other TARGET SUBJECTS and their co-conspirators, or identify the
TARGET SUBJECTS' narcotics suppliers and their confederates.  In
order to make use of an undercover a viable option, there would
have to be someone inside the organization working with the

28

517

Government who could make the introduction. Moreover, based on my experience as a narcotics investigator, as well as discussions with my fellow agents, I believe that drug traffickers are unlikely to discuss the full extent of their organization's activities or membership when dealing with an "outsider" such as an undercover officer or confidential informant. Narcotics traffickers tend to be highly reticent about discussing narcotics with unknown persons.

b. As demonstrated above, this and related investigations have resulted in the arrests of Chimdi Ibiam; Emmanuel Obi Maduka, a/k/a "Mazu"; William Wagabono; Ikechukwu Ojeogwu; and TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH. Nevertheless, these arrests do not obviate the need for interception of the TARGET CELLPHONE. Other than Wagabono, none of these individuals are signed up cooperators at this time. Wagabono was a signed up cooperator, but my understanding is that he has been released from prison. His incentive to cooperate is therefore minimal. Moreover, any information he could provide would be purely historical, and almost three years old. As for the other four individuals, although two of them, Ojeogwu and FOMUM-TIBAH, have attended proffer sessions with the Government, law enforcement officials do not believe that they have been completely forthcoming and there are no additional proffers currently scheduled. Indeed, as discussed above, there is some

29

indication that FOMUM-TIBAH is still collaborating with TARGET SUBJECT EMMANUEL ORUCHE. Additionally, neither Ojeogwu nor Fomum-Tibah are knowledgeable enough about the organization to negate the need for a wiretap. FOMUM-TIBAH, for example, indicated that she knew ORUCHE worked for two individuals in Detroit, but she was unable to provide their names. Even if someone other than Wagabono were signed up in the future, there is no information at this time indicating that they could advance the investigation proactively. ORUCHE undoubtedly knows that they have been arrested and would not trust them if they were released or tried to place a call to ORUCHE. Accordingly, these arrests are unlikely to further the investigation substantially.

c. The investigation has involved the use of some physical surveillance to observe ORUCHE. For example, as discussed above, on or about October 2, 2006, agents observed ORUCHE picking up TARGET SUBJECT COSME FREDERIC TIBURCE JEMY at the Holiday Motel. In addition, on or about November 7, 2006, agents observed ORUCHE meeting FESTUS AFOLABI at ORUCHE's medical supply store on White Plains Road in the Bronx. Based on intercepted communications, however, I have learned that, on at least two occasions, ORUCHE observed law enforcement agents conducting surveillance, and he has begun employing counter-surveillance measures. For this reason, I do not believe that surveillance will significantly further the goals of the

30

519

investigation. Moreover, pure physical surveillance, without the wiretap, would not accomplish the goals of this investigation given the geographical breadth of the organization, including couriers who travel from Africa, Turkey, and elsewhere with heroin. Pure physical observation, without wire surveillance, would not be likely to advance the investigation, as the purpose of a TARGET SUBJECT's visit to a location or in-person meeting with another individual would not be known. For example, the purpose of the November 7 meeting between ORUCHE and AFOLABI was known only because of intercepted phone calls over the TARGET CELLPHONE. Based on those interceptions, I learned that the purpose of the meeting was for ORUCHE to pay AFOLABI thousands of dollars, which I believe was paid in connection with drug-related activities. Accordingly, with the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, with the knowledge of the purpose and nature of the meeting. Wire surveillance would also minimize the risks of discovery inherent in following subjects or remaining at target locations for extended periods of time.

d. As demonstrated above, telephone toll records and pen registers have been used in this investigation and have been helpful to connect certain individuals. However, such information provides only limited information. At most, it

31

520

reveals contact between two individuals, not the nature of the contact or the substance of the conversation. Moreover, these methods do not enable law enforcement officers to identify with certainty the persons involved in the conversations or the significance of the communications in the context of ongoing narcotics trafficking or money laundering. Among other problems, a telephone number appearing in the records may not be listed or subscribed in the name(s) or address(es) of the person(s) using the telephone. Indeed, in this investigation, at least some of the individuals with whom the TARGET CELLPHONE has been in contact cellular telephones with no subscriber information or false subscriber information. In addition, many phone numbers in contact with the TARGET CELLPHONE are numbers from other countries. Subscriber information for such numbers are not readily available to United States law enforcement authorities. It is only through intercepting calls into and out of the TARGET CELLPHONE that we have been able to gain any understanding as to the identity of a caller and that individual's role in the drug-trafficking organization.

      e.    Use of a federal grand jury does not appear to be a promising method of investigation. Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under

32

investigation.  Because any such individuals would face

prosecution, it is unlikely that they would testify voluntarily.

Nor would it be desirable at this time to seek immunity for such

individuals and to compel their testimony.  Immunizing them could

thwart the public policy that they be held accountable for their

crimes.  The issuance of grand jury subpoenas likely would not

lead to the discovery of critical information and undoubtedly

would alert the TARGET SUBJECTS to the pendency of this

investigation.  For many of the same reasons, the use of witness

interviews does not appear to be a promising method of

investigation.  Again, witnesses who could provide additional

relevant evidence have not been identified or would themselves be

participants in the narcotics trafficking or money laundering

activities under investigation.

   f. While certain addresses associated with the

TARGET SUBJECTS have been identified, a search of such locations

is impracticable without more specific knowledge about the

identity of the individual living there and the nature of his or

her involvement in the organization.

   g. Arresting any of the TARGET SUBJECTS and

attempting to obtain their cooperation in investigating the

narcotics trafficking and money laundering of their criminal

associates is an investigative route that, in the judgment of the

law enforcement agencies involved, is too risky at the present

33

time.  Were an attempt made to arrest certain TARGET SUBJECTS and obtain their cooperation in the current investigation without success, other TARGET SUBJECTS almost certainly would be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize the investigation. Accordingly, the risks of failure in attempting to obtain these targets' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make that investigative technique unavailable.

h.  Although the wiretaps on the Ibiam Phone, the FIRST ORUCHE PHONE, and the SECOND ORUCHE PHONE, have been useful in developing evidence against certain of the TARGET SUBJECTS, including ORUCHE, the wiretaps have not revealed the full extent of the TARGET SUBJECTS' narcotics trafficking and money laundering activities.  For example, the wiretaps have not revealed the identity of all TARGET SUBJECTS, where they store their drugs and drug proceeds, or who the suppliers to ORUCHE are.  Moreover, as discussed above, I have reason to believe that ORUCHE has begun using the TARGET CELLPHONE either in lieu of or in addition to the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE, due in part to his belief that those telephones might be monitored by law enforcement.  For that reason, the wiretaps of the FIRST ORUCHE PHONE and the SECOND ORUCHE PHONE do not obviate the need to intercept communications over the TARGET CELLPHONE.

34

32. Because the above-described investigative techniques have been unsuccessful, authorization to intercept communications over the TARGET CELLPHONE is necessary to identify and develop evidence against the TARGET SUBJECTS.

III.  **CONCLUSION**

A.  **Personnel**

33. As noted above, this case is being investigated by the DEA. It is anticipated that, during the requested electronic surveillance, all monitoring will be performed and supervised in the Southern District of New York by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the DEA, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

B.  **Minimization**

34. All monitoring of wire communications over the TARGET CELLPHONE will be minimized in accordance with Chapter 119 of Title 18, United States Code. The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they

35

524

should take to avoid infringing upon any attorney-client
privilege or other recognized privileges.  In addition, all
communications intercepted will be conducted in such a way as to
minimize the interception of communications not otherwise
criminal in nature or subject to interception under Chapter 119,
Title 18, United States Code.  All monitoring will cease when it
is determined that the monitored conversation is not criminal in
nature.   Interception will be suspended immediately when it is
determined through voice identification, physical surveillance,
or otherwise, that TARGET SUBJECTS or any of their confederates,
when identified, are not participants in the conversation, unless
it is determined during the portion of the conversation already
overheard that the conversation is criminal in nature.  If an
interception is minimized, monitoring agents shall spot check to
insure that the conversation has not turned to criminal matters.

    35.    It is requested that the order authorizing
interception of wire communications provide that, if necessary,
translators be authorized to assist in conducting this
surveillance and to receive disclosure of intercepted
communications.  Certain of the TARGET SUBJECTS may be expected
to communicate with each other in Igbo, a Nigerian language.  It
may therefore be necessary to secure the services of translators
in order to assist Agents in monitoring and translating the
intercepted communications.  All such translators will be under

36

contract to the DEA and will be directly supervised by the DEA. It is further requested, pursuant to Title 18, United States Code, Section 2518(5), that, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

###    C.    Authorization Request

36.    The information set forth in this affidavit establishes, among other things, probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE is utilizing the TARGET CELLPHONE to discuss and engage in the TARGET OFFENSES.  Based on the foregoing, it is my opinion that the interception of wire communications occurring over the TARGET CELLPHONE, as specified above, is essential to uncover the full scope of the illegal activity described herein.

37. IT IS HEREBY REQUESTED that orders be issued authorizing Special Agents of the DEA and other investigative and law enforcement officers to intercept wire communications occurring over the TARGET CELLPHONE concerning the affairs of the enterprise described herein and the TARGET SUBJECTS' commission of the above-described offenses.  Because the offenses described herein are continuing in nature and are likely to continue after the initial interception of the particular communications that

37

are the objects of this request, it is requested that the Court's
orders authorizing interception of wire communications not be
required to terminate automatically when the communications
described above have first been obtained, but be permitted to
continue until all wire communications are intercepted that
reveal fully the manner in which the TARGET SUBJECTS, and others
as yet unknown, participate in the above-described offenses, or
until the accomplishment of the objectives set forth herein, or
for a period of thirty (30) days, whichever is earlier.  It is
further requested that such thirty (30) day period begin on the
earlier of the day on which an investigative or law enforcement
officer first begins to conduct an interception under the Court's
order or ten (10) days after the order is entered.

        38. IT IS HEREBY REQUESTED, pursuant to the provisions
of Title 18, United States Code, Section 2518(4), that it be
ordered that the ultimate service provider for the TARGET
CELLPHONE furnish the technical assistance necessary to
accomplish the interception unobtrusively and with a minimum of
interference with such services as those providers accord the
persons whose communications are to be intercepted (including all
incoming and outgoing calls), pen register information (including
all dial digits), trap and trace information, and audio
interception capability.  The assistance of these providers is
required to accomplish the objectives of the requested

38

interceptions.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

      39. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

 

ANDREW ARTHURTON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to me before this
21st day of November, 2006

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

528