UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                    :
IN THE MATTER OF THE APPLICATION OF :
THE UNITED STATES OF AMERICA FOR    :    AFFIDAVIT IN SUPPORT
AUTHORIZATION TO INTERCEPT WIRE     :    OF APPLICATION FOR
COMMUNICATIONS OCCURRING OVER (1) A :    CONTINUED
CELLULAR TELEPHONE ASSIGNED CALL    :    AUTHORIZATION TO
NUMBER (646) 533-8587, WITH         :    INTERCEPT WIRE
INTERNATIONAL MOBILE SUBSCRIBER     :    COMMUNICATIONS
IDENTITY NUMBER ("IMSI")            :
316010013940954; AND (2) A PREPAID  :
CELLULAR TELEPHONE ASSIGNED CALL    :
NUMBER (917) 815-6747, WITH IMSI    :
NUMBER 310260910058759.             :
                                    :
                                    :
- - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK          )
COUNTY OF NEW YORK         : ss.:
SOUTHERN DISTRICT OF NEW YORK )

          ANDREW ARTHURTON, a Special Agent with the Drug

Enforcement Administration ("DEA"), being duly sworn, deposes and

states:

**INTRODUCTION**

          1.    I am an "investigative or law enforcement officer

of the United States" within the meaning of Section 2510(7) of

Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and

to make arrests for offenses enumerated in Section 2516 of Title

18, United States Code.  I have been employed as a Special Agent

for the DEA for approximately four years.  I have participated in

several investigations of unlawful drug distribution and have

conducted or participated in surveillance, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.

2.    I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications concerning offenses enumerated in Section 2516 of Title 18, United States Code — that is, offenses involving (1) importation of, distribution of, and possession with intent to distribute of, controlled substances, the use of wire facilities to facilitate the same, conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; and (2) laundering the monetary proceeds of criminal activity, in violation of Title 18, United States Code, Sections 1956 and 1957 (the "TARGET OFFENSES").[1]

3.    I believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed

_____

[1]    Although not a predicate offense under 18 U.S.C. § 2516, the DEA is also investigating the TARGET SUBJECTS (as subsequently defined herein) in connection with violations of 18 U.S.C. § 2, for aiding and abetting the TARGET OFFENSES.

2

by EMMANUEL ORUCHE, WISE UKOMADU, REBECCA AMBO FOMUM-TIBAH,[2] FNU

LNU, a/k/a "Charlie," FNU LNU, a/k/a "Mike," FNU LNU, a/k/a

"Ralph," a/k/a "Chidi Obi," JOSEPH OLUIGBO, OKEKE FRANCIS,

EMMANUEL OBIDIASO, LARRY DAVIS, TONY EBI, LESLIE NESBITT, OKPARA

OKECHUKWU, COSME FREDERIC TIBURCE JEMY, CHISOZIE ANORUE, a/k/a

"Michael Anorue," a/k/a "Chief," EDWARD YARBROUGH, ANTONIO HILL,

IVY SHELTON, LOIS HARGROBE, KEVIN APPLE, FNU LNU, a/k/a "Eva,"

FNU LNU, a/k/a "Leroy," BLESSING IGBINOSA BROWN, OKEY IWUOHA,

PAUL OSUJI, a/k/a "Sir P," FNU LNU a/k/a "Jaster," FNU LNU, a/k/a

"Uchenna," FNU LNU, a/k/a "Obi," FNU LNU, a/k/a "Emeka," JOEL

LNU, FESTUS AFOLABI, LINUS IHEUKWU, UCHECHUKWU AKALONU, and

others as yet unknown (the "TARGET SUBJECTS").  The requested

Order is sought for a period of time until the interception fully

reveals the manner in which the above-named individuals and their

confederates participate in the TARGET OFFENSES, or for a period

of thirty (30) days, whichever occurs first, pursuant to Title

18, United States Code, Section 2518(5).  Pursuant to Section

2518(5) of Title 18, United States Code, it is further requested

that the 30-day period be measured from the date of this Court's

Order.

---

[2]    TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH was arrested on or
about August 9, 2006, and is currently detained.  Based on
recorded telephone conversations with TARGET SUBJECT EMMANUEL
ORUCHE, however, I believe she may still be involved in the
TARGET OFFENSES.  Accordingly, she is included as a TARGET
SUBJECT.

3

4.    This case is being investigated by the Drug Enforcement Administration, in the New York metropolitan area, Detroit, Michigan, and elsewhere in the United States.  I have personally participated in the investigation of the offenses referred to above, and make this affidavit based on my personal participation in this investigation, and based on reports made to me by other agents and officers and other law enforcement authorities.  Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed.  Such statements are reported in substance and in part, unless otherwise indicated.

5.    Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date.  Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued.  Nor do I request that this Court rely on any

4

facts not set forth herein in reviewing this application for an order authorizing the interception of wire and electronic communications. Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate that:

### DESIGNATED CELLULAR TELEPHONES

6.    There is probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE has been using, is using, and will in the future use, in order to accomplish, to discuss and to commit the TARGET OFFENSES, (1) a cellular telephone assigned call number (646) 533-8587, with International Mobile Subscriber Identity ("IMSI") number 316010013940954, UFMI number 173*109485*1, subscribed to "Nicobi Health Care Services, 3682B White Plains Road, Bronx, New York 10467," and service provided by Sprint Nextel ("TARGET CELLPHONE #1"), and (2) a prepaid cellular telephone assigned call number (917) 815-6747, with IMSI number 310260910058759, no listed subscriber, and service provided by T-Mobile USA (the "TARGET CELLPHONE #2") (together, with TARGET CELLPHONE #1, the "TARGET CELLPHONES").

7.    I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack. The cellular

5

573

telephone system divides the New York City and other metropolitan area into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed. Each portable cellular telephone that does not contain party lines bears a unique electronic number called an ESN or an IMSI number, and an assigned telephone number. It is requested that interception be permitted over any changed telephone numbers subsequently assigned to the IMSI numbers for the TARGET CELLPHONES.[3]

8.    Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518(3), authorization is requested for interception of wire communications both within the Southern District of New York, and, in the event the TARGET CELLPHONES are transferred outside the jurisdiction of this Court, in any other jurisdiction within the United States. In addition, it is requested that background

---

[3]    The TARGET CELLPHONES utilize IMSI numbers, encoded into removable computer chips located inside the instruments. The IMSI number assigned to the computer chip is unique to the subscriber, as opposed to the phone. This application seeks authorization to intercept communications occurring over any telephones or telephone numbers accessed by or through the use of the IMSI numbers identified above.

6

conversations in the vicinity of the TARGET CELLPHONES while they are off the hook or otherwise in use also be permitted to be intercepted.

9.    It is anticipated that the TARGET SUBJECT EMMANUEL ORUCHE will use the TARGET CELLPHONES to place calls to and from the Southern District of New York, as well as other locations.  This belief is supported by the facts described below.  In any event, pursuant to United States v. Rodriguez, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992), a Court in the Southern District of New York is empowered to issue an Order for the interception of wire communications over telephones located in other districts, as long as the interceptions of these communications are first heard in the Southern District of New York.

10.    In connection with the telecommunication companies which provide the service for the TARGET CELLPHONES, all interceptions over the TARGET CELLPHONES will automatically be routed to New York, New York, regardless of where the telephone calls are placed to or from.  Accordingly, all interceptions will first be heard in the Southern District of New York.  During the requested wire surveillance, all monitoring will be performed in New York, New York, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including law

7

575

enforcement officers with the DEA, and Government employees or
individuals operating under a contract with the Government,
including, if necessary, translators, who will be acting under
the supervision of investigative or law enforcement officers
authorized to conduct the interception, and specifically under
the supervision of law enforcement officers from the DEA.

## OBJECTIVES

11.  There is probable cause to believe that the
interception of wire communications, the authorization for which
is sought herein, will help to reveal:  (i) the nature, extent
and methods of operation of the TARGET SUBJECTS' narcotics
trafficking and money laundering activities; (ii) the identity of
the TARGET SUBJECTS, their accomplices, aiders and abettors, co-
conspirators and participants in their illegal activities; (iii)
the receipt and distribution of contraband and money involved in
those activities; (iv) the locations and items used in
furtherance of those activities; (v) the existence and locations
of records relating to those activities; (vi) the location and
source of resources used to finance their illegal activities; and
(vii) the location and disposition of the proceeds from those
activities.  In addition, these wire communications are expected
to constitute admissible evidence of the commission of the TARGET
OFFENSES.

8

576

### PRIOR APPLICATIONS

12.   I have been informed that reviews have been done of the electronic surveillance files of the New York Drug Enforcement Task Force, the Drug Enforcement Administration (DEA), Immigration and Customs Enforcement (ICE), the Federal Bureau of Investigation (FBI) and other law enforcement agencies.[4] Based on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS, or over the facilities or places named herein, except as follows:

a.   An order dated May 25, 2006, signed by the Honorable Naomi Reice Buchwald, United States District Judge, Southern District of New York, authorizing wire interceptions over a cellular telephone used by Chimdi Ibiam (the "Ibiam Phone").   Interceptions pursuant to that order began on or about May 26, 2006, and ended on or about June 23, 2006.

b.   An order dated June 23, 2006, signed by the Honorable William H. Pauley III, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the Ibiam Phone for another 30 day-period. Interceptions pursuant to that order began on or about June 23, 2006, and ended on or about July 21, 2006.

---

[4]    A check of DEA and FBI files was completed on or about November 27, 2006.

9

c.    An order dated July 21, 2006, signed by the
Honorable Richard J. Holwell, United States District Judge,
Southern District of New York, authorizing continued wire
interceptions over the Ibiam Phone for another 30-day period.
Interceptions pursuant to that order began on or about July 21,
2006, and ended on or about August 22, 2006, with Ibiam's arrest.

d.    An order dated August 7, 2006, signed by the
Honorable Stephen C. Robinson, United States District Judge,
Southern District of New York, authorizing wire interceptions
over a cellular telephone used by Emmanuel Obi Maduka, a/k/a
"Mazu" (the "Maduka Phone").    Interceptions pursuant to that
order began on or about August 7, 2006, and ended on or about
August 23, 2006, with Maduka's arrest.

e.    An order dated August 30, 2006, signed by the
Honorable Denise L. Cote, United States District Judge, Southern
District of New York, authorizing wire interceptions over TARGET
CELLPHONE #1 (the "August 30th Order").    Interceptions pursuant
to that order began on or about August 31, 2006, and terminated
on or about September 27, 2006.

f.    An order dated September 21, 2006, signed by
the Honorable Gerard E. Lynch, United States District Judge,
Southern District of New York, authorizing wire interceptions
over TARGET CELLPHONE #2 (the "September 21st Order").

10

578

Interceptions pursuant to that order began on or about September 21, 2006, and terminated on or about October 20, 2006.

g.   An order dated September 27, 2006, signed by the Honorable Denise L. Cote, United States District Judge, Southern District of New York, authorizing continued wire interceptions over TARGET CELLPHONE #1 (the "September 27th Order").   Interceptions pursuant to that order began on or about September 27, 2006, and terminated on or about October 26, 2006.

h.   An order dated October 13, 2006, signed by the Honorable Robert P. Patterson, Jr., United States District Judge, Southern District of New York, authorizing interception of communications over another cellular telephone (the "THIRD ORUCHE CELLPHONE") used by ORUCHE (the "October 13th Order"). Interceptions pursuant to that order began on or about October 16, 2006, and terminated on or about November 15, 2006.

i.   An order dated October 26, 2006, signed by the Honorable Denise L. Cote, United States District Judge, Southern District of New York, authorizing continued wire interceptions over the TARGET CELLPHONES (the "September 27th Order").   Interceptions pursuant to that order began on or about October 26, 2006, and terminated on or about November 25, 2006. As discussed in part below, interception of wire communications occurring over TARGET CELLPHONES have revealed that the user of

the phones is ORUCHE and that he is using the TARGET CELLPHONES
to conduct his narcotics trafficking activities.

j.    An order dated November 21, 2006, signed by
the Honorable Richard Conway Casey, United States District Judge,
Southern District of New York, authorizing continued interception
of communications over the THIRD ORUCHE CELLPHONE (the "November
21st Order"). As discussed in part below, interception of wire
communications occurring over the THIRD ORUCHE CELLPHONE reveals
that the user of the phone is ORUCHE and that he is using the
THIRD ORUCHE CELLPHONE to conduct his narcotics trafficking
activities.

I.    **THERE IS PROBABLE CAUSE TO BELIEVE THAT TARGET SUBJECTS ARE
USING AND WILL CONTINUE TO USE THE TARGET CELLPHONES IN
FURTHERANCE OF THE TARGET OFFENSES.**

A.    <u>Overview of Criminal Investigation of Target Subjects</u>

13.    As set forth below and in my affidavits in support
of the August 30th Order (the "August 30th Affidavit"), the
September 21st Order (the "September 21st Affidavit"), the
September 27th Order (the "September 27th Order"), and the
October 26th Order, there is probable cause to believe that
TARGET SUBJECT EMMANUEL ORUCHE is using the TARGET CELLPHONES in
furtherance of narcotics trafficking activities involving the

12

importation of heroin into the United States from Nigeria and other countries, and the distribution of heroin within the United States.    ORUCHE, the user of the TARGET CELLPHONES, has been identified as a member of a drug organization that brings heroin from Pakistan, through Turkey and countries in Africa, and to the United States for ultimate distribution.    Wire interceptions have further revealed that ORUCHE is involved in the distribution and/or export of cocaine from or within the United States.

     B.    Interception of the Target Cellphones Pursuant to the October 26th Order

     14.    Interception of the TARGET CELLPHONES pursuant to the October 26th Order began on or about October 26, 2006, and is ongoing.    The pertinent calls made and received on the TARGET CELLPHONES, some of which are summarized below, demonstrate that the TARGET CELLPHONES are being used by TARGET SUBJECT EMMANUEL ORUCHE and other TARGET SUBJECTS, to arrange for the importation and distribution of heroin and cocaine.[5]    Based on my training and experience and my discussions with other law enforcement officers

---

[5]    Over the course of this investigation, the DEA has intercepted each of the TARGET SUBJECTS in at least one conversation concerning the TARGET OFFENSES.    This affidavit includes summaries of only some of those communications.

involved in this investigation, I have also included in the following summaries interpretations of certain terms and phrases.[6]

<u>October 26, 2006</u>

      a.   At approximately 2:41 p.m., ORUCHE received a call on TARGET CELLPHONE #1 from FNU LNU, a/k/a "Uchenna" ("UCHENNA") who was using phone number (416) 888-8877.  ORUCHE told UCHENNA that "things haven't improved but we are just praying and that things will work out, you understand..."  ORUCHE told UCHENNA to call him next week, "on Friday next week."  UCHENNA said, "Please brother, however much so I can manage with."  ORUCHE responded, "No problem, call me by next week."  Based on their training and experience, participation in this investigation, and review of other intercepted communications, agents inform me that in this call UCHENNA was asking ORUCHE for money, and ORUCHE told UCHENNA that he did not have money, but that he hoped the situation would improve ("praying that things will work out"), an apparent reference to an anticipated shipment of drugs.

---

[6]  The original language of many of the intercepted conversations was Igbo, a West African language.  These conversations have been translated by translators assigned to assist the DEA in connection with this case.  Translations are preliminary and are subject to modification.  Quoted portions are not necessarily exact quotes, but are the sum and substance of the calls according to the monitoring agent or translator.

582

October 29, 2006

     b.   At approximately 4:56 p.m. ORUCHE received a call from FNU LNU, a/k/a "Obi" ("OBI") in Nigeria on TARGET CELLPHONE #2. OBI told ORUCHE that he was in Lagos. OBI told ORUCHE that he "and this guy were talking ... he says he is not happy ... that you are too slow, that how can they give you another one when you are too slow. It's been two months, what kind of thing is that?," apparently complaining that ORUCHE was slow in distributing narcotics. ORUCHE protested, saying, "Is he saying it's two months? Let him go somewhere else if he says's he's not happy." ORUCHE said that it was "just a month that it's taken. I've given it all to him, yes." ORUCHE further said that "they've been given all the money, what is he complaining for?"

November 2, 2006

     c.   At approximately 10:04 a.m., ORUCHE received a call on TARGET CELLPHONE #1 from FNU LNU, a/k/a "Emeka" ("EMEKA"), who was using phone number (646) 238-1874. ORUCHE told EMEKA to "tell these people, if this thing comes back here and they seize their money, nobody should call me here and tell me to call Western Union or do this or that, you understand, because it's a problem and we have encountered such problem.... If I start bothering them, they would start calling you and if

15

583

it's big like that, they'll start looking into social security
and all these things.  I don't want people to call here and
disturb us here unnecessarily."  EMEKA responded, "OK, by god's
grace, it won't have any problem."  EMEKA later said, "He said
they bring it back, that if it has problems, that they pay it
back."  ORUCHE said, "They bring it back but we don't want to go
through that nonsense.  It's not good to go through all of that."
EMEKA then said, "I don't know why these people want someone to
bring the money..."  ORUCHE said, "They should break it down, so
that someone will not ... Do you know that in this country, do
they know what's in this country?"  ORUCHE continued, saying that
"People have problems because of all these things."  Based on
their training and experience, participation in this
investigation, and review of other intercepted communications,
agents inform me that in this call ORUCHE discussed with EMEKA
their money laundering business through a Western Union account,
including problems they could encounter if Western Union began
scrutinizing their transactions.   November 4, 2006

        d.   At approximately 4:19 p.m., ORUCHE called
JOEL LNU ("JOEL") in Nigeria using TARGET CELLPHONE #2 and asked
whether he had received what ORUCHE sent him, referring to an
apparent money transfer.   JOEL confirmed that he had taken it

16

from the bank.   JOEL asked ORUCHE whether Festus (presumably

FESTUS AFOLABI) had "come to collect the other one," meaning

another amount of money.   ORUCHE told him that he had traveled

the day before but had called FESTUS, and that FESTUS had told

him he would send his brother.   ORUCHE said he would "call the

brother" when he got home.   JOEL then told ORUCHE, "You know

there is a Tuesday person, he is saying the thing is too slow,"

referring to a possible drug courier who was scheduled to travel

on Tuesday.   JOEL told ORUCHE that "he was saying that the thing

is slow, that the thing is not favorable, so I told him not to

worry ... that within two weeks that the thing will go well."

ORUCHE said that it would be "weekly.   It will be two weekly, you

understand, bi-weekly," referring to the frequency with which the

drug couriers would be traveling.   JOEL then mentioned "the one

that went to Baltimore," referring to a drug courier who had gone

to Baltimore, and said that "that of Tuesday will come there, you

know," meaning New York.   When ORUCHE asked whether anyone had

come last week, JOEL said, "Yes, that is what I am saying, one

went to Baltimore, so due to the fact that they have not finished

that one, they are saying it's slow (possibly referring to the

pace of the drug distribution), and are saying that it should be

given to others."


17

585

<u>November 6, 2006</u>

   e. At approximately 9:56 a.m., ORUCHE, using
TARGET CELLPHONE #2, called TONY EBI, using a Nigerian telephone
assigned call number 234 806 270-9334.  After ORUCHE asked EBI
how he was doing, EBI stated: "We're fine, with crises
everywhere, it's still alright."  ORUCHE responded: "Yeah, that
thing didn't work out."  EBI then stated: "In fact, this person
and I just talked before he left.  He said this person will leave
from . . . but he's not from our country. . . .  He's leaving
from somewhere.  There's also another one I want to see about but
time factor will be an immense. . . .  That one's coming from
Mandela's country."  ORUCHE then stated: "There's one that came
in from Mandela's country but I haven't seen. . . .  One came in
from Mandela's country, someone was telling me that something
came in from Mandela's country two days ago. . . last week." EBI
then asked: "Yeah, they're usually regualar.  Where does the
person live?"  ORUCHE responded: "He lives in Mandela, but he's
in . . . Brooklyn somewhere."  EBI then stated: "I'm not sure
it's those people.  Those people are doing it for me, you
understand.  But they want me to lend a hand so it can be faster
cause they have . . . like every week, they have something but
they're still telling me and I'm weighing them so I'll know . . .

18

what kind of people they are.  You know, it's not everybody that

I . . . ."  (Session 462).  Based on my training and experience,

participation in this investigation, and review of other

intercepted communications, I believe that during this

conversation, ORUCHE and EBI were discussing various heroin

couriers, including some that were coming from South Africa.

       f.    At approximately 2:25 p.m., ORUCHE, using

TARGET CELLPHONE #2, received a call from FNU LNU, a/k/a "Jaster"

("JASTER"), using a telephone assigned call number (313) 585-

7130.  (ORUCHE had previously supplied JASTER with approximately

two kilograms of heroin.)  During their brief conversation,

ORUCHE stated: "I'll probably see you this week, let me see what

happens tomorrow."  JASTER then said: "Alright."  (Session 465).

Based on my training and experience, participation in this

investigation, and review of other intercepted communications, I

believe that during this conversation, ORUCHE was telling JASTER

that he might see him later in the week, presumably to collect

some of the drug debt owed by JASTER.

    November 8, 2006

       g.    At approximately 11:31 a.m., ORUCHE called

OKEY IWUOHA using TARGET CELLPHONE #1.  During the conversation,

ORUCHE stated: "This guy called me this morning, you understand?

. . . So it seems like we will have two to . . . it seems like they will bring two out tomorrow so I'm hoping that . . . . He asked me this morning if I was ready and I told him I was ready, but I asked him to bring out what I want, but I told him that I don't mind that whatever he can bring out, he should bring out, you understand?"  Later in the conversation, IWUOHA stated: "And this boy you said it carrying this thing out, he told you the kind it is because I will call Nigeria now for the guy to wire me some the money you understand what I mean?"  (Session 10218). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE and IWUOHA were discussing two heroin couriers.

### November 9, 2006

h.    At approximately 3:12 p.m. ORUCHE received a call from an unidentified male (the "UM #1") on TARGET CELLPHONE #1.  During the lengthy call, ORUCHE and the UM #1 discussed working with different people.  At one point, ORUCHE stated: "If it were someone like you, I'll say okay come, but eeh this person, I know that if they touch him, he'll excrete everything out," meaning that if he is caught he will talk to law enforcement.  The UM #1 then stated: "There's nothing like doing

20

something with one who has a straong will/heart.  Then you know
what you're doing." ORUCHE then replied: "And if something
happens to the person, you'll know that you'll bring out
everything you have and help him out." Shortly thereafter,
ORUCHE and the UM were discussing "the boy," and ORUCHE stated:
"I'm not sure that he's back.  He called me two days ago and told
me that the boy went there and said that he's not coming back
anymore.  I told him, that's his business.  What I know is that I
wish him the best, but if he comes in . . . that I know he's not
strong-willed so he shouldn't . . . that I didn't send him on
anything." ORUCHE then stated: "If he had told you that that
boy, that he had however amount/quantity he had, and that boy
knows who I am, and if I hold his money, that boy . . . the
lawyers said this is how much it is.  And he says if I don't get
it, that trouble will befall me, what would you do if it were
you?  Will you run away?  Is that how it is, if you come out, if
I come out, I'll run away from you if something were to happen.
No.  If I hold anybody's money, I'll put everyone's money in
there." (Session 10511).  Based on my training and experience,
participation in this investigation, and review of other
intercepted communications, I believe that during this
conversation, ORUCHE and the UM #1 were discussing the importance

21

589

of working with drug couriers who would not talk after getting caught.

<u>November 11, 2006</u>

          i.    At approximately 10:08 a.m., ORUCHE, using TARGET CELLPHONE #2, called another unidentified male (the "UM #2") on a Nigerian telephone assigned call number 234 803 402-2926. During the conversation, UM #2 stated that he had seen "Otikpo, our friend." He then stated: "I raised that issue with him and he said you know exactly what is happening, why haven't eeh . . . that you should call him." ORUCHE then stated: "Mazi, this man doesn't pick up his phone, you understand? I've called his house phone and . . . ." The UM #2 then stated: "That you should call him, that you guys have a lot of things outstanding and I shouldn't get myself involved with this because you know exactly what is happening, you know so that if you're in doubt, you should call him so you and he . . . that you guys used to talk so why're you coming through me, that you should call him so you guys can discuss, so guys can straighten you guy's record. Say what you're saying." Shortly thereafter, ORUCHE stated: "Please, I'll like you to see that Otikpo's record. If you could do me a favor, see Otikpo's record with Otikpo. . . . If Otikpo says he kept a record, he should tell you when and when he had

22

that record and . . . you understand, including the money he owes

me from the money that man gave him, he still owed me before I

told that man to give him money, you understand?  He should give

you the record."  Later in the same conversation, ORUCHE stated:

"He had been given money before the people in this state/country

started talking nonsense.  Half of the money had been given to

Otikpo and it was remaining a little. . . These people then

started saying that the thing was not good, that they wouldn't

give the money anymore."  Shortly thereafter, ORUCHE stated: "Why

did he leave some money before that man gave him money?  He has

222,000 . . .  Ask him, before that man gave him money, if he has

my 222,000. . . .  Yes, mine.  The money that he left over when

we did the business we did.  Ask him if he has it."  (Session

514).  Based on my training and experience, participation in this

investigation, and review of other intercepted communications, I

believe that during this conversation, ORUCHE and the UM #2 were

discussing an alleged drug debt owed by ORUCHE to FNU LNU, a/k/a

"Otikpo."

     November 15, 2006

          j.    At approximately 10:38 a.m., ORUCHE, using

TARGET CELLPHONE #1, received a call from LINUS IHEUKWU using a

telephone assigned call number (614) 989-9905.  During the call,

IHEUKWU stated: "I know you'll say you're not hearing from me
because eeh why I have called is that Onuwuo told me that you and
he talked, you understand, and some certain things. . . . Unless
there's some way you and I can talk this evening, you call me
from somewhere or you give me a number, you understand. . . . So
I can let you know what's going on. It's not that there's
anything. Sometimes things go wrong you don't know why but you
try to make sure that." Shortly thereafter, IHEUKWU stated:
"This boy ran away since then. God knows, I didn't [U/I] so
finally after three weeks . . . I almost died . . . Even it was
on Monday that he explained to me. He was telling me . . .
because he gave me three, five thousand, you understand. He said
okay, I should leave the thing for him so he can pay me my money.
So I told him that he should have told me since instead of saying
. . . that this thing is not mine, that it's people that I own
it. So please brother, have patience. I don't take people's
things." ORUCHE then stated: "No, no, no. I knew that you had
problems." (Session 11109). Based on my training and
experience, participation in this investigation, and review of
other intercepted communications, I believe that during this
conversation, ORUCHE and IHEUKWU were discussing a drug debt owed
by IHEUKWU to ORUCHE.

k.    At approximately 10:45 p.m., ORUCHE, using TARGET CELLPHONE #2, received a call from ANTONIO HILL, using a telephone assigned call number (313) 729-9025.  During the call, HILL asked ORUCHE how he was, and ORUCHE answered: "I'm alright. Just a little bit problems but everything is alright.  We're trying to . . . we're hoping that things settle."  Later in the call, ORUCHE stated: "I'll get back with you guys probably by next week. . . . We just have some minor delays."  (Session 577). Based on my training and experience, participation in this investigation, and review of other intercepted communications, I believe that during this conversation, ORUCHE and HILL were discussing a heroin transaction; ORUCHE was explaining that there were some delays, and that he would call HILL the next week, when he expected to receive more heroin.

November 17, 2006

l.    At approximately 11:50 a.m., ORUCHE, using TARGET CELLPHONE #2, called UCHECHUKWU AKALONU, using a telephone assigned call number (646) 919-2538.  During the conversation, ORUCHE asked: "That money, you didn't bring it out?"  After AKALONU said no, ORUCHE stated: "Bring it out then so I can tell these people to bring it out."  AKALONU then asked: "Is it even available?"  ORUCHE replied: "Yeah, it will be.  It's still

25

available." Shortly thereafter, AKALONU stated: "Okay, cause it

can be brought out and kept until we know what's going on."

(Session 596). Based on my training and experience,

participation in this investigation, and review of other

intercepted communications, I believe that during this

conversation, ORUCHE and AKALONU were discussing the wire

transferring of drug money via Western Union, which AKALONU was

doing on ORUCHE's behalf; the reference to "bring it out" is to

wiring money.

<u>November 18, 2006</u>

      m. At approximately 4:19 p.m., ORUCHE, using

TARGET CELLPHONE #1, received a call from BLESSING IGBINOSA

BROWN, using a telephone assigned call number (917) 476-9347.

During the call, BROWN asked ORUCHE if he was being watched by

the FBI. ORUCHE said he did not think so, but that he takes his

time. BROWN stressed that she meant ORUCHE's telephone. She

then promised to call ORUCHE back by next week and said she hoped

ORUCHE would have some money by then. (Session 11773).

<u>November 20, 2006</u>

      n. At approximately 9:31 a.m., ORUCHE, using

TARGET CELLPHONE #1, received a call from PAUL OSUJI, a/k/a "Sir

P" ("SIR P"), using a telephone assigned call number (718) 407-

26

594

9110.  During the conversation, OSUJI asked: "Have they got that
thing?"  ORUCHE replied: "I haven't got that address yet, I
didn't get the address. . . . He's saying that he'll bring it for
me, he told me over the weekend that he'll call me but I don't
know if he was talking about something else and forgot what's
being done but I called him this morning and told him to call me
so we can send that thing out, you understand?"  OSUJI responded:
"It seems that he's not serious.  If he's not serious, one will
just cash this thing and continue what he's doing men.  Check on
that kid you said. . .  That does this thing there.  Let's know
. . . what we're doing."  Shortly thereafter, ORUCHE asked: "That
thing we talked about with these people right, are they going to
bring somebody or will they want you to bring someone for them?"
OSUJI responded: "They want me to bring someone for them."
(Session 11941).  Based on my training and experience,
participation in this investigation, and review of other
intercepted communications, I believe that during this
conversation, ORUCHE and OSUJI were discussing couriers, either
for drugs or for money.

27

595

## II. ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR UNLIKELY TO SUCCEED IF TRIED AND THUS THERE IS A NEED FOR THE INTERCEPTION OF WIRE COMMUNICATIONS

15.    The investigation to date has produced some evidence against the TARGET SUBJECTS concerning the TARGET OFFENSES.  As discussed above, the principal goals of this continuing investigation are to identify and develop evidence against not only the currently identified TARGET SUBJECTS, but also all of their suppliers, customers, accomplices, and associates, as well as the locations at which the TARGET SUBJECTS store narcotics and/or narcotics proceeds, and the methods by which they operate their narcotics trafficking and money laundering business.  As a result of the facts set forth above, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives:

a.    There is currently no expectation that an undercover officer or confidential informant will be able to infiltrate the organization involving the user of the TARGET CELLPHONES, let alone determine the full scope of the TARGET SUBJECTS' operations, identify and meet all of the other TARGET SUBJECTS and their co-conspirators, or identify the TARGET SUBJECTS' narcotics suppliers and their confederates.  In order

to make use of an undercover a viable option, there would have to be someone inside the organization working with the Government who could make the introduction. Moreover, based on my experience as a narcotics investigator, as well as discussions with my fellow agents, I believe that drug traffickers are unlikely to discuss the full extent of their organization's activities or membership when dealing with an "outsider" such as an undercover officer or confidential informant. Narcotics traffickers tend to be highly reticent about discussing narcotics with unknown persons.

    b.    As demonstrated in my previous affidavits, this and related investigations have resulted in the arrests of Chimdi Ibiam, a/k/a "Actor"; Emmanuel Obi Maduka, a/k/a "Mazu"; William Wagabono; Ikechukwu Ojeogwu; and TARGET SUBJECT REBECCA AMBO FOMUM-TIBAH. Nevertheless, these arrests do not obviate the need for interception of the TARGET CELLPHONES. Other than Wagabono, none of these individuals are signed up cooperators at this time. Wagabono was a signed up cooperator, but my understanding is that he is due to be released from prison soon. His incentive to cooperate is therefore minimal. Moreover, any information he could provide would be purely historical, and almost three years old. As for the other four individuals,

29

although two of them, Ojeogwu and FOMUM-TIBAH, have attended
proffer sessions with the Government, law enforcement officials
do not believe that they have been completely forthcoming and
there are no additional proffers currently scheduled. Indeed,
from communications intercepted over TARGET CELLPHONE #2,
including a communication as recently as October 18, 2006, I
believe that FOMUM-TIBAH is still collaborating with TARGET
SUBJECT EMMANUEL ORUCHE. Additionally, neither Ojeogwu nor
FOMUM-TIBAH are knowledgeable enough about the organization to
negate the need for a wiretap. FOMUM-TIBAH, for example,
indicated that she knew ORUCHE worked for two individuals in
Detroit, but she was unable to provide their names. Even if
someone other than Wagabono were signed up in the future, there
is no information at this time indicating that they could advance
the investigation proactively. ORUCHE undoubtedly knows that
they have been arrested and would not trust them if they were
released or tried to place a call to ORUCHE. Accordingly, these
arrests are unlikely to further the investigation substantially.

c.    The investigation has involved the use of
some physical surveillance to observe ORUCHE and the use of a
Global Positioning System device on ORUCHE's vehicle. For
example, on or about October 2, 2006, agents observed ORUCHE

30

598

picking up TARGET SUBJECT COSME FREDERIC TIBURCE JEMY at the

Holiday Motel.   In addition, on or about November 7, 2006, agents

observed ORUCHE meeting TARGET SUBJECT FESTUS AFOLABI at ORUCHE's

medical supply store on White Plains Road in the Bronx.   Based on

intercepted communications, however, I have learned that, on at

least two occasions, ORUCHE observed law enforcement agents

conducting surveillance, and he has begun employing counter-

surveillance measures.   For this reason, I do not believe that

surveillance will significantly further the goals of the

investigation.   Moreover, pure physical surveillance, without the

wiretap, would not accomplish the goals of this investigation

given the geographical breadth of the organization, including

couriers who travel from Africa, Turkey, and elsewhere with

heroin.   Pure physical observation, without wire surveillance,

would not be likely to advance the investigation, as the purpose

of a TARGET SUBJECT's visit to a location or in-person meeting

with another individual would not be known.   For example, the

purpose of the November 7 meeting between ORUCHE and AFOLABI was

known only because of intercepted phone calls over the TARGET

CELLPHONE.   Based on those interceptions, I learned that the

purpose of the meeting was for ORUCHE to pay AFOLABI thousands of

dollars, which I believe was paid in connection with drug-related

31

599

activities.  Accordingly, with the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, with the knowledge of the purpose and nature of the meeting.  Wire surveillance would also minimize the risks of discovery inherent in following subjects or remaining at target locations for extended periods of time.

            d.    Telephone toll records and pen registers have been used in this investigation and have been helpful to connect certain individuals.  However, such information provides only limited information.  At most, it reveals contact between two individuals, not the nature of the contact or the substance of the conversation.  Moreover, these methods do not enable law enforcement officers to identify with certainty the persons involved in the conversations or the significance of the communications in the context of ongoing narcotics trafficking or money laundering.  Among other problems, a telephone number appearing in the records may not be listed or subscribed in the name(s) or address(es) of the person(s) using the telephone. Indeed, in this investigation, at least some of the individuals with whom the TARGET CELLPHONES have been in contact use cellular telephones with no subscriber information or false subscriber

information.  In addition, many phone numbers in contact with the

TARGET CELLPHONES are numbers from other countries.  Subscriber

information for such numbers are not readily available to United

States law enforcement authorities.  It is only through

intercepting calls into and out of the TARGET CELLPHONES that we

have been able to gain any understanding as to the identity of a

caller and that individual's role in the drug-trafficking

organization.

   e.  Use of a federal grand jury does not appear

to be a promising method of investigation.  Witnesses who could

provide additional relevant evidence to a grand jury have not

been identified or would themselves be participants in the

narcotics trafficking or money laundering activities under

investigation.  Because any such individuals would face

prosecution, it is unlikely that they would testify voluntarily.

Nor would it be desirable at this time to seek immunity for such

individuals and to compel their testimony.  Immunizing them could

thwart the public policy that they be held accountable for their

crimes.  The issuance of grand jury subpoenas likely would not

lead to the discovery of critical information and undoubtedly

would alert the TARGET SUBJECTS to the pendency of this

investigation.  For many of the same reasons, the use of witness

33

interviews does not appear to be a promising method of investigation. Again, witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the narcotics trafficking or money laundering activities under investigation.

f.    While certain addresses associated with the TARGET SUBJECTS have been identified, a search of such locations is impracticable without more specific knowledge about the identity of the individual living there and the nature of his or her involvement in the organization.

g.    Arresting any of the TARGET SUBJECTS and attempting to obtain their cooperation in investigating the narcotics trafficking and money laundering of their criminal associates is an investigative route that, in the judgment of the law enforcement agencies involved, is too risky at the present time. Were an attempt made to arrest certain TARGET SUBJECTS and obtain their cooperation in the current investigation without success, other TARGET SUBJECTS almost certainly would be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize the investigation. Accordingly, the risks of failure in attempting to obtain these targets' cooperation at this stage of the investigation greatly

34

602

outweigh any likely benefits, and make that investigative
technique unavailable.

        h.    Although the wiretaps on the Ibiam Phone were
useful in developing evidence against certain of the TARGET
SUBJECTS, including ORUCHE, the wiretaps did not reveal the full
extent of the TARGET SUBJECTS' narcotics trafficking and money
laundering activities.  For example, the wiretaps did not reveal
the identity of all TARGET SUBJECTS, where they store their drugs
and drug proceeds, or who the suppliers to ORUCHE are.  Aside
from the TARGET CELLPHONES, the DEA is currently intercepting
communications of the TARGET SUBJECTS only on the THIRD ORUCHE
CELLPHONE.  Although this wiretap has been useful in developing
evidence of ORUCHE's narcotics activities, it does not obviate
the need for the wiretaps of TARGET CELLPHONES.  My investigation
and intercepted communications have revealed that ORUCHE uses at
least three different cellphones (the TARGET CELLPHONES and the
THIRD ORUCHE CELLPHONE) and that he often uses different
cellphones to communicate with different people.  For example,
ORUCHE primarily, if not exclusively, uses TARGET CELLPHONE #2 to
speak with TARGET SUBJECT FNU LNU, a/k/a "Jaster," to whom ORUCHE
has distributed at least two kilograms of heroin.  As a result,
wiretaps on all three of ORUCHE's cellphones are necessary to

reveal the full scope of ORUCHE's narcotics-trafficking activities and to intercept loads of narcotics that he is actively arranging to import and distribute.

      16. Because the above-described investigative techniques have been unsuccessful, authorization to intercept communications over the TARGET CELLPHONES is necessary to identify and develop evidence against the TARGET SUBJECTS.

## III. CONCLUSION

### A. Personnel

      17. As noted above, this case is being investigated by the DEA. It is anticipated that, during the requested electronic surveillance, all monitoring will be performed and supervised in the Southern District of New York by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the DEA, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

36

**B.    Minimization**

18.    All monitoring of wire communications over the
TARGET CELLPHONES will be minimized in accordance with Chapter
119 of Title 18, United States Code.  The "investigative or law
enforcement officers of the United States" and translators, if
necessary, who are to carry out the requested interception of
wire communications, will be instructed concerning the steps they
should take to avoid infringing upon any attorney-client
privilege or other recognized privileges.  In addition, all
communications intercepted will be conducted in such a way as to
minimize the interception of communications not otherwise
criminal in nature or subject to interception under Chapter 119,
Title 18, United States Code.  All monitoring will cease when it
is determined that the monitored conversation is not criminal in
nature.  Interception will be suspended immediately when it is
determined through voice identification, physical surveillance,
or otherwise, that TARGET SUBJECTS or any of their confederates,
when identified, are not participants in the conversation or
message, unless it is determined during the portion of the
conversation already overheard that the conversation is criminal
in nature.  If an interception is minimized, monitoring agents
shall spot check to insure that the conversation has not turned

37

to criminal matters.

19.   It is requested that the order authorizing interception of wire communications provide that, if necessary, translators be authorized to assist in conducting this surveillance and to receive disclosure of intercepted communications.   Certain of the TARGET SUBJECTS may be expected to communicate with each other in Igbo, a West African language. It may therefore be necessary to secure the services of translators in order to assist Agents in monitoring and translating the intercepted communications.   All such translators will be under contract to the DEA and will be directly supervised by the DEA.   It is further requested, pursuant to Title 18, United States Code, Section 2518(5), that, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

C.   <u>Authorization Request</u>

20.   The information set forth in this affidavit establishes, among other things, probable cause to believe that TARGET SUBJECT EMMANUEL ORUCHE is utilizing the TARGET CELLPHONES to discuss and engage in the TARGET OFFENSES.   Based on the

38

foregoing, it is my opinion that the interception of wire and electronic communications occurring over the TARGET CELLPHONES, as specified above, is essential to uncover the full scope of the illegal activity described herein.

21.   IT IS HEREBY REQUESTED that orders be issued authorizing Special Agents of the DEA and other investigative and law enforcement officers to continue intercepting wire communications occurring over the TARGET CELLPHONES concerning the affairs of the enterprise described herein and the TARGET SUBJECTS' commission of the above-described offenses.  Because the offenses described herein are continuing in nature and are likely to continue after the initial interception of the particular communications that are the objects of this request, it is requested that the Court's orders authorizing interception of wire communications not be required to terminate automatically when the communications described above have first been obtained, but be permitted to continue until all wire communications are intercepted that reveal fully the manner in which the TARGET SUBJECTS, and others as yet unknown, participate in the above-described offenses, or until the accomplishment of the objectives set forth herein, or for a period of thirty (30) days, whichever is earlier.  It is further requested that such thirty (30) day

39

period begin on the date of the Court's order.

   22. IT IS HEREBY REQUESTED, pursuant to the provisions of Title 18, United States Code, Section 2518(4), that it be ordered that the ultimate service provider(s) for the TARGET CELLPHONES furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all incoming and outgoing calls), pen register information (including all dial digits), trap and trace information, and audio interception capability. The assistance of these providers is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

   23. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the

608

safety of agents and others.

ANDREW ARTHURTON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to me before this
27th day of November, 2006

THE HONORABLE LEWIS A. KAPLAN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

41

609