UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF THE APPLICATION OF    :

THE UNITED STATES OF AMERICA FOR A     :    **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR**

SEARCH WARRANT FOR THE CONTENTS OF     :    <u>**SEARCH WARRANT**</u>

(1) A HEWLETT PACKARD COMPAQ COMPUTER  :

BEARING SERIAL NUMBER USV3490FQT;      :

(2) A HEWLETT PACKARD COMPAQ COMPUTER  :

BEARING SERIAL NUMBER USV3490FQW;      :

(3) A HEWLETT PACKARD COMPAQ COMPUTER  :

BEARING SERIAL NUMBER USV3490FQS;      :

(4) A HEWLETT PACKARD COMPAQ COMPUTER  :

BEARING SERIAL NUMBER USV3490FQR;      :

(5) A HEWLETT PACKARD RP5000 COMPUTER  :

BEARING SERIAL NUMBER USW3510678;      :

(6) A HEWLETT PACKARD PROLIANT ML330   :

COMPUTER BEARING SERIAL NUMBER         :

349119-002; (7) A DELL POWER EDGE 830  :

COMPUTER BEARING SERIAL NUMBER         :

3LW28B1; (8) A DELL OPTIPLEX GX50      :

BEARING SERIAL NUMBER 6252V01; AND     :

(9) A MONEYGRAM COMPUTER TERMINAL      :

BEARING SERIAL NUMBER POS86-BK01, ALL  :

IN THE CUSTODY OF THE NATIONAL DRUG    :

INTELLIGENCE CENTER, 319 WASHINGTON

STREET, JOHNSTOWN, PA

- - - - - - - - - - - - - - - - - - X

APPLICATION AND AFFIDAVIT

JEFFREY SENN, being duly sworn, deposes and says:

1.  I am a Special Agent with the Drug Enforcement
Administration ("DEA"), and have been so employed for
approximately three and a half years.  During my tenure as a
Special Agent with the DEA, I have conducted and participated in
numerous investigations of criminal activity, including
international narcotics trafficking and money laundering.  During
the investigation of these cases, I have participated in the
execution of numerous search warrants, and seized evidence of
such violations.

2.  I make this affidavit based upon my personal
knowledge and upon information received by me from other law
enforcement officials and from non-law enforcement sources.
Because this affidavit is submitted for the limited purpose of
establishing probable cause to search the premises described
below, I have not included herein the details of every aspect of
the investigation.  Where actions, conversations and statements
of others are related herein, they are related in substance and
in part, except where otherwise indicated.

3.  I respectfully submit this affidavit in support of
the Government's application for a warrant to search the items
known and described as (1) A HEWLETT PACKARD COMPAQ COMPUTER
BEARING SERIAL NUMBER USV3490FQT; (2) A HEWLETT PACKARD COMPAQ
COMPUTER BEARING SERIAL NUMBER USV3490FQW; (3) A HEWLETT PACKARD

2

COMPAQ COMPUTER BEARING SERIAL NUMBER USV3490FQS; (4) A HEWLETT
PACKARD COMPAQ COMPUTER BEARING SERIAL NUMBER USV3490FQR; (5) A
HEWLETT PACKARD RP5000 COMPUTER BEARING SERIAL NUMBER USW3510678;
(6) A HEWLETT PACKARD PROLIANT ML330 COMPUTER BEARING SERIAL
NUMBER 349119-002; (7) A DELL POWER EDGE 830 COMPUTER BEARING
SERIAL NUMBER 3LW28B1; (8) A DELL OPTIPLEX GX50 BEARING SERIAL
NUMBER 6252V01; AND (9) A MONEYGRAM COMPUTER TERMINAL BEARING
SERIAL NUMBER POS86-BK01, ALL OF WHICH ARE CURRENTLY IN THE
CUSTODY OF THE NATIONAL DRUG INTELLIGENCE CENTER, 319 WASHINGTON
STREET, JOHNSTOWN, PA (COLLECTIVELY, THE "SUBJECT COMPUTERS").
Based on the facts set forth in this affidavit, there is probable
cause to believe that the SUBJECT COMPUTERS contain evidence,
instrumentalities, and fruits of the following offenses:
distribution and possession with intent to distribute controlled
substances, and conspiracy to do the same, in violation of Title
21, United States Code, Sections 812, 841, and 846; importation
of controlled substances into the United States from a place
without, and conspiracy to do the same, in violation of Title 21,
United States Code, Sections 952 and 963; money laundering, and
conspiracy to do the same, in violation of Title 18, United
States Code, Sections 1956 and 1957; health care fraud, false
statements related to health care matters, and conspiracy to do
the same, in violation of Title 18, United States Code, Sections
371, 1035, and 1347; and access device (credit card) fraud, and
conspiracy to do the same, in violation of Title 18, United
States Code, Section 1029 (collectively, the "SUBJECT OFFENSES").

3

THE SUBJECT COMPUTERS

4.    The SUBJECT COMPUTERS are computer processing units containing hard drives and a MoneyGram computer terminal used in connection with transferring money through the MoneyGram wire transfer service.  They were lawfully seized on or about February 28, 2007, during a consent search of NICOBI HEALTH CARE SERVICES ("NICOBI"), located at 3682B White Plains Road in the Bronx, New York.  The SUBJECT COMPUTERS were placed into non-drug evidence in the custody of the New York Field Division of the DEA at 99 Tenth Avenue in New York, NY, designated Exhibit Numbers N-12 through N-20.  In early July 2007, they were sent via private carrier to the National Drug Intelligence Center, 319 Washington Street, Johnstown, PA, where they are now in custody.  They are in the same condition they were in on February 28, 2007.

BACKGROUND

5.    NICOBI is a store located at 3682B White Plains Road in the Bronx, New York.  From surveillance, review of communications intercepted pursuant to court-authorized wiretaps, and review of public source documents, I have learned that NICOBI is a supplier of Durable Medical Equipment ("DME"), including motorized wheelchairs.  EMMANUEL ORUCHE was the owner and manager of NICOBI until he was arrested in connection with this case on or about February 28, 2007.  Prior to his arrest on or about the same date, JOSEPH OLUIGBO worked for ORUCHE at NICOBI.

6.    As noted above, DEA agents conducted a consent search of NICOBI on or about February 28, 2007, during which time

4

they seized the SUBJECT COMPUTERS.  During the search, agents observed computer software boxes and boxes containing materials for purposes of upgrading computers.

        7.  From in or about August 2006 through in or about November 2006, the DEA obtained court orders in the Southern District of New York authorizing the interception of communications over three cellphones used by EMMANUEL ORUCHE. Based in part on those intercepted communications, on or about February 15, 2007, a grand jury sitting in the Southern District of New York returned a four-count Indictment in UNITED STATES v. EMMANUEL ORUCHE et al., 07 Cr. 124 (WHP).  Count One charged that, in or about December 2003, EMMANUEL ORUCHE conspired with others to distribute one kilogram or more of heroin, in violation of Title 21, United States Code, Section 846.  Count Two charged that, in or about December 2003, ORUCHE conspired with others to import into the United States from a place outside thereof one kilogram or more of heroin, in violation of Title 21, United States Code, Section 963.  Count Three charged that, in or about 2006, ORUCHE and five other defendants conspired to distribute one kilogram or more of heroin, in violation of Title 21, United States Code, Section 846.  Count Four charged that, in or about 2006, ORUCHE and those five defendants conspired to import into the United States from a place outside thereof one kilogram or more of heroin, in violation of Title 21, United States Code, Section 963.  The original Indictment also contained a Forfeiture Allegation.

8.    On or about February 28, 2007, DEA agents arrested EMMANUEL ORUCHE and JOSEPH OLUIGBO (who had been charged separately in a complaint (the "Complaint"), a copy of which is attached hereto as Exhibit A, and incorporated by reference herein).  Following his arrest, ORUCHE voluntarily consented to a search of NICOBI.  During the resulting search, agents seized the SUBJECT COMPUTERS, which were then designated Exhibit Numbers N-12 through 20 and brought to the DEA at 99 Tenth Avenue in New York, NY.

9.    On or about June 12, 2007, a grand jury sitting in the Southern District of New York returned a five-count Superseding Indictment in UNITED STATES v. EMMANUEL ORUCHE et al., S2 07 Cr. 124 (WHP) (the "Indictment"), a copy of which is attached hereto as Exhibit B and incorporated by reference herein.  (The Grand Jury had previously returned another superseding indictment, S1 07 Cr. 124 (WHP).)  Count One of the Superseding Indictment at S2 07 Cr. 124 charges that, in or about December 2003, EMMANUEL ORUCHE conspired with others to distribute one kilogram or more of heroin, in violation of Title 21, United States Code, Section 846.  Count Two charges that, in or about December 2003, ORUCHE conspired with others to import into the United States from a place outside thereof one kilogram or more of heroin, in violation of Title 21, United States Code, Section 963.  Count Three charges that, in or about 2006, ORUCHE, OLUIGBO and five other defendants conspired to distribute one kilogram or more of heroin, in violation of Title 21, United

6

States Code, Section 846.  Count Four charges that, in or about

2006, ORUCHE, OLUIGBO, and those five defendants conspired to

import into the United States from a place outside thereof one

kilogram or more of heroin, in violation of Title 21, United

States Code, Section 963.  And Count Five charges that ORUCHE and

another defendant conspired to distribute or possess with intent

to distribute 500 grams or more of cocaine, in violation of Title

21, United States Code, Section 846.  The Indictment also

contains a Forfeiture Allegation.

<u>EVIDENCE OF CONTROLLED SUBSTANCE AND MONEY LAUNDERING VIOLATIONS</u>

        10.  From surveillance and my review of intercepted

communications and other evidence (some of which is set forth in

the Indictment and Complaint attached as exhibits hereto), I

believe there is probable cause to believe that ORUCHE and

OLUIGBO, among others, were involved in importing and

distributing heroin, and laundering money derived from those

activities, and that they utilized the SUBJECT COMPUTERS in

connection with those activities.  For example, as detailed in

the Complaint, intercepted communications and surveillance reveal

that in or about late September 2006, a co-conspirator not named

as a defendant herein (designated in the Complaint as "CC-2")

contacted ORUCHE regarding a heroin courier, Cosme Frederick

Jemy, due to arrive.  Intercepted communications detailed in the

Complaint reveal that, after Jemy's arrival in the United States,

ORUCHE instructed OLUIGBO to obtain approximately $8000 or $8500

in cash and to meet Jemy at a restaurant called Aziza, which is

7

located at 3716 White Plains Road, which is down the street from
the NICOBI. Additional interceptions reveal that OLUIGBO did, in
fact, meet Jemy there and paid him approximately $8500 in cash.
Surveillance and subsequent intercepted communications reveal
that ORUCHE subsequently met Jemy, and that he then traveled to
the area of Detroit, Michigan, for purposes of delivering the
heroin to FNU LNU, a/k/a "Jaster."

     11.  In addition, as noted in the Indictment, on or
about August 9, 2006, REBECCA AMBO FOMUM-TIBAH was arrested at
John F. Kennedy International Airport in possession of
approximately 1.3 kilograms of heroin. Following her arrest,
FOMUM-TIBAH made statements to law enforcement agents, stating,
among other things, that the heroin she was carrying was to be
delivered to ORUCHE, who was her boyfriend, that she was sent on
his behalf to Istanbul to get the heroin, and that ORUCHE works
in the drug business for two unidentified individuals in Detroit.
During the consent search of NICOBI on or about February 28,
2007, agents found an electronic airline ticket for FOMUM-TIBAH
for travel from Houston, Texas, to Detroit, Michigan, on July 29,
2006 (approximately 11 days prior to her arrest). The ticket
indicated that it had been purchased by EMMANUEL ORUCHE. Based
on the date of the travel, the fact that it was an electronic
ticket, and that it was found in NICOBI, I believe that ORUCHE
used the SUBJECT COMPUTERS to arrange for travel in connection
with the SUBJECT OFFENSES, including narcotics trafficking.

8

12.  Among the intercepted communications revealing
ORUCHE and/or OLUIGBO's involvement in narcotics trafficking
and/or money laundering are the following:[1]

a.  On or about September 26, 2006, at
approximately 11:26 a.m., ORUCHE, using a telephone assigned call
number (917) 815-6747 (the "ORUCHE 917 NUMBER"), called OLUIGBO,
using a telephone assigned call number (718) 510-6880 (the
"OLUIGBO NUMBER").  ORUCHE told OLUIGBO: "Western Union called me
now and asked about unusual/large amount of this thing that's
being done . . . if we got all the money, and if they paid cash,
and I said yes."  OLUIGBO replied: "Ok, they think something's
going on, but as long as you tell them that cash was paid,
there's no problem."  ORUCHE then asked how much OLUIGBO
"transfer[red]."  OLUIGBO replied: "Fourteen thousand something,
plus remember Emeka has not been settled, so I have to take out
money."  OLUIGBO then clarified that, contrary to ORUCHE's
understanding, "Emeka" had not been paid the day before.  ORUCHE
asked: "[D]id he give you something else?"  OLUIGBO replied:
"Yeah, I wrote it down.  It's there."  Based on my training and
experience, my involvement in this investigation, and my review
of other intercepted communications, I believe that during this

---

[1] The original language of many of the intercepted
conversations discussed in this Affidavit was Igbo, a Nigerian
language.  These conversations have been translated by
translators assigned to assist the DEA in connection with this
case.  Translations are preliminary and are subject to
modification.  Quoted portions are not necessarily exact quotes,
but are the sum and substance of the calls according to the
monitoring agent or translator.

conversation ORUCHE and OLUIGBO were discussing wire transfer transactions, and a call from Western Union regarding unusually large wire transfer transactions from NICOBI consistent with money laundering.

        b.  On or about September 29, 2006, at approximately 4:30 p.m., ORUCHE, using a telephone assigned call number (646) 533-8587 (the "ORUCHE 646 NUMBER"), received a call from "Blessing," using a telephone assigned call number (347) 296-9039. During the course of this call, Blessing reminded ORUCHE that he was "supposed to come there and collect." ORUCHE replied: "I said not everyday 'cause you know they watch." In response, Blessing says: "I know, but you guys should have brought a better one . . . 'cause a better one came out for me last time when I came." ORUCHE then asked: "Wasn't it six that he gave you that day?" Blessing said that the "six" was what she was supposed to collect last week. ORUCHE reminded Blessing that, "we've agreed about this collection." Blessing then informed ORUCHE that, "the one that I did has a problem. They can't collect it. . . . So at this moment, I'm not doing anymore." ORUCHE stated: "Joe has to be able to watch what he is doing. I don't wanna people to charge us for money laundering. I cannot go to the bank." Blessing replied: "[I]t's the same money laundering. . . . I came to collect so you're supposed to pay it, right?" ORUCHE responded: "But this case is that I happened to go to the bank. It's not like someone came to collect. We have to be very careful with what we do." Blessing

10

explained that she cannot send anything now: "I sent it to Moneygram and they said that it was held; Western Union held it, so I can't send this time around.  They have to send someone near me to come collect the money."  ORUCHE then informed Blessing that "[i]t has to be sent out the other way."  He continued: "I just told Joe this morning.  We agreed with you, you have to send something out.  That's the way we make money."  When Blessing asked whether she would have to send "everything," ORUCHE responded: "[Y]ou have to send at least half of it out to be going through this thing."  Based on my training and experience, my involvement in this investigation, and my review of other intercepted communications, I believe that during this conversation ORUCHE and Blessing were discussing their concerns that law enforcement or a money transmitting service like Western Union or MoneyGram would suspect them of money laundering given their illicit transactions.

        c.   On or about October 13, 2006, at approximately 9:56 a.m., ORUCHE, using the ORUCHE 646 NUMBER, received a call from "Gloria," using a telephone assigned call number (732) 322-6362.  During this call, ORUCHE told Gloria that he needed to see her.  He explained that there was approximately $5,000 for Western Union that "didn't go through, so I want to cover it before it 'spoils.'"  ORUCHE then stated: "[W]e need to put it back to Western Union."  Gloria explained that she does not have $5,000 and ORUCHE asked whether he can get "three" from her.  He stated that he would "give it back to [her] on Monday."

11

Based on my training and experience, my involvement in this
investigation, and my review of other intercepted communications,
I believe that this call reveals further ORUCHE's frequent
utilization of money transmitting services like Western Union.

        d.   On or about November 2, 2006, at
approximately 10:04 a.m., ORUCHE, using the 646 ORUCHE NUMBER,
received a call from "Emeka," using a telephone assigned call
number (646) 238-1874. During this call, ORUCHE stated: "[T]ell
these people, if this thing comes back here and they seize their
money, nobody should call me here and tell me to call Western
Union . . . . [I]f it's big like that they'll start looking into
social security and all these things. I don't want people to
call here and disturb us unnecessarily. . . If they call me
. . . I don't want anybody to call anybody else." In response to
a query about why "these people want someone to bring the money,"
ORUCHE told Emeka: "They should break it down." Based on my
training and experience, my involvement in this investigation,
and my review of other intercepted communications, I believe that
during this conversation ORUCHE and Emeka were discussing their
money laundering activities. The reference to "these people"
wanting to bring some money is to individuals who were supposed
to provide unlawful funds to ORUCHE; in stating that they "should
break it down," ORUCHE was instructing Emeka that those "people"
should structure the funds so as to avoid detection.

        e.   On or about November 8, 2006, at
approximately 4:19 p.m., ORUCHE, using a telephone assigned call

12

number (832) 613-4067 (the "ORUCHE 832 NUMBER"), spoke to

OLUIGBO.  OLUIGBO stated that "Gery," the "security" from Western

Union, called OLUIGBO when OLUIGBO was not available.  OLUIGBO

subsequently left him a message and hoped that Gery would call

back.  ORUCHE then asked whether OLUIGBO had called the manager,

and OLUIGBO said that he had not.  OLUIGBO then explained: "I was

calling every Western Union number I could think of, until they

directed [me] to that person saying that the person is the one

that put the stop on it."  ORUCHE told OLUIGBO to call Gery back

again because otherwise they would start to lose customers.

Based on my training and experience, my involvement in this

investigation, and my review of other intercepted communications,

I believe that during this conversation ORUCHE and OLUIGBO were

discussing the fact that, around that time, Western Union shut

down the account for NICOBI based on suspected fraud and money

laundering.

        f.    On or about November 9, 2006, at

approximately 9:32 a.m., ORUCHE, using the ORUCHE 646 NUMBER,

called OLUIGBO, using the OLUIGBO NUMBER.  During the

conversation, OLUIGBO told ORUCHE that he had called Western

Union and that "the man said he has to talk to you, that my name

is not on the contract . . . . He said because of fraudulent

activities on the account."  Based on my training and experience,

my involvement in this investigation, and my review of other

intercepted communications, I believe that during this

conversation ORUCHE and OLUIGBO were further discussing Western

13

Union's shut down of NICOBI's account based on suspected fraud
and money laundering.

g.    On or about November 27, 2006, at
approximately 9:35 p.m., ORUCHE, using the ORUCHE 832 NUMBER,
received a call from OLUIGBO, using the OLUIGBO NUMBER.  OLUIGBO
asked ORUCHE: "How will this thing be sent out? . . . He gave me
three names. . . . The one that will be sent out for/to him is
3200 right?"  ORUCHE replied: "Yeah, 3200 because the 2-7 (2700)
one hasn't cleared; he hasn't paid it in."  The two then began to
calculate the amount.  ORUCHE suggested that OLUIGBO should
"[m]ake it into small divisions."  OLUIGBO then arrived at the
final number: "1280 with transaction fee."  When OLUIGBO asked
which "name to send them to," ORUCHE replied, "[s]end it to any
of the names.  He gave you three names, right?"  OLUIGBO later
said that he will "fill two papers/documents for him."  Based on
my training and experience, my involvement in this investigation,
and my review of other intercepted communications, I believe that
during this conversation ORUCHE and OLUIGBO were discussing a
money laundering transaction.  The references to "three names"
and "two papers" presumably relate to transfer money while
evading detection by law enforcement.

13.  Based upon my training, experience and
participation in narcotics investigations, as well as my
conversations with other agents, I know that individuals involved
in the distribution of narcotics and the laundering of money
commonly maintain addresses and/or telephone numbers which

14

reflect names, addresses, telephone numbers and/or paging numbers for their associates in the trafficking and money laundering organization; and books, ledgers, records and other documents relating to the ordering, sale and distribution of controlled substances and the laundering of money.  Such documents are frequently maintained where the traffickers have ready access to them, and may be maintained on computer(s).

14.  Based upon my training and experience and discussions with other law enforcement agents and experts in this area, I am aware that individuals like ORUCHE and companies like NICOBI that engage in unlawful money laundering usually have a detailed record keeping system.  They must necessarily keep a ledger or record of the terms and details of their transactions, and they normally retain such records for long periods of time because they deal regularly with same individuals or organizations.  Based on the investigation in this case, including the facts described above, I believe that ORUCHE and NICOBI maintained customer accounts and ledgers or records of its accounts and specific transactions.

15.  In addition, based on my training and experience, based on conversations with other law enforcement officers and experts in this area, and based on a conversation with a representative of Western Union, I am aware that persons involved in laundering money through wire services like Western Union often use computers to facilitate communication.  In particular, according to a representative of Western Union, Western Union

15

licenses entities like NICOBI to serve as wire transfer agents;

such agents, including NICOBI, then use their own computers in

connection with conducting the Western Union transactions.  As

noted, the SUBJECT COMPUTERS were at NICOBI where ORUCHE and

OLUIGBO engaged in the unlawful activities discussed herein.

<u>EVIDENCE OF HEALTH CARE FRAUD</u>

16.  From intercepted communications, surveillance and

other evidence, I also believe that there is probable cause to

believe that ORUCHE and OLUIGBO, among others, were engaged in

health care and/or Medicare fraud.

17.  From my experience and conversations with other

law enforcement agents, I know that Medicare is a federally

funded health care benefit program that generally pays for health

coverage of qualified individuals in the range of approximately

65 years and older.  Under this program, Medicare will pay a

large percentage of the cost for DME provided to Medicare

beneficiaries (usually about 80%), for which the beneficiaries'

doctor has certified that the DME necessary.  The certification

provided by the doctor is known as a "Certificate of Medical

Necessity."  The program requires that the Certificate of Medical

Necessity be maintained by Medicare DME suppliers, who provide

the prescribed DME to the beneficiaries and then submit a claim

to Medicare for payment after delivery of the equipment.  As for

the remaining cost of the DME that is not covered by Medicare

(usually about 20% of the cost), this cost is usually paid for by

the beneficiary's secondary insurance provider if the beneficiary

has such insurance.    In cases where a beneficiary has such
secondary insurance, the DME supplier submits a claim to both
Medicare and to the secondary insurance provider.

18.    As noted above, NICOBI is, and was prior to
EMMANUEL ORUCHE's arrest and the seizure of the SUBJECT
COMPUTERS, a supplier of DME.  From conversations with other law
enforcement agents, I know that the Medicare Supplier Guidelines
require medical equipment suppliers to maintain for several years
"Certificates of Medical Necessity" and information related to
billing, including receipts.  I further know that DME suppliers
like NICOBI frequently maintain records relating to Medicare and
insurance payments on computer.

19.    From surveillance and from my review of
intercepted communications discussed herein, I believe that there
is probable cause to believe that ORUCHE and others were involved
in health care fraud.  Specifically, I believe that they
purchased patient information, including patient names and Social
Security Numbers, from individuals working in physician's
offices, and then submitted claims for reimbursement in the names
of these individuals.  Among those intercepted communications are
the following:

a.    On or about August 31, 2006, at approximately
1:47 p.m., ORUCHE, using the ORUCHE 646 NUMBER, received a call
from an unidentified female (the "UF #1").  During the call,
ORUCHE handed his telephone over to OLUIGBO who was with him,
presumably at NICOBI.  OLUIGBO asked the UF #1: "Are you going to

17

give me that one today?" The UF #1 responded: "This is for out
of town," specifically, Huntsville. OLUIGBO then explained: "I
can do that no problem." The UF #1 explained that she did not
know OLUIGBO was capable of "deal[ing] out of town." In response
to his inquiry, the UF #1 told OLUIGBO that she would be able to
get him "another one" by Monday or Tuesday and that she "ha[s]
more than one." OLUIGBO then indicated that he would "take care
of them." Based on my training and experience, my involvement in
this investigation, and my review of other intercepted
communications, I believe that this conversation related to UF #1
providing the identifying information for a patient to OLUIGBO;
the reference to "one" is to one patient's identity.

       b.   On or about September 1, 2006, at
approximately 3:34 p.m., ORUCHE, using the ORUCHE 646 NUMBER,
called "Sylvia" on a telephone assigned call number (832) 715-
6006 (the "SYLVIA NUMBER"). During the conversation, ORUCHE and
Sylvia spoke about a meeting the two had scheduled for that day.
At one point, Sylvia said: "Right now I am very very busy I have
six patients here in the doctor's office." Nevertheless, Sylvia
promised to meet ORUCHE later that day and said that she would
call him. On or about September 5, 2006, at approximately 12:29
p.m., ORUCHE, using the ORUCHE 646 NUMBER, called Sylvia, using
the SYLVIA NUMBER, and arranged a time to meet. Based on my
training and experience, my involvement in this investigation,
and my review of other intercepted communications, I believe that
Sylvia works in a physician's office, and that this call related

18

to ORUCHE's efforts to meet Sylvia for the purpose of getting one or more patients' identities from her.

       c.  On or about September 6, 2006, at approximately 1:24 p.m., someone identifying himself as "Joseph," but sounding like ORUCHE, using the ORUCHE 646 NUMBER, called "Dooce," using a telephone assigned call number (281) 701-3571. After "Joseph" identified himself and stated "Me and my cousin met you," "Dooce" said to hold on and indicated that she was "trying to get in the restroom," presumably to speak without being overheard. "Joseph" then stated: "Remember the two guys that met you while you were at the doctor?" Dooce replied: "Yeah, I remember. How much do you give a patient? . . . How much do you give for a patient?" "Joseph" indicated that he "hate[s] to talk over the phone" and asked to discuss the matter in person. Dooce then agreed to meet the next day if she could "get some gas" to make the trip. "Joseph" then put his "cousin" on the line. "Dooce" confirmed that she had nothing for him. When he asked "[W]hen are you gonna have?," Dooce replied: "Dr. Mill won't be back until tomorrow." They agreed that Dooce would meet with "him" by 11 a.m. the next day. Based on my training and experience, my involvement in this investigation, and my review of other intercepted communications, I believe that "Dooce," like Sylvia, works in a physician's office, and that this call related to ORUCHE's efforts to purchase patient information from "Dooce." In asking how much "Joseph" would "give for a patient," "Dooce"

19

was inquiring how much money "Joseph" was offering for patient
information.

      d.   The same day, at approximately 4:58 p.m.,
ORUCHE, using the ORUCHE 646 NUMBER, called an unidentified male
(the "UM"), using a telephone assigned call number (713) 449-0092
(the "0092 Number"). During the call, ORUCHE stated: "She called
me and asked me to come and pick up two of the things." The UM
asked: "Where is she?" In response, ORUCHE stated: "She said she
is at the mall in Jessna." Later in the conversation, the UM
stated: "It's good news, you understand what I mean?" ORUCHE
then explained that he did not have "money to give her here now."
The UM replied: "No, she will give it to you and you tell her
that you will bring the money. Let her first sell her stuff . . .
. If she gets stubborn about the money, then leave it and we can
see if we can get some money." Based on my training and
experience, my involvement in this investigation, and my review
of other intercepted communications, I believe that during this
conversation ORUCHE was informing the UM that he had plans to
meet a Sylvia to obtain information relating to two patients.

      e.   Later the same day, at approximately 5:00
p.m., ORUCHE, using the ORUCHE 646 NUMBER, called "Sylvia" on the
SYLVIA NUMBER. During the call, Sylvia explained that she was
"in the shopping center in the Banco Popular." ORUCHE stated: "I
think I went to where Washington Mutual is." They agreed to meet
at a Mexican restaurant. Based on my training and experience, my
involvement in this investigation, and my review of other

intercepted communications, I believe that ORUCHE and Sylvia were arranging to meet so that she could provide him with the stolen patient information.

f.    At approximately 5:07 p.m., ORUCHE, using the ORUCHE 646 NUMBER, called the UM, using the 0092 Number.  The UM asked what "she" said, and ORUCHE replied: "She knows what she gave me."  The UM then asked: "Those aren't good right?"  ORUCHE responded: "It's not that it's not good, but you know."  The UM asked about "the big one," and ORUCHE indicated that she said the big one would be delivered tomorrow.  The UM then replied: "Okay, but she gave those and you have a hold of them."  ORUCHE confirmed that this was the case and said: "We will see this evening."  Based on my training and experience, my involvement in this investigation, and my review of other intercepted communications, I believe that during this conversation ORUCHE and the UM were discussing ORUCHE's receipt from Sylvia of patient information.

g.    On or about September 7, 2006, at approximately 4:37 p.m., someone identifying himself as "Joseph," but again sounding like ORUCHE, using the ORUCHE 646 NUMBER, called another unidentified female (the "UF #2"), using a telephone assigned call number (281) 701-3571.  During this call, "Joseph" stated: "You were supposed to meet today."  The UF #2 responded: "I've been trying to call you. You gave me the wrong number."  After some discussion about the correct number, "Joseph" asked: "Do you have anything for us today?"  The UF #2

asked: "How much you give . . . . Do you give six?" "Joseph"
said: "You said five. That's what you told me the other day."
The UF #2 stated that she was able to find someone who gave her
"six or six-fifty" and that she is "dropping" all of her
customers that "want to give me five." "Joseph" then asked her,
"[h]ow many do you have now?" The UF #2 responded that she had
only one and that she has "the paperwork in [her] purse." They
agreed to meet potentially the next morning. The UF #2 then
stated: "I have another patient. Do you want to check her for me
to make sure she is good?" "Joseph" replied: "Ok, I am not in the
office to check." The UF #2 asked "Joseph" for "the number of
the check" for the other patient. "Joseph" stated: "I need his
number, age, name, number, and the date of birth." The UF stated
that the name is "Ella Carlton," and provided a date of birth and
Social Security number. Joseph then stated that he would call.
The UF #2 stated: "Check this one out I'll call you back." Based
on my training and experience, my involvement in this
investigation, and my review of other intercepted communications,
I believe that during this conversation, "Joseph" and UF #2 were
discussing the sale by UF #2 of patient information, including
name, age, date of birth, and Social Security Number, to
"Joseph."

      h.   On or about October 27, 2006, at
approximately 2:24 p.m., ORUCHE, using the ORUCHE 917 NUMBER,
called FNU LNU, a/k/a "Godfather," at an international telephone
assigned call number 011-234-803-779-3188. After discussing the

arrest of an individual they knew on money laundering and other fraud charges, ORUCHE stated: "I heard they got somebody in Houston last week. . . . [T]hey said it's a Medicare thing." ORUCHE and Godfather then discussed Arthur Rokpo, who was caught committing Medicare fraud. Godfather said: "They get a doctor to sign. They take 1000 . . . . They fill it out, fill in the patient's name, and sign the doctor's name." In response, ORUCHE said: "You know these people would have done it for me - Sylvia in Houston. Those people I met. They sent me bogus . . . They said it was the doctor that signed. I told them look, whenever they got one that's good, let them call me, that I don't do all these fake things." Later, ORUCHE said: "These Houston people . . . . I told them that I want the doctor to fax me the prescription. The doctor said they don't have such patience. I told them to leave that thing. If they don't have they should say don't have." Based on my training and experience, my involvement in this investigation, and my review of other intercepted communications, I believe that during this conversation, ORUCHE was discussing his scheme to obtain patient information from individuals, including "Sylvia in Houston."

20. From conversations with other law enforcement officials, and based on my experience and training, I know that persons engaged in health care fraud frequently maintain records relating to the fraud, including billing and claim records, payment records, address books and/or personal diaries, rolodexes, calendars, correspondence and memos, receipts,

telephone records, bank account and financial information, notes and personal documents, names of coconspirators, and equipment purchase, sale, and delivery records. Such information is frequently stored in electronic databases on computers, stored in electronic or magnetic form.

<u>EVIDENCE OF ACCESS DEVICE FRAUD</u>

21. From intercepted communications, surveillance and other evidence, I further believe that there is probable cause to believe that ORUCHE and OLUIGBO, among others, are involved in access device (credit card) fraud. Intercepted communications relating to access device fraud include the following:

a. On or about October 8, 2006, at approximately 8:40 p.m., ORUCHE, using the 646 ORUCHE NUMBER, called OLUIGBO, using the OLUIGBO NUMBER. During the call, OLUIGBO stated: "This guy . . . I forgot to ask you , you know . . . Leroy. . . . He is using here to do address for this thing he is doing." ORUCHE then asked: "He is using what?" OLUIGBO replied: "This address." ORUCHE responded: "Is he mad?" OLUIGBO then stated: "Well, the letter says Henry Hayes and this address is what the thing is using to get done . . . ." ORUCHE then asked: "It came with your address?" OLUIGBO replied: "Yeah and Henry Hicks is the name on the credit card, the American Express card is on. . . . I don't see why he should use this address when he has his own address. . . . You see Henry Hicks 1018 East 223rd." ORUCHE then asked: "What came there?" OLUIGBO replied: "Is a letter from HSBC Bank." ORUCHE responded: "Seize all the letter, let he and I

24

speak to him first." Based on my training and experience, my involvement in this investigation, and my review of other intercepted communications, I believe that during this conversation, ORUCHE and OLUIGBO were discussing a scheme of their associate "Leroy" to obtain credit cards in false names; they were upset because Leroy was using OLUIGBO's address for the fraudulent scheme, risking that he would get caught.

b.    On or about October 17, 2006, at approximately 10:34 a.m., ORUCHE, using the ORUCHE 832 NUMBER, spoke to OLUIGBO, using the OLUIGBO NUMBER. OLUIGBO explained: "They came to ask about a transaction in June. They said that someone stole a credit card from the post office and that they forged an ID and used it to purchase something. . . . They purchase some things here." ORUCHE asked whether OLUIGBO had a photo identification, and OLUIGBO replied that he did. ORUCHE then asked: "Does he/she have photo ID?" OLUIGBO told ORUCHE that she did and she was a black female. OLUIGBO continued: "It's one of those ones the Yoruba person brought for us." ORUCHE explained that he would not be "in on" anything "stolen from the post office" unless "the person personally applies for it." OLUIGBO added: "When it comes, then you can do whatever you want" but that the stolen ones are "never good." The two then discussed transfers and payments that needed to be made, including a debt owed to "Blessing." At the conclusion of their call, ORUCHE stated: "Maria, the computer she is on every time . . . . She doesn't learn how to do this billing. . . . I want you

25

to make it known to her that she has to put more effort into
learning this thing and not being on computer every time. . . .
After she is done counting the money . . . . She stays on that
computer." Based on my training and experience, my involvement
in this investigation, and my review of other intercepted
communications, I believe that during this conversation ORUCHE
and OLUIGBO were discussing a visit by fraud investigators to
NICOBI relating to suspected credit card fraud, and the types of
fraud (namely, involving in stolen credit cards) that they would
not engage in because of the risk of getting caught.

        c.   On or about November 10, 2006, at
approximately 9:25 a.m., ORUCHE, using the ORUCHE 832 NUMBER,
spoke to OLUIGBO, using the OLUIGBO NUMBER. ORUCHE asked OLUIGBO
for any information from them, to which OLUIGBO replied that
there was none. OLUIGBO suggested, however, that ORUCHE might
want to call "him and find out what he's gonna say." OLUIGBO
suggested that ORUCHE tell "him" that "the thing is still not
on." OLUIGBO then advised ORUCHE to remove the remaining IDs.
The two speculated that a Chinese woman was responsible for
causing the situation because she supplied 18 names, presumably
to the authorities. ORUCHE and OLUIGBO then discussed ORUCHE's
probation status because "the guy said he just wanted to make
sure that their thing is not revoked." The question of whether
ORUCHE was on probation arose in this context. Based on my
training and experience, my involvement in this investigation,
and my review of other intercepted communications, I believe that

during this conversation, ORUCHE and OLUIGBO were discussing their fraudulent credit card activities in the wake of the visit by fraud investigators to NICOBI.

22. From conversations with other law enforcement officials, and based on my experience and training, I know that persons engaged in access device fraud frequently maintain records relating to the fraud, including account numbers, names, billing and claim records, payment records, address books and/or personal diaries, rolodexes, calendars, correspondence and memos, receipts, telephone records, bank account and financial information, notes and personal documents, names of coconspirators, and equipment purchase, sale, and delivery records. Such information is frequently stored in electronic databases on computers, stored in electronic or magnetic form.

ORUCHE'S CALL TO "REMOVE EVERYTHING FROM THE STORE"

23. In addition to interceptions summarized above, on or about September 22, 2006, at approximately 2:44 p.m., ORUCHE, using the ORUCHE 646 NUMBER, called OLUIGBO, using the OLUIGBO NUMBER. At the time, law enforcement agents were conducting surveillance of ORUCHE. During the call, ORUCHE stated: "The police are following me. . . . There are two cars that've been following me since I left the store [Nicobi], you understand? . . . They've been trailing me, but I don't know what they are trailing me for." After conversation between ORUCHE and OLUIGBO regarding ORUCHE's suspicions that he was being followed, ORUCHE stated: "Joe, just mind the store. Remove everything in the

27

store. . . . Take out your book, take out everything in the
store, let me know who is following me here." Based on my
training and experience, my involvement in this investigation,
and my review of other intercepted communications, I believe that
this conversation reveals that ORUCHE and OLUIGBO were using
NICOBI to commit one or more of the SUBJECT OFFENSES, and that
ORUCHE wanted OLUIGBO to discard any evidence of those crimes.

<u>REQUEST TO SEARCH THE SUBJECT COMPUTERS AND ITEMS TO BE SEIZED</u>

        24.  Based on the foregoing and the facts in the
attached Indictment and Complaint, and based on my experience and
training, I submit that there is probable cause to believe that
at this time at the SUBJECT COMPUTERS there are
instrumentalities, evidence, and fruit of the SUBJECT OFFENSES.
Specifically, based on the investigation and my training and
experience, I believe that the SUBJECT COMPUTERS are likely to be
a storage device for instrumentalities, evidence, and fruit of
the crimes because computers often maintain for long periods of
time data directly on the hard drive, including email messages
that have been deleted by the user, but have not yet been
overwritten by new files by the computer, and therefore remain
potentially recoverable.

        25.  Based on training and experience and my
discussions with other law enforcement officers, I further know
that computer systems located inside a office generally contain
files and data, such as letters, documents, e-mail, etc., that
can be used to identify the person or persons who use that

28

computer system.  As files and data that can be used to identify

the person or persons using the computer system come in a broad

variety of formats and types, this Affidavit requests

authorization to search all files and data contained in any

computer system found within the SUBJECT COMPUTERS.

METHODS TO BE USED TO SEIZE AND SEARCH
COMPUTERS AND COMPUTER-RELATED EQUIPMENT

26.  Based upon my training, experience, and

information related to me by agents and others involved in the

forensic examination of computers, I know that computer data can

be stored on a variety of systems and storage devices including

hard disk drives, floppy disks, compact disks, magnetic tapes and

memory chips.  I also know that searching computerized

information for evidence or instrumentalities of a crime commonly

requires agents to seize most or all of a computer system's

input/output peripheral devices, related software documentation,

and data security devices (including passwords) so that a

qualified computer expert can accurately retrieve the system's

data in a laboratory or other controlled environment. This is

true for the following reasons:

a.  Searching computer systems is a highly

technical process which requires specific expertise and

specialized equipment.  There are so many types of computer

hardware and software in use today that it is impossible to bring

to the search site all of the necessary technical manuals and

specialized equipment necessary to conduct a thorough search.  In

29

addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing up to 40 gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of millions of pages of data.

30

d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

27.    In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a.    The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

31

b.   The analysis of electronically stored data may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, "mirroring" or copying the hard drive or any other magnetic or digital storage device such as floppy disks or CD-ROMs; surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

28.   Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of a crime, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above.

29.   In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and

32

attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

30. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), such materials and/or equipment will be returned within a reasonable time.

31. It may be necessary for programmers and other outside experts to assist the DEA during the examination of the computer evidence.

32. Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 21, United States Code, Sections 812, 841, 846, 952 and 963; and Title 18, United States Code, Sections 371, 1029, 1035, 1347, 1956 and 1957, will be found on the subject computers:

> a. Any and all addresses and/or telephone numbers;

> b. Any and all books, ledgers, records and other documents in electronic format relating to the ordering, sale and distribution of controlled substances or the laundering of money; and

> c. Any and all account numbers, names, billing and claim records, payment records, personal diaries, rolodexes, calendars, correspondence and memos, receipts, telephone records, bank account and financial information, travel information, notes and personal documents, names of coconspirators, and equipment purchase, sale, and delivery records.

        d.    All data, records, documents, programs, applications or materials, including data, records, documents, programs, applications, messages or materials created, modified, deleted or stored in any form.


JEFFREY SENN
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
11th day of August 2007
      September

KEITH A. PESTO
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF PENNSYLVANIA

Approved: _____  07 MAG    0263
        JESSE M. FURMAN
        Assistant United States Attorney

Before:  THE HONORABLE MICHAEL H. DOLINGER
        United States Magistrate Judge
        Southern District of New York

- - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA : | **SEALED COMPLAINT** |
| | |
|      - v - : | Violation of |
| | 21 U.S.C. §§ 846, 963 |
| JOSEPH OLUIGBO, : | |
| | COUNTY OF OFFENSE: |
|     Defendant. : | BRONX |

- - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    JEFFREY SENN, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") and charges as follows:

<u>COUNT ONE</u>

    1.  In or about 2006, in the Southern District of New York and elsewhere, JOSEPH OLUIGBO, the defendant, and others known and unknown, unlawfully, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

    2.  It was a part and an object of the conspiracy that JOSEPH OLUIGBO, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, to wit, 1 kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Sections 812, 841(a)(1), and 841(b)(1)(A) of Title 21, United States Code.

    (Title 21, United States Code, Section 846.)

<u>COUNT TWO</u>

    3.  In or about 2006, in the Southern District of New York and elsewhere, JOSEPH OLUIGBO, the defendant, and others known and unknown, unlawfully, intentionally, and knowingly did

Exhibit A

combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

4.    It was a part and an object of the conspiracy that JOSEPH OLUIGBO, the defendant, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, to wit, one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 812, 952(a) and 960(a)(1) and (b)(1)(A).

(Title 21, United States Code, Section 963.)

The bases for deponent's knowledge and the foregoing charge are, in part, as follows:

5.    I am a Special Agent with the Drug Enforcement Administration (the "DEA").  My duties include investigating violations of federal narcotics laws.  I have investigated the above-captioned case and have spoken with other law enforcement officers and witnesses and have reviewed pertinent documents. When I rely upon statements made by others, such statements are related in part and in substance unless otherwise indicated. Because this affidavit is submitted only for the limited purpose of establishing probable cause, I have not set forth each and every fact learned during the course of this investigation.

6.    Since at least in or about June 2006, the DEA has been investigating an organization involved in the importation of multi-kilogram shipments of heroin from Turkey, Nigeria, and other countries and the distribution of that heroin in the United States.  On or about June 2, 2006, the DEA arrested an individual at John F. Kennedy Airport who had swallowed approximately 742 grams of heroin ("Courier #1").  On or about August 9, 2006, the DEA arrested another individual at John F. Kennedy Airport who had concealed in her stomach and vagina approximately 1.3 kilograms of heroin ("Courier #2").  Both Courier #1 and Courier #2 identified a co-conspirator not named as a defendant herein ("CC-1") as the intended recipient of the heroin.  Courier #2 further stated that "Joseph," who worked with CC-1 at Nicobi Health Services in the Bronx, New York, was supposed to pick her up at the airport.  In both cases, laboratory tests of the seized heroin revealed it to be high-purity heroin from the Afghanistan-Pakistan area.

7.    From in or about August through in or about October 2006, the DEA obtained court orders authorizing the interception of communications over three cellphones used by CC-

1.  Among the communications intercepted were many with an individual referred to as "Joe" or "Joseph," using telephone number (718) 510-6880.  From telephone records, I have learned that that telephone number is listed or leased to JOSEPH OLUIGBO, the defendant.  Further, intercepted communications (in which "Joe" talks about being in the "store") and surveillance reveal that the individual using that telephone worked with CC-1 at Nicobi Health Services in the Bronx.  Based on my training and experience, my participation in this investigation, and review of intercepted communications, I believe that OLUIGBO is the person Courier #2 referred to as "Joseph."

8.  Among the communications intercepted over CC-1's cellphones were the following, relating to the importation and distribution of a quantity of heroin by CC-1's organization in September and October 2006:[1]

a.  On or about September 26, 2006, at approximately 6:03 a.m., a co-conspirator not named as a defendant herein ("CC-2"), using a Nigerian telephone number, called CC-1 and informed him that "something will be coming in." Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that CC-2 was informing CC-1 in this conversation that a heroin courier ("Courier #3") was due to arrive in New York.

b.  On or about September 30, 2006, at approximately 8:34 a.m., CC-2, using a Nigerian telephone number, spoke with CC-1 again, and informed him that "this guy has entered the hotel."  Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that, during this conversation, CC-2 was informing CC-1 that Courier #3 had arrived at a hotel in the Bronx, New York.

c.  Later that morning, at approximately 10:05 a.m., CC-1 called JOSEPH OLUIGBO, the defendant.  During the call, OLUIGBO asked CC-1: "Is there any way you can go [to] the bank and get the money?  The last time I went there they gave me a lot of headaches. . . .  Going to the bank to get $10,000 is a headache."  CC-1 responded: "No don't, don't bring $10,000, bring like eight something."  OLUIGBO then stated: "He called me very

---

[1] The original language of many of the intercepted conversations was Igbo.  These conversations have been translated by translators assigned to assist the DEA in connection with this case.  Translations are preliminary and are subject to modification.  Quoted portions are not necessarily exact quotes, but are the sum and substance of the calls according to the monitoring agent or translator.

3

early this morning, I am getting very early this morning." CC-1
then replied: "I cannot do this, bring out eight something and
give him." OLUIGBO replied: "I hope you understand, to get out
10 thousand you have to fill out papers, and all those things. I
am not going to do that - fill out that and I don't want to be
snooping about to know what I am doing with this money." CC-1
then stated: "Bring out eight something, bring out eight five or
bring out eight, you understand, that what we usually bring."
Based on my training and experience, my participation in this
investigation, and review of other intercepted communications, I
believe that, during this conversation, OLUIGBO and CC-1 were
discussing OLUIGBO's withdrawal of money to provide Courier #3
and OLUIGBO's desire to avoid withdrawing $10,000 because of the
extra scrutiny it triggers at the bank. CC-1's references to
"eight" and "eight five" are to $8000 and $8500, respectively.

   d. That same day, at approximately 1:46 and 2:15
p.m., CC-1 had two additional conversations with CC-2. In the
first conversation, CC-1 instructed CC-2 to tell "him" (that is,
Courier #3) to go to Aziza, a restaurant in the Bronx, New York.
During that call, CC-2 informed CC-1 that Courier #3 was from
Cotonue, a city in Togo, in West Africa. In the second
conversation, CC-2 confirmed that he had instructed Courier #3 to
go to Aziza. In addition, he told CC-1 that Courier #3's name is
"Jemy."

   e. At approximately 3:05 and 3:21 p.m. that same
day, CC-1 had two conversations with OLUIGBO. During the first
conversation, CC-1 instructed OLUIGBO to "check at Aziza and see
if there are any Togolese there." During the second
conversation, CC-1 stated: "Has the person come in? . . . I
think the person just got in there now, his name is Jemy, he is
wearing something black and carrying a bag like how our people
carries bag." Based on my training and experience, my
participation in this investigation, and review of other
intercepted communications, I believe that, during this
conversation, CC-1 was instructing OLUIGBO to meet Courier #3 at
Aziza in the Bronx, New York.

   f. That same day, at approximately 5:14 p.m.,
OLUIGBO called CC-1. During the conversation, CC-1 asked: "What
did you conclude with the person? Has he left?" OLUIGBO
answered: "Yeah, he left." CC-1 then asked: "You gave him
eight?" OLUIGBO responded: "I gave him nine." Based on my
training and experience, my participation in this investigation,
and review of other intercepted communications, I believe that,
during this conversation, OLUIGBO was informing CC-1 that he had

met Courier #3 and provided him the money OLUIGBO had withdrawn earlier that day, approximately $9000.

g.    In or about October and November 2006, CC-1 and CC-2 had several conversations in which they discussed how much money CC-1 had paid to CC-2 and how much additional money he owed CC-2. During one of those calls, on or about November 7, 2006, CC-1 stated that he had just given one of CC-2's associates "the balance of 3,440." CC-2 contended that CC-1 actually owed him $6000, and the two then proceeded to begin recounting CC-1's payments. In doing so, CC-2 stated: "The first one that was given is 8500 that was paid to the person that swallowed the drugs." Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that this reference to "8500" is to $8500 that OLUIGBO withdrew from the bank and paid to Courier #3 on or about September 30, 2006.

WHEREFORE, the deponent prays that a warrant be issued for the arrest of JOSEPH OLUIGBO, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

JEFFREY SENN
Special Agent
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
20th day of February, 2007

THE HONORABLE MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA            :
                                    :    **INDICTMENT**
              -v-                   :
                                    :    S2 07 Cr. 124 (WHP)
EMMANUEL ORUCHE,                    :
FNU LNU,                            :
   a/k/a "Agwu,"                    :
REBECCA AMBO FOMUM-TIBAH,           :
COSME FREDERIC TIBURCE JEMY,        :
FNU LNU,                            :
   a/k/a "Jaster,"                  :
LINUS IHEUKWU,                      :
PAUL OSUJI,                         :
   a/k/a "Mr. P,"                   :
JOSEPH OLUIGBO,                     :
                                    :
              Defendants.           :
                                    :
- - - - - - - - - - - - - - - - - - x


                          **COUNT ONE**

        The Grand Jury charges:

        1.    In or about December 2003, in the Southern

District of New York and elsewhere, EMMANUEL ORUCHE, the

defendant, and others known and unknown, unlawfully,

intentionally, and knowingly did combine, conspire, confederate,

and agree together and with each other to violate the narcotics

laws of the United States.

        2.    It was a part and an object of the conspiracy that

EMMANUEL ORUCHE, the defendant, and others known and unknown,

would and did distribute, and possess with intent to distribute,

a controlled substance, to wit, one kilogram and more of mixtures

and substances containing a detectable amount of heroin, in


                          Exhibit B

violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(A).

### Overt Acts

3.    In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about December 5, 2003, a co-conspirator not named as a defendant herein ("CC-1") arrived at Newark Liberty International Airport in Newark, New Jersey, in possession of approximately three kilograms of heroin.

b.    On or about December 8, 2003, EMMANUEL ORUCHE, the defendant, traveled to the Bronx, New York, for the purpose of meeting CC-1.

(Title 21, United States Code, Section 846.)


### COUNT TWO

The Grand Jury further charges:

4.    In or about December 2003, in the Southern District of New York and elsewhere, EMMANUEL ORUCHE, the defendant, and others known and unknown, unlawfully, intentionally and knowingly, did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

5.    It was a part and an object of the conspiracy that

2

EMMANUEL ORUCHE, the defendant, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, to wit, one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 812, 952(a) and 960(a)(1) and (b)(1)(A).

### Overt Acts

6.    In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about December 5, 2003, CC-1 arrived at Newark Liberty International Airport in Newark, New Jersey, in possession of approximately three kilograms of heroin.

b.    On or about December 8, 2003, EMMANUEL ORUCHE, the defendant, traveled to the Bronx, New York, for the purpose of meeting CC-1.

(Title 21, United States Code, Section 963.)

### COUNT THREE

The Grand Jury further charges:

7.    In or about 2006, in the Southern District of New York and elsewhere, EMMANUEL ORUCHE, FNU LNU, a/k/a "Agwu," REBECCA AMBO FOMUM-TIBAH, COSME FREDERIC TIBURCE JEMY, FNU LNU, a/k/a "Jaster," LINUS IHEUKWU, and JOSEPH OLUIGBO, the

3

defendants, and others known and unknown, unlawfully,
intentionally, and knowingly did combine, conspire, confederate,
and agree together and with each other to violate the narcotics
laws of the United States.

8.    It was a part and an object of the conspiracy that
EMMANUEL ORUCHE, FNU LNU, a/k/a "Agwu," REBECCA AMBO FOMUM-TIBAH,
COSME FREDERIC TIBURCE JEMY, FNU LNU, a/k/a "Jaster," LINUS
IHEUKWU, and JOSEPH OLUIGBO, the defendants, and others known and
unknown, would and did distribute, and possess with intent to
distribute, a controlled substance, to wit, one kilogram and more
of mixtures and substances containing a detectable amount of
heroin, in violation of Title 21, United States Code, Sections
812, 841(a)(1), and 841(b)(1)(A).

### Background of the Conspiracy

9.    During the relevant period, the Oruche
Organization (the "Organization"), based in New York and Detroit,
was involved in the importation and distribution of multi-
kilogram quantities of heroin. The Organization arranges for the
importation of heroin from the Afghanistan-Pakistan area, through
various countries including Turkey and Nigeria, into the United
States. The Organization uses couriers, primarily of West
African descent, to import the heroin; some of the couriers
transport heroin in suitcases and some of them transport the
heroin internally. The Organization distributes the heroin to
various locations in the United States, including New York,

4

Michigan, and Ohio.

10. EMMANUEL ORUCHE, the defendant, is a leader of the Oruche Organization. He is responsible for meeting couriers upon arrival in the United States, and for distributing the heroin within the United States. JOSEPH OLUIGBO, the defendant, directly assisted ORUCHE and would provide assistance to couriers upon arrival in the United States.

11. FNU LNU, a/k/a "Agwu," the defendant, is a Nigeria-based source of supply for the Organization who is responsible for sending couriers to the United States.

12. REBECCA AMBO FOMUM-TIBAH and COSME FREDERIC TIBURCE JEMY, the defendants, have served as couriers for the Organization. FOMUM-TIBAH made at least three trips on behalf of the Organization to Istanbul, Turkey, for the purpose of ingesting heroin for importation. On the last of these three trips, she imported approximately 1.3 kilograms of heroin, concealed in her stomach and in her vagina.

13. FNU LNU, a/k/a "Jaster," and LINUS IHEUKWU, the defendants, are customers of the Organization responsible for receiving multi-kilogram quantities of heroin in Michigan and Ohio, respectively.

<u>Overt Acts</u>

14. In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and

5

elsewhere:

        a.   On or about June 2, 2006, a co-conspirator not named as a defendant herein ("CC-2") arrived at John F. Kennedy International Airport in Queens, New York, in possession of approximately 742 grams of heroin.

        b.   On or about August 9, 2006, REBECCA AMBO FOMUM-TIBAH, the defendant, arrived at JFK Airport in possession of approximately 1.3 kilograms of heroin, inside her stomach and inside her vagina.

        c.   On or about September 14, 2006, EMMANUEL ORUCHE, the defendant, provided a quantity of heroin to LINUS IHEUKWU, the defendant, in Ohio.

        d.   On or about September 26, 2006, FNU LNU, a/k/a "Agwu," the defendant, spoke by telephone with ORUCHE regarding the impending arrival of a heroin courier.

        e.   On or about September 29, 2006, COSME FREDERIC TIBURCE JEMY, the defendant, arrived at JFK Airport in possession of a quantity of heroin.

        f.   On or about September 30, 2006, FNU LNU, a/k/a "Agwu," the defendant, spoke by telephone with ORUCHE regarding the arrival of JEMY.

        g.   On or about September 30, 2006, JOSEPH OLUIGBO, the defendant, spoke by telephone with ORUCHE regarding the arrival of JEMY.

        h.   On or about September 30, 2006, ORUCHE spoke

by telephone with FNU LNU, a/k/a "Jaster," the defendant,
regarding the sale of a quantity of heroin.

        i.   On or about October 2, 2006, ORUCHE met JEMY
at a hotel in the Bronx, New York.

        j.   On or about October 19, 2006, ORUCHE spoke by
telephone with FNU LNU, a/k/a "Jaster," regarding payment for
heroin that ORUCHE had provided.

        k.   On or about October 19, 2006, ORUCHE spoke by
telephone with FNU LNU, a/k/a "Agwu," regarding payment for the
heroin that ORUCHE had distributed.

        (Title 21, United States Code, Section 846.)

## COUNT FOUR

The Grand Jury further charges:

    15.  In or about 2006, in the Southern District of New
York and elsewhere, EMMANUEL ORUCHE, FNU LNU, a/k/a "Agwu,"
REBECCA AMBO FOMUM-TIBAH, COSME FREDERIC TIBURCE JEMY, FNU LNU,
a/k/a "Jaster," LINUS IHEUKWU, and JOSEPH OLUIGBO, the
defendants, and others known and unknown, unlawfully,
intentionally and knowingly, did combine, conspire, confederate
and agree together and with each other to violate the narcotics
laws of the United States.

    16.  It was a part and an object of the conspiracy
that EMMANUEL ORUCHE, FNU LNU, a/k/a "Agwu," REBECCA AMBO FOMUM-
TIBAH, COSME FREDERIC TIBURCE JEMY, FNU LNU, a/k/a "Jaster,"

LINUS IHEUKWU, and JOSEPH OLUIGBO, the defendants, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, to wit, one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 812, 952(a) and 960(a)(1) and (b)(1)(A).

                              Overt Acts

        17.  In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

               a.   On or about June 2, 2006, CC-2 arrived at John F. Kennedy International Airport in Queens, New York, in possession of approximately 742 grams of heroin.

               b.   On or about August 9, 2006, REBECCA AMBO FOMUM-TIBAH, the defendant, arrived at JFK Airport in possession of approximately 1.3 kilograms of heroin, inside her stomach and inside her vagina.

               c.   On or about September 14, 2006, EMMANUEL ORUCHE, the defendant, provided a quantity of heroin to LINUS IHEUKWU, the defendant, in Ohio.

               d.   On or about September 26, 2006, FNU LNU, a/k/a "Agwu," the defendant, spoke by telephone with ORUCHE regarding the impending arrival of a heroin courier.

               e.   On or about September 29, 2006, COSME

                                    8

FREDERIC TIBURCE JEMY, the defendant, arrived at JFK Airport in possession of a quantity of heroin.

        f.   On or about September 30, 2006, FNU LNU, a/k/a "Agwu," the defendant, spoke by telephone with ORUCHE regarding the arrival of JEMY.

        g.   On or about September 30, 2006, JOSEPH OLUIGBO, the defendant, spoke by telephone with ORUCHE regarding the arrival of JEMY.

        h.   On or about September 30, 2006, ORUCHE spoke by telephone with FNU LNU, a/k/a "Jaster," the defendant, regarding the sale of a quantity of heroin.

        i.   On or about October 2, 2006, ORUCHE met JEMY at a hotel in the Bronx, New York.

        j.   On or about October 19, 2006, ORUCHE spoke by telephone with FNU LNU, a/k/a "Jaster," regarding payment for heroin that ORUCHE had provided.

        k.   On or about October 19, 2006, ORUCHE spoke by telephone with FNU LNU, a/k/a "Agwu," regarding payment for the heroin that ORUCHE had distributed.

        (Title 21, United States Code, Section 963.)

## COUNT FIVE

The Grand Jury further charges:

18.  In or about December 2006, in the Southern District of New York and elsewhere, EMMANUEL ORUCHE and PAUL OSUJI, a/k/a "Mr. P," the defendants, and others known and unknown, unlawfully, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

19.  It was a part and an object of the conspiracy that EMMANUEL ORUCHE and PAUL OSUJI, a/k/a "Mr. P," the defendants, and others known and unknown, would and did distribute, and possess with intent to distribute, a controlled substance, to wit, 500 grams and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(B).

20.  PAUL OSUJI, a/k/a "Mr. P," the defendant, committed the offense charged in Count Five while released under Chapter 207 of Title 18 of the United States Code, pursuant to an order of the United States District Court for the Eastern District of New York.

10

<u>Overt Acts</u>

21.   In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about December 18, 2006, PAUL OSUJI, a/k/a "Mr. P," the defendant, met with EMMANUEL ORUCHE, the defendant, in the Bronx, New York.

b.   On or about December 19, 2006, ORUCHE spoke by telephone with a co-conspirator not named as a defendant herein ("CC-3") regarding the price of cocaine in Detroit, Michigan.

c.   On or about December 19, 2006, ORUCHE spoke by telephone with OSUJI regarding his conversation with CC-3.

(Title 21, United States Code, Section 846, and
Title 18, United States Code, Section 3147.)

## Forfeiture Allegation

22.    As a result of committing one or more of the controlled substance offenses alleged in Counts One through Five of this Indictment, EMMANUEL ORUCHE, FNU LNU, a/k/a "Agwu," REBECCA AMBO FOMUM-TIBAH, COSME FREDERIC TIBURCE JEMY, FNU LNU, a/k/a "Jaster," LINUS IHEUKWU, PAUL OSUJI, a/k/a "Mr. P," and JOSEPH OLUIGBO, the defendants, shall forfeit to the United States, pursuant to 21 U.S.C. §§ 853 and 970, any and all property constituting or derived from any proceeds the defendants obtained directly or indirectly as a result of the said violations and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violations alleged in this Indictment.

## Substitute Asset Provision

23.    If any of the above-described forfeitable property, as a result of any act or omission of EMMANUEL ORUCHE, FNU LNU, a/k/a "Agwu," REBECCA AMBO FOMUM-TIBAH, COSME FREDERIC TIBURCE JEMY, FNU LNU, a/k/a "Jaster," LINUS IHEUKWU, PAUL OSUJI, a/k/a "Mr. P," and JOSEPH OLUIGBO, the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of

12

the Court;

        d.   has been substantially diminished in value;

or

        e.   has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C.

§ 853(p), to seek forfeiture of any other property of EMMANUEL

ORUCHE, FNU LNU, a/k/a "Agwu," REBECCA AMBO FOMUM-TIBAH, COSME

FREDERIC TIBURCE JEMY, FNU LNU, a/k/a "Jaster," LINUS IHEUKWU,

PAUL OSUJI, a/k/a "Mr. P," and JOSEPH OLUIGBO, the defendants, up

to the value of the above forfeitable property.

        (Title 21, United States Code, Sections 853 and 970.)

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

13

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

EMMANUEL ORUCHE,
FNU LNU, a/k/a "Agwu,"
REBECCA AMBO FOMUM-TIBAH,
COSME FREDERIC TIBURCE JEMY,
FNU LNU, a/k/a "Jaster,"
LINUS IHEUKWU,
PAUL OSUJI,
a/k/a "Mr. P," and
JOSEPH OLUIGBO,

Defendants.

### INDICTMENT

S2 07 Cr. 124 (WHP)

(Title 21, United States Code, Sections
846 and 963, and Title 18, United States
Code, Section 3147)

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

_____
Foreperson.