Approved: _____
JESSE M. FURMAN
Assistant United States Attorney

07 MAG  0263

Before:   THE HONORABLE MICHAEL H. DOLINGER
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA            :    **SEALED COMPLAINT**

             - v -                  :    Violation of
                                         21 U.S.C. §§ 846, 963
JOSEPH OLUIGBO,                     :
                                         COUNTY OF OFFENSE:
                   Defendant.       :    BRONX

- - - - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JEFFREY SENN, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") and charges as follows:

                          COUNT ONE

        1.   In or about 2006, in the Southern District of New York and elsewhere, JOSEPH OLUIGBO, the defendant, and others known and unknown, unlawfully, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

        2.   It was a part and an object of the conspiracy that JOSEPH OLUIGBO, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, to wit, 1 kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Sections 812, 841(a)(1), and 841(b)(1)(A) of Title 21, United States Code.

              (Title 21, United States Code, Section 846.)

                          COUNT TWO

        3.   In or about 2006, in the Southern District of New York and elsewhere, JOSEPH OLUIGBO, the defendant, and others known and unknown, unlawfully, intentionally, and knowingly did

combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

4. It was a part and an object of the conspiracy that JOSEPH OLUIGBO, the defendant, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, to wit, one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 812, 952(a) and 960(a)(1) and (b)(1)(A).

(Title 21, United States Code, Section 963.)

The bases for deponent's knowledge and the foregoing charge are, in part, as follows:

5. I am a Special Agent with the Drug Enforcement Administration (the "DEA"). My duties include investigating violations of federal narcotics laws. I have investigated the above-captioned case and have spoken with other law enforcement officers and witnesses and have reviewed pertinent documents. When I rely upon statements made by others, such statements are related in part and in substance unless otherwise indicated. Because this affidavit is submitted only for the limited purpose of establishing probable cause, I have not set forth each and every fact learned during the course of this investigation.

6. Since at least in or about June 2006, the DEA has been investigating an organization involved in the importation of multi-kilogram shipments of heroin from Turkey, Nigeria, and other countries and the distribution of that heroin in the United States. On or about June 2, 2006, the DEA arrested an individual at John F. Kennedy Airport who had swallowed approximately 742 grams of heroin ("Courier #1"). On or about August 9, 2006, the DEA arrested another individual at John F. Kennedy Airport who had concealed in her stomach and vagina approximately 1.3 kilograms of heroin ("Courier #2"). Both Courier #1 and Courier #2 identified a co-conspirator not named as a defendant herein ("CC-1") as the intended recipient of the heroin. Courier #2 further stated that "Joseph," who worked with CC-1 at Nicobi Health Services in the Bronx, New York, was supposed to pick her up at the airport. In both cases, laboratory tests of the seized heroin revealed it to be high-purity heroin from the Afghanistan-Pakistan area.

7. From in or about August through in or about October 2006, the DEA obtained court orders authorizing the interception of communications over three cellphones used by CC-

1. Among the communications intercepted were many with an individual referred to as "Joe" or "Joseph," using telephone number (718) 510-6880. From telephone records, I have learned that that telephone number is listed or leased to JOSEPH OLUIGBO, the defendant. Further, intercepted communications (in which "Joe" talks about being in the "store") and surveillance reveal that the individual using that telephone worked with CC-1 at Nicobi Health Services in the Bronx. Based on my training and experience, my participation in this investigation, and review of intercepted communications, I believe that OLUIGBO is the person Courier #2 referred to as "Joseph."

      8. Among the communications intercepted over CC-1's cellphones were the following, relating to the importation and distribution of a quantity of heroin by CC-1's organization in September and October 2006:[1]

      a. On or about September 26, 2006, at approximately 6:03 a.m., a co-conspirator not named as a defendant herein ("CC-2"), using a Nigerian telephone number, called CC-1 and informed him that "something will be coming in." Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that CC-2 was informing CC-1 in this conversation that a heroin courier ("Courier #3") was due to arrive in New York.

      b. On or about September 30, 2006, at approximately 8:34 a.m., CC-2, using a Nigerian telephone number, spoke with CC-1 again, and informed him that "this guy has entered the hotel." Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that, during this conversation, CC-2 was informing CC-1 that Courier #3 had arrived at a hotel in the Bronx, New York.

      c. Later that morning, at approximately 10:05 a.m., CC-1 called JOSEPH OLUIGBO, the defendant. During the call, OLUIGBO asked CC-1: "Is there any way you can go [to] the bank and get the money? The last time I went there they gave me a lot of headaches. . . . Going to the bank to get $10,000 is a headache." CC-1 responded: "No don't, don't bring $10,000, bring like eight something." OLUIGBO then stated: "He called me very

---

[1] The original language of many of the intercepted conversations was Igbo. These conversations have been translated by translators assigned to assist the DEA in connection with this case. Translations are preliminary and are subject to modification. Quoted portions are not necessarily exact quotes, but are the sum and substance of the calls according to the monitoring agent or translator.

early this morning, I am getting very early this morning." CC-1 then replied: "I cannot do this, bring out eight something and give him." OLUIGBO replied: "I hope you understand, to get out 10 thousand you have to fill out papers, and all those things. I am not going to do that - fill out that and I don't want to be snooping about to know what I am doing with this money." CC-1 then stated: "Bring out eight something, bring out eight five or bring out eight, you understand, that what we usually bring." Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that, during this conversation, OLUIGBO and CC-1 were discussing OLUIGBO's withdrawal of money to provide Courier #3 and OLUIGBO's desire to avoid withdrawing $10,000 because of the extra scrutiny it triggers at the bank. CC-1's references to "eight" and "eight five" are to $8000 and $8500, respectively.

    d. That same day, at approximately 1:46 and 2:15 p.m., CC-1 had two additional conversations with CC-2. In the first conversation, CC-1 instructed CC-2 to tell "him" (that is, Courier #3) to go to Aziza, a restaurant in the Bronx, New York. During that call, CC-2 informed CC-1 that Courier #3 was from Cotonue, a city in Togo, in West Africa. In the second conversation, CC-2 confirmed that he had instructed Courier #3 to go to Aziza. In addition, he told CC-1 that Courier #3's name is "Jemy."

    e. At approximately 3:05 and 3:21 p.m. that same day, CC-1 had two conversations with OLUIGBO. During the first conversation, CC-1 instructed OLUIGBO to "check at Aziza and see if there are any Togolese there." During the second conversation, CC-1 stated: "Has the person come in? . . . I think the person just got in there now, his name is Jemy, he is wearing something black and carrying a bag like how our people carries bag." Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that, during this conversation, CC-1 was instructing OLUIGBO to meet Courier #3 at Aziza in the Bronx, New York.

    f. That same day, at approximately 5:14 p.m., OLUIGBO called CC-1. During the conversation, CC-1 asked: "What did you conclude with the person? Has he left?" OLUIGBO answered: "Yeah, he left." CC-1 then asked: "You gave him eight?" OLUIGBO responded: "I gave him nine." Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that, during this conversation, OLUIGBO was informing CC-1 that he had

met Courier #3 and provided him the money OLUIGBO had withdrawn earlier that day, approximately $9000.

        g.  In or about October and November 2006, CC-1 and CC-2 had several conversations in which they discussed how much money CC-1 had paid to CC-2 and how much additional money he owed CC-2.  During one of those calls, on or about November 7, 2006, CC-1 stated that he had just given one of CC-2's associates "the balance of 3,440."  CC-2 contended that CC-1 actually owed him $6000, and the two then proceeded to begin recounting CC-1's payments.  In doing so, CC-2 stated: "The first one that was given is 8500 that was paid to the person that swallowed the drugs."  Based on my training and experience, my participation in this investigation, and review of other intercepted communications, I believe that this reference to "8500" is to $8500 that OLUIGBO withdrew from the bank and paid to Courier #3 on or about September 30, 2006.

    WHEREFORE, the deponent prays that a warrant be issued for the arrest of JOSEPH OLUIGBO, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

                                      JEFFREY SENN
                                      Special Agent
                                      DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
20th day of February, 2007

THE HONORABLE MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

5