UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

UNITED STATES OF AMERICA,                   :
                                            :
                  v.                        :
                                            :    07 Cr. 0124 (WHP)
EMMANUEL ORUCHE, et al.,                     :
                                            :
                  Defendants.                :
                                            :
-------------------------------------------------------- x


### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOSEPH OLUIGBO'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

Andrew J. Ceresney
Eric D. Meyer
Neuman Leverett III
Gordon Eng
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000


*Counsel for Defendant*
 JOSEPH OLUIGBO

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

PROCEDURAL HISTORY..............................................................................1

STATEMENT OF FACTS ...............................................................................2

I.    Special Agent Andrew Arthurton ...........................................................2

II.   Rebecca Fomum-Tibah...........................................................................6

III.  Donald Rigby ........................................................................................9

IV.   Special Agent Ramona Sy .....................................................................9

ARGUMENT ................................................................................................10

I.    JUDGMENT OF ACQUITTAL OR NEW TRIAL IS APPROPRIATE
      BECAUSE THE EVIDENCE CANNOT REASONABLY SUPPORT A
      FINDING OF GUILT BEYOND A REASONABLE DOUBT AGAINST
      OLUIGBO........................................................................................10

      A.    Legal Standard ..........................................................................11

      B.    Rodriguez and Cruz ...................................................................12

      C.    The Evidence Against Oluigbo Does Not Support A Conviction ............15

            1.    Rebecca Fomum-Tibah...............................................16

            2.    Telephone Calls .........................................................17

CONCLUSION...............................................................................................19

## TABLE OF AUTHORITIES

### FEDERAL CASES                    Page

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) .......................................................11

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004) ................................................. *passim*

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ....................................................11

*United States v. Gaviria*, 740 F.2d 174 (2d Cir. 1984)......................................................15

*United States v. Lopac*, 411 F. Supp. 2d 350 (S.D.N.Y. 2006) ..................................12, 18

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004)......................................... *passim*

*United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001)................................................12, 18

*United States v. Small*, No. 03 Cr. 1368, 2006 WL 572857 (E.D.N.Y. Mar. 8, 2006).....15

### FEDERAL RULES

Federal Rule of Criminal Procedure 29 ...................................................................... *passim*

Federal Rule of Criminal Procedure 33 ...................................................................... *passim*

## **PRELIMINARY STATEMENT**

Defendant Joseph Oluigbo submits this memorandum of law in support of his motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33, because the government failed to introduce sufficient evidence at trial to reasonably support a finding of guilt beyond a reasonable doubt. Even when viewed in the light most favorable to the government, the evidence against Oluigbo – at most – permits inferences that he was associated with persons engaged in criminal activity and was aware of criminal activity.  The evidence in no way permits any inference – and there was no direct evidence to establish – that Oluigbo knowingly joined a <u>drug</u> conspiracy or intentionally took actions in furtherance of a <u>drug</u> conspiracy, the crime for which he was convicted.  His conviction must be overturned.

## **PROCEDURAL HISTORY**

As the Court is aware, a trial was held in this matter starting on June 16, 2008 involving Oluigbo and his co-defendant Emmanuel Oruche.  The jury rendered a verdict on June 25 convicting Oluigbo of conspiracy to distribute and possess with intent to distribute 100 grams or more but less than one kilogram of heroin, in violation of 21 U.S.C. § 846, and conspiracy to import into the United States 100 grams or more but less than one kilogram of heroin, in violation of 21 U.S.C. § 963.

Oluigbo moved at the close of the government's case for a judgment of acquittal pursuant to Rule 29.  [Tr. 6/23/08, 939:19-941:19].  The Court reserved decision.  [Tr. 6/23/08, 945:12-13].  At the close of Oluigbo's affirmative case he renewed his motion for a judgment of acquittal under Rule 29, and the Court reserved decision.  [Tr. 6/23/08, 963:7-9].  Following the jury verdict, the Court invited further briefing on Oluigbo's motion for a judgment of acquittal

under Rule 29 and any other post-trial motions, and set a deadline of July 16 for that briefing. [Tr. 6/25/08, 1176:21-1177:16]. On July 2, to comply with the deadlines set forth in Rules 29 and 33, Oluigbo moved for a judgment of acquittal under Rule 29 and in the alternative for a new trial under Rule 33, and indicated that further briefing would follow within the schedule established by the Court.

## STATEMENT OF FACTS[1]

Even when viewed in the light most favorable to the government, the evidence introduced against Oluigbo at trial fails to establish that he agreed to join the conspiracies for which he was convicted and intentionally took steps to further their goals. The government's evidence against Oluigbo at trial consisted of the audio recordings and written translations of nine conversations, and testimony from Rebecca Fomum-Tibah, Special Agent Andrew Arthurton, Special Agent Ramona Sy, Donald Rigby, and translator Emanuel Orji. The government's other witnesses did not offer evidence against Oluigbo. Because of the fact-specific nature of the analysis involved in a claim asserting insufficient evidence, it is necessary to examine the evidence introduced at trial in some detail.

I.    Special Agent Andrew Arthurton

Special Agent Arthurton testified that despite extensive surveillance by as many as 14 federal agents, he never saw Oluigbo in possession of heroin or any other drugs, never saw him involved in a purchase of drugs, never saw him involved in a sale of drugs, never saw him take someone to an airport, and never saw him pick up someone from an airport. [Tr. 6/18/08,

---

[1]    For purposes of this motion, evidence is viewed in the light most favorable to the government. By presenting this statement of facts and incorporating the evidence introduced at trial into his arguments, Oluigbo does not intend to acknowledge that any piece of evidence introduced against him was entitled to any weight.

474:10-475:23].  He testified that Oluigbo "worked at the Nicobi Health Care store where he took care of business in terms of whatever needed to be taken care of, bills, etcetera, for the business for Emmanuel Oruche."  [Tr. 6/17/08, 394:16-19].

Agent Arthurton testified that the government recorded over 3,000 conversations [Tr. 6/18/08, 460:9-16] that were placed to and from three telephone numbers used by Oruche.  Nevertheless, the government introduced nine recorded conversations in connection with Oluigbo.  Agent Arthurton and Assistant United States Attorney Michael Rosensaft read those calls into evidence without any explanation of the substance of the conversations.  No participant in any of those conversations testified to offer any explanation of the substance of any of the conversations.  In none of the conversations involving Oluigbo did he or any other participant speak the word "heroin" or any known or suspected code word for heroin or any other controlled substance.

The government introduced GX. 41T-1, a translation of a phone call recorded on September 22, 2006 at 2:44:21 p.m. between Oruche and Oluigbo.  Oruche called Oluigbo and told him that he thought the police were following him (Oruche).  Oluigbo responded by asking "were you on the phone"?  Oruche then said "they've been trailing me and I don't know what they are following me for."  Oluigbo first responded, "Stop at a place and clear, then let them pass you, make a U-turn and leave."  Neither Oruche nor Oluigbo gave any indication that they knew why the police were following Oruche.  At the end of the conversation, Oruche told Oluigbo, "Just mind the store. Remove everything in the store."  Oluigbo responded, "What?"  Oruche then repeated, "Remove everything, remove your papers, remove everything that is in the store."  Oluigbo responded "Ok."  The government did not offer any evidence as to the items referenced in this last exchange between Oruche and Oluigbo.

The government then introduced GX. 41T-5, a phone call dated September 30, 2006 at 3:05:45 p.m. between Oluigbo and Oruche. Oruche called Oluigbo while Oluigbo was working at Nicobi, and instructed him to "go to Aziza [Restaurant] and check whether someone from Togo is there." Oluigbo asked Oruche what this person looked like, but Oruche responded that he didn't know. Oluigbo then told Oruche that he "cannot leave this place because Maria is on lunch." Oluigbo stated that once Maria returned to the store, he would walk down the street to see if the person whom Oruche was seeking was at the restaurant. No evidence was introduced indicating that Oruche told Oluigbo why the person was waiting, why Oruche wanted to meet with the person, or whether Oluigbo knew the person.

The next phone call the government introduced, GX. 41T-6, took place between Oluigbo and Oruche sixteen minutes after GX. 41T-5. Oruche asked Oluigbo if the other employee had returned to Nicobi. When Oluigbo said that she had not and that he was with a customer, Oruche told him that the "person has just entered that place. His name is Jimmy. I think I saw him. He is dressed in black and carrying a bag the way our people carry bag." Oluigbo said "There is no one here. I can't leave this place." Oruche then told Oluigbo, "Lock the door and ask that person to accompany you to buy some food. When both of you get there, you understand, you say, 'Jimmy, how now?'" Oluigbo responded "Okay."

The government then introduced GX. 41T-7, a phone call between Oruche and Oluigbo at 5:14:48 p.m. the same day. In this call, Oluigbo told Oruche that he did not find the person at Aziza.

The government introduced a call dated October 1, 2006 at 9:19:34 a.m., GX. 41T-10, in which Oruche told a person named Eva that he would arrange to have an unidentified man stay with Joe. The government then introduced a conversation from 10:30:25 a.m. the same morning,

4

GX. 41T-11, in which Oluigbo and Oruche discussed Oruche's request to have someone stay with Oluigbo. Oluigbo asked Oruche, "How long is that person going to stay?" and he told Oruche that he had "somebody coming here on the 6th from Pennsylvania." They discussed the date, and finally Oruche said, "Let's talk about it later." Oluigbo and Oruche did not reach an agreement in this call as to whether or not the person will stay with Oluigbo and the government did not produce any other evidence that Oluigbo hosted this guest. In fact, in its closing arguments, the government conceded that no person stayed with Oluigbo. [Tr. 6/24/08, 1030:19-25].

The government introduced a call from October 2, 2006 at 6:10 p.m., GX. 41T-13, in which Oruche asked Oluigbo, "What is that man doing?" Oluigbo responded that the man was sleeping when he went to the house, and that Oluigbo left food for him. Oruche then asked "Were you vigilant enough to observe whether you were trailed…. Did you observe today if anybody was following you?" Oluigbo responded, "Yeah, yeah."

The government also introduced a call from October 8, 2006 at 8:40 p.m., GX. 41T-15, in which Oluigbo told Oruche that he went to visit a man and knocked several times on the man's door, but that the man neither answered his door nor picked up the phone when the building receptionist called his room.

Finally, the government then introduced a call dated October 9, 2006 at 12:26 p.m., GX. 41T-16. Oruche called Oluigbo and asked him what time Oluigbo was going to drive a man to the airport. Oluigbo responded, "His flight six o'clock."

On cross-examination, counsel for Oluigbo elicited testimony from Agent Arthurton that Oruche used three different telephones, and that he used a 646 number for "more legitimate business" and used his other phones for "dirty business." [Tr. 6/18/08; 485:5-486:20]. All the

recorded telephone conversations that the government introduced at trial involving Oluigbo and Oruche occurred on Oruche's 646 number.  [Tr. 6/18/08, 486:18-20].

II.    Rebecca Fomum-Tibah

The government also offered the testimony of Rebecca Fomum-Tibah.  Fomum-Tibah testified on behalf of the government pursuant to a cooperation agreement in an effort to obtain a reduced prison sentence and acknowledged lying to the government repeatedly during her proffer meetings with federal agents and several Assistant United States Attorneys.  [Tr. 6/19/08, 625:21-626:8; 734:22-735:11].  Viewing her testimony in the light most favorable to the government, she testified as follows:

In her direct testimony, Fomum-Tibah described several interactions with Oluigbo.  She testified that in early 2006, as she was preparing for her first trip to Istanbul for the purpose of smuggling drugs, Oluigbo made a phone call to her in which he asked her how her name appeared on her ID, and discussed flight schedules to Istanbul with her.  [Tr. 6/18/08, 582:7-11, 583:14-22].  Fomum-Tibah did not testify that she and Oluigbo discussed the purpose of her trip to Istanbul or that Oluigbo knew the purpose of her trip.  She stated that Oruche picked her up and took her to Nicobi Health Care Services, that Oluigbo was looking at hotels on the computer when she arrived, and she then "took over the computer [from Oluigbo] and continued and [she] did the reservations for the hotel."  [Tr. 6/18/08, 583:20-584:12].  Fomum-Tibah testified that once the reservation was made, Oruche provided her with money for her trip, but she said, "I don't remember if [Oluigbo] was standing close by" during this exchange.  [Tr. 6/18/08, 585:6-8].  Fomum-Tibah testified in detail about her discussions with  Oruche in preparation for her first trip to Istanbul, but she did not place Oluigbo in any of those conversations.  [Tr. 6/18/08, 585:9-586:13].

6

Fomum-Tibah next mentioned Oluigbo when she described her arrival back into the United States after her first trip to Istanbul. She testified that Oluigbo met her at the exit area past Customs in the airport and helped carry her bag, and that he "welcomed me back and I asked for Manny and he said somewhere around and we walked down a little and Manny joined us." [Tr. 6/18/08, 592:1-15]. Fomum-Tibah then testified that the three of them entered Oruche's car, with Oluigbo driving. Fomum-Tibah said that during the drive to Oruche's house, they discussed her trip. She testified that "on my way to Istanbul I was put on oxygen. I wasn't feeling good and we talked a little about that. And Manny said you could not swallow, huh? And I said, yes." [Tr. 6/18/08, 592:20-23; Tr. 6/19/08, 607:4-608:1].

According to Fomum-Tibah, when they arrived at Oruche's home, she and Oruche went into his bedroom where she gave him a package of heroin. Fomum-Tibah testified twice that Oluigbo was in the living room during this exchange and did not observe the drugs. [Tr. 6/19/08, 608:4-8; 640:5-9].

Fomum-Tibah made no other references to Oluigbo in connection with her first trip to Istanbul.

In her direct examination, Fomum-Tibah also testified that before her second trip to Istanbul, she became involved in a dispute over drugs with Oruche and an individual named "Ed" in Detroit. [Tr. 6/19/08, 610:11-611:22]. Fomum-Tibah testified that while this dispute was ongoing, "Joe told me Manny's car, that Paul had used the rock to shoot Manny's car, that people were threatening him that he is in so much debt. Those were the kinds of calls I was getting on a regular basis." [Tr. 6/19/08, 614:9-12]. She testified that during this phone call, Oluigbo "started off by saying that I'm a good girl, that naturally if I had done what I did something had to have pushed me to that point, that he just wanted to talk and see how this could

be resolved because Manny was really having a lot of trouble back there in New York." [Tr. 6/19/08, 614:17-21].

Fomum-Tibah did not mention Oluigbo at all during her testimony about her second trip to Istanbul. [Tr. 6/19/08, 614:23-618:18]

Fomum-Tibah then discussed her third trip to Istanbul. She mentioned Oluigbo only once in connection with this trip, when she testified that she needed a visa to travel to London, so she "called Emmanuel and I told him about it. He said he wasn't at the store but he was going to have Joe wire the money by Western Union. … When I called -- Joseph Oluigbo called later, sorry, and he told me that the money was sent, I should receive it as it has been sent by Nicole Oruche, who is Manny's daughter." [Tr. 6/19/08, 620:16-22] Fomum-Tibah did not testify that she discussed her third trip to Istanbul with Oluigbo or that he knew the purpose of her trip.

On cross-examination, Fomum-Tibah testified that she participated in proffer sessions with the government six times in the year after her August 2006 arrest. [Tr. 6/19/08, 703:3-8]. During those meetings, she provided information to the government about criminal conduct by Oruche and at least ten other individuals, but she did not mention Oluigbo engaging in any criminal conduct. [Tr. 6/19/08, 720:12-14; 691:5-14]. She testified that (1) the government asked her questions about Oluigbo, (2) she told them that he was Oruche's "errand boy" and (3) he picked her up from the airport once. [Tr. 6/19/08, 709:2-15, 721:3-9]. Fomum-Tibah did not receive a cooperation agreement from the government after these six proffer sessions. She acknowledged that she became desperate after those proffers and wrote a letter to Assistant United States Attorney Jesse Furman stating "N:B. I remember information on what you asked me about Joe and something about Ken." [Tr. 6/19/08, 704:6-705:2; Dx. 3501-6; 705:3-25]. The government granted Fomum-Tibah another proffer meeting in January 2008 and she then

provided them with the additional information regarding Oluigbo noted above, and she received a cooperation agreement. [Tr. 6/19/08, 720:17-721:23].

III.   Donald Rigby

Western Union representative Donald Rigby testified that a money transfer in the amount of $300 was sent to Rebecca Fomum-Tibah via the Western Union terminal in the Nicobi Health Care Services store on July 27, 2006 at 2:41 p.m. using the operator number assigned to Maria Tolentio, and that a money transfer in the amount of $2,000 was sent to Fomum-Tibah via the same Western Union terminal on July 28, 2006 at 11:22 a.m. using the operator number assigned to Joseph Oluigbo. [Gx. 32.1, Gx. 32.2; Tr. 6/17/08, 321:10-327:21]. The name recorded as the sender on both money transfers was Nicole Oruche, the daughter of Emmanuel Oruche. Nicole Oruche's address on the transfer for $300 is listed as 3682 White Plains Road, Bronx, NY. [Gx. 32.1]. Nicole Oruche's address on the transfer for $2000 is listed as 3678 White Plains Road, Bronx, NY. [Gx. 32.2].

IV.   Special Agent Ramona Sy

Special Agent Ramona Sy testified that she was part of the team that arrested Joseph Oluigbo on February 28, 2007. [Tr. 6/23/08, 914:20-915:1]. Through Agent Sy, the government introduced images of seven contact names and phone numbers on Oluigbo's cell phone, including phone numbers for "Becky," "Emmanuel Oruche," "Emma" at an 832 number, "Emmanuel O" at another 646 number, "Emmanuel Oruche" at a 347 number, "Eva" and "Leroy." [Tr. 6/23/08, 915:20-920:19]. She testified that she could not tell how many times any of the numbers were called. [Tr. 6/23/08, 928:21-23]. Per Agent Sy, Emmanuel Oruche's 917 number was not found on Oluigbo's phone. [Tr. 6/23/08, 928:24-929:1].

9

Agent Sy also testified that the address 3678 White Plains Road belongs to the Starlight Beauty Salon. [Tr. 6/23/08, 920:20-920:24].

## ARGUMENT

I.    JUDGMENT OF ACQUITTAL OR NEW TRIAL IS APPROPRIATE BECAUSE THE EVIDENCE CANNOT REASONABLY SUPPORT A FINDING OF GUILT BEYOND A REASONABLE DOUBT AGAINST OLUIGBO

The evidence introduced at trial against Oluigbo was so scant that it fails to meet even the low standard for affirming a conviction, and necessitates a judgment of acquittal or a new trial. Despite hours and hours of investigation by as many as 14 federal agents, there was no direct evidence that Oluigbo possessed drugs, participated in the purchase or sale of drugs, or negotiated the sale or purchase of drugs. Nor was there any evidence that Oluigbo agreed to join a drug conspiracy. Even crediting Rebecca Fomum-Tibah's testimony in its entirety, nothing she said establishes proof beyond a reasonable doubt that Oluigbo knowingly agreed to join a narcotics conspiracy and intentionally took steps in furtherance of that conspiracy. Instead, her testimony places Oluigbo out of the room when drugs are exchanged. Fomum-Tibah did not testify that Oluigbo was ever present during any open discussions of drugs or the operations of the conspiracy, or otherwise was aware of a drug conspiracy.

The remaining evidence consisted largely of unexplained, vague telephone calls that do not on their face establish knowledge of a drug conspiracy. Even accepting the inference that some of the conversations suggest Oluigbo had an awareness that some type of unlawful activity was occurring, no evidence proves beyond a reasonable doubt that he either knew or consciously avoided learning the nature of that activity, i.e., drug trafficking, or intentionally took steps to advance it.

A.    <u>Legal Standard</u>

Federal Rule of Criminal Procedure 29(c) provides for a court to set aside a guilty verdict

and enter a judgment of acquittal if the evidence introduced at trial is insufficient to sustain a

conviction.  Rule 33(a) similarly authorizes the Court to "vacate any judgment and grant a new

trial if the interest of justice so requires."

The Second Circuit has stated that "when challenged on sufficiency grounds, a conviction

will be affirmed if, viewing all the evidence in the light most favorable to the prosecution, 'the

record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  *United

States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318

(1979)).  That said, it is axiomatic that a jury's verdict of guilty does not establish that the

government introduced sufficient evidence to support a conviction, because Rules 29 and 33 are

only invoked after a jury has rendered such a verdict.

Even drawing all permissible inferences in favor of the government, "where the

Government seeks to prove a fact that is also an element of the offense by circumstantial

evidence, [the Court] must be satisfied that the inferences are sufficiently supported to permit a

rational juror to find that the element, like all elements, is established beyond a reasonable

doubt."  *United States v. Rodriguez*, 392 F.3d 539, 546-47 (2d Cir. 2004) (internal quotations

omitted) (finding evidence insufficient to support conviction).  As the Second Circuit has stated,

"a conviction based on speculation and surmise cannot stand. . . . Therefore, the government

must do more than introduce evidence at least as consistent with innocence as with guilt."

*United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (internal quotations omitted)

(finding evidence insufficient to support conviction); *see also United States v. Cassese*, 428 F.3d

92, 99 (2d Cir. 2005) (affirming district court grant of Rule 29 acquittal and stating when

evidence viewed in government's favor "gives equal or nearly equal circumstantial support to a

theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt").  Moreover, in conspiracy cases, the Second Circuit "has repeatedly emphasized that a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy."  *United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001) (finding evidence insufficient to support conviction).

Under Rule 33(a), which allows the Court to grant a new trial in the interest of justice, "[t]he court is not required to view the evidence in the light most favorable to the government, but rather is to weigh the evidence and determine the credibility of the witnesses." *United States v. Lopac*, 411 F. Supp 2d. 350, 359 (S.D.N.Y. 2006) (granting Rule 33 motion for new trial and collecting cases).

B.    *Rodriguez* and *Cruz*

Viewed in its totality, the evidence presented against Oluigbo is similar to a related pair of recent cases in which the Second Circuit overturned convictions for possession with intent to distribute heroin in *United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004) and for conspiracy to distribute heroin in *United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004).  In *Rodriguez*, the court emphasized that " 'proof that the defendant knew that some crime would be committed is not enough.'"  *Id.* at 545 (quoting *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004)); *see also Cruz*, 363 F.3d at 199 (stating presence at scene of crime, association with wrongdoer, and knowledge of crime insufficient to establish intentional participation in crime).  The court in *Rodriguez* explained that "even when the evidence is viewed cumulatively and in the light most favorable to the government, . . . the evidence was not sufficient to demonstrate that [the defendant] knew the *specific nature* of the conspiracy or underlying crime."  *Rodriguez*, 392

12

F.3d at 548 (internal quotations omitted)(emphasis added). The court made clear that it will not sustain a conviction for conspiracy when the government fails to introduce "some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Id.* at 545 (internal quotations omitted).

In *Rodriguez*, the government asserted that Rodriguez had knowingly and intentionally assisted in a heroin transaction by acting as a lookout for a seller. 392 F.3d at 541. The government introduced evidence showing that Rodriguez and another individual (Cruz, discussed below) arrived together at the scene of a scheduled drug deal shortly before the seller arrived. *Id.* at 542. Rodriguez and Cruz examined cars in the area and then entered a restaurant and sat several tables from the buyer. *Id.* The seller then entered the restaurant, sat with and spoke to the buyer, then left the restaurant and made a telephone call. *Id.* Rodriguez and Cruz then left the restaurant, entered their car, and drove in the direction the seller had walked. *Id.* Agents then viewed Rodriguez's car drive past them with three people inside. *Id.* The car reappeared a few minutes later with two people inside – the seller and Cruz. *Id.* Rodriguez was then seen standing on a street corner near the restaurant. *Id.* The buyer, a confidential informant, then entered the back seat of the car and found the drugs. *Id.* The government also introduced at trial phone records showing that the seller and Rodriguez had called each other a total of 13 times during the two days before the drug deal and six times the day of the deal, including the call that the seller made when he left the restaurant. *Id.* at 543.

The court held that a reasonable finder of fact could have concluded that Rodriguez had agreed to act as a lookout. *Id*. at 545. Nevertheless, the court ruled that the government had failed to prove beyond a reasonable doubt "that Rodriguez had the knowledge and specific intent

to aid and abet a *drug* transaction," and accordingly directed the entry of a judgment of acquittal. *Id.* at 546, 549 (emphasis in original). The court noted that even if Rodriguez was the third person in the car when it passed the observing agents, and even if he had been sitting in the back seat where the drugs were located, the drugs were found wrapped in several bags inside a box. *Id.* at 547. This evidence was inadequate to prove knowledge of a drug transaction or intent to advance it. *Id.* The court also was not persuaded that the recovery of weapons belonging to Rodriguez from his vehicle or the flurry of calls with the seller proved that Rodriguez knew the purpose of his actions was to facilitate a drug deal. *Id.* at 547-48.

In *Cruz*, the court examined largely the same fact pattern described above and entered a judgment of acquittal in favor of defendant Cruz on the charge of possession with intent to distribute heroin. 363 F.3d at 189. The facts differed from *Rodriguez* only in that days before the drug deal occurred, the seller had asked Cruz if he would participate in an assault for hire, and Cruz agreed to watch the seller's back while the seller finalized a "deal." *Id.* at 190. Additionally, Cruz and the seller were arrested in the car with the drugs. *Id.* Cruz made a post-arrest statement that was introduced at trial, stating that he had agreed to watch the seller's back while he conducted a deal, but that he did not know it was a drug deal. *Id.* at 191. The Second Circuit directed a judgment of acquittal because, even assuming that the government had proven that Cruz acted as a lookout for the seller, "[i]n essence, the trial record . . . reflects that Cruz was present at the scene of the crime and likely knew that some type of crime was being committed. … [T]here is little evidence in the record which suggests that Cruz knew of the specific crime [the seller] proposed to commit or that Cruz intended to facilitate such a crime." *Id.* at 198-99. Again, the court in *Cruz* emphasized that even when acting as a lookout, a "defendant's mere presence at the scene of the crime or association with wrongdoers does not constitute intentional

participation in the crime, *even if the defendant had knowledge of the criminal activity*." *Id.* at 199 (emphasis added). Also relevant here, the Second Circuit was not persuaded by Cruz's "surveillance-conscious" behavior, and the court stated that such evidence "did not categorically suggest that Cruz engaged in such so-called 'countersurveillance' because he knew [the seller] was engaged in a narcotics transaction and hoped to further the commission of the crime." *Id.* at 198. *See also United States v. Gaviria*, 740 F.2d 174 (2d Cir. 1984) (overturning and dismissing drug conspiracy conviction based on insufficient evidence that defendant knowingly participated in drug conspiracy despite defendant's presence in apartment where drugs and drug-packaging materials were found, surveillance-conscious behavior, knowledge that others in apartment were engaged in narcotics dealing, association with drug dealers, presence in vehicle where drugs were found, and false statements to law enforcement).

      C.      <u>The Evidence Against Oluigbo Does Not Support A Conviction</u>

The government presented even less evidence against Oluigbo here than it did against the defendants in *Rodriguez*, *Cruz*, and *Gaviria*. Unlike those defendants, Oluigbo was not present for any drug transaction, was not arrested with any drugs, and did not agree to engage in criminal conduct. At the very worst, drawing all permissible inferences in the government's favor as the Court must do here, the evidence shows that Oluigbo had some awareness that Oruche was engaging in some type of criminal activity, and he participated in activities including providing food to an individual at his employer's request and possibly driving an individual to an airport. No evidence established that Oluigbo agreed to join a drug conspiracy or intentionally took actions to further it. *See United States v. Small*, No. 03 Cr. 1368, 2006 WL 572857, at *1 (E.D.N.Y. Mar. 8, 2006) (granting Rule 29 judgment of acquittal when defendant received "hush

money" and had knowledge that some criminal conduct was occurring, because evidence insufficient to show that defendant intentionally participated in *drug* conspiracy).

          1.     <u>Rebecca Fomum-Tibah</u>

Like the defendants in *Cruz* and *Rodriguez*, who were present or possibly present in Rodriguez's car where drugs were present wrapped in two bags and a box, Oluigbo picked up Rebecca Fomum-Tibah and carried her bag containing drugs from the airport to Oruche's car (assuming that one credits Fomum-Tibah's testimony). But there was no evidence introduced at trial to suggest that Oluigbo knew Fomum-Tibah had drugs hidden inside a cell phone box inside her bag. Fomum-Tibah testified only that Oluigbo knew she was traveling to Istanbul, and that he helped her – his boss's girlfriend – find a hotel on the Internet when she came to Nicobi to visit Oruche and to plan her trip. Fomum-Tibah did not testify that she, or Oruche, or anyone else, spoke to Oluigbo about the *purpose* of her trip to Istanbul before she traveled, or that she discussed drug-related preparations for her trip in Oluigbo's presence. The government introduced no evidence at trial to prove directly or to support any permissible inference that Oluigbo knew *why* Fomum-Tibah was traveling to Istanbul, or that he should have had any reason to believe that her trip involved drugs.

Fomum-Tibah also testified that on her return from her first trip to Istanbul, in the car en route from the airport to Oruche's house, Oluigbo was driving while Fomum-Tibah and Oruche discussed Fomum-Tibah's illness during her flight from the United States to Turkey. Fomum-Tibah testified that during this conversation, Oruche said "so, you could not swallow, huh." [Tr. 6/18/08, 592:19-23]. There is no indication that drugs were mentioned or discussed in Oluigbo's presence, and no reason introduced at trial that Oluigbo should have been able to understand that

the question "so, you could not swallow" in the context of a discussion of illness was a reference to drugs.

Moreover, according to Fomum-Tibah, later that same day when the three arrived at Oruche's home, Fomum-Tibah and Oruche went into Oruche's bedroom to exchange the narcotics that Fomum-Tibah brought back from Turkey while Oluigbo remained in the living room. This separation by Oruche and Fomum-Tibah from Oluigbo for the purpose of exchanging drugs is not consistent with Oluigbo's involvement in the conspiracy. To the contrary, it is consistent with Oluigbo's argument that he was not a member of a drug conspiracy.

In short, Fomum-Tibah's testimony provided no evidence of Oluigbo's knowledge of a conspiracy involving drugs.

2.    <u>Telephone Calls</u>

The government introduced a handful of telephone calls involving Oluigbo out of the thousands of conversations recorded from Oruche's telephones. These few calls involving Oluigbo contain no references to drugs and no information sufficient to support any inference that Oluigbo knew of a drug conspiracy. The bulk of the calls involving Oluigbo, when viewed in the government's favor, relate to an individual named Cosme Jemy. Viewed in the light most favorable to the government, the most that these calls show is that Oruche, Oluigbo's employer at Nicobi, asked Oluigbo to meet with Jemy, and Oluigbo agreed to look for Jemy when he was finished dealing with customers at Nicobi; that Oluigbo brought food to Jemy; and that he drove him to an airport. But the evidence does not support any inference that Jemy was involved in a drug conspiracy or that Oluigbo had any awareness of that involvement.

The government introduced no evidence to support an inference that even if Jemy was involved in a drug conspiracy, Oluigbo was aware of the nature of Jemy's conduct.  Even if Oluigbo went to look for Jemy at Aziza, gave him food, let him stay in his house, and drove him to the airport – facts which are not at all clearly supported by the evidence[2] – nothing in the record permits any inference that Oluigbo was aware of a connection between these acts and a drug conspiracy.

Finally, the government introduced a telephone call in which, taking all inferences in favor of the government, Oluigbo gave Oruche instructions on evading police surveillance, and agreed to remove certain items from the Nicobi store as Oruche requested.  [Gx. 41T-1].  The government introduced no explanation for this call.  The government introduced no evidence showing that this conversation had any relation to narcotics.  Whatever items were being referenced by Oruche, there is nothing which connects them to drugs.  One might infer from this telephone call that like the defendants in *Rodriguez*, *Cruz*, and *Samaria*, Oluigbo was aware of some criminal activity, but the government did not introduce sufficient evidence at trial to establish or support any inference beyond a reasonable doubt that Oluigbo was aware of the specific nature of this supposed criminal activity – here, a drug conspiracy.[3]  As one court recently noted in overturning the conviction of a defendant at the fringes of a drug conspiracy

---

[2]    Indeed, the government ultimately acknowledged that Oluigbo did not meet Jemy on September 30, 2006 and that he did not stay at Oluigbo's home.  [Tr. 6/24/08, 1027:13-18; 1030:19-25 ]**.**

[3]    Similarly, even if Oluigbo served as the operator for the $2000 Western Union transfer to Fomum-Tibah, the government did not introduce evidence to establish that Oluigbo had any knowledge of the purpose of the transfer.  The only other evidence related to this transfer was Fomum-Tibah's testimony that she asked Oruche for money and Oruche said he would tell Oluigbo to send a Western Union transfer to her.  There is no evidence to support a conclusion that Oluigbo should have known that the $2000 was to be used in connection with a drug conspiracy.

who engaged in ordinary, everyday activities, "caution must be exercised lest those engaged in normal associations and friendships become too readily inculpated." *United States. v. Lopac*, 411 F. Supp. 2d. 350, 367-68 (S.D.N.Y. 2006).

In sum, even when taken in the light most favorable to the government, the cumulative evidence introduced at trial amounts only to circumstantial evidence that Oluigbo was aware that some criminal conduct was occurring, was associated with individuals engaged in criminal conduct, and engaged in conduct that was as consistent with innocence as with guilt. No direct or circumstantial evidence established that Oluigbo knowingly agreed to join a drug conspiracy or intentionally took actions to further the conspiracy. No reasonable fact finder could have found Oluigbo guilty beyond a reasonable doubt.

## <u>CONCLUSION</u>

For the foregoing reasons, Joseph Oluigbo respectfully requests that this Court grant his motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33, and whatever other relief the Court deems proper.

Dated: New York, New York
     July 16, 2008

<div style="margin-left: 40%;">

Respectfully submitted,


<u>/S/ Andrew J. Ceresney</u>
Andrew J. Ceresney
Eric D. Meyer
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Counsel for Defendant Joseph Oluigbo*

</div>