86H7ORU1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                          07 CR 124 (WHP)

EMMANUEL ORUCHE and JOSEPH
OLUIGBO,

            Defendants.

------------------------------x

                         New York, N.Y.
                         June 17, 2008
                         9:45 a.m.

Before:

                HON. WILLIAM H. PAULEY III,

                               District Judge

                      APPEARANCES

MICHAEL J. GARCIA
     United States Attorney for the
     Southern District of New York
MICHAEL ROSENSAFT
VIRGINIA CHAVEZ ROMANO
     Assistant United States Attorneys

LAW OFFICE OF MARTIN STOLAR
     Attorneys for Defendant Emmanuel Oruche
MARTIN STOLAR
ZOE DOLAN

DEBEVOISE & PLIMPTON
     Attorneys for Defendant Joseph Oluigbo
ANDREW J. CERESNEY
ERIC MEYER
GORDON ENG
NEUMAN LEVERETT III

86HTORU4                          Rigby - direct

1    records and I testify to those records.

2    Q.   In your job as a records custodian are you familiar with

3    the way Western Union keeps records?

4    A.   Yes.

5    Q.   How does Western Union keep records?

6    A.   The records are kept by capturing the information input by

7    the Western Union agents when they send a money transfer.

8    Q.   How are these records kept?

9    A.   They're kept in a computer.

10   Q.   I'm passing you what's been previously marked for

11   identification as Government Exhibits 32.1 and 32.2.  Can you

12   take a look at those documents and tell me if you recognize

13   them?

14   A.   Yes, I recognize them.  These are Western Union money

15   transfers.

16   Q.   And how do you recognize them?

17   A.   I recognize the format, and I of course reviewed the

18   records that we provided.

19   Q.   Are those accurate copies of the records as they exist in

20   the Western Union systems?

21   A.   Yes, sir, they are.

22        MR. ROSENSAFT:  Your Honor, the government would offer

23   Government Exhibits 32.1 and 32.2 into evidence.

24        THE COURT:  Any objection?

25        MR. LEVERETT:  No, your Honor.

86HTORU4                          Rigby - direct

1              MS. DOLAN:  No, your Honor.

2              THE COURT:  All right.  Government Exhibits 32.1 and

3    32.2 are received in evidence.

4              (Government's Exhibit 32.1 and 32.2 received in

5    evidence)

6    Q.  Mr. Rigby, I want to take you through these records for a

7    little bit.  If you could first turn to Government

8    Exhibit 32.1.

9    A.  Okay.

10   Q.  And I see there are two pages in this exhibit.  Can you

11   identify what the first and second pages are?

12   A.  The first page is our money transfer record that is

13   captured and retained as a computer image.  The second page is

14   the check that is processed in payment of the money transfer.

15   We print a check, have the receiver endorse the check, and

16   usually they will cash the check on the spot.

17   Q.  Looking at the top of Government Exhibit 32.1, I want to

18   direct your attention to the upper top left which says payee

19   Rebecca Fomum-Tibah.  What does that indicate?

20   A.  That's the intended -- the receiver of this transaction was

21   Rebecca Fomum-Tibah.  It's the payee's name.

22   Q.  And then right across from that I see it has sender Nicole

23   Oruche?  What does that indicate?

24   A.  That indicates the sender is Nicole Oruche.

25   Q.  How does this information get put into your records?

86HTORU4                    Rigby - direct

1    A.   Our sending agent keyed that information in.

2    Q.   And when you say sending agent, what do you mean?

3    A.   Well, we have agents in the country.  We contract with

4    local businesses and food chains and check cashers and they

5    provide money transfer service to the public on behalf of

6    Western Union.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

86H7ORU5                          Rigby - direct

1    BY MR. ROSENSAFT:

2    Q.  Directing your attention to the fourth line, could you read

3    that?

4    A.  Paying city, Chicago.

5    Q.  What does that indicate?

6    A.  That's where the transfer was paid out.

7    Q.  Down a little bit more, where there is an open parentheses

8    and 300, on Government Exhibit 32.1, what does that indicate?

9    A.  That's the amount that was sent.

10   Q.  Finally, if I could direct your attention to the middle of

11   the page, I see a bunch of codes.  I want to take you through

12   them.  The line that starts REC equals 292, can you tell us

13   what that indicates on the form?

14   A.  Yes.  REC is abbreviation for record.  That means that's

15   when it was sent.  And the 292 is the operator number at the

16   location where the transfer was sent.

17   Q.  Where does this operator number come from?

18   A.  It's assigned to the person at the Western Union agent.

19   Q.  Do you know what operator corresponds to the operator

20   number 292?

21   A.  Yes, I've got some information.

22   Q.  Actually if you could look at the exhibits in front of you.

23   I guess I will direct your attention to Government Exhibit 32.2

24   on the last page.

25   A.  OK.  Thank you.  Yes, 292 belongs to Maria Tolentino.

86H7ORU5                      Rigby - direct

1            MR. STOLAR:  Spell that.

2            THE WITNESS:  T-O-L-E-N-T-I-N-O.

3   Q.  Now, referring back to Government Exhibit 32.1, after REC

4   equals 292, I see more information there.  Can you tell us what

5   that information indicates?

6   A.  Yes.  There is the date, July 27, 2006, and the time.

7   Q.  And then below that, in that line below, what information

8   is reflected in the line below in Government Exhibit 32.1 which

9   starts?

10  A.  The line below that starts out paying.  That's the date and

11  time that the transaction was paid out.

12  Q.  Now, you have referenced the operator number 292.  What is

13  this operator number?  What is an operator number?

14  A.  That's a number that's assigned to the employee at the

15  Western Union location.

16  Q.  Does the employee have to provide any other information

17  besides the operator number when they input this information?

18  A.  There is a password that goes along with it.

19  Q.  Finally, Government Exhibit 32.1, I want to direct your

20  attention to the bottom of that exhibit which starts Nicole

21  Oruche.  Can you tell us what's indicated in that line?

22  A.  Yes, that is the information the center provided us, the

23  name of Nicole Oruche, the address, city, state, zip.

24  Q.  What is the address?

25  A.  The address, 3682 White Plains Road, Bronx, New York.

86H7ORU5                      Rigby - direct

1   Q.   Now if I could take you to Government Exhibit 32.2.   What

2   is this document?

3   A.   This is also a Western Union money transfer document.

4   Q.   If you could again tell me at the top of the page, is the

5   payee and sender information indicated?

6   A.   Yes, it is, payee Rebecca Fomum, sender Nicole Oruche.

7   Q.   Again on this document, where the Western union money was

8   sent, is that indicated?

9   A.   Yes, it was sent to Chicago.

10  Q.   What about the amount, is that indicated on this record?

11  A.   Yes, the amount of $2,000.

12  Q.   Now, I want to direct your attention again to these codes

13  that are in the middle of the page.   REC equals 913.   Again, if

14  you could explain what that indicates.

15  A.   Of course.   REC means the date and time this was recorded.

16  The 913 is an operator number.

17  Q.   And do you know what name that operator number corresponds

18  to?

19  A.   Yes, 245 operator number corresponds to Joseph Oluigbo.

20  Q.   And then after the operator number, what information is

21  included in that line of Government Exhibit 32.2?

22  A.   The date it was sent, July 28, '06.

23  Q.   And is the time indicated?

24  A.   And the time 11:22 a.m.   That would be Eastern Time.   All

25  of our times are Eastern.

86H7ORU5                    Rigby - direct

1    Q.   Finally, at the bottom of the page, where it starts Nicole

2    Oruche there is a line.  Can you tell us what's indicated in

3    that line?

4    A.   Yes.  Nicole Oruche, that's in the center field, providing

5    an address of 3678 White Plains road in Bronx, New York.

6    Q.   And the sender name Nicole Oruche, who actually enters this

7    into the Western Union records?

8    A.   The Western Union agent, operator, at the Western Union

9    location.

10   Q.   Is that the same operator that corresponds to the number

11   that we just went over, 913?

12   A.   Yes.

13   Q.   Turning to the second, third pages of Government Exhibit

14   32.2, can you tell us what those documents are?

15   A.   Those are checks that were written out to pay out this

16   transaction.  We always write out a check, and then we have it

17   endorsed and usually cash the check for the recipient on the

18   spot.

19   Q.   And why are there two checks in this instance?

20   A.   The checks are only good for $1,000 or less, so this was

21   2,000, so that takes two checks to pay out this transaction.

22          MR. ROSENSAFT:  Your Honor, may I have one moment?

23          THE COURT:  Yes.

24   Q.   Mr. Rigby, just one more question, and I apologize if I

25   asked this before.  But on the second transfer, Government

86HTORU6                        Arthurton - direct

1    A.  By his voice and being told that he is utilizing the phone

2    when we were conducting surveillance on it.

3    Q.  And Joseph Oluigbo, who is that?

4    A.  Joseph Oluigbo is his business partner, if you will, that

5    works for him in his Nicobi Health Care store.

6            MR. CERESNEY:  Objection, your Honor, the

7    characterization of business partner.

8            THE COURT:  I'll sustain that objection and strike

9    that portion of Special Agent Arthurton's testimony.

10           Members of the jury, you're directed to disregard that

11   characterization.

12   Q.  How did you identify Joseph Oluigbo as a participant in

13   this call?

14   A.  Through his voice, many of the phone calls we have with

15   Joseph.  In fact he may have been one of the number one phone

16   calls that we received from Oruche.  In addition, Joseph worked

17   at the Nicobi Health Care store where he took care of business

18   in terms of whatever needed to be taken care of, bills, et

19   cetera, for the business for Emmanuel Oruche.

20   Q.  Did you conduct surveillance of Joseph Oluigbo?

21   A.  Yes, many times.

22   Q.  How often did you see him during the investigation?

23   A.  Depending upon who we're following on that particular day,

24   we followed Joseph usually from his house to Nicobi Health Care

25   to wherever he goes during the day.  But mainly he stays in the

408

86I7ORU1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.

                        07 CR 124 (WHP)

EMMANUEL ORUCHE and JOSEPH
OLUIGBO,

           Defendants.

------------------------------x

                        New York, N.Y.
                        June 18, 2008
                        9:35 a.m.

Before:

                HON. WILLIAM H. PAULEY III,

                              District Judge

                      APPEARANCES

MICHAEL J. GARCIA
    United States Attorney for the
    Southern District of New York
MICHAEL ROSENSAFT
VIRGINIA CHAVEZ ROMANO
    Assistant United States Attorneys

LAW OFFICE OF MARTIN STOLAR
    Attorneys for Defendant Emmanuel Oruche
MARTIN STOLAR
ZOE DOLAN

DEBEVOISE & PLIMPTON
    Attorneys for Defendant Joseph Oluigbo
ANDREW J. CERESNEY
ERIC MEYER
GORDON ENG
NEUMAN LEVERETT III

86IAAORU2                          Arthurton - Cross

1  midmorning recess now and maybe the government can help us out

2  now.

3           THE COURT:  Why don't you move to something else for a

4  short time then we will take our recess, Mr. Stolar.

5           MR. STOLAR:  Okay.

6  Q.  There are roughly four months of wiretapping on three

7  separate phones; is that correct?

8  A.  Correct.

9  Q.  How many phone calls were intercepted over the course of

10  the entire surveillance period, the wiretap period?

11  A.  On all three phones?

12  Q.  On all three phones.

13  A.  Thousands.

14  Q.  Thousands.  Did you ever count them up?

15  A.  I'm sure I did.  I don't know -- I think maybe three

16  thousand or more.

17  Q.  More than three thousand?

18  A.  I'm not sure.

19  Q.  Five thousand?

20           MR. ROSENSAFT:  Objection, your Honor.

21           THE COURT:  Sustained.

22  Q.  Now, some of those calls contained discussions about

23  business, did they not?

24           MR. ROSENSAFT:  Objection.

25           THE COURT:  Sustained.

86I7ORU3                          Arthurton - cross

1    A.  Is it a lot of resources?

2    Q.  Yes.  Is that a lot of resources?

3    A.  It depends on what the goal is, sir.

4    Q.  I'm not asking you about the goal.

5    A.  Right.

6    Q.  I'm just asking you is that a lot of government resources,

7    in your view?

8    A.  We could always have more, so in some sense it's enough and

9    sometimes it's not enough.  I mean it's all relative, sir.

10   Q.  You said there were about 14 agents that were intimately

11   involved in this investigation, right?

12   A.  Approximately.

13   Q.  Now, you knew during the course of this investigation where

14   Mr. Oluigbo lived, didn't you?

15   A.  Yes, I did.

16   Q.  You knew where he worked, right?

17   A.  Yes, I did.

18   Q.  You knew his phone numbers, didn't you?

19   A.  Yes, we did.

20   Q.  You knew what he looked like, didn't you?

21   A.  That is correct.

22   Q.  In fact you said you surveilled him many times, didn't you?

23   A.  That is correct.

24   Q.  And isn't it true during the whole time of this

25   investigation you never personally saw Mr. Oluigbo with drugs,

8617ORU3                          Arthurton - cross

1    correct?

2    A.  Personally, I've never seen him with drugs.

3    Q.  You never surveilled Mr. Oluigbo involved in a drug

4    transaction, correct?

5             MR. ROSENSAFT:  Objection.

6             THE COURT:  Overruled.

7    A.  Can you repeat the question?

8    Q.  You never surveilled Mr. Oluigbo involved in a drug

9    transaction, correct, a sale of drugs?

10   A.  Well, a drug transaction doesn't necessarily mean a sale,

11   sir.

12   Q.  A sale of drugs.

13   A.  A sale of drugs?

14   Q.  Yes.

15   A.  No.

16   Q.  Or a purchase of drugs.

17   A.  No.

18   Q.  You never surveilled Mr. Oluigbo taking someone to the

19   airport, correct?

20   A.  I personally did not, no.

21   Q.  You never surveilled Mr. Oluigbo picking somebody up at the

22   airport, correct?

23   A.  Not me personally, no.

24   Q.  By the way, when -- strike that.

             As part of your investigation, I think we have talked

86170RU3                           Arthurton - cross

1                  (In open court)

2            THE COURT:  The objection is overruled.  Put a

3      question to the witness.

4      BY MR. CERESNEY:

5      Q.  Agent Arthurton, did you testify one phone he used for more

6      legitimate business, and one phone he used for dirty business,

7      and one phone dirty with people, and more people had more?

8            Did you testify to that in the grand jury?

9      A.  That is correct.

10     Q.  OK.  Now, which phone did he use in your language for "more

11     legitimate business" of the three phones that you described?

12     A.  At the time I think I was referring to the 646 phone.

13     Q.  The 646 phone is the number you said he used for more

14     legitimate business, right?

15     A.  That's what I just said.

16     Q.  OK.  By the way, have you examined the telephone calls that

17     are admitted into evidence, the government put before you, that

18     relate to Mr. Oluigbo?  Have you examined those?

19     A.  Have I examined the phone calls in evidence referring to

20     Mr. Oluigbo?

21     Q.  Yes.

22     A.  Yes, I have.

23     Q.  And have you looked at the telephone numbers that Mr.

24     Touche used in each of those calls with Mr. Oluigbo?

25     A.  A good portion of 646.

86I7ORU3                        Arthurton - cross

Q.  Isn't it true that each and every call that was admitted
into evidence by the government at this trial involving Mr.
Oluigbo involved Mr. Oruche's 646 number?

A.  I guess so.  I'm not aware of all the calls, so if that's
true, then that's true.

Q.  OK.  Well, why don't we just look at -- do you want to take
a moment to look at them?

        Just take one moment.  Take your time.  Look at -- I
think there is less than ten calls with Mr. Oluigbo.  Tell me
whether all of those calls are Mr. Oruche's 646 number.

        THE COURT:  For the record, what exhibits have you
placed in front of the witness?

        MR. CERESNEY:  Yes, I apologize.  I put in front of
him 41T-1 through 41T-17, only some of which involve Mr.
Oluigbo.

Q.  Have you completed your review?

A.  I have.

Q.  And are all the calls involving Mr. Oluigbo, between Mr.
Oluigbo and Mr. Oruche, using Mr. Oruche's 646 number?

A.  That is correct.

Q.  OK.  Now, there were I think a few calls that you looked
at, and I'm going to ask you to look at 41T-2, 41T-4.  And
actually, your Honor, if we could just ask the jury just to
look in their binders.

        THE COURT:  Members of the jury, you can turn to the

86IAAORU6                          Fomum-Tibah - Direct

1              THE COURT:  Try to speak right into the microphone so

2     we can hear you.

3     A.   No.

4     Q.   When you say "earlier 2006" what do you mean?

5     A.   I mean in the earlier part of 2006 about when the first

6     four months or five months -- first four months.

7     Q.   How did you got your ticket to travel to Istanbul?

8     A.   Was purchased -- well, Joe called me that morning when,

9     after Emmanuel left to confirm how my name was to appear on

10    the, how my name appears on the ID card that I would be using.

11    My ticket was bought Online.

12    Q.   Who is Joe?

13    A.   Joe is Manny's should I say right-hand man?

14

15              MR. CERESNEY:  Objection.

16              THE COURT:  Overruled.

17    Q.   How would you describe your relationship between Joe and

18    Manny?

19    A.   Very close.

20    Q.   What do you mean by that?

21    A.   They shared both personal and business information.  Joe

22    will basically do a lot of the things that Manny asked him to

23    do.

24    Q.   When did you first meet Joe?

25    A.   About 2005.

86IAAORU6                    Fomum-Tibah – Direct

1   Q.  Do you know what Joe's last name is?

2   A.  I must have seen it somewhere but we weren't on a last name

3   basis.

4   Q.  How often did you see Joe since you first met him?

5   A.  Every time I would go to New York.

6   Q.  Could you look around the courtroom and tell me if you see

7   Joe in the courtroom?

8   A.  Yes, I do.

9   Q.  Can you describe where he is sitting, an article of

10  clothing that he is wearing?

11  A.  Second row and second from my left, blue shirt, glasses.

12          THE COURT:  All right.  The record should reflect that

13  Ms. Fomum-Tibah has identified the defendant Joseph Oluigbo.

14  Q.  So, you were speaking about a conversation that you had

15  with Joe on the phone about your ticket.  What, specifically,

16  did you and he say about your ticket?

17  A.  Not too much.  After my name we discussed the flight

18  schedules that he was looking at.

19  Q.  Then what happened?

20  A.  Later on Manny picked me up from the house from his

21  apartment and I went down there and I took over the computer

22  and continued and I did the reservations for the hotel.

23  Q.  Let me back you up a bit.  When you say you "went down

24  there" what do you mean?

25  A.  To the store.

86IAAORU6                      Fomum-Tibah - Direct                    584

1    Q.  How did you get to the store?
2    A.  Emmanuel picked me up from his apartment.
3    Q.  This is the store you talked about earlier?
4    A.  Yes, it is.
5    Q.  What happened when you got to the store with Manny?
6    A.  Joe was on the computer and I took over picking out which
7    hotels I would like to live in.
8    Q.  Did you see what Joe was doing on the computer before you
9    took over?
10   A.  He was looking at the hotels.
11   Q.  Before your trip?
12   A.  Yes.
13   Q.  Did you find a reservation for the hotel?
14   A.  Yes, I did.
15   Q.  Did you pay for the hotel?
16   A.  Yeah.  First, Manny called to find out if my selection was
17   close enough to where his contacts in Istanbul, then he let me
18   use his credit card to pay.
19   Q.  When you say your selection, the place you were going to
20   stay in Istanbul?
21   A.  Yes.
22   Q.  What happened next?
23   A.  We finalized that.  He gave me three thousand to give to
24   the people when I got to Istanbul.  He gay me one thousand five
25   machine for myself, total of four thousand five hundred

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IAAORU6                              Fomum-Tibah - Direct

1     dollars.

2     Q.   When you say "he"?

3     A.   Emmanuel.

4     Q.   Where did he give you this money?

5     A.   At the store.

6     Q.   Was Joe there when he gave you this money?

7     A.   I don't remember.  Joe was in the store but I don't

8     remember if he was standing close by.

9     Q.   So after you were given this money by Emmanuel Oruche what

10    did you do next?

11    A.   We talked some more.  He told me not to discuss his

12    business with the people when I got there.  And he took me to

13    the airport.

14    Q.   What, if any, instructions did you receive about what to do

15    when you got to Istanbul?

16    A.   Well, he said that when I got there they were going to give

17    me a phone that I could use to call him on and also the number,

18    that I would the number to contact Chuka who was the person he

19    was supposed to meet.

20    Q.   And, again, when you say "he" you are referring to Emmanuel

21    Oruche?

22    A.   Yes.

23    Q.   Did you have any discussion with Emmanuel Oruche about how

24    you should act when you got to the airport?

25    A.   Yes.

86IAAORU6                          Fomum-Tibah - Direct

1    Q.  What did you say and what did he say in those discussions?

2    A.  Look presentable and just be myself.

3    Q.  Who said that?

4    A.  Emmanuel.

5    Q.  Did you make it to Istanbul?

6    A.  Yes, I did.

7    Q.  What happened when you arrived in Istanbul?

8    A.  I went to the transportation got a taxi and went to the

9    hotel.

10   Q.  What did you do when you got to the hotel?

11   A.  I called the number that he had given me.

12   Q.  And again, did --

13   A.  Emmanuel.

14   Q.  What happened when you made this call?

15   A.  And he asked what room I was in.  I told him and he said

16   he'll be there.

17   Q.  Please, try to make sure when you are going to say "he" you

18   are saying who you are referring to?

19   A.  I called the number he had given me for Chuka and Chuka

20   said he would be there.  So a few minutes later he came.

21   Q.  What happened when Chuka arrived at your hotel?

22   A.  I went down and I saw him.  He came with another boy,

23   another man.

24   Q.  What conversations, if any, did you have at that point with

25   Chuka?

86IAAORU6                    Fomum-Tibah - Direct

1    Q.   What happened after you got through Customs?

2    A.   I came out of the luggage claim and passed the last few

3    officers and Joe was standing where you have families and

4    friends wait for their loved ones or people they are expecting.

5    Q.   Is this the same Joe you identified before?

6    A.   Yes.

7    Q.   What, if anything, did Joe say to you?

8    A.   He welcomed me back and I asked for Manny and he said

9    somewhere around and we walked down a little and Manny joined

10   us.

11   Q.   What happened to your bag?

12   A.   Joe had it.  Joe took my bag.

13   Q.   You picked up your bag first?  Who picked up the bag from

14   where the bags are let off from the airlines?

15   A.   I did.  He only took the bags from me when I came out.

16   Q.   So then you walked out of the airport with Joe and Emmanuel

17   Oruche?

18   A.   Yes.

19   Q.   What happened next?

20   A.   We got in the car and on my way to Istanbul I was put on

21   oxygen.  I wasn't feeling good and we talked a little about

22   that.  And Manny said you could not swallow, huh?  And I said,

23   yes.

              MR. ROSENSAFT:  Would you like it read back?

              THE COURT:  Could you read back for Mr. Stolar the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

86JTORU1

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA,
3
4          v.                              07 CR 124 (WHP)
4
5  EMMANUEL ORUCHE and JOSEPH
5  OLUIGBO,
6
6          Defendants.
7
7  ------------------------------x
8
8                                     New York, N.Y.
9                                     June 19, 2008
9                                     9:45 a.m.
10
10
11  Before:
11
12          HON. WILLIAM H. PAULEY III,
12
13                                     District Judge
13
14
14                  APPEARANCES
15
15  MICHAEL J. GARCIA
16      United States Attorney for the
16      Southern District of New York
17  MICHAEL ROSENSAFT
17  VIRGINIA CHAVEZ ROMANO
18      Assistant United States Attorneys
18
19  LAW OFFICE OF MARTIN STOLAR
19      Attorneys for Defendant Emmanuel Oruche
20  MARTIN STOLAR
20  ZOE DOLAN
21
21  DEBEVOISE & PLIMPTON
22      Attorneys for Defendant Joseph Oluigbo
22  ANDREW J. CERESNEY
23  ERIC MEYER
23  GORDON ENG
24  NEUMAN LEVERETT III
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

607

86JTORU1                          Fomum-Tibah - direct

1   corner, and shortly after Emmanuel joined us.
2   Q.  Sorry, and?
3   A.  Emmanuel joined us.
4   Q.  And once Emmanuel met up with you, where did you go?
5   A.  Proceeded to his car.
6   Q.  What kind of car was it?
7   A.  Cadillac SUV.
8   Q.  What happened when you got in the car?
9   A.  They both sat in front and I sat behind between the two of
10  them.
11  Q.  When you say between the two of them, can you describe kind
12  of more specifically how the car was set up?
13  A.  There's the driver's seat and the passenger seat, front
14  seat, and the back long seat, and I sat right in the middle.
15  Q.  What happened on the way home or when you got in the car?
16  A.  Well, we chitchatted a little, and on my way to Istanbul I
17  was put on oxygen, we talked about that a little bit.  And he
18  asked you could not swallow, huh?  And I said yes.
19  Q.  When you say he asked you --
20  A.  Emmanuel.
21  Q.  Where was Emmanuel sitting when he asked you that?
22  A.  On the passenger side.
23  Q.  And you were in the back?
24  A.  Yes.
25  Q.  And where was Joe sitting?

608

86JTOPU1                          Fomum-Tibah - direct
1   A.  Driver's seat.
2   Q.  What happened then?
3   A.  We proceeded and we went to Emmanuel's apartment.
4   Q.  What happened when you got to Emmanuel's apartment?
5   A.  I went into the room and I removed the package from my bag
6   and give it to him, Emmanuel.
7   Q.  And where was Joe when you gave when package to him?
8   A.  In the living room.
9   Q.  And did there come a time when you made a second trip to
10  Istanbul?
11  A.  Yes.
12  Q.  When was that, approximately?
13  A.  About a month, a few weeks after the first trip.
14  Q.  How did that come about?
15  A.  The proceeds from the drugs that I brought the first time,
16  Emmanuel said he owed a lot of people that he owes, going to
17  use that to pay off some of the debts that he had and use the
18  other part to reinvest, that way more money to could come in.
19          One of the ways he was going to reinvest that was in
20  his friends Peter and Paul who would also bring drugs from
21  Istanbul.  When Paul brought drugs Manny left those drugs in my
22  car, in my van.  I was getting ready to pick up a client of
23  mine and looking over the car I saw the drugs, and as usual,
24  when I called him, he doesn't answer his phone right away.  I
25  was also still very mad at him, things had not changed, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

610

86JTORU1                          Fomum-Tibah - direct

1   that trip because Paul just came back from Istanbul and I knew
2   he had drugs.
3   Q.  Did you ever open the bag?
4   A.  Yes, when I got to Ed.
5   Q.  And you mentioned you called Ed, who is Ed?
6   A.  Ed is Emmanuel's buyer.
7   Q.  What happened when you called Ed?
8   A.  Luckily Ed was -- or not luckily, he was just down the
9   street, and he told me to meet him at a restaurant down the
10  street.  I told him I had something for him.
11  Q.  Why did you call Ed?
12  A.  I was really being -- when I first saw it in my car I
13  didn't like the fact that it was in my car, especially my
14  business van, and I wanted to be spiteful to Manny.
15  Q.  What was your intention?
16  A.  My intentions were to give it to Ed and take some money
17  from Ed.
18  Q.  And keep the money?
19  A.  Yes.
20  Q.  So what happened after you called Ed?
21  A.  He told me to meet him at a restaurant down the street.
22  And I did.
23  Q.  What happened at that meeting?
24  A.  Well, he was with another friend and he moved, he came to
25  the window, and I showed him what was there, he opened it, he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JTORU1                         Fomum-Tibah - direct
1    went back and brought his -- the way to measure quantity.
2    Q.  He brought something that could measure the amount of
3    drugs?
4    A.  Yes.
5    Q.  Then what happened?
6    A.  He did that.  He said he only had 14,000 because he wasn't
7    ready, and he gave me the 14,000.  And he was trying to tell me
8    to pick up the rest later on.  I was like he can just take care
9    of that with Emmanuel.
10   Q.  Did you see how much the drugs weighed?
11   A.  Yes.
12   Q.  How much did they weigh?
13   A.  About half a key.
14   Q.  That's half a kilogram?
15   A.  Yes.
16   Q.  And when you say he gave you 14,000, he gave you $14,000?
17   A.  Yes.
18   Q.  What specifically was said, what did Ed say specifically
19   after that?
20   A.  He told me he only had 14,000 on him, and that I could meet
21   up with him later on to get the balance, because it was
22   supposed to be about 60,000, 62, actually.
23   Q.  What was your response?
24   A.  I was like it was okay, he could just take care of the
25   balance with Emmanuel.

86JTORU1                    Fomum-Tibah - direct

1    Q.  What happened from there?
2    A.  I continued to call Ed, Emmanuel continued to call Ed and
3    Ed's wife, and we did not get the right feedback.
4    Q.  Did you ever -- how did the situation with Ed resolve
5    itself?
6    A.  Well, it never really did, because after that I was making
7    a trip to go to Istanbul and make up for the balance of the
8    money.  Joe was calling me, Paul was calling me, Emmanuel was
9    calling me.  Joe told me Manny's car, that Paul had used the
10   rock to shoot Manny's car, that people were threatening him
11   that he is in so much debt.  Those were the kinds of calls I
12   was getting on a regular basis.
13   Q.  When you say Joe, are you referring to the same Joe you
14   were referring to yesterday?
15   A.  Yes, sir.
16   Q.  What specifically did he tell you?
17   A.  Well, he started off by saying that I'm a good girl, that
18   naturally if I had done what I did something had to have pushed
19   me to that point, that he just wanted to talk and see how this
20   could be resolved because Manny was really having a lot of
21   trouble back there in New York.
22   Q.  So what happened next?
23   A.  I suggested after a while that I would make a trip to
24   Istanbul and see if I could -- the drugs that I bring could
25   make up for the balance.  And at that point Manny was like he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JTORU1                    Fomum-Tibah - direct                    615

1   didn't have any money, he could not deal with that, he could
2   not afford to pay for another trip.  So I said I would do it if
3   it was going to make the situation go away.
4   Q.  Did you go back to Istanbul?
5   A.  Yes, I did.
6   Q.  And when was that, approximately?
7   A.  A month and a few weeks after the first trip.
8   Q.  And what preparations, if any, were made for that trip?
9   A.  Not very much.  Just the same number for Chuka where I was
10  to call.
11  Q.  When you say the same number, how did you obtain that
12  number?
13  A.  From Emmanuel.
14  Q.  How was your ticket purchased for that trip?
15  A.  I did that from a debit card.
16  Q.  And why did you purchase the ticket this type?
17  A.  At that point Emmanuel said he didn't have any money.
18  Q.  Where did you fly from for your second trip?
19  A.  New York.
20  Q.  What happened when you got to Istanbul?
21  A.  I went to the same hotel and I called Chuka.
22  Q.  What happened after you met with Chuka?
23  A.  He came over and we talked a little.  Most of what he
24  wanted to talk about was the incident that happened back in
25  Michigan with the drugs that Paul had brought.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

616

86JTORU1                        Fomum-Tibah - direct

1    Q.  What did they say about that?
2    A.  They wanted to know how that happened and why I did what I
3    did, and what the situation was when I was there before I got
4    to Istanbul.
5    Q.  Did you have any conversations between you and Emmanuel
6    Oruche once you got to Istanbul?
7    A.  Yes.
8    Q.  What did you say and what did he say in those
9    conversations?
10   A.  Basically how was your trip.  He also talked to Chuka and
11   the other guys that were there, and he was supposed to see if
12   they would be able to give me the drugs.
13   Q.  What happened next?
14   A.  Well, they asked me if I had some money.  I went and did a
15   Western Union withdrawal for $2,000 -- sorry, debit withdrawal
16   for $2,000.
17   Q.  Where was that withdrawal from?
18   A.  My business checking account.
19   Q.  What did you do with that money?
20   A.  I gave it to Chuka.
21   Q.  And why did you give him $2,000?
22   A.  The balance of the drugs.
23   Q.  What happened after than point?
24   A.  They started complaining and saying the person they had to
25   buy the drugs from to give it to me wasn't back yet.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

617

86JTORU1                          Fomum-Tibah - direct

1   Q.  How did things proceed from there?
2   A.  I extended my trip a day later to wait for this person but
3   the person never came.  Emmanuel thought it was because of the
4   whole situation they wasn't trusting me too much.
5   Q.  Was that a conversation that you had with Emmanuel Oruche?
6   A.  Yes.
7   Q.  When was that, approximately?
8   A.  Right before I extended my trip for one day.
9   Q.  So while you were in Istanbul?
10  A.  Yes.
11  Q.  So after you extended your trip one day, what happened on
12  the next day?
13  A.  They still did not bring the drugs.  I left, but before
14  leaving Emmanuel said he was going to take care of the 2,000
15  balance, which before that Chuka had said that they were going
16  to find another transporter to bring me drugs or to bring the
17  drugs in that amount.
18  Q.  And when you say to bring the drugs, you mean bring the
19  drugs back to the United States?
20  A.  Yes.
21  Q.  So did you take any drugs back with you on your second trip
22  to Istanbul?
23  A.  No.
24  Q.  What happened when you got back home from Istanbul from
25  your second trip?

86JTORU1                          Fomum-Tibah - direct                          618

1   A. I came to the airport and I had to get another ticket for
2   Michigan. I met with Emmanuel at the airport and we went to
3   another terminal and I finally got a ticket and I flew to
4   Michigan.
5   Q. So where did you fly into from Istanbul?
6   A. I forgot which exact airport, I believe it was -- it was
7   Delta, JFK though, I don't know if it was Delta at that time
8   or --
9   Q. Then from JFK you flew back to Michigan?
10  A. Yes.
11  Q. What, if any, conversations did you have with Emmanuel
12  Oruche regarding this failed trip?
13  A. He was still disappointed because things had not changed.
14  He complained about the calls he was still getting. He didn't
15  know what he was going to do with Paul. He said he still owed
16  the people in Istanbul, and he said it's because of the whole
17  thing, when things like that start happening people are not as
18  trusting to give out drugs.
19  Q. Did you go back to Istanbul after that second time?
20  A. Yes, I did.
21  Q. When was that?
22  A. A month and a few weeks after.
23  Q. Do you remember what month specifically?
24  A. August.
25  Q. How did that trip come about?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

86JTORU1                          Fomum-Tibah - direct

1    Q.  Why did you go to Chicago to get that visa?
2    A.  Because Michigan did not have an embassy for London.
3    Chicago was the closest thing.
4    Q.  What happened when you got to Chicago?
5    A.  I went upstairs and I needed an address in London where I
6    would be staying, and I called Emmanuel, he called a girl Ida,
7    his brother's -- the mother of his brother's son in London who
8    gave me her address on a three-way call to Emmanuel.
9    Q.  So you had to provide where you would be staying in London
10   in order to get your visa?
11   A.  Yes.
12   Q.  Did you have to give any other information to get your
13   visa?
14   A.  Yes, I needed to show some money, like a traveler's check.
15   Q.  How did you do that?
16   A.  I called Emmanuel and I told him about it.  He said he
17   wasn't at the store but he was going to have Joe wire the money
18   by Western Union.
19   Q.  And then what happened?
20   A.  When I called -- Joseph Oluigbo called later, sorry, and he
21   told me that the money was sent, I should receive it as it has
22   been sent by Nicole Oruche, who is Manny's daughter.
23   Q.  Do you know Nicole Oruche?
24   A.  Yes, I do.
25   Q.  How old was she at that time?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86J7ORU2                    Fomum-Tibah - direct

1   uncomfortable.  They called and Amika said it would be
2   preferable if I wore tight jeans.  And when Manny also called
3   that morning I told him that I was uncomfortable but Amika had
4   told me to wear tight jeans, and he said if Amika said that,
5   then that's a good idea.
6   Q.  Did you fly out of Istanbul?
7   A.  Yes, I did.
8   Q.  What happened when you got to the United States?
9   A.  I got arrested at the airport.
10  Q.  Can you specifically take us through what happened from
11  when you entered the airport.
12  A.  Yes.  When I got to the airport I gave them my passport,
13  and the guy looked at it, and he took me to a little room to
14  the side.  In that room an agent asked me what I was doing in
15  Istanbul, and I told him I was going to by clothes for sale.
16  Q.  Was that true?
17  A.  No.
18  Q.  Why did you tell him you went to buy clothes?
19  A.  That was the story that Emmanuel said I was allowed to say,
20  and I was also given money to shop.
21  Q.  After your arrest did you meet with prosecutors from the
22  United States attorney's office?
23  A.  Yes, I did.
24  Q.  How soon did you meet with them after your arrest?
25  A.  Few weeks.  Few weeks.

626

86J7ORU2                    Fomum-Tibah - direct

```
 1    Q.  Were you truthful with them?
 2    A.  No.
 3    Q.  What did you lie about?
 4    A.  A lot of things.
 5    Q.  Can you tell us specifically?
 6    A.  That I was raped to get the vaginal insert to fit.  I lied
 7    that I was coerced to go get the drugs.  I don't remember all
 8    of what I said.
 9    Q.  Why did you tell them that you were raped?
10    A.  I was hoping they would feel sorry for me and let me go.
11    Q.  Did you admit that you went to Istanbul three different
12    times to bring back drugs?
13    A.  I admitted going to Istanbul three times, but I said I
14    didn't bring drugs the other first two times.
15    Q.  Why did you lie about that?
16    A.  Well, talking to Emmanuel, he said that they could only
17    charge me with what they found me with, and gave me the idea
18    that I would get in more trouble if I mentioned the other
19    times.
20    Q.  Did you finally admit to the U.S. attorney's office that
21    you lied?
22    A.  Yes, I did.
23    Q.  And what did you tell them?
24    A.  The true story that --
25              MR. CERESNEY:  Can we get a time frame, your Honor?
```

86J7ORU2                      Fomum-Tibah - direct

1   A.  Yes.
2   Q.  And you said before that you gave the drugs to Emmanuel,
3   right?
4   A.  Yes.
5   Q.  Where were you specifically in the apartment when you gave
6   the drugs to Emmanuel?
7   A.  In Emmanuel's room.
8   Q.  And where was Joe when you were giving drugs to Emmanuel?
9   A.  In the living room.
10  Q.  Now, you said you lied to the government in your proffer
11  sessions with them, correct?
12  A.  Yes.
13  Q.  Were you truthful to the government about Emmanuel Oruche's
14  full involvement in your proffer sessions at first?
15  A.  At that time I was mostly concerned about feeling sorry for
16  me and letting me go, so I don't remember how much I told them
17  about Emmanuel.
18  Q.  Did you tell them about Emmanuel's involvement in your
19  first trip to Istanbul?
20  A.  I think so.  I am not quite sure.
21  Q.  Did you admit to bringing back drugs on that first trip?
22  A.  No.
23  Q.  Did you admit to giving drugs to Emmanuel on that first
24  trip?
25  A.  No.

86J7ORU4                    Fomum-Tibah - cross

1    Q.  How about somebody named Leroy?  Did you also talk to them
2    about criminal conduct by somebody named Leroy during this
3    meeting, right?
4    A.  I might have, yeah.
5    Q.  Ms. Fomum-Tibah, at this April 25, 2007 meeting, after four
6    months of thinking about additional information, in the sixth
7    proffer with the government you did not mention Mr. Oluigbo a
8    single time, isn't that true?
9    A.  I don't remember all that was said.
10   Q.  Take a look, tab 17, a three-page document.  Take your time
11   and tell me whether that refreshes your recollection that at
12   the April 25, 2007 proffer you did not mention Joseph Oluigbo a
13   single time.
14   A.  It doesn't say his name.
15            THE COURT:  Mr. Ceresney, is this an appropriate time
16   to recess?
17            MR. CERESNEY:  A good time, your Honor.
18            THE COURT:  All right.  Members of the jury, we're
19   going to take our luncheon recess now.  Keep an open mind and
20   come to no conclusions.  Don't discuss the case among
21   yourselves or with anyone else.  We're going to resume promptly
22   at 2:15.
23            Please recess the jury.
24            Ms. Fomum-Tibah, you may step down.
25            (Jury not present)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

86J7ORU4                    Fomum-Tibah - cross                    703

1   2, 2007 you had another proffer with the government?
2   A.  Yes, sir.
3   Q.  OK.  So at that point you had proffers on September 7,
4   September 13, October 3, December 12, April 25 and now another
5   proffer July 2, right?
6   A.  Yes, sir.
7   Q.  It's your sixth proffer, right?
8   A.  About that.
9   Q.  And Mr. Oluigbo had been arrested by that point, hadn't he?
10  A.  Yes, sir.
11  Q.  You knew that it might be helpful to you to provide
12  information on Mr. Oluigbo, didn't you?
13  A.  Yes, sir.
14  Q.  And the government asked you some questions about Mr.
15  Oluigbo during that proffer, didn't they?
16  A.  I don't remember.
17  Q.  Do you have any recollection at all of the questions the
18  government asked you about Mr. Oluigbo during that proffer?
19  A.  No, sir.
20  Q.  Do you have any recollection sitting here today -- and I'm
21  looking for your best recollection -- of telling the government
22  anything about Mr. Oluigbo during that July 2nd proffer?
23  A.  No, sir.
24  Q.  Now, after that meeting the government told you they would
25  not sign you up to a cooperation agreement, right?

86J7ORU4                      Fomum-Tibah - cross                      704

1    A.  Yes, sir.
2    Q.  You had now had six meetings with the government, right?
3    A.  Yes, sir.
4    Q.  You had spent hours and hours with them, correct?
5    A.  Yes, sir.
6    Q.  And you were still facing a pretty lengthy jail sentence,
7    correct?
8    A.  Yes, sir.
9    Q.  And you were still facing certain deportation, correct?
10   A.  Yes, sir.
11   Q.  And you had now been sitting in jail almost a year, hadn't
12   you?
13   A.  Yes, sir.
14   Q.  You were getting concerned, very concerned about the fact
15   that you didn't have a cooperation agreement yet, isn't that
16   right?
17   A.  I had some concerns.
18   Q.  You weren't concerned?
19   A.  I had some concerns.
20   Q.  OK.  Let me just understand your answer.  Were you very
21   concerned at that point?
22   A.  Yes, sir.
23   Q.  Can we agree you were desperate?
24            MR. ROSENSAFT:  Objection, your Honor.
25            THE COURT:  Sustained.

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

86J7ORU4                          Fomum-Tibah - cross

1   Q.  Were you desperate?
2   A.  Yes.
3   Q.  You wrote another letter to the government, didn't you?
4   A.  Yes.
5   Q.  A letter to Jessy Furman, the assistant United States
6   attorney, didn't you?
7   A.  Yes.
8   Q.  Let me show you 3501-16.  Open up to tab 19 in your binder.
9   Sorry.  3501-6.
10        Can you take a look at that letter?  Do you see the
11  second page, the signature on that letter?
12  A.  Yes, sir.
13  Q.  Is that your signature?
14  A.  Yes, sir.
15  Q.  Is that dated July 30, 2007?
16  A.  Yes, sir.
17  Q.  Is that 28 days after your proffer with the government?
18  A.  Yes, sir.
19        MR. CERESNEY:  Your Honor, I offer Defendant's Exhibit
20  3501-06 into evidence.
21        MR. ROSENSAFT:  No objection for the limited purpose.
22        THE COURT:  All right.  Mr. Stolar.
23        MR. STOLAR:  Certainly no objection here, Judge.
24        THE COURT:  All right.  Members of the jury, I'm going
25  to receive 3501-06 in evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86J7ORU4                          Fomum-Tibah - cross

1  A.  Yes, sir.
2  Q.  Now, the government had asked you questions about Joe
3  before, right?
4  A.  Yes, sir.
5  Q.  You couldn't remember that information before, is that what
6  you're saying in this letter?
7  A.  Yes, sir.
8  Q.  And finally in July of 2007, almost one year after your
9  arrest, you remembered information about Joe.  Is that what you
10  were saying in this letter?
11  A.  Repeat that question again.
12  Q.  One year after your arrest, July 30, 2007, after six
13  proffers with the government, almost a year, you now remembered
14  information about Joe, correct?
15  A.  Yes, sir.
16  Q.  You had not remembered that information before, correct?
17  A.  I don't think so.
18  Q.  Now, you didn't just write Mr. Furman, isn't that right?
19  Did you write Mr. Trisone as well on the same day?
20  A.  Trisone, yes.
21  Q.  Have I been mispronouncing his name?
22  A.  I don't know.  That's what I know him to be.
23  Q.  OK.  Take a look at tab 20.  Do you see that letter?  Do
24  you see your name on tab 20, which is 3501-25?
25  A.  Yes, sir.

720

86JTORU5                         Fomum-Tibah - cross

1   the government with information; correct?
2   A.  Yes, sir.
3   Q.  You knew at that time that Mr. Oluigbo had pled not guilty,
4   didn't you?
5   A.  Yes, sir.
6   Q.  You knew Mr. Oluigbo at that time was planning on going to
7   trial, didn't you?
8   A.  I'm not quite sure.
9   Q.  You had previously met with the government and provided
10  information about Mr. Oruche; correct?
11  A.  Yes, sir.
12  Q.  You had provided information on at least ten other people;
13  correct?
14  A.  About that.
15  Q.  You still hadn't gotten your cooperation agreement; right?
16  A.  Yes, sir.
17  Q.  And then for the first time in January 2008 in this
18  proffer, one and a half years after your arrest, you told the
19  government information about Mr. Oluigbo regarding some
20  conversations when you returned from Istanbul on your first
21  trip; correct?
22  A.  I think so.
23  Q.  And in fact in this meeting was the first time you told the
24  government anything about Mr. Oluigbo other than the fact that
25  he had once picked you up at the airport and that he was when

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JTORU5                              Fomum-Tibah - cross

1    Oruche's, quote, errand boy, unquote; correct?
2    A.   I don't remember.
3    Q.   Do you have any recollection, sitting here today -- again
4    I'm asking about events that were six months ago -- do you have
5    any recollection of ever telling the government prior to
6    January 14, 2008 anything about Mr. Oluigbo other than that he
7    drove you back from the airport on one occasion and that he was
8    Mr. Oruche's quote, unquote, errand boy?
9    A.   No.
10   Q.   You met with the government on a couple of other occasions
11   after that, didn't you?
12   A.   Yes.
13   Q.   And then May 6, 2008 you were presented with a cooperation
14   agreement; right?
15   A.   Again the date.
16   Q.   Take a look at tab 27 in the binder before you, I think
17   this was offered by the government, I believe it's Government
18   Exhibit 49 already in evidence.  It's the cooperation
19   agreement.  Take a look at the date on the top of the
20   cooperation agreement.  May 6, 2008?
21   A.   Yes, sir.
22   Q.   Is that the date you got that cooperation agreement?
23   A.   Yes, sir.
24   Q.   That's about a month and a half ago; right?
25   A.   Yes, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JTORU5                          Fomum-Tibah - cross

1    middle of the page and then close the binder, please.
2              MR. ROSENSAFT:  Objection, your Honor, she hasn't
3    testified that she doesn't remember anything as of yet.
4              MR. CERESNEY:  I asked her whether she recalled saying
5    that.
6              THE COURT:  Overruled.
7    Q.  You can close the binder.  And this I think is a yes or no
8    question.  Does that refresh your recollection that you told
9    the government three weeks ago that you had $3,000 in Turkey,
10   not $4,500?
11   A.  By 3,000 I was --
12   Q.  Yes or no.
13             THE COURT:  You can answer the question yes or no.  If
14   you can't answer the question yes or no tell that to
15   Mr. Ceresney and it will be up to him to decide how to proceed.
16   A.  I can't answer that question yes or no.
17   Q.  Okay.  Let me move on.  When you testified yesterday --
18   actually I think you testified earlier today that you had
19   previously, when you were first arrested, told the government
20   that you were raped on your last trip to Istanbul; correct?
21   A.  Yes, sir.
22   Q.  Tell us what you told the government about that rape on
23   September 7, 2006.
24   A.  That it was so that my vaginal inserts would fit.
25   Q.  You were raped so that vaginal inserts would fit, that's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JTORU5                    Fomum-Tibah ~ cross                    735

1   what you told the government?
2   A.   Yes, sir.
3   Q.   And you told the government that was after you had
4   swallowed the 83 pellets; right?
5   A.   Yes, sir.
6   Q.   That was a lie?
7   A.   I think so.
8   Q.   That was a lie, wasn't it?
9   A.   Yes, sir.
10  Q.   There was no rape, was there?
11  A.   No.
12  Q.   You also I think testified this morning about your second
13  trip to Istanbul, and I think you testified on this trip you
14  didn't try to swallow drugs; correct?
15  A.   Yes, sir.
16  Q.   Do you recall on September 7th, 2006 telling the government
17  that in fact you had tried to swallow drugs on this occasion?
18  A.   I don't remember.
19  Q.   Let me ask you to turn to tab 4, 3501-05.  Direct your
20  attention to paragraph 23, read that paragraph and then close
21  your binder.
22  A.   You said tab 4, paragraph 3?
23  Q.   Paragraph 23.  When you're done close the binder.
24          Does that refresh your recollection that on
25  September 7, 2006, in discussing the second trip to Istanbul,

86NHORU1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          07 CR 124 (WHP)

5   EMMANUEL ORUCHE and JOSEPH
    OLUIGBO,
6
              Defendants.
7
    ------------------------------x
8
                                        New York, N.Y.
9                                       June 23, 2008
                                        9:45 a.m.
10

11  Before:

12              HON. WILLIAM H. PAULEY III,

13                                      District Judge

14
                        APPEARANCES
15
    MICHAEL J. GARCIA
16       United States Attorney for the
         Southern District of New York
17  MICHAEL ROSENSAFT
    VIRGINIA CHAVEZ ROMANO
18       Assistant United States Attorneys

19  LAW OFFICE OF MARTIN STOLAR
         Attorneys for Defendant Emmanuel Oruche
20  MARTIN STOLAR
    ZOE DOLAN
21
    DEBEVOISE & PLIMPTON
22       Attorneys for Defendant Joseph Oluigbo
    ANDREW J. CERESNEY
23  ERIC MEYER
    GORDON ENG
24  NEUMAN LEVERETT III

25

86NHORU3                          Sy - direct
1   Q.  Again, if you could just describe what is happening in this
2   picture in relation to your surveillance that day.
3   A.  Yes.  The subject in the multicolored shirt is entering
4   Emmanuel's vehicle with the bag.
5   Q.  So this was after he had gone up to his room and come back
6   down with the bag?
7   A.  Yes, it is.
8           MR. ROSENSAFT:  Again if we could turn to the next
9   exhibit, Government Exhibit 42.5.
10  Q.  And again, this is the individual entering the car?
11  A.  Correct.
12  Q.  Finally the last exhibit, Government Exhibit 42.6.  Can you
13  describe what is happening in this exhibit as it relates to
14  your surveillance that day?
15  A.  That is a few moments before they were leaving or departing
16  from the hotel.
17  Q.  Emmanuel Oruche and the individual and his bag were all in
18  the car departing together, is that correct?
19  A.  That is correct.
20  Q.  Now let me take you forward a bit to February 28, 2007.
21          Were you assisting with this same investigation on
22  that day?
23  A.  Yes, I was.
24  Q.  What were you doing as part of the investigation on that
25  day?

915

86NHORU3                          Sy - direct

1   A.  I was part of the arrest team of Joseph Oluigbo.
2   Q.  Approximately when did you arrest him?
3   A.  The early morning hours.
4           MR. ROSENSAFT:  Can I have one moment, your Honor?
5           THE COURT:  Take your time.
6           (Pause)
7   Q.  I'm passing you what's been marked as Government Exhibit 48
8   for identification.  Please take a look at that and tell me if
9   you recognize it.
10  A.  Yes, I do.
11  Q.  What do you recognize that to be?
12  A.  Joseph Oluigbo's cell phone.
13  Q.  How do you recognize that?
14  A.  I recognize it because of the Playboy bunny insignia on the
15  cover.
16  Q.  Have you seen that phone before?
17  A.  Yes, I have.
18  Q.  When did you see it before?
19  A.  Inside of Joseph Oluigbo's residence on the date of arrest.
20  Q.  What happened to that phone on the date of arrest?
21  A.  I received it from either his girlfriend or his wife Martha
22  Enyioko, I believe is her name.
23          MR. ROSENSAFT:  Your Honor, the government would offer
24  Government Exhibit 49 into evidence.
25          THE COURT:  Any objection?  Mr. Stolar.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

916

86NHORU3                          Sy - direct
 1              MR. STOLAR:  I'm not sure I have standing, but no.
 2              THE COURT:  Every defendant has standing on any
 3      exhibit.
 4              Mr. Meyer.
 5              MR. MEYER:  No objection.
 6              THE COURT:  All right.  Government Exhibit 49 is
 7      received in evidence.
 8              MR. ROSENSAFT:  Your Honor, I misspoke.  Your Honor,
 9      it is Government Exhibit 48.
10              THE COURT:  Government Exhibit 48 is received in
11      evidence.
12              (Government Exhibit 48 received in evidence)
13              MR. ROSENSAFT:  Your Honor, I would like to publish it
14      to the jury.
15              THE COURT:  You may.
16      Q.  Now, what did you do with that phone after you seized it?
17      A.  Special Agent Jeffrey Senn and myself brought it back to
18      our office and we looked at the phone numbers and took note of
19      it.
20      Q.  What did you find when you looked at the phone numbers?
21              MR. STOLAR:  Objection.
22              THE COURT:  Overruled.
23      A.  Many phone numbers, the most recent contacts, like a phone
24      book list inside.
25      Q.  I am passing you what's been previously marked as
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

86NHORU3                      Sy - direct
1   Government Exhibits 48.1P through 48.5P.
2           Can you tell me if you recognize those exhibits.
3   A.  Yes, I do.
4   Q.  How do you recognize them?
5   A.  By the names.
6   Q.  Had you seen those pictures before?
7   A.  Yes, I have.
8   Q.  What do you recognize them to be?
9   A.  The names and phone numbers inside of Joseph Oluigbo's
10  phone.
11  Q.  Are those fair and accurate depictions of some of the phone
12  numbers and names that you saw in Joseph Oluigbo's phone?
13  A.  Yes.
14          MR. ROSENSAFT:  Your Honor, the government would move
15  Government Exhibits 48.1P through 48.5P into evidence.
16          THE COURT:  Any objection?
17          MR. STOLAR:  Can I take a brief voir dire, Judge?
18          THE COURT:  Go ahead.
19  VOIR DIRE EXAMINATION
20  BY MR. STOLAR:
21  Q.  Are the photos that we see pictures from his address book
22  or from recent calls?
23  A.  I'm not certain.
24  Q.  Are they of the address book or are they recent calls?
25  A.  They appear to be more of the recent calls.

918

86NHORU3                    Sy - direct

1   Q.  These five entries that you have here represent five out of
2   how many entries?
3   A.  Of recent calls you mean?
4   Q.  Recent calls or address books.
5   A.  I don't know the exact number.
6   Q.  Lots of them, right?
7   A.  Yes.
8              MR. STOLAR:  I have no objection, Judge.
9              THE COURT:  Any objection, Mr. Meyer?
10             MR. MEYER:  No objection, your Honor.
11             THE COURT:  All right.  Government Exhibits 48.1P
12  through 48.5P are received in evidence.
13             (Government's Exhibits 48.1P through 48.5P received in
14  evidence)
15  BY MR. ROSENSAFT:
16  Q.  Agent Sy, I know you testified that you both looked at
17  recent calls and in the address book, but these five
18  specifically in the photographs here, are these from the
19  address book?
20  A.  Yes, as well as were in the address book.
21  Q.  So these aren't the recent calls that you saw?
22  A.  They were on the address book, the same numbers.
23             MR. ROSENSAFT:  Your Honor, I would like to publish
24  Government Exhibits 48.1P through 48.5P to the jury.
25             THE COURT:  You may proceed, Mr. Rosensaft.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

919

86NHORU3                          Sy - direct

1    Q.  Now first up on the elmo is Government Exhibit 48.1P.  As
2    each one comes up, can you just tell us what that contact is
3    that you found.
4    A.  Yes.  That's Becky's phone number.
5    Q.  And what phone number is listed?
6    A.  313-461-8050.
7    Q.  And do you know what it means, speed No. 35?  Do you know
8    what that means?
9    A.  That may indicate the number, the contact number on the
10   phone list.
11          (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

920

86N7ORU4                    Sy - direct

1  BY MR. ROSENSAFT:
2  Q.  If we could go to the next exhibit, Government Exhibit
3  48.2P.  Again, if you could just tell us what is the contact
4  here that you found?
5  A.  Emmanuel Oruche, 646-533-8587.
6  Q.  Now again if we could go to Government Exhibit 48.3P.
7  Agent Sy, if you could again read what contact this is?
8  A.  Emma, 832-613-4067.
9  Q.  If we could go to Government Exhibit 48.4P.  If you could
10 please read what this exhibit is a contact of.
11 A.  Emmanuel O, 646-462-2737.
12 Q.  Finally if we could turn to Government Exhibit 48.5P, Agent
13 Sy, if you could again just read what that exhibit is a number
14 of from the contact list?
15 A.  Emmanuel Oruche, 347-275-1140.
16 Q.  So, if I am looking at the exhibits correctly, there were
17 four different contacts you found for Emmanuel Oruche, is that
18 correct?
19 A.  That's correct.
20 Q.  Finally, Agent Sy, as part of your investigation did you go
21 to the address 3678 White Plains Road?
22 A.  Yes, I did.
23 Q.  And what did you find at that address?
24 A.  Starlight Beauty Salon.
25                MR. ROSENSAFT:  May I have one moment, your Honor?
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

928

86N7ORU4                              Sy - cross

1                    MR. STOLAR:  Yes.  Sorry, Judge.
2                    THE COURT:  All right.  Cross-examination, Mr. Meyer.
3    CROSS EXAMINATION
4    BY MR. MEYER:
5    Q.  Good afternoon, Special Agent Sy.
6    A.  Good afternoon.
7    Q.  You only showed us five entries from Mr. Oluigbo's contact
8    information, didn't you?
9    A.  Yes, that's what we have here.
10   Q.  And there are actually 68 entries in his contact list,
11   weren't there?
12   A.  There were a lot.  I don't know the exact number.
13   Q.  I am going to show you what's marked as Defendant's Exhibit
14   3502-7 for identification.  Take a look at that.  Do you
15   recognize that?
16   A.  Yes, I do.
17   Q.  And take a look at that.  Does that refresh your
18   recollection that there were 68 entries in Mr. Oluigbo's
19   contact list on this phone?
20   A.  Yes.
21   Q.  Now, the entries that you did show, you can't tell how
22   often each of those numbers was called, can you?
23   A.  No.
24   Q.  And when you were looking at Mr. Oluigbo's phone, you did
25   not find the phone number 917-815-6747, isn't that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

929

86N7ORU4                    Sy - cross
1   A.  That's correct, I don't see it on here.
2   Q.  And lastly, Special Agent Sy, when did you go to the
3   Starlight Beauty Salon?
4   A.  This morning.
5            MR. MEYER:  Thank you.  Nothing further.
6            THE COURT:  Redirect examination?
7            MR. ROSENSAFT:  One moment, your Honor.
8            THE COURT:  Sure.
9            MR. ROSENSAFT:  Very briefly, your Honor.
10  REDIRECT EXAMINATION
11  BY MR. ROSENSAFT:
12  Q.  Agent Sy, of the 68 entries in the phone, do you remember
13  there being an entry for a Leroy?
14            MR. MEYER:  Objection.
15            THE COURT:  Overruled.
16  Q.  Without looking at that first, do you remember if there was
17  an entry?
18  A.  I don't.
19  Q.  Could you use that to refresh your recollection?  Look over
20  and tell me if that refreshes your recollection as to whether
21  there was a Leroy.
22  A.  Yes, there is, number 43.
23  Q.  And if you could now close that again.  Do you remember
24  looking through the phone if there was a contact for an Eva
25  Tchakpana?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

86N7ORU4

1   Mr. Wagabono was in possession of heroin.  There is no evidence
2   to show that.  There is no phone call setting anything up.
3   There is no rush of him getting over there.  There is nothing
4   said on the telephone about heroin.  So, the government's
5   obligation to prove essentially knowledge and intent to violate
6   the narcotics laws, there is a disconnect.
7           The agents have somebody who is in custody with
8   heroin, there is contact with Mr. Oruche.  Mere association is
9   insufficient.  There is nothing that places any kind of mental
10  state, even by circumstantial evidence, into Mr. Oruche's head.
11  Therefore, the government's proof in connection with Counts One
12  and Two fails, not so much that they didn't discover heroin,
13  but they failed to connect Mr. Oruche to that heroin.  We
14  played lots of phone calls.  He wasn't anxious to get over
15  there.  Nothing was said about the heroin.  Nothing was said
16  about suitcases.  So, where is the government's proof of
17  knowledge and intent with respect to Counts One and Two?  I
18  suggest it's not there.
19          MR. CERESNEY:  Your Honor, I have a similar
20  application, although different grounds with regard to Mr.
21  Oluigbo, in particular Rule 29, failure of the government to
22  provide sufficient evidence beyond a reasonable doubt.
23          For Mr. Oluigbo I think actually focused on the 2006
    conduct, there is a viable motion here, your Honor.  First,
    with regard to Ms. Fomum-Tibah, I think we can all agree that

the government's case rests on two basic foundations:
Ms. Fomum-Tibah's testimony, and the tape recordings.

Just addressing Ms Fomum-Tibah first, the first point
I think is that given the testimony here over the past few
days, I think it's clear that her testimony cannot be believed
beyond a reasonable doubt, and that no reasonable juror could
believe it beyond a reasonable doubt.

However, even if you were to credit what she says
about Mr. Oluigbo, and if you were to credit the things that
she said she observed him doing, we would argue, your Honor,
that that doesn't prove knowing participation in a conspiracy.

She argued that he was present to pick her up at the
airport.  She stated that on occasion he made travel
arrangements for her.  Those were perfectly innocent acts,
nothing to connect him up with a conspiracy.

When the drugs were allegedly brought and unpacked in
the apartment, she testified that Mr. Oluigbo was in the living
room, when Mr. Oruche and Ms. Fomum-Tibah were looking at the
drugs in the bedroom.  So, he is not even in the room with the
drugs.

So, I would submit, your Honor, even with regard to
her testimony, even if it's credited -- which I don't think any
reasonable juror can beyond a reasonable doubt -- it does not
show participation in the conspiracy.

On the tapes, your Honor, you know I think you have

1    been here to see the tapes.  Again, eight tapes, all of them

2    essentially show innocent acts by my client, none of them have

3    sufficient evidence to show his knowing participation in any

4    conspiracy to import or to traffic in heroin, things like going

5    down to the block to a restaurant where he didn't meet anybody

6    ultimately, things like going and meeting someone, taking them

7    to the airport, those are all innocent acts, Mr. Oluigbo being

8    an employee of Nicobi are certainly not sufficient for a

9    reasonable juror to find beyond a reasonable doubt.

10          Finally I would note -- and Mr. Stolar mentioned this

11   at sidebar, but I think it's an additional point here on Rule

12   29 -- the evidence is even insufficient to find that Mr. Jemy

13   was actually a courier.  I think what we saw here in the

14   evidence was really nothing to demonstrate that he in fact had

15   narcotics, separate and apart from anything else he might have

16   had.  And certainly on those tapes there is insufficient

17   evidence to show that.

18          So, for those reasons we believe a judgment of

19   acquittal is appropriate under Rule 29.

20          THE COURT:  Thank you, Mr. Ceresney.

21          Mr. Rosensaft?

22          MR. ROSENSAFT:  Thank you, your Honor.  Let me address

23   each of those separately.

24          First with regards to Counts One and Two, the December

25   2003 conduct.  I think there is ample evidence for a jury to

86N7ORU4

1    of things.

2           Number two, the $2,000 that was in the Western Union,

3    and the efforts to conceal that the government just mentioned,

4    even if there were any efforts to conceal -- which I would not

5    concede there were -- that doesn't amount to a knowledge of

6    joining a heroin conspiracy.  I think that's a heck of a leap.

7           Three, the same holds true with regard to if somebody

8    is being followed by the police, saying somebody who is your

9    friend, telling them to stop and let the police go past you, I

10   think it's fair to say that doesn't make you a member of a

11   heroin conspiracy.  So that's our response on those points.

12          THE COURT:  All right.  Counsel, decision on the Rule

13   29 motions is reserved.  We will take five minutes.  Then we

14   will bring the jury out.  I will ask you in the presence of the

15   jury whether you wish to present any evidence on behalf of the

16   defendant Emmanuel Oruche.  We will proceed from there.  All

17   right?

18          my law clerk will distribute to you drafts of the

19   charge.  I emphasize that they are still a draft, a work in

20   progress, and we will talk about it after we complete the

21   evidence today.  All right.  We will take a few minutes.

22          (Recess)

23          THE COURT:  All right.  We will bring out the jury.

24   Question for you.  Has the government had an opportunity to

25   inquire of Ms. Fomum-Tibah concerning a diary?

963

86NHORU5

1          (Jury not present)

2          THE COURT:  Mr. Stolar.

3          MR. STOLAR:  At the close of all the evidence I would

4    like to renew the Rule 29 motion that was made previously based

5    on the arguments that I made before the close of all the

6    evidence.

7          MR. CERESNEY:  Your Honor, I would also like to renew

8    our motion on behalf of defendant Joseph Oluigbo.

9          THE COURT:  All right.  Decision reserved.

10          Now, I have distributed a draft copy of the charge.

11    Let me just give you a quick precis of how it differs in what

12    the parties proposed.

13          With respect to, and taking the parties' joint request

14    to charge, with respect to request No. 2, I have added

15    Mr. Oluigbo's request to add proof of guilt and I have deleted

16    the sentence that I will not read the entire indictment.

17          In request No. 3, I have conformed it to the four

18    counts that have been tried in this case.  So I have eliminated

19    references to the fifth count.

20          In request No. 4, I have included defendant Oluigbo's

21    changes to the first paragraph, but I did not include defendant

22    Oluigbo's requested changes in the second and third paragraph.

23          In request No. 5 --

24          MR. STOLAR:  Judge, in request No. 4, did you take the

25    word innocence out?

86OHORU2                    Summation - Mr. Rosensaft

1   dressed in black and carrying a bag, the way our people carry
2   bag.
3           What is Emmanuel Oruche telling Joseph Oluigbo in this
4   call? He is telling him to go see if Jemy is there and that
5   Jemy is carrying a bag the way our people carry bag.
6           So let me go through these again. Emmanuel Oruche and
7   the man from Nigeria first talk, they set up this elaborate
8   process for how to meet Jemy, because, as Emmanuel Oruche says,
9   you have to be careful in this country. And then they send
10  Jemy to Aziza Restaurant, where Emmanuel Oruche sends Joseph
11  Oluigbo to go check him out, and find the man that is carrying
12  a bag the way our people carry bag.
13          Now Joseph Oluigbo does go and check out to see if
14  Jemy is there, and we know that from the next call, because he
15  reports back to Emmanuel Oruche and says he didn't see anyone
16  there. And then Emmanuel Oruche calls the man from Nigeria and
17  says it wasn't successful. We didn't meet Jemy in the
18  restaurant today, but I am going to try again tomorrow.
19          then there is a very interesting call, and this is
20  Government Exhibit 41T-9. If we could bring that one up on the
21  screen.
22          This is a fairly long call between Emmanuel Oruche,
23  Eva, his girlfriend, who is translating French -- and remember
24  Jemy has the French passport, speaks French -- and between Jemy
25  on that call.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86OHORU2                    Summation - Mr. Rosensaft

1    then tried to send Joseph Oluigbo to find the guy who is
2    carrying bag the way our people carry bag.  And then he talks
3    to Jemy on the phone and he wants to make sure he is not being
4    followed.
5         It is absolutely clear that Cosme Jemy is not a
6    relative coming from out of town.  He is a drug courier, coming
7    in, bringing in drugs, for Emmanuel Oruche.  And Emmanuel
8    Oruche is doing whatever he can to try to make sure that law
9    enforcement doesn't catch him.
10        Now if we could go to Government Exhibit 41T-10, there
11   is one last call with Eva that I wanting to through.  Go to the
12   next page.  One more.
13        Emmanuel Oruche calls Jemy again -- rather, calls Eva
14   again so that he can talk to Jemy in French and he says, Yeah,
15   Eva, could you tell, tell this guy that in the evening I will
16   come and pick him up and put him, let him stay with Joe.  But I
17   have to talk to Joe.  Let Joe know to stay in my house.  OK?
18   That I will move him.
19        Now, what Joe is Emmanuel Oruche talking about?  He is
20   talking about Joseph Oluigbo.  We know that from the very next
21   call, because Emmanuel Oruche then calls Joseph Oluigbo and
22   says that there's a guy, and he talks about staying at Joe's
23   house.  And Joseph Oluigbo says, oh, I have other people coming
24   in from Pennsylvania.  And so Cosme Jemy doesn't ultimately
25   stay with Joseph Oluigbo.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**6/25/2008  ORUCHE TRANSCRIPT 7**

```
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 2
 3    UNITED STATES OF AMERICA,
 3
 4            v.                              07 CR 124  (WHP)
 4
 5    EMMANUEL ORUCHE and JOSEPH
 5    OLUIGBO,
 6
 6                   Defendants.
 7
 7    ------------------------------x
 8
 8                                        New York, N.Y.
 9                                        June 25, 2008
 9                                        9:45 a.m.
10
10
11    Before:
11
12                   HON. WILLIAM H. PAULEY III,
12
13                                        District Judge
13
14
14                        APPEARANCES
15
15    MICHAEL J. GARCIA
16         United States Attorney for the
16         Southern District of New York
17    MICHAEL ROSENSAFT
17    VIRGINIA CHAVEZ ROMANO
18         Assistant United States Attorneys
18
19    LAW OFFICE OF MARTIN STOLAR
19         Attorneys for Defendant Emmanuel Oruche
20    MARTIN STOLAR
20    ZOE DOLAN
21
21    DEBEVOISE & PLIMPTON
22         Attorneys for Defendant Joseph Oluigbo
22    ANDREW J. CERESNEY
23    ERIC MEYER
23    GORDON ENG
24    NEUMAN LEVERETT III
24
25
```

1    called to that service.  I am now going to relieve you of all

2    of the prohibitions I set on you up to the present time.

3              You are free to discuss the case with anyone you want,

4    or not to discuss it at all.  I would only urge you in

5    discussing the case with anyone, that you observe the sanctity

6    of jury deliberations and that you speak only for yourself in

7    connection with the case.

8              I am going to discharge you now as jurors.  Your jury

9    service is concluded; you are free to leave.  For those of you

10   who can stay for a few minutes, I will come into the jury room

11   shortly and speak with you, but I understand completely if you

12   wish to leave the courthouse at this time.

13             Thank you so much.

14             Please recess the jury.

15             (Jury dismissed)

16             THE COURT:  All right.  Everyone may be seated.

17             I will fix a date for sentencing.  At this time I will

18   set this matter down for sentencing on Friday, September 26,

19   2008 at 2:30.

20             Are there any further applications at this time?

21             MR. STOLAR:  Judge, there is still the Rule 29 motions

22   that you reserved on, and if you want to consider, keep the

23   reserve on it and let us put in a written motion for a new

24   trial, which would be essentially the same as under Rule 29 as

25   you sitting as the 13th juror, and extend the time that we

**6/25/2008  ORUCHE TRANSCRIPT 7**

1    could get that in to you beyond ten days, then I would

2    appreciate it.

3           THE COURT:  Does the defendant Oluigbo have any

4    applications?

5           MR. CERESNEY:  The same, your Honor.

6           THE COURT:  All right.  When do you want to submit

7    your motion?

8           MR. STOLAR:  How about on or before July 9?

9           THE COURT:  Is that date acceptable to defendant

10   Oluigbo?

11          MR. CERESNEY:  If we could have one more week beyond

12   that, that would be better.

13          MR. STOLAR:  I'm going on vacation that week, but

14   that's all right.

15          THE COURT:  I will fix July 16 as the last day for the

16   defendants to file any motions for a new trial.

17          I only caution counsel that in the court fixing this

18   date, this court does not bind the Court of Appeals.  Be

19   mindful of all time limits with respect to motions for new

20   trials.

21          Are there any other matters that counsel wish to

22   raise?

23          MR. ROSENSAFT:  Nothing from the government, your

24   Honor.

25          MR. STOLAR:  I can't think of anything else.