UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA          :

   -against-                     :

EMMANUEL ORUCHE, et al.,          :

      Defendants.          :

- - - - - - - - - - - - - - - - - -X

S2 07 Cr. 124 (WHP)


**MEMORANDUM OF LAW RESPONDING TO DEFENDANTS ORUCHE AND OLUIGBO'S MOTIONS FOR JUDGMENTS OF ACQUITTAL OR NEW TRIALS**


                    **MICHAEL J. GARCIA**
                    **United States Attorney for the**
                    **Southern District of New York**
                    **Attorney for the United States**
                        **of America**


**MICHAEL M. ROSENSAFT**
**Assistant United States Attorney**

      **- Of Counsel -**

## TABLE OF CONTENTS

Preliminary Statement.. . . . . . . . . . . . . . . . . . 1

Background. . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Evidence Regarding 2003 Conspiracy. . . . . . . . . 2

    B.   Evidence Regarding 2006 Conspiracy. . . . . . . . . 4

        1.   Rebecca Fomum-Tibah. . . . . . . . . . . . . . 4

        2.   September 22, 2006 Call. . . . . . . . . . . . 9

        3.   Cosme Jemy.. . . . . . . . . . . . . . . . . . 9

I.   Oruche And Oluigbo's Motions For Judgements of
    Acquittal Or New Trials Should Be Denied.. . . . . . . 13

    A.   Applicable Law

    B.   Oruche's Motion For A Judgment Of Acquittal Or New
        Trial As To Counts One And Two Should Be Denied.. . 16

    C.   Oruche And Oluigbo's Motions For A Judgments Of
        Acquittal Or New Trials As to Counts Three And
        Four Should Be Denied.. . . . . . . . . . . . . . . 18

        1.   There Was Ample Evidence Of Oruche's
            Participation In The 2006 Conspiracy.. . . . . 18

        2.   There Was Sufficient Evidence That Oluigbo
            Knowingly Joined The 2006 Conspiracy.. . . . . 20

II.  Oruche's Motion For A New Trial Due To Alleged
    Failure Of The Government To Timely Disclose Brady
    Material Should Be Denied. . . . . . . . . . . . . . . 32

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . 35

i

**TABLE OF AUTHORITIES**

<u>Statutes and Regulations</u>                                        <u>Page</u>

21 U.S.C.§ 846 . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

21 U.S.C. § 950. . . . . . . . . . . . . . . . . . . . . . . . . . 2


**<u>Cases</u>**

<u>Holland</u> v. <u>United States</u>, 348 U.S. 121 (1954).. . . . . . . 14, 22

<u>United States</u> v. <u>Abelis</u>, 146 F. 3d 73 (2d Cir. 1998). . . 15, 20

<u>United States</u> v. <u>Allah</u>, 130 F. 3d 33 (2d cir. 1997).. . . . . 14

<u>United States</u> v. <u>Autori</u>, 212 F. 3d 105 (2d Cir. 2000).. . 13, 14

<u>United States</u> v. <u>Cruz</u>, 363 F. 3d 187 (2d cir. 2004).. . 28-29, 31

<u>United States</u> v. <u>Ferguson</u>, 246 F. 3d 129 (2d cir. 2001).. . . 15

<u>United States</u> v. <u>Guadagna</u>, 183 F. 3d 122 (2d Cir. 1999).13-14, 22

<u>United States</u> v. <u>Hernandez</u>, 85 F. 3d 1023 (2d Cir. 1999). . 14,20

<u>United States</u> v. <u>Lopez</u>, 534 F.3d 153 (2d Cir. 2008).. . . . 30-31

United States v. Lopez,
No. 03-1055L, 112 Fed. Appx. 774 (2d Cir. Oct. 26, 2004). . . 29

<u>United States</u> v. <u>Lorenzno</u>, 534 F. 3d 153 (2d Cir. 2008).. . . 28

<u>United States</u> v. <u>Mariani</u>, 725 F.2d 862 (2d Cir. 1984).. . . . 13

<u>United States</u> v. <u>Masotto</u>, 73 F. 3d 1233 (2d Cir. 1996). . . . 14

<u>United States</u> v. <u>Morrison,</u> 153 F. 3d 34 (2d Cir. 1998). . . . 14

<u>United States</u> v. <u>Resto</u>, 824 F. 2d 210 (2d Cir. 1987). . . . . 14

<u>United States</u> v. <u>Rodriguez</u>,
392 F. 3d 539 (2d Cir. 2004). . . . . . . . . . . . 28, 29-30, 31

<u>United States</u> v. <u>Sanchez</u>, 969 F. 2d 1409 (2d cir. 1992).. . . 15

<u>United States</u> v. <u>Snow</u>, 462 F. 3d 55, 70 (2d cir. 2006). . . . 30

**PRELIMINARY STATEMENT**

The Government respectfully submits this omnibus response to defendant Emmanuel Oruche and defendant Joseph Oluigbo's motions for judgments of acquittal pursuant to Rule 29 or new trials pursuant to Rule 33. Oruche argues that a judgment of acquittal or a new trial is appropriate as to Counts One and Two because there was "no evidence that [Oruche] knew that William Wagabono had heroin," Oruche Mot., at 2; and as to Counts Three and Four because there was no evidence that Emmanuel Oruche participated in the 2006 conspiracy. Id. Oruche further argues that a new trial pursuant to Rule 33 is appropriate due to an alleged failure by the Government to disclose Brady material. Id., at 4. Joseph Oluigbo moves for a judgment of acquittal or new trial, arguing that there was no evidence that Oluigbo had the requisite knowledge to be adjudged guilty of a heroin conspiracy. Oluigbo Mot., at 3. As set forth below, both defendants' motions should be denied in their entirety.

**BACKGROUND**

On June 25, 2008, after a six-day trial, a jury convicted Emmanuel Oruche on Counts One through Four, and Joseph Oluigbo on Counts Three and Four, of superseding indictment S2 07 Cr. 124 (the "Indictment"). Count One charged Oruche with conspiring to distribute or possess with the intent to distribute heroin in or about 2003, in violation of 21 U.S.C. § 846.

Count Two charged Oruche with conspiring to import heroin into the United States in or about 2003, in violation of 21 U.S.C. § 950.  Count Three charged both Oruche and Oluigbo with conspiring to distribute or possess with the intent to distribute heroin in or about 2006, in violation of 21 U.S.C. § 846.  Finally, Count Four charged both Oruche and Oluigbo with conspiring to import heroin into the United States in or about 2006, in violation of 21 U.S.C. § 950.

The jury trial began on June 16, 2008, and ended on June 25, 2008, when the jury returned its guilty verdict.  In a special verdict, the jury found that Oruche's offenses in Count One and Two involved at least one kilogram of heroin; and Oruche and Oluigbo's offenses in Counts Three and Four involved at least 500 grams of heroin.

### A.    Evidence Regarding The 2003 Conspiracy

The proof at trial overwhelmingly established Emmanuel Oruche's knowledge and participation in the 2003 conspiracy. At trial, Inspector Jose Aires and Special Agent Amy Turner testified that a drug courier, William Wagabono, was arrested coming into the United States with approximately three kilograms of heroin, which was concealed in the lining of his suitcases. Trial Transcript ("Tr."), at 163, 174-75.  After Wagabono's arrest, in an effort to cooperate with the Government, Wagabono placed a series of recorded calls to Emmanuel Oruche.  Tr., at

-2-

180-81, 566-68.  In the first such call, which occurred two days after Wagabono's arrival (and arrest), Oruche, in a relieved tone, told Wagabono that he was glad that Wagabono was okay. Tr., at 180-81; Gov't Exh. 14.1, 14.2.  On the following day, Oruche told Wagabono that he was coming to meet Wagabono, Gov't Exh. 14.1T, 14.2T, but then called back and expressed concern over vans that were parked in front of the hotel:

> EMMANUEL ORUCHE:     Hold on.  Let me ask you something ih...
> WILLIAM WAGABONO:    Yeah.
> EMMANUEL ORUCHE:     Who are those vans over there? . . . The van by the car by that thing.  Is it a car there?

Gov't Exh. 14.3T.  Thus, Oruche had in fact been to the hotel and seen the vans parked outside.  Those vans were, in fact, vans of law enforcement agents.  Tr., at 188.  In a later call, Wagabono called the heroin supplier in Nigeria.  Gov't Exh. 14.6T, Tr., at 207-08.  The supplier confirmed that he had spoken to Emmanuel Oruche and that Oruche was concerned about the vans:

> WAGABONO:  But I don't know why why he even ask me there is some vehicle here.  People come sleep here.  Those vehicles I don't mind about them because I don't know them.  And the others here, he's always fare away.  People ...
> UM:        That's that's what he... that's what he said.  I'm I'm I've been thinking about it since he said that.

Gov't Exh. 14.6T.  Finally, in the last call between Oruche and Wagabono, Oruche told Wagabono: "This country you have to be very careful what you do," and "that place doesn't look good."  Gov't Exh. 14.7T.  Oruche continued by instructing Wagabono to look out

-3-

at the vans, and then to "leave that place.  Ih. Just Leave that
room."  Id.  When Wagabono asked Oruche if he should take his
"bag," referring to the bag that had been lined with heroin,
Oruche, stuttering, corrects Wagabono's use of the word "bag" on
the phone: "Leave leave leave your clothes there.  Leave your
clothes there.  No no.  Not now.  Hello."  Id.  Oruche stumbles
with what Wagabono should do with his "clothes," that is, the
heroin, and finally tells Wagabono to call "Charlie," the source
of the heroin in Nigeria.  Id.

**B.    Evidence Regarding 2006 Conspiracy**

    **1.    Rebecca Fomum-Tibah**

The evidence at trial established that Emmanuel Oruche was
continuing to distribute heroin at the very end of 2005 and
throughout 2006.  Tr., at 572-75.  Rebecca Fomum-Tibah, who was
Oruche's girlfriend, testified that on two occasions in 2005, she
found a large quantity of heroin that Oruche had left in her
house, Tr., at 572-73, and in his car that she was using, Tr., at
573-75.  Then, in 2006, Fomum-Tibah began helping Oruche with his
drug business by picking up money from Oruche's buyers.  Tr., at
576-78.

Eventually, Oruche told Fomum-Tibah that the "feds" had been
closely monitoring the route that his drug mules were taking,
prompting Fomum-Tibah to offer to act as a drug mule for Oruche
and bring back heroin from Istanbul for him.  Tr., at 579-80.  In

-4-

preparing for Fomum-Tibah's first trip to Istanbul, Oruche drove
her to renew her passport, and then dropped her off in New York
at his apartment.  Tr., at 581-82.  While at his apartment,
Joseph Oluigbo, who Fomum-Tibah described as Oruche's "right hand
man," called Fomum-Tibah to speak to her about flight schedules
to Istanbul and how her name should appear on her ticket.  Tr.,
at 582-83.  Oluigbo bought Fomum-Tibah's ticket using Oruche's
credit card.  Tr., at 832.  Oruche then picked Fomum-Tibah up
from his house and drove her to Nicobi Healthcare, Oruche's
business, where Oluigbo was on the computer looking for hotel
rooms for her in Istanbul.  Tr., at 583-84.  While still in
Nicobi Healtchare, Oruche gave Fomum-Tibah $3,000 for her trip to
give to the heroin suppliers in Istanbul.  Tr., at 584-85.
Fomum-Tibah testified that Oluigbo was in the store, but doesn't
remember if he was close by when Oruche gave her the money.  Tr.,
at 585.  After giving her money, Oruche drove Fomum-Tibah to the
airport and told Fomum-Tibah what to do once she arrived in
Istanbul.  Tr., at 585.  When Fomum-Tibah arrived in Istanbul,
she tried to swallow heroin pellets, but could not, and so, after
speaking to Oruche on the phone, the heroin suppliers in Istanbul
gave Fomum-Tibah heroin hidden in a cellular phone box to bring
back to the United States.  Tr., at 589-91.

     When Fomum-Tibah flew back into the United States, Oluigbo
and Oruche picked her up at the airport.  Tr., at 592.  While in

the car on the way home, Oruche, sitting right next to Oluigbo, asked Fomum-Tibah, "So you could not swallow?"  Tr., at 607. Fomum-Tibah replied that she could not.  Tr., at 607.  Oluigbo drove Oruche and Fomum-Tibah to Oruche's house and all three went inside.  Tr., at 608.  Oruche and Fomum-Tibah then went to the bedroom where Fomum-Tibah gave Oruche the heroin.  Tr., at 608.

A short time after Fomum-Tibah's first trip to Istanbul, Fomum-Tibah found half a kilogram of heroin that Oruche had left in her van.  Tr., at 608, 611.  The heroin had been brought by Paul and Peter, two of Oruche's friends.  Tr., at 608.  Out of spite, Fomum-Tibah sold the heroin to Ed, one of Oruche's buyers, but did not get the full price for the heroin.  Tr., at 608-11. When Oruche found out that Fomum-Tibah had sold his heroin, he was very upset.  Tr., at 613.  To make matters worse, Ed later told Oruche that he had not received any heroin from Fomum-Tibah, and Fomum-Tibah began receiving numerous calls from people to try to resolve the situation.  Tr., at 613-14.  One of those people was Joseph Oluigbo, who told Fomum-Tibah that Paul (who Fomum-Tibah had identified as bringing in the heroin) had shot a rock at Oruche's car.  Tr., at 614.  Oluigbo further told Fomum-Tibah, that she was a:

> good girl, that naturally if [she] had done what [she]
> did, something had to have pushed [her] to that point,
> that he just wanted to talk and see how this could be
> resolved because Manny was really having a lot of
> trouble back there in New York.

Tr., at 614.

Eventually, Fomum-Tibah offered to go back to Istanbul to bring back heroin once again for Oruche to "make the situation go away." Tr., at 614-15. Again, Oruche told Fomum-Tibah who to contact in Istanbul and how to contact them. Tr., at 615. Once Fomum-Tibah arrived in Istanbul, she spoke to Oruche, who also spoke to Chuka, one of the individuals with whom Fomum-Tibah was meeting in Istanbul. Tr., at 616. Fomum-Tibah was not successful in bringing back heroin on this trip, however. Tr., at 617.

Fomum-Tibah took one last trip to Istanbul in August 2006. Tr., at 618. However, this time in order to make it more difficult to be detected by law enforcement, Oruche told her to fly through London. Tr., at 619. In order to fly through London, Fomum-Tibah needed to get a special visa, and traveled to Chicago to obtain one. Tr., at 619-20. Once in Chicago, Fomum-Tibah was told that she needed to show "some money, like a traveler's check," in order to obtain the visa. Tr., at 620. Fomum-Tibah called Oruche for help, and Oruche responded that "Joe," Joseph Oluigbo, would wire Fomum-Tibah the money from Oruche's store. Tr., at 620. Subsequent to that call, Oluigbo called Fomum-Tibah and told her that the wire had been sent under the name "Nicole Oruche," the name of Emmanuel Oruche's 19 year old daughter. Tr., at 620-21. Records from Western Union

-7-

reflect that on July 27, 2006, two wires were sent from "Nicole Oruche" in New York to "Rebecca Fomum-Tibah" in Chicago in the amounts of $300 and $2,000.  Gov't Ex. 32.1, 32.2; Tr., at 322-29.  Records for each wire had operator codes associated with them that correspond to the person who input the wire into the Western Union Terminal.  Tr., at 325-26.  Those records indicated that the person who input the $2,000 wire was Joseph Oluigbo. Tr., at 326.  Oluigbo put in the address of the sender as "3678 White Plains Road,"  Tr., at 327, which corresponded to a business by the name of "Starlight Beauty Salon."  Tr., at 920. After Oluigbo had wired Fomum-Tibah this money, she was able to get a visa to fly through London to Istanbul.  Tr., at 621.

Once in Istanbul, Fomum-Tibah successfully swallowed 84 pellets of heroin.  Tr., at 623-24; Gov't Exh. 30S.  Fomum-Tibah also concealed a further amount of heroin in a vaginal insert, and then flew back to the United States.  Tr., at 624-25.  When she arrived in the United States, Fomum-Tibah was arrested with 871.4 grams of heroin.  Tr., at 625; Gov't Exh. 30S.  Oruche continued speaking to Fomum-Tibah by telephone after her arrest and wrote her letters.  Tr., at 632-33.  In one letter to Fomum-Tibah, Oruche wrote:

> [T]hose people can only charge you with what they
> caught you with . . . they will threaten and pressure
> you to tell them about other people . . . . Never,
> never never allow anyone to pressure you into admitting
> to know more than what you know or that you have done
> this more than one time.

-8-

Tr., at 633-34; Gov't Exh. 33.1.  Fomum-Tibah understood this to mean that she should not tell the truth about "her involvement and the people involved and what really happened.  Tr., at 633.

### 2.    September 22, 2006 Call

The Government also presented a call between Oruche and Oluigbo that occurred on September 22, 2006, which demonstrated Oruche and Oluigbo's close, criminal relationship.  In that call, which was played for the jury, Oruche frantically tells Oluigbo, "Police are following me.  Police are on my tail."  Gov't Exh. 41T-1.  In response, Oluigbo instructs Oruche: "Stop at a point. When you pull over, you do like this, just stop somewhere, to let them overtake you, then you will make a u-turn and drive off." Gov't Exh. 41T-1.  Special Agent Andrew Arthurton testified that law enforcement agents were in fact following Oruche that day, and Oruche took Oluigbo's advice, driving erratically and pulling over.  Tr., at 397-98.  Oruche ended the call with Oluigbo by telling him: "Remove everything, remove your papers, remove everything that is in the store."  Gov't Exh. 41T-1.

### 3.    Cosme Jemy

In September 2006, after Fomum-Tibah had been arrested, Oruche spoke to a drug supplier in Nigeria about the arrival of another drug courier.  As captured by intercepted wire communications, on September 26, 2006, at approximately 12:32 p.m., Emmanuel Oruche spoke to an unidentified male ("UM-1") from

Nigeria.  Gov't Exh. 41T-2, 41C.  In that call, Oruche first asked UM-1 "Do you know the reason I told you not to speak on this phone," and then began speaking about a third individual: "don't give him information about the bank.  It seems that you give such information to all the people that you have been bringing in. . . . They can, they should memorize the number and should not have to write it down on paper. . . . . [T]hey should commit it to memory, not to write it down."  When UM-1 told Oruche that he thought "there was something you promised to bring," Oruche responded, "I wanted to bring it, but I have been very busy running about."

Two days later, on September 28, 2006, an individual from Benin by the name of Cosme Jemy entered the United States.  Tr., at 215, 234; Gov't Exh. 44.  On September 30, 2006, Jemy checked into the Holiday Motel in the Bronx.  Tr., at 896-900; Gov't Exh. 43.  That same day, at approximately 1:46 p.m., Oruche had another conversation with UM-1, the unidentified male from Nigeria.  In that call, Oruche told UM-1 to tell "him," who was identified as an individual from Cotonou, Benin, to go by taxi to "3716 White Plains Road" to a restaurant called "Aziza."  Gov't Exh. 41T-3.  In the next call, Oruche described to UM-1 a set of procedures by which he was to meet up with "Jimmy" (phonetically), explaining:  "It is just that one must be careful, hope you understand, in this country."  Gov't Exh. 41T-

-10-

4.   After getting off the phone with UM-1, Oruche then called
Oluigbo and told him to check to see if Jemy had arrived at Aziza
restaurant.  Gov't Exh. 41T-5.  In that same conversation,
Oluigbo asked Oruche if Jemy had called Oruche yet, and then
laughed when Oruche joked, "am I suppose to call him for what?"
Gov't Exh. 41T-5.  Fifteen minutes later, Oruche told Oluigbo to
check again to see if Jemy was at Aziza restaurant and told
Oluigbo that Jemy "is dressed in black and carrying a bag the way
our people carry bag."  Gov't Exh. 41T-6.

        Later that night, Oruche had another conversations with UM-
1, the unidentified man from Nigeria, in which he told UM-1 that
he did not meet up with Jemy, and explained:

> I personally will not rush to meet him . . . .  There
> is a way people look at me, a way that the local police
> are looking at me.  I am being extra careful and watch
> everything I do, do you understand what I am saying?
> So, I feel like people are monitoring me since two
> weeks or last week, last two weeks.

Gov't Exh. 41T-8.

        On October 1, 2008, at approximately 8:56 a.m., Oruche,
Jemy, and the mother of Oruche's child, Eva, all spoke on the
phone.  Gov't Exh. 41T-9.  Eva was present to translate for Jemy,
who spoke French.  Id.  In that call Oruche asked Eva to ask
Jemy:  "if he didn't have problem or something.  No person is
following him?"  Gov't Exh. 41T-9, at 6-7.  Jemy responded that
he didn't have any problems, and wanted Oruche to know that he
was there "to do a business."  Gov't Exh. 41T-9, at 10.  The call

                                -11-

ended with Eva telling Jemy: "be vigilant, the moment you observe
that somebody is following you, try to be really vigilant."
Gov't Exh. 41T-9, at 11.  Minutes later, at approximately 9:19
a.m., another call was made between Oruche, Eva, and Jemy in
which Oruche asked Eva to tell Jemy that Oruche would "bring him
out of the hotel and put him in my house where Joe is."  Gov't
Exh. 41T-10, at 2.  An hour later, in a call between Oluigbo and
Oruche at approximately 10:30 a.m., Oluigbo asked Oruche how long
"that person" was going to stay and told Oruche that he had
someone else coming on August 6th.  Gov't Exh. 41T-11, at 1-2.

    The next day, on October 2, 2008, at approximately 11:20
a.m., DEA agents, including Special Agent Andrew Arthurton and
Special Agent Romona Sy, conducted surveillance of the Holiday
Motel in the Bronx.  Tr., at 439-40.  Agents observed Emmanuel
Oruche drive into the parking lot of the hotel, and observed
Cosme Jemy walk out of the Holiday Motel, up to Oruche's vehicle,
speak to Oruche, and then walk back upstairs to his hotel room.
Tr., at 440, 910.  Jemy then exited the hotel a few minutes later
with a bag, got into Oruche's car, and then Oruche and Jemy both
drove away from the hotel.  Tr., at 910-11; Gov't Exh. 42.1-42.6.
Later that day, Oruche and Oluigbo spoke again at approximately
6:10 p.m., during which time Oruche asked Oluigbo what "that man"
was doing.  Gov't Exh. 41T-13, at 2.  When Oluigbo responded that
the man was sleeping and that Oluigbo had given the man food,

Oruche asked, "Did you observe to see if anybody was following you?" Gov't Exh. 41T-13, at 2. Oluigbo responded, "Yeah, yeah." Gov't Exh. 41T-13, at 2.

Based on further intercepted calls, law enforcement officers believed that Jemy was leaving the United States on October 7, 2006, Tr., and established surveillance at JFK airport. Tr., at 447-48. However, Jemy was not seen at the airport on that day, and successfully avoided apprehension, leaving the United States on October 9, 2006. Tr., at 447-48, 215.

**I.   Oruche & Oluigbo's Motions For Judgments Of Acquittal Or New Trials Should Be Denied**

    **A.   Applicable Law**

A defendant challenging the sufficiency of the evidence under Rule 29 bears a "heavy burden." United States v. Autori, 212 F.3d 105, 114 (2d Cir. 2000). In considering a motion for judgment of acquittal, "[t]he Court 'must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

Accordingly, a motion under Rule 29 must be denied if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Guadagna, 183 F.3d at 130

(quoting United States v. Resto, 824 F.2d 210, 212 (2d Cir.
1987)).  "In other words, the court may enter a judgment of
acquittal only if the evidence that the defendant committed the
crime is 'nonexistent or so meager that no reasonable jury could
find guilt beyond a reasonable doubt.'"  Guadagna, 183 F.3d at
130 (citation omitted); see also United States v. Hernandez, 85
F.3d 1023, 1029 (2d Cir. 1996).

        In a Rule 29 motion, the Court must view the evidence in the
light most favorable to the Government, see Autori, 212 F.3d at
114; Guadagna, 183 F.3d at 129, and must "credit[] every
inference that the jury might have drawn in favor of the
government."  Hernandez, 85 F.3d at 1029; United States v.
Morrison, 153 F.3d 34, 49 (2d Cir. 1998); United States v. Allah,
130 F.3d 33, 45 (2d Cir. 1997); United States v. Masotto, 73 F.3d
1233, 1241 (2d Cir. 1996).  Similarly, the Second Circuit has
repeatedly emphasized that to defeat a Rule 29 motion, "the
government need not 'exclude every reasonable hypothesis other
than that of guilt.'" Guadagna, 183 F.3d at 130 (quoting Holland
v. United States, 348 U.S. 121, 139 (1954)).  Where "either of
the two results, a reasonable doubt or no reasonable doubt, is
fairly possible, [the Court] must let the jury decide the
matter." Autori, 212 F.3d at 114 (internal quotation marks
omitted).  Consistent with this approach, all issues of
credibility must be resolved  in the Government's favor.  See

United States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998).

Rule 33, on the other hand, gives the trial court discretion to order a new trial "to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). While the trial court may weigh the evidence and the credibility of the witnesses on a Rule 33 motion, the Second Circuit has warned against "wholly usurping the role of the jury." United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (internal quotation marks omitted). Accordingly, "courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility." Id. In general, the trial court need only satisfy itself that the jury's verdict is supported by "'competent, satisfactory and sufficient'" evidence, and a verdict should only be overturned where there is "'a real concern that an innocent person may have been convicted.'" Id. (quoting Sanchez, 969 F.2d at 1414).

The Second Circuit has made plain that trial courts "must exercise the Rule 33 authority 'sparingly,'" and only "in 'the most extraordinary circumstances.'" Ferguson, 246 F.3d at 133 (quoting Sanchez, 969 F.2d at 1414). "'It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" Id. at 133-34 (quoting Sanchez, 969 F.2d at 1414).

"An example of exceptional circumstances [warranting a new trial] is where testimony is 'patently incredible or defies physical realities.'" <u>Id.</u> at 133-34.  Even "the district court's rejection of trial testimony by itself," however "does not automatically permit Rule 33 relief." <u>Id.</u>  In short, the "ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." <u>Id.</u> at 134.

### B.  Oruche's Motion For A Judgment Of Acquittal Or New Trial As To Counts One And Two Should Be Denied

Oruche moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 as to Counts One and Two, under which Oruche was convicted of conspiring to import and to distribute heroin in December 2003.  Defense counsel argues that "[n]othing in any of this evidence establishes that [Oruche] had any knowledge that Wagabono possessed heroin."  Oruche Mot., at 3.  However, there was ample evidence presented at trial that Oruche knowingly conspired to distribute and import heroin, as found by the jury.

First, the recorded calls between William Wagabono and Emmanuel Oruche demonstrated his fear of law enforcement and full knowledge that he was taking part in an illegal act.  Oruche had planned to meet with Wagabono at the Crown Motor Inn, but then, upon seeing vans parked outside, canceled the meeting.  Gov't Exh. 14.7T.  These vans were, in fact, law enforcement vans.  Tr., at 188.  In addition, in explaining why he was reluctant to

-16-

meet Wagabono, Oruche told Wagabono: "This country, you have to
be very careful what you do," 14.7T, again referring to his fear
of being caught by law enforcement.

Second, Oruche not only spoke to Wagabono, the drug courier,
but also spoke to "Charlie," the source of supply of the heroin
in Nigeria.  After Oruche had not shown up at Wagabono's hotel
room, Wagabono called "Charlie."  Gov't Exh. 14.6T; Tr., at 207-
08.  "Charlie" confirmed that he had spoken to Oruche, and that
Oruche was concerned about the vans.  Gov't Exh. 14.6T, Tr., at
207-08.  Finally, in their last call, Oruche tells Wagabono that
Wagabono should call "Charlie" and that "Charlie" would explain
everything.  Gov't Exh. 14.7T.  Oruche's interactions not only
with Wagabono, the drug courier, but also the fact that he spoke
to the heroin supplier, "Charlie," demonstrates Oruche's
knowledge of and interaction with the entire the heroin
conspiracy.

Simply put, Wagabono was a heroin courier who was trying to
meet with Oruche to deliver heroin, which had lined his bags.
The last call between Wagabono and Oruche makes a direct
reference to that heroin.  Scared that law enforcement may be
involved, Oruche tells Wagabono to leave the hotel room.  Gov't
Exh. 14.7T.  Wagabono responds by asking Oruche what he should do
with his bag – that same bag that was lined with three kilograms
of heroin.  Id.  Oruche responds by correcting Wagabono's use of

the word "bag" and, stuttering, tells him to use the word
"clothes" instead, first instructing Wagabono to leave the
"clothes" in the hotel room, but then telling Wagabono to call
"Charlie" for instructions.  Id.  It is clear from the tone and
words said in this call that Oruche knew exactly what was in that
bag, and corrected Wagabono's choice of terms over the phone as a
further protection against apprehension.

In short, Oruche's conversations with Wagabono – both the
actual words and the tone in which they are delivered –, his
apprehension of law enforcement, and his communications with the
supplier of the heroin in Nigeria all demonstrate Oruche's full
knowledge of the heroin conspiracy in which he was a part.  As
such, Oruche's Motion for a judgment of acquittal or a new trial
as to Counts One and Two should be denied.

**C.    Oruche And Oluigbo's Motions For Judgment Of Acquittals
Or New Trials As to Counts Three And Four Should Be
Denied**

**1.    There Was Ample Evidence Of Oruche's Participation
In The 2006 Conspiracy**

Oruche also argues that no jury could find beyond a
reasonable doubt that Oruche participated in the 2006 conspiracy.
Oruche acknowledges that the Government presented "wiretap
recordings and transcripts, testimony from cooperating witness
Rebecca Fomum-Tibah, and testimony regarding surveillance of the
Holiday Motel in Bronx, New York of an individual known as Cosme
Jemy," but states that none of this evidence established that

"Jemy in fact had heroin." Oruche Mot., at 3. As discussed more fully below with respect to Joseph Olugibo, the Government disagrees with defense counsel's conclusions regarding Cosme Jemy. However, even apart from Jemy, defense counsel neglects to address Fomum-Tibah's direct testimony that Oruche was the leader of a heroin organization and specifically directed her actions on her three trips to Istanbul to import heroin.

Fomum-Tibah directly testified that Oruche conspired with her and others on three separate occasions to bring heroin into the United States from Istanbul, Turkey. On the first of these trips, Oruche told Fomum-Tibah that the "feds" had been closely monitoring the route that his drug mules were taking, Tr., at 579-80, and then instructed Fomum-Tibah how to act as a drug mule. Tr., at 581-82. Fomum-Tibah's first trip resulted in her successfully returning to the United States with a cellular phone box full of heroin, which she gave to Oruche. Tr., at 589-91; 608. Fomum-Tibah then discovered half a kilogram of heroin that Oruche had left in her car, and sold that heroin to Ed, one of Oruche's buyers. Tr., at 608, 611. Fomum-Tibah took a second trip to Istanbul, again on Oruche's instructions, Tr., at 615, but Fomum-Tibah was unsuccessful in bringing back heroin to Oruche on that trip. Tr., at 617. Finally, Oruche sent Fomum-Tibah to Istanbul one last time in August 2006 during which she swallowed 84 pellets (871.4 grams) of heroin. Tr., at 623-35;

-19-

Gov't Exh. 30S.  Resolving all issues of credibility in the Government's favor, see Abelis, 146 F.3d at 80, there was ample evidence of Oruche knowingly and willfully joining a conspiracy to import and distribute heroin in the United States on Fomum-Tibah's testimony alone.

### 2.    There Was Sufficient Evidence That Oluigbo Knowingly Joined The 2006 Conspiracy

Defendant Joseph Oluigbo argues that the evidence presented by the Government at trial "permits inferences that [Oluigbo] was associated with persons engaged in criminal activity and was aware of criminal activity," but that there is no evidence that Oluigbo "knowingly joined a drug conspiracy."  Oluigbo Mot., at 1.  However, crediting "every inference that the jury might have drawn in favor of the government," Hernandez, 85 F.3d at 1029, the Government presented more than sufficient evidence such that a jury could reasonably find Oluigbo knowingly joined Oruche's heroin conspiracy beyond a reasonable doubt.

First, evidence at trial established that Oluigbo knowingly participated in Fomum-Tibah's trips to Istanbul to bring back heroin.  As discussed more fully above, Fomum-Tibah testified that Emmanuel Oruche imported and distributed large amounts of heroin into the United States.  Fomum-Tibah described Joseph Oluigbo as Oruche's "right hand man," testifying that their relationship was "very close," in that "[t]hey shared both personal and business information."  Tr., at 582.  Fomum-Tibah

-20-

continued by stating that Oluigbo would "do a lot of the things that Manny asked him to do," Id., and then specifically described how Oluigbo aided her own efforts to act as a drug mule for Oruche.

In describing Fomum-Tibah's first trip to Istanbul, she related how Joseph Oluigbo made the plane reservation for her and looked for hotel reservations for her trip. Tr., at 582-83. Oruche gave Fomum-Tibah $3,000 for her trip while Oluigbo was still in the store. Tr., at 584-85. Moreover, when Fomum-Tibah returned to the United States with heroin, Oluigbo and Oruche picked her up at the airport together. Tr., at 592. Fomum-Tibah then related a conversation that Oruche had with her in the car in front of Oluigbo:

> Q. What happened on the way home or when you got in
>    the car?
> A. Well, we chitchatted a little, and on my way to
>    Istanbul I was put on oxygen, we talked about that
>    a little bit. And he asked you could not swallow,
>    huh? And I said yes.
> Q. When you say he asked you --
> A. Emmanuel.
> Q. Where was Emmanuel sitting when he asked you that?
> A. On the passenger side.
> Q. And you were in the back?
> A. Yes.
> Q. And where was Joe sitting?
> A. Driver's seat.

Tr., at 607.

Defense counsel argues that this conversation could have been interpreted by Oluigbo as having to do with Fomum-Tibah's receipt of oxygen on the flight (although the connection between

-21-

receiving oxygen and having an inability to swallow seems tenous
at best), but the most reasonable interpretation is that Oruche
and Oluigbo both picked up Fomum-Tibah when she returned with
heroin from Istanbul and Oruche felt comfortable speaking about
Fomum-Tibah's inability to swallow heroin pellets in front of
Oluigbo because they were both knowing members of the conspiracy.
Moreover, that is the interpretation that the jury adopted, and
the Government need not "'exclude every reasonable hypothesis
other than that of guilt.'" Guadagna, 183 F.3d at 130 (quoting
Holland v. United States, 348 U.S. 121, 139 (1954)).

     Even if Fomum-Tibah's first trip was the totality of the
Government's evidence against Oluigbo it would be sufficient, but
Fomum-Tibah continued to provide further evidence that Oluigbo
knew about the heroin conspiracy and willfully was a member of
it.  After Fomum-Tibah returned from her first trip to Istanbul,
she found 500 grams of heroin that Oruche had left in her van and
sold it to Ed, one of Oruche's customers.  Tr., at 608-11.  When
Ed later denied having taken the heroin, causing Oruche trouble
with his suppliers, Joseph Oluigbo called Fomum-Tibah to tell her
to straighten things out:

          Q.   Did you ever -- how did the situation with Ed
               resolve itself?
          A.   Well, it never really did, because after that I
               was making a trip to go to Istanbul and make up
               for the balance of the money.  Joe was calling me,
               Paul was calling me, Emmanuel was calling me.  Joe
               told me Manny's car, that Paul had used the rock
               to shoot Manny's car, that people were threatening

him that he is in so much debt.  Those were the
kinds of calls I was getting on a regular basis.
Q.   When you say Joe, are you referring to the same
     Joe you were referring to yesterday [identified in
     Court as Joseph Oluigbo]?
A.   Yes, sir.
Q.   What specifically did he tell you?
A.   Well, he started off by saying that I'm a good
     girl, that naturally if I had done what I did
     something had to have pushed me to that point,
     that he just wanted to talk and see how this could
     be resolved because Manny was really having a lot
     of trouble back there in New York.

Tr., at 614.  This conversation demonstrates that Oruche had told

Oluigbo about Fomum-Tibah selling heroin to Ed and the problem

with Oruche's suppliers that Fomum-Tibah had caused.

Furthermore, Oluigbo was actively advising Fomum-Tibah how to

rectify the situation, which she did by returning as a drug mule

to Istanbul.

     Finally, after making arrangements for Fomum-Tibah's first

trip, picking her up from the airport and hearing that she could

not swallow, and discussing the incident with Ed, Oluigbo again

helped Fomum-Tibah to bring back heroin into the United States by

helping her to obtain a visa.  In order to obtain this visa,

Fomum-Tibah was told that she needed to show "some money, like a

traveler's check,"  Tr., at 620, and so Oluigbo wired her $2,300.

Tr., at 322-29.  Oluigbo called Fomum-Tibah and told her that he

had sent the wire under the name "Nicole Oruche," Emmanuel

Oruche's 19 year old daughter.  Tr., at 620-21.  In addition,

when he entered the address where the wire was being sent from,

Oluigbo did not put in the real address of Nicole Oruche, himself, or Nicobi Healthcare, but inputted the address as "3678 White Plains Road," Tr., at 327, which corresponds to a business by the name of "Starlight Beauty Salon." Tr., at 920. Oluigbo was actively taking measures to hide the fact that he had sent the wire to Fomum-Tibah because he had full knowledge why Fomum-Tibah was taking another trip to Istanbul. After Fomum-Tibah obtained this money, she was able to get a visa to fly through London to Istanbul. Tr., at 621.

Thus, the testimony of Fomum-Tibah presented compelling evidence, which the jury credited, that demonstrated Oluigbo's knowing and willful participation in the 2006 heroin conspiracy. In short, Oluigbo was an integral part of both of Fomum-Tibah's successful trips to bring back heroin from Istanbul, and her testimony demonstrated that he was a willing and knowing participant.

Moreover, the evidence that Fomum-Tibah presented about Joseph Oluigbo must not be viewed in a vacuum, but in the context of the other evidence presented against Joseph Olugibo at trial. The Government also presented a call between Oruche and Oluigbo on September 22, 2006, after Fomum-Tibah's arrest, which demonstrated Oruche and Oluigbo's close, criminal relationship. In that call, Oruche frantically tells Oluigbo, "Police are following me. Police are on my tail," and Oluigbo responds by

-24-

telling Oruche how to lose the police.  Gov't Exh. 41T-1.
Oruche then tells Oluigbo to "remove everything that is in the
store."  Gov't Exh. 41T-1.  In this call, when Oruche thought law
enforcement was following him, he immediately called Oluigbo, his
"right hand man," to ask advice from him.  It thus demonstrates
not only Oluigbo and Oruche's close criminal relationship, but
that on this occasion it was Oluigbo who was instructing Oruche
in criminal matters.  Defense counsel is right in that the word
"heroin" doesn't appear in this call, but the jury can reasonably
infer given the totality of the evidence that Oruche's
instructions to Oluigbo to "remove everything that is in the
store," refers to narcotics or narcotics proceeds.

    Finally, the Government presented evidence that Oluigbo
aided Cosme Jemy, another of Oruche's drug couriers.  Again, the
evidence pertaining to Cosme Jemy must be viewed in the
aggregate, and, specifically, in light of the sequence of events
that led up to Jemy's arrival.  Cosme Jemy entered the United
States in September 2006, which was after Fomum-Tibah had been
arrested for acting as a drug mule for Oruche (aided by Oluigbo).
By this point in time, Oluigbo had assisted Fomum-Tibah during
his first trip to Istanbul (including being present when Oruche
openly asked her about her inability to swallow the pellets),
advised Fomum-Tibah after the incident where she sold Oruche's
heroin to Ed, and helped Fomum-Tibah obtain a visa for her third

trip to Istanbul.  Cosme Jemy's interactions with Oruche and Oluigbo were also after Oluigbo counseled Oruche on what to do when police were following him.

With this background, on September 26, 2006, Oruche spoke multiple times with an unidentified male in Nigeria who was sending Jemy, a drug courier, to Oruche.  As discussed previously, Oruche was extremely cautious of law enforcement and thus did not speak openly about drugs on the phone, and this was no different when speaking about Jemy.  See Gov't Exh. 41T-2 ("Do you know the reason I told you not to speak on this phone?").  However, the words he used and the one of the calls leave no doubt that Jemy was a drug courier.  Oruche first told an unidentified male in Nigeria not to give information to Jemy about the bank, and that Jemy should not write "the number" down on paper, but should memorize it.  Id.  In that same call, Oruche also referenced "all the people" that the man in Nigeria had been bringing in, i.e. referring to other couriers.  Id.  After Jemy had arrived, Oruche told the man in Nigeria to tell Jemy to wait at Aziza restaurant and then had Oluigbo check Aziza restaurant for Jemy instead of meeting him himself, again showing how concerned Oruche was about law enforcement.  Gov't Exh. 41T-3, 41T-4, 41T-5.  Oruche also made references to Jemy and to Oluigbo about making sure they were not followed.  Gov't exh. 41T-9, 415-13.  In explaining to the man in Nigeria why Oruche set up these

-26-

procedures, Oruche explained, "It is just that one must be careful, hope you understand, in this country." Gov't Exh. 41T-4. Oruche was even clearer in a subsequent call to that same man in Nigeria, stating that "There is a way people look at me, a way that the local police are looking at me. I am being extra careful and watch everything I do." Gov't Exh. 41T-8. Finally, in speaking with Oluigbo about Jemy, Oruche specifically referred to what Jemy was carrying, describing him as "dressed in black and carrying a bag the way our people carry bag." Gov't Exh. 41T-6. Days later, Jemy was later seen by law enforcement officers with his bag getting into Oruche's car. Tr., at 910-11. In the context of the other evidence at trial establishing Oruche as a heroin dealer and establishing Oluigbo's knowing participation in Oruche's organization, there is no reasonable doubt that Jemy was a drug courier.

Furthermore, the evidence at trial established that Oluigbo knew that Jemy was a drug courier. In Oruche's first conversation with Oluigbo about Jemy, Oruche asked Oluigbo to meet an unknown individual who would be at Aziza restaurant "carrying a bag the way our people carry bag." Gov't Exh. 41T-6. Oluigbo did not question what this meant, and did not give any indication that he did not know what Jemy was there for. In fact, when Oluigbo asked Oruche if Jemy had called him yet, Oruche joked, "am I suppose to call him for what," leading

Oluigbo to laugh.  Gov't Exh. 41T-5.  This strange set of exchanges can best be explained because Oluigbo and Oruche were sharing an inside joke and knew exactly what Jemy was there to do (but obviously were not going to state that on the phone). Later, after Oruche and Oluigbo had met Jemy, Oruche called Oluigbo to ask him what Jemy was doing.  Gov't Exh. 41T-13. After Oluigbo told Oruche that he was sleeping, Oruche asked Oluigbo: "Did you observe to see if anybody was following you?" Id.  Again, rather than feign ignorance at what Oruche was speaking about, Oluigbo simply responded that he had taken those precautions.  Id.  Especially in the context of Oluigbo's interactions with Fomum-Tibah and other evidence of his close, criminal partnership with Oruche, these exchanges demonstrate Oluigbo's knowledge of what he was doing - aiding Jemy, a drug courier, at the direction of Emmanuel Oruche.

Defense counsel argues that the facts presented to the jury in this case against Oluigbo are similar to a pair of recent Second Circuit cases, United States v. Cruz, 363 F.3d 187 (2d Cir. 2004) and United States v. Rodriguez, 392 F.3d 539 (2d Cir. 2004), in which the Second Circuit overturned other drug convictions.  In a supplemental letter to the Court, defense counsel also argues that the Second Circuit's recent decision in United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008), supports their motion for a judgment of acquittal.  However, each of these

cases is distinguishable from the instant case against Oluigbo.

In Cruz, the jury had convicted Cruz of aiding and abetting the possession with the intent to distribute cocaine, but had acquitted him on the related conspiracy count. Cruz, 363 F.3d at 192. There was testimony at trial that Cruz had joined a conspiracy to assault several Ecuadorians, and there was no indication that he knew that the object of the conspiracy had changed. Id. at 198. In a later decision, the Second Circuit explained that their decision in Cruz rested on a number of key facts:

> In Cruz, we concluded that certain circumstances could support only an inference that Cruz lacked guilty knowledge: a jury found Cruz guilty of possessing cocaine with intent to distribute through an aiding and abetting theory but acquitted him on a conspiracy count; his agreement with his criminal confederates had involved a completely different crime from the one charged; when plans changed, confederates deliberately put some physical distance between Cruz and the criminal activity; and, in a post-arrest statement, Cruz specifically disavowed guilty knowledge.

United States v. Lopez, No. 03-1055L, 112 Fed. Appx. 774 (2d Cir. Oct. 26, 2004). There is no such evidence in the instant case that Oluigbo thought he was participating in another type of conspiracy, and, in fact, direct references to the drug conspiracy in which he was acting.

Similarly, Rodriquez concerned a case where "the only evidence linking the defendant to any drug trafficking was that he had been seen surveying a parking lot shortly before a drug

-29-

transaction there; drugs were found in the back seat of his car, hidden inside a box and wrapped in two bags; and the defendant may have been in the back seat of the car at some point while the drugs were there." United States v. Snow, 462 F.3d 55, 70 (2d Cir. 2006) (citing Rodriguez, 392 F.3d at 548-59). Again, the evidence against Oluigbo is not limited to drugs being found in his car or the like with no other evidence of his knowledge. As described above, Oluigbo demonstrated through his actions and conversations, most notably with Fomum-Tibah and Oruche himself, that he had full knowledge of how he was furthering the heroin conspiracy.

Finally, defense counsel's reliance on United States v. Lopez, 534 F.3d 153 (2d Cir. 2008), is misplaced. In Lopez, the Government presented evidence that Julio Lorenzo had driven and taken care of the lodging of someone that was a drug courier, had given $14,000 to that courier to deliver to another individual, and gave false exculpatory statements upon his arrest. Id. at 160. The Second Circuit found that there was not sufficient evidence presented that Julio Lorenzo knew he was participating in a drug conspiracy. Id.[1]    There is no doubt that in this case

---

[1]    Even while granting a judgment of acquittal in Lopez, the Second Circuit was careful to emphasize that "a defendant's knowing agreement to join a conspiracy must, more often than not, be proven through circumstantial evidence." Lopez, 534 F.3d at 161. In fact, in some cases, "the circumstantial evidence considered in the aggregate demonstrates a pattern of behavior from which a rational jury could infer knowing participation."

Oluigbo played a factually similar role to Julio Lorenzo in that he aided and cared for Jemy, a drug courier, and assisted Fomum-Tibah in her activities as a drug mule.  However, that is where the similarities end.  Again, and unlike in Lopez, there was specific evidence presented by the Government that Oluigbo knew the object of the conspiracy in which he was participating.

     Cruz, Rodriguez, and Lopez all entail circumstantial cases where the Government did not have any evidence showing the defendant's knowledge of the object of the conspiracy.  The panels in those cases found that the Government had not presented evidence of the defendant's knowledge such as "conversations directly related to the substance of the illegal activity" or "exercise of authority within a conspiracy."  Cruz, 363 F.3d at 199.  However, in the instant case, the Government did present the exact kind of evidence that was lacking in Cruz, Rodriguez, and Lopez.  This is not a case where the evidence showed Oluigbo thought he was joining another type of conspiracy, contra Cruz, 363 F.3d 187; where the evidence is limited to drugs being found in Oluigbo's car, contra Rodriguez, 392 F.3d 539; or where Oluigbo's actions could be consistent with a wide variety of criminal activities, contra Lopez, 534 F.3d 153.  This is a case where the evidence demonstrated Oluigbo's willing participation

_____

Id. (citing United States v. Martino, 759, F.2d 998, 1003-04 (2d Cir. 1985).

and full knowledge in a conspiracy to distribute heroin: a
conspiracy where Oluigbo and arranged for Fomum-Tibah to travel
to Istanbul to "swallow" heroin; a conspiracy where Oluigbo gave
instructions to Fomum-Tibah to rectify the situation when she
sold Oruche's heroin to Ed; a conspiracy where Oluigbo was
instructed to meet another drug courier, Jemy, who was carrying a
bag "the way our people carry bags" while making sure he wasn't
followed; and a conspiracy where Oluigbo was giving advice on how
to evade law enforcement to the leader of a multi-kilogram heroin
organization.   These actions and conversations not only
established that Oluigbo was participating in the conspiracy, but
showed that he was a knowing member of the conspiracy that was
fully informed of the activities of the conspiracy.  Viewing all
of the evidence in the aggregate and in the light most favorable
to the Government, a rational jury could, and did, find Oluigbo
guilty beyond a reasonable doubt.  Thus, Oluigbo's motion for a
judgment of acquittal should be denied.

## II.   Oruche's Motion For A New Trial Due To Claimed Failure Of The Government To Timely Disclose Brady Material Should Be Denied

Oruche also moves for a new trial pursuant to Federal Rule
of Criminal Procedure 33 due to an alleged failure of the
Government to disclose <u>Brady</u> material in advance of trial.
Specifically, defense counsel argues that the Government failed
to disclose the fact that "going to Istanbul to swallow drugs was

[Fomum-Tibah's] idea."  Oruche Mot., at 5.  Defense counsel
argues that this fact was exculpatory because it undermines the
idea that Oruche was the leader of his organization and because
it was impeaching as to Fomum-Tibah because it contradicts her
earlier proffers to the Government.  Oruche Mot., at 5.  Oruche's
motion on these grounds should also be denied.

First, defense counsel is misconstruing Fomum-Tibah's
testimony.  Fomum-Tibah's testimony as a whole demonstrated that
Emmanuel Oruche was running a large-scale heroin organization.
In relating how Fomum-Tibah first became involved in transporting
heroin for Oruche, she testified:

> Our relationship got to a point where we were having a
> lot of fights. [Oruche] came home late, never answered
> his phone.  He had a lot of early morning calls and
> late night calls, and he was also complaining about not
> having money a lot.  It got to a point where he opened
> up and said that part of the reason was because the
> route that mules carried drugs from Nigeria into the
> country, the feds were on to that route and it was very
> difficult to bring in drugs from there.  He talked
> about Istanbul.  The people from Istanbul were calling
> him, and he said Istanbul, the feds were not on to that
> route as they were on to Nigeria, they were not as
> aware. . . . Well, we talked and after a while I
> suggested going [to Istanbul].

Tr., at 579-80.  It is clear from Fomum-Tibah's testimony that it
was in fact Emmanuel Oruche that was managing drug mules from
Nigeria, and that Fomum-Tibah suggested being a drug mule <u>for
Emmanuel Oruche</u> due to problems in their relationship.  It was
also clear from Fomum-Tibah's testimony that it was Oruche who:
told her about how the suppliers in Istanbul would wrap the drugs

-33-

so she could swallow them, Tr., at 580; gave her money to pay the
suppliers, Tr., at 584; and to whom Fomum-Tibah brought the drugs
back, Tr., at 608. Fomum-Tibah credibly testified that Emmanuel
Oruche was the leader of his organization, and the fact that she
volunteered to become a drug mule for him after he told her about
the problems he was having with the "feds," does not undermine
that testimony. Moreover, it is certainly not exculpatory
evidence, and, in fact, directly inculpates Oruche.

Second, defense counsel did not suffer any prejudice
assuming it didn't learn of the specific words used in this
conversation until trial. Fomum-Tibah's testimony that Oruche
was the leader of the organization and directed her on her trip
to Istanbul was not a surprise. Defense was provided hundreds of
pages of 3500 and Giglio material as to Fomum-Tibah. This
material included accounts of her three trips to Istanbul, about
which she testified at trial. The fact that she took such trips,
or did so in order to import heroin into the United States, was
no secret. The "secret" about which defense counsel complains is
the specific fact that in response to Oruche's complaints about
his drug mules, Fomum-Tibah volunteered to be a drug mule for
him. This was stated in her June 19, 2008 testimony. Defense
counsel's cross-examination of Fomum-Tibah, however, only began
on June 20, 2008, and lasted through June 23, 2008. Thus,
defense counsel had ample time to craft an effective cross-

-34-

examination of Fomum-Tibah during this time, assuming that this specific detail would have changed how he cross-examined her in any way.  Furthermore, defense counsel never raised these objections or requested more time for their "investigation" of Fomum-Tibah (again, assuming that this detail would have somehow changed their investigation).

Simply put, this detail was not <u>Brady</u> material, the Government complied with all of its disclosure obligations, and Oruche has not identified any actual harm as a result of even its alleged delinquencies.  Therefore, Oruche's motion for a mistrial pursuant to Federal Rule of Evidence 33 should be denied.

## CONCLUSION

For the reasons discussed above, defendants motions should be denied.

Dated:    New York, New York
          September 8, 2008


                    Respectfully Submitted,

                    MICHAEL J. GARCIA
                    United States Attorney


          By:    /s Michael M. Rosensaft
                 Michael M. Rosensaft
                 Assistant United States Attorney
                 (212) 637-2366