UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
UNITED STATES OF AMERICA,                          :
                                                                    :   **FILED ELECTRONICALLY**
                           v.                                    :
                                                                    :   07 Cr. 0124 (WHP)
EMMANUEL ORUCHE, et al.,                       :
                                                                    :
                           Defendants.                      :
                                                                    :
------------------------------------------------------------ x

### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT JOSEPH OLUIGBO'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

Andrew J. Ceresney
Eric D. Meyer
Neuman Leverett III
Gordon Eng
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Counsel for Defendant*
 JOSEPH OLUIGBO

Defendant Joseph Oluigbo submits this reply memorandum of law in further support of his motions for judgment of acquittal and for a new trial.

**ARGUMENT**

After months of investigation by more than ten federal agents, hundreds of hours of wiretaps, six days of trial and nearly two months to consider Mr. Oluigbo's Rule 29 and Rule 33 motions, the government is still unable to point to a single piece of direct or circumstantial evidence offered at trial to establish that Joseph Oluigbo knowingly agreed to join a narcotics conspiracy and intentionally took any act to further that narcotics conspiracy.  Instead, the government time and again in its brief relies on what it characterizes as the "close criminal relationship" or "partnership" between Mr. Oruche and Mr. Oluigbo [Govt. Br. at 9, 20, 24, 25, 28] and asks the Court to conclude that simply because of this alleged relationship, Mr. Oluigbo must have known about the narcotics conspiracy and must have intended to join and advance it. But as the Second Circuit has repeatedly emphasized in recent years and again just weeks ago, suspicious circumstances, close association with those involved in criminal activity, or presence at the scene of a crime, even with knowledge of the conspiracy (when the evidence is viewed in the light most favorable to the government), are not sufficient to sustain a conviction.  Rather, the government must present evidence sufficient to prove beyond a reasonable doubt that Mr. Oluigbo <u>agreed and intended to participate in a *narcotics* conspiracy</u>.  Its complete failure to do so here compels a judgment of acquittal for Mr. Oluigbo or a new trial.[1]

---

[1]  In its brief, the government incorrectly asserts that Mr. Oluigbo was convicted of narcotics offenses involving at least 500 grams of heroin.  Govt. Br. at 2.  At trial, the jury found that Mr. Oluigbo's offenses involved 100 grams or more of heroin, but less than one kilogram. Trial transcript 1173:16-1174:21.

The government fails to distinguish *United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004), *United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004), and *United States v. Lorenzo*, 534 F.3d 154 (2d Cir. 2008), three recent, directly on-point Second Circuit precedents overturning convictions on grounds of insufficient evidence that the defendants knowingly and intentionally participated in drug conspiracies. In fact, the evidence on which the government relies in an attempt to show Mr. Oluigbo's knowing and intentional participation in a drug conspiracy pales in comparison to the evidence presented in even those cases – which the Second Circuit deemed insufficient for conviction.

To be sure, a conviction can be sustained on solely circumstantial evidence. But as the Second Circuit explained in *Cruz*:

> Although the government may prove the requisite knowledge and specific intent by circumstantial evidence, that evidence must still include some indicia of the specific elements of the underlying crime. For example, such indicia could include conversations directly related to the substance of the illegal activity, possession of documents related to the crime, exercise of authority within a conspiracy, receiving a share of the profits from the deal, or explicit confirmation of the nature of the crime.

363 F.3d at 199. Even when viewed in the light most favorable to the government, there is simply nothing here resembling any of these indicia, let alone sufficient evidence to reasonably support a finding of guilt beyond a reasonable doubt: there are no conversations involving Mr. Oluigbo that directly and clearly relate to a narcotics conspiracy; Mr. Oluigbo was not found in possession of any narcotics, drug paraphernalia, funds, or documents related to a narcotics conspiracy, nor were any such materials found at his home; there was no suggestion that Mr. Oluigbo exercised any authority in the charged narcotics conspiracy; no evidence he received one penny from narcotics; and no evidence of any explicit recognition by Mr. Oluigbo that he was participating in a narcotics conspiracy.

2

Instead, the government points to several pieces of evidence – none of which demonstrate that Mr. Oluigbo joined a narcotics conspiracy. The government first argues that Rebecca Fomum-Tibah's testimony "established that Oluigbo knowingly participated in Fomum-Tibah's trips to Istanbul to bring back heroin." [Govt Br. at 20]. Fomum-Tibah's testimony did no such thing.

- Fomum-Tibah testified that, as far as she understood, Mr. Oluigbo booked Fomum-Tibah's flight using Mr. Oruche's credit card and helped her locate a hotel before she went to Istanbul. These are perfectly legal activities. Nothing Ms. Fomum-Tibah said, even viewed in the light most favorable to the government, established that Mr. Oluigbo had any inkling as to <u>why</u> she was traveling to Istanbul.

- The government highlights Ms. Fomum-Tibah's statement that Mr. Oruche gave her $3000 for her trip to Istanbul while Mr. Oluigbo was somewhere in the Nicobi Health Services store as evidence of Mr. Oluigbo's knowledge. [Govt. Br. at 21]. Again, however, there is absolutely no evidence from Ms. Fomum-Tibah or any other witness that Mr. Oluigbo saw Mr. Oruche give her this money or had any knowledge of what the money was to be used for.

- Ms. Fomum-Tibah's testimony that Mr. Oluigbo accompanied Mr. Oruche to the airport to pick up Fomum-Tibah when she returned from Turkey also fails to establish Oluigbo's knowledge and intent to participate in a narcotics conspiracy. There is no evidence that Mr. Oluigbo was informed why Fomum-Tibah had traveled to Turkey or what she did while she was there. Viewed in the light most favorable to the government, Mr. Oluigbo accompanied his friend and boss to the airport to pick up his girlfriend, and carried her bag after she arrived from a transatlantic flight. It provides no support for the government's theory that Mr. Oluigbo knew why Ms. Fomum-Tibah had traveled to Turkey, or knew that Ms. Fomum-Tibah may have had heroin in her suitcase.

- The government emphasizes Ms. Fomum-Tibah's testimony in the car ride to Mr. Oruche's home from the airport, during which Ms. Fomum-Tibah claims Mr. Oruche asked her: "[Y]ou could not swallow, huh?" in Mr. Oluigbo's presence. The government argues this question proves Mr. Oluigbo's knowledge and intent in connection with the drug conspiracy because it shows that "Oruche felt comfortable speaking about Fomum-Tibah's inability to swallow heroin pellets in front of Oluigbo . . . ." [Gov't Resp. Br. 22]. First, the government's argument overlooks the obvious fact that – even assuming this conversation occurred – Mr.

3

> Oruche did not use the word "heroin" or any other reference to drugs when talking about narcotics in Mr. Oluigbo's presence and instead spoke in vague terms, even when inside a car where no one else could overhear the conversation. Moreover, the conversation occurred in the context of Ms. Fomum-Tibah discussing her illness during her trip and her need to be placed on oxygen support. This single vague question, in the context of a discussion of Ms. Fomum-Tibah's illness, provides no support for the notion that Mr. Oluigbo understood, beyond a reasonable doubt, the existence of a drug conspiracy.

- Ms. Fomum-Tibah testified that when she, Mr. Oruche, and Mr. Oluigbo arrived at Mr. Oruche's home after their drive from the airport, she and Mr. Oruche separated themselves from Mr. Oluigbo and went into Mr. Oruche's room to transfer the drugs she claims she transported, while Mr. Oluigbo remained in the living room, even though no one else was apparently in the home. [6/19/08 Tr. 639:14-640:9]. These actions are simply inconsistent with the notion that Mr. Oluigbo was a knowing participant in the narcotics conspiracy.

In sum, Ms. Fomum-Tibah's testimony, viewed in the light most favorable to the government, established that Mr. Oluigbo helped her make travel arrangements for a trip to Istanbul; that Mr. Oruche gave her cash while Mr. Oluigbo was elsewhere in the store; that Mr. Oruche made no express reference to drugs when speaking to Ms. Fomum-Tibah in Mr. Oluigbo's presence in a conversation that could not be overheard; and that Ms. Fomum-Tibah and Mr. Oruche separated themselves from Mr. Oluigbo when they were physically exchanging narcotics. There is not a single conversation referencing a drug conspiracy. Indeed, this testimony directly contradicts the government's argument that Mr. Oruche felt comfortable discussing freely the narcotics conspiracy in Mr. Oluigbo's presence – instead, the testimony makes clear that even in private conversations inside his car and his home, Mr. Oruche was <u>not</u> comfortable displaying or speaking freely about narcotics in front of Mr. Oluigbo. A careful review of the evidence shows that Ms. Fomum-Tibah's testimony is utterly insufficient to reasonably support a finding of guilt beyond a reasonable doubt.

In its brief, the government also emphasizes a telephone call Mr. Fomum-Tibah claims to have received from Mr. Oluigbo in which the two discussed Mr. Oruche's financial troubles. Even if this testimony is credited, it does not prove Oluigbo's knowing participation in the drug conspiracy. Fomum-Tibah testified that Mr. Oluigbo called her – his boss's girlfriend – to tell her that someone had damaged Oruche's car and that Oruche was "having a lot of trouble back there in New York," and that he understood that Ms. Fomum-Tibah might have been involved in the cause of these troubles and encouraged her to repair things with Mr. Oruche. Tr. 614. There was no indication that Mr. Oluigbo's comments signaled knowledge of the underlying cause of Mr. Oruche's difficulties.

Finally, the fact that Mr. Oluigbo wired money to Fomum-Tibah at Mr. Oruche's request so she could obtain a visa does not establish his knowledge and intent to participate in a drug conspiracy.[2] Fomum-Tibah testified that she told Oruche that she needed funds to obtain a visa, and Oruche told her that "he was going to have [Oluigbo] wire the money by Western Union." Tr. 620:12-18. Ms. Fomum-Tibah was not privy to conversations between Mr. Oluigbo and Mr. Oruche about the transfer. While the government focuses on the incorrect address of the sender on the $2000 wire transfer, there is no evidence to support the argument that this establishes Mr. Oluigbo's knowledge of and intentional assistance in a narcotics conspiracy.

The government then points to one telephone call that Mr. Oruche made to Mr. Oluigbo when Mr. Oruche believed he was being followed by law enforcement, and characterizes this call as evidence of the "close criminal relationship" between the two men. [Govt. Br. at 24]. But whatever this conversation showed about this relationship, or Mr. Oluigbo's knowledge of some

---

[2] The government incorrectly asserts that the evidence established Mr. Oluigbo wired $2300 to Ms. Fomum-Tibah. Evidence at trial established that Mr. Oluigbo wired $2000 and another employee of the store, Maria Tolentino, wired $300. [Tr. 324:7-326:19].

5

unlawful activity by Mr. Oruche, there is simply no basis to conclude that the conversation – which made no reference to narcotics – demonstrates that Mr. Oluigbo was aware that Mr. Oruche was participating in a <u>narcotics</u> conspiracy. The government cannot simply speculate that was the import of the conversation – it must offer evidence compelling that inference, which it failed to do. *See United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001) ("a defendant's mere . . . association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy").

Finally, the government contends that evidence relating to Cosme Jemy established that Mr. Oluigbo was intentionally and knowingly involved in the narcotics conspiracy. To establish that Mr. Jemy was a drug courier, the government refers to a number of conversations between Mr. Oruche and an individual in Nigeria – conversations that did not involve Mr. Oluigbo. [Govt. Br. at 26-27]. The government then argues that the evidence establishes that Mr. Oluigbo knew Mr. Jemy was a drug courier because Mr. Oruche – Mr. Oluigbo's boss – called Mr. Oluigbo and asked him to go down the street to see if Mr. Oruche's visitor was at a restaurant. But as the evidence showed, Mr. Oluigbo agreed to go to look in the restaurant hours later after he was finished dealing with customers at the store, without questioning his boss about who the person was and why Mr. Oruche was meeting him. No conversation shows Mr. Oluigbo's knowledge that Mr. Jemy was a drug courier.

Finally, the government's attempts to distinguish *Cruz*, *Rodriguez*, and *Lorenzo* are unpersuasive. The government relies on *United States v. Lopez*, No. 03-1055L, 112 Fed. Appx. 774 (2d Cir. Oct. 26, 2004), an unpublished opinion with a cursory discussion of *Cruz*, to contend that *Cruz* is distinguishable from this case. Govt. Br. at 29. But in *Lopez*, the court emphasized that unlike in *Cruz*, the defendant's co-conspirators never isolated him from "the

6

critical events of their scheme." *Lopez*, 112 Fed. Appx. at 778.  Here, by contrast, Mr. Oruche and Ms. Fomum-Tibah <u>did</u> intentionally and repeatedly exclude Mr. Oluigbo from the critical events of their scheme – namely, the transfer of cash in the Nicobi store before Ms. Fomum-Tibah's first trip to Istanbul for the purchase of narcotics, and most significantly the exchange of the actual narcotics in Mr. Oruche's home at the end of Ms. Fomum-Tibah's first trip.  Similarly, Mr. Oruche never discussed drugs or drug transactions openly in front of Mr. Oluigbo, like he did in his calls to Nigeria or his conversations with Ms. Fomum-Tibah.  Nor is there any evidence that Mr. Oluigbo was directly involved in any drug transaction.

The government attempts to distinguish *Rodriguez* by arguing that "the evidence against Oluigbo is not limited to drugs being found in his car or the like with no other evidence of his knowledge," and that Mr. Oluigbo's actions and conversations demonstrate his knowledge of and intent to participate in a drug conspiracy.  Govt Br. at 30.  But in *Rodriguez* the defendant acted as a lookout at the scene of a drug deal, was viewed sitting in the back seat of a vehicle next to a package of drugs wrapped inside a box, and spoke repeatedly with the seller before and then immediately after the seller had met with the buyer.  Such evidence is much more compelling than the tenuous connections the government draws between the drug conspiracy and Mr. Oluigbo.

Finally, the government barely attempts to distinguish *Lorenzo* (miscited in the government's brief at 30-31 as *United States v. Lopez*), and even concedes that Oluigbo's actions were similar to the acquitted defendants' actions in that case, Govt. Br. at 30-31, i.e. providing food, lodging, and travel assistance to one or more drug couriers.  If anything, this case is more compelling because, unlike Mr. Oluigbo, in *Lorenzo*, one defendant also provided false exculpatory statements to law enforcement, and gave the drug courier $14,000 cash to deliver to

7

the leader of the drug conspiracy, and the Second Circuit nevertheless held the evidence was insufficient to support a conviction. Thus, clear Second Circuit caselaw compels a finding that the evidence is insufficient to convict Mr. Oluigbo of participating in a narcotics conspiracy.

## CONCLUSION

For the foregoing reasons, and for the reasons advanced in Mr. Oluigbo's memorandum of law dated July 16, 2008, defendant Joseph Oluigbo respectfully requests that this Court grant his motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33, and whatever other relief the Court deems proper.

Dated: New York, New York
September 16, 2008

Respectfully submitted,

/s/ Andrew J. Ceresney
Andrew J. Ceresney
Eric D. Meyer
Neuman Leverett III
Gordon Eng
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000
*Counsel for Defendant Joseph Oluigbo*